# EXHIBIT 8

JAY A. FERGUSON - 01/13/2016

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MICHAEL SKIDMORE, ETC.,      )
                             )
          PLAINTIFFS,        )   CASE NO.
                             )
          VS.                )   2:15-CV-03462 RGK (AGRx)
                             )
LED ZEPPELIN, ET AL.,        )
                             )
          DEFENDANTS.        )
                             )
_____)

VIDEOTAPED DEPOSITION OF JAY A. FERGUSON

WEDNESDAY, JANUARY 13, 2016

JOB NO. 68321

REPORTED BY:  DAYNA HESTER, C.S.R. 9970

**EXHIBIT 8**
**7**

```
09:39  1    Trust.
09:39  2                THE VIDEOGRAPHER:  We're on the record.
09:39  3                Would the court reporter, please, swear in
09:39  4    the witness.
09:39  5                THE REPORTER:  And I do want to
09:39  6    acknowledge my Rule 30 obligation for a federal
09:39  7    case.
09:39  8                My name is Dayna Hester, and I am
09:39  9    contracted by Personal Court Reporters.
      10                At this time, please raise your right
      11    hand.
      12                THE WITNESS:  (Witness did as requested.)
      13                THE REPORTER:  Do you affirm the testimony
      14    you are about to give in the cause now pending will
      15    be the truth, the whole truth, and nothing but the
      16    truth?
      17                THE WITNESS:  I do.
      18                THE REPORTER:  Thank you.
      19
      20                     JAY A. FERGUSON,
      21                having been first duly sworn, was
09:39 22                examined and testified as follows:
09:39 23    ///
09:39 24    ///
09:39 25    ///
```

JAY A. FERGUSON - 01/13/2016

```
09:39  1                    EXAMINATION
09:39  2   BY MR. ANDERSON:
09:39  3       Q.   Mr. Ferguson, again, I represent the
09:39  4   defendants in this action.
09:39  5       A.   Uh-huh.
09:40  6       Q.   Could you please state and spell your full
09:40  7   name.
09:40  8       A.   Jay Ferguson.  Spelled J-a-y; middle
09:40  9   initial A; Ferguson, F-e-r-g-u-s-o-n.
09:40 10       Q.   Have you ever had your deposition taken
09:40 11   before?
09:40 12       A.   No.  This is the first time.
09:40 13       Q.   Okay.  Let me describe the procedure we're
09:40 14   going to follow today.  Hopefully, that will help
09:40 15   ensure that the transcript is the most accurate
09:40 16   possible transcription of your -- of the information
09:40 17   that you have.
09:40 18            The woman to your right is a certified
09:40 19   shorthand reporter.  She will be taking down my
09:40 20   questions, any objections by Mr. Malofiy, and your
09:40 21   testimony.
09:40 22            Because of the procedure we are following,
09:40 23   it's important that you answer audibly.
09:40 24       A.   Uh-huh.
09:40 25       Q.   It's difficult for the court reporter to
```

EXHIBIT 8

**9** Page 10

09:45  1    witness?

09:45  2          A.   No.

09:45  3          Q.   What did you do to prepare for your

09:45  4    deposition today?

09:45  5          A.   Basically, I had a collection of what you

09:45  6    would call nostalgia, which is clippings, tapes,

09:45  7    newspaper pieces in a box, which I opened.

09:45  8               I was instructed to bring materials, so

09:45  9    that was the preparation, going through that and

09:45 10    removing everything that I thought was pertinent to

09:45 11    this.  Excuse me.

09:45 12          Q.   Okay.  And did you talk to anybody about

09:45 13    the fact that your deposition was going to be taken

09:45 14    today?

09:45 15          A.   I talked with Francis Malofiy.

09:45 16          Q.   And when did you talk to Mr. Malofiy?

09:45 17          A.   Two times in December before the holiday.

09:45 18          Q.   And both of them were by phone?

09:46 19          A.   Yes.

09:46 20          Q.   And how long did the first conversation

09:46 21    last?

09:46 22          A.   They were both around 20 minutes.

09:46 23          Q.   And what did you tell him in sum or

09:46 24    substance in the first conversation?

09:46 25          A.   It was basically ask- -- answering

JAY A. FERGUSON - 01/13/2016

09:46  1    questions he had about recollections of events and

09:46  2    places and time.  So I didn't tell him anything as

09:46  3    much as answer his questions.

09:46  4        Q.   And what -- what events in the past did he

09:46  5    ask you about?

09:46  6        A.   He asked about shows that we

09:46  7    did together -- Spirit did together with Led

09:46  8    Zeppelin.  Asked about the recording process Spirit

09:46  9    went through to record songs like "Taurus."

09:46 10    Pretty much in -- pretty much in those realms.

09:46 11            A lot of questions about venues, where we

09:46 12    would play together, and did we spend time off stage

09:46 13    together.  Did we communicate.  Did we hang out.

09:46 14        Q.   Did he tell you that it's his -- that it's

09:46 15    his and his client's contention that you did spend

09:46 16    time together with the members of Led Zeppelin?

09:46 17            MR. MALOFIY:  Objection.

09:47 18            You can answer.

09:47 19            THE WITNESS:  He brought that up.

09:47 20            Specifically, I think it was a show in

09:47 21    Birmingham, and I spent a little -- a brief time

09:47 22    with Robert Plant.  I met him.  He was in the

09:47 23    audience.  I do -- do not recall meeting anybody

09:47 24    else from the band or hanging out with anybody in

09:47 25    that band after the show.  I may have gone right

JAY A. FERGUSON - 01/13/2016

09:47  1    back to the hotel.

09:47  2    BY MR. ANDERSON:

09:47  3        Q.   How did it come to be that you spoke with

09:47  4    Mr. Malofiy in the -- on that first occasion?  Did

09:47  5    he call you?

09:47  6        A.   He called me.  It was prior to this suit.

09:47  7    And he was calling as sort of a friend of -- not the

09:47  8    band but Randy's trust, and spoke about the issue of

09:47  9    similarities of these songs, and his feeling that

09:47 10    there was a wrongdoing here, and that there was a

09:47 11    lawsuit that was valid to pursue.

09:48 12             He asked me do I -- did I want to be part

09:48 13    of it, and I said no.  And I think the phrase I used

09:48 14    was, "I just don't have a dog in this fight."

09:48 15    Didn't concern me at all.  It was a songwriter's

09:48 16    lawsuit, and I was not the songwriter.

09:48 17        Q.   Okay.  I apologize.  And maybe I

09:48 18    misunderstood.

09:48 19             On how many occasions have you spoken with

09:48 20    Mr. Malofiy from the beginning of time to today?

09:48 21        A.   Twice I think before the suit.  Once was

09:48 22    just to say hi, and he was going to call me the next

09:48 23    day.  The following day was when he talked about

09:48 24    wanting to pursue the suit, feeling it was valid.

09:48 25    And then twice in December.

| | | |
|---|---|---|
| 09:50 | 1 | Sorry.  I can't just nod? |
| 09:50 | 2 | Q.  -- did you and he discuss "Taurus"? |
| 09:50 | 3 | A.  No. |
| 09:50 | 4 | Q.  Do you know if "Taurus" was played by |
| 09:50 | 5 | Spirit that night? |
| 09:50 | 6 | A.  You know, it was a song that would be in |
| 09:51 | 7 | the set and out of the set, in the set and out of |
| 09:51 | 8 | the set, depending on the length of time usually. |
| 09:51 | 9 | So I can't remember specifically. |
| 09:51 | 10 | It was not -- there were certain songs |
| 09:51 | 11 | that we played religiously every show.  "Taurus" was |
| 09:51 | 12 | not, but it was played often. |
| 09:51 | 13 | Q.  What were the songs you played religiously |
| 09:51 | 14 | every show in the time period from '67 to '71, to |
| 09:51 | 15 | the end of '71? |
| 09:51 | 16 | A.  "Fresh Garbage," "I Got a Line on You," |
| 09:51 | 17 | "Nothing to Hide," "Mechanical World." |
| 09:51 | 18 | I wish I had a song list.  I could -- I |
| 09:51 | 19 | could be more accurate.  But those were sort of the |
| 09:51 | 20 | tent pole songs. |
| 09:51 | 21 | Q.  Anything else you recall being said by |
| 09:51 | 22 | Mr. Malofiy or you in that first conversation last |
| 09:51 | 23 | month? |
| 09:51 | 24 | A.  In December? |
| 09:51 | 25 | Q.  In December of 2015. |

JAY A. FERGUSON - 01/13/2016

09:51  1        A.   No.  It was really, as I said, questions
09:51  2   about proximity and the recording.
09:52  3        Q.   And what was said by you and
09:52  4   Mr. Malofiy -- or, let me rephrase that.  Well, no.
09:52  5             What was the sum and substance of what was
09:52  6   said by you and Mr. Malofiy in the second
09:52  7   conversation you had with him in December of 2015?
09:52  8        A.   It was follow-up.  I believe the first
09:52  9   conversation I was -- I was busy.  I was working on
09:52 10   a show.  And he re-called and then we continued.
09:52 11        Q.   And anything that was said in the second
09:52 12   conversation that was different or beyond what was
09:52 13   said in the first conversation?
09:52 14        A.   No.  Just the same topic, same questions.
09:52 15   Some of the same questions answered again.
09:52 16        Q.   Okay.  And have you discussed this case --
09:52 17   this deposition with anyone else other than with
09:52 18   Mr. Malofiy and the conversations you have testified
09:52 19   to?
09:52 20        A.   No.  Just to tell people in my family that
09:52 21   I am being deposed.
09:52 22        Q.   Okay.  When were you born?
09:52 23        A.   May 10th, 1947.
09:52 24        Q.   Where?
09:53 25        A.   Burbank, California.

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 09:58 | 1 | A.   Right. |
| 09:58 | 2 | Q.   Okay.  Did you ever meet Jimi Hendrix? |
| 09:58 | 3 | A.   I did on a couple of occasions when we |
| 09:58 | 4 | played shows together. |
| 09:58 | 5 | Q.   How long were you a member of Spirit? |
| 09:58 | 6 | A.   From February of 1967 through January of |
| 09:58 | 7 | 1971. |
| 09:58 | 8 | Q.   And what was your role in the band? |
| 09:59 | 9 | A.   I was a singer and tambourine player, |
| 09:59 | 10 | which at the time was a valid instrument. |
| 09:59 | 11 | Q.   It still is. |
| 09:59 | 12 | And when you joined Spirit, who was -- you |
| 09:59 | 13 | were a founding member of Spirit? |
| 09:59 | 14 | A.   Uh-huh.  Yes. |
| 09:59 | 15 | Q.   And who else was in the band when it was |
| 09:59 | 16 | first formed in February of 1967? |
| 09:59 | 17 | A.   It was the core group.  We would go on for |
| 09:59 | 18 | years:  Randy California; Mark Andes; John Locke, on |
| 09:59 | 19 | keyboards; Ed Cassidy; and myself. |
| 09:59 | 20 | Q.   You said Mr. Locke was on keyboards. |
| 09:59 | 21 | Who -- I'm sorry.  What did -- Mark Andes, what was |
| 09:59 | 22 | his role? |
| 09:59 | 23 | A.   Mark Andes was playing bass.  Randy on |
| 09:59 | 24 | guitar.  Ed Cassidy on drums.  And me singing and |
| 09:59 | 25 | playing tambourine. |

witness addition: four

JAY A. FERGUSON - 01/13/2016

09:59  1       Q.    Did you leave Spirit before it was

10:00  2   disbanded?

10:00  3       A.    Did I meet Spirit before --

10:00  4       Q.    "Leave."  Did you leave?

10:00  5       A.    Oh, did I leave.  Well, that was the

10:00  6   disbanding.

10:00  7            In January of 1971, Mark Andes and I

10:00  8   decided we were going to leave the band and form our

10:00  9   own group.  And Spirit continued under that name of

10:00 10   "Spirit," but the core group ceased.

10:00 11       Q.    And what group did you and Mr. Andes form?

10:00 12       A.    It was a band called Jo-Jo, J-o J-o,

10:00 13   Gunne, G-u-n-n-e.

10:00 14       Q.    And who were the members of Spirit -- I'm

10:00 15   sorry.

10:00 16            You said that Spirit continued as a band

10:00 17   after you and Mr. Andes left.  Who were the people

10:00 18   that were in that continuation of the band?

10:00 19       A.    Can I refer to the notes, because they are

10:00 20   listed.  It was a constantly changing lineup.

10:00 21            [Witness reviews document].

10:00 22            So it was Randy California, Ed Cassidy,

10:01 23   John Locke, and John Arliss was the first band that

10:01 24   followed us.

10:01 25            And then there was Cass, Ed Cassidy, and

10:09  1    the same day, you mean with a highlighter?

10:09  2        A.   I did.

10:09  3        Q.   And were you highlighting from memory, or

10:09  4    were you highlighting based on what Mr. Pates or

10:09  5    someone else had told?

10:09  6        A.   I highlit it -- highlighted based on Bruce

10:09  7    Pates' notes.

10:09  8        Q.   Okay.

10:09  9        A.   Some of these shows, I remember very

10:09 10    clearly; some of them, I don't, so I had to refresh.

10:09 11             For instance, the festivals, you know, we

10:09 12    might have played five or six festivals, and the

10:09 13    lineups were very rich and complex, and I couldn't

10:10 14    remember if Led Zeppelin played this festival or

10:10 15    this or that, so these notes were very helpful.

10:10 16        Q.   Is any occasion where you actually do

10:10 17    remember that Led Zeppelin and Spirit performed at

10:10 18    the same venue on the same day?

10:10 19        A.   Yeah.  I have a very clear memory of

10:10 20    Atlanta Pop Festival.  Not only the same day but on

10:10 21    the same stage and right after each other.  Janis

10:10 22    Joplin played followed by Spirit followed by Led

10:10 23    Zeppelin.

10:10 24        Q.   Any other occasion?

10:10 25        A.   The first show that Led Zeppelin did in

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 10:10 | 1 | the United States in Colorado, yes. |
| 10:10 | 2 | Q.   Other than those two occasions, do you |
| 10:10 | 3 | have any recollection of Spirit and Led Zeppelin -- |
| 10:10 | 4 | A.   No.  No -- |

10:10  5      Q.   -- Led Zeppelin performing in the same

10:10  6   venue on the same day?

10:10  7      A.   No.  No specific visual memories of us

10:10  8   playing on the same day.  I would refer, at that

10:10  9   point, just to the concert posters who would list us

10:10 10   on the same show.

10:11 11      Q.   Do you have a general recollection of

10:11 12   Spirit and Led Zeppelin -- and, again, I don't want

10:11 13   you to speculate.  And, as you might imagine --

10:11 14   well, let me ask it this way.

10:11 15           Did you find inaccuracies in any of the

10:11 16   information that Mr. Pates provided to you on any

10:11 17   subject?

10:11 18      A.   No.  I think he prided himself on being

10:11 19   meticulous and very accurate; this is my impression

10:11 20   of him.

10:11 21      Q.   And is it correct, though, that you cannot

10:11 22   vouch for all the information that is in

10:11 23   Exhibit 300?

10:11 24      A.   No.

10:11 25           MR. MALOFIY:  Objection.

| | | |
|---|---|---|
| 10:11 | 1 | THE WITNESS:  No. |
| 10:11 | 2 | BY MR. ANDERSON: |
| 10:11 | 3 |     Q.   That is correct? |
| 10:11 | 4 |     A.   Correct.  I cannot personally vouch. |
| 10:11 | 5 |     Q.   Okay.  I don't want you to speculate, and |
| 10:11 | 6 | I don't want -- for the purposes of this question, I |
| 10:11 | 7 | don't want you to rely on what Mr. Pates has said |
| 10:11 | 8 | unless it actually refreshes your memory. |
| 10:11 | 9 |     A.   Okay. |
| 10:11 | 10 |     Q.   But focussing just on your memory, do you |
| 10:11 | 11 | have any general recollection of Spirit and Led |
| 10:11 | 12 | Zeppelin performing at the same venue on the same |
| 10:11 | 13 | day? |
| 10:11 | 14 |     A.   With the -- |
| 10:12 | 15 |     MR. MALOFIY:  Objection.  Asked and |
| 10:12 | 16 | answered. |
| 10:12 | 17 |     THE WITNESS:  The exception of Atlanta Pop |
| 10:12 | 18 | Festival, which is a very clear memory, no. |
| 10:12 | 19 | BY MR. ANDERSON: |
| 10:12 | 20 |     Q.   Okay.  Did Spirit perform "Taurus" at the |
| 10:12 | 21 | Atlanta Pop Festival? |
| 10:12 | 22 |     A.   I do not know.  I know that set lists were |
| 10:12 | 23 | kept by certain people.  Bruce Pates may have a set |
| 10:12 | 24 | list for that show.  I personally did not collect |
| 10:12 | 25 | them like some people did.  So I couldn't tell you |

10:12  1    on a given show what was in that set.

10:12  2         Q.   Who prepared set lists for Spirit in the

10:12  3    1960- -- in 1968, '69 and '70?

10:12  4         A.   I think it was just a consensus.  It was

10:12  5    often done in the dressing room right before a show.

10:12  6              We had a general outline.  We knew what we

10:12  7    start with and what we would finish with.  Like I

10:12  8    said, we had the tent pole songs.

10:12  9              And then there were other songs that would

10:12 10    come in and out of rotation based on how we liked

10:13 11    them at the time, based on the length of our show.

10:13 12         Q.   It's correct that "Taurus" was not a tent

10:13 13    pole composition?

10:13 14         A.   No.  It was -- it was a feature, but it

10:13 15    was not used every time we played.

10:13 16         Q.   What do you mean by a feature?

10:13 17         A.   Well, it had a unique moment in the set.

10:13 18    It was -- which you might call a palate cleanser in

10:13 19    the middle of all of this electronic music.  Randy

10:13 20    would just stop everything, sit down with an

10:13 21    acoustic guitar and play "Taurus."

10:13 22         Q.   Do you have any recollection of --

10:13 23    actually, let me rephrase it.

10:1  24              Did Spirit perform "Taurus" in Denver when

10:1  25    Led Zeppelin was at the same venue?

JAY A. FERGUSON - 01/13/2016

10:13 1      A.   I could not tell you.

10:13 2      Q.   Okay.  If you don't mind, I'm going to ask

10:13 3  that the court reporter -- if we can make a copy of

10:13 4  the notes you brought today --

10:13 5      A.   That I brought today.

10:13 6      Q.   -- that were the earlier version?

10:13 7      A.   Good idea.

10:13 8      Q.   And we'll do that during a break rather

10:13 9  than hold things up.

10:13 10          MR. MALOFIY:  I don't mean to interrupt.

10:14 11  Do you want to mark that as 301 or collectively as

10:14 12  part of 300?

10:14 13          MR. ANDERSON:  We'll deal with that, but

10:14 14  let me just ask Mr. Ferguson...

10:14 15  BY MR. ANDERSON:

10:14 16      Q.   The notes that you brought with you

10:14 17  today --

10:14 18      A.   Uh-huh.

10:14 19      Q.   -- do you want to walk out of here with

10:14 20  them, which is absolutely fine.  I'll have a copy

10:14 21  made.  Otherwise, we can have the court reporter

10:14 22  mark that one, and she'll keep it.

10:14 23      A.   As long as at the end of the entire

10:14 24  process, materials are returned, you can hold on to

10:14 25  them.

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 10:14 | 1 | Q.   Well, then, we'll have a copy made. |
| 10:14 | 2 | MR. MALOFIY:   Yeah. |
| 10:14 | 3 | BY MR. ANDERSON: |
| 10:14 | 4 | Q.   I'll have a copy made. |
| 10:14 | 5 | We started talking about the notes when I |
| 10:14 | 6 | was asking you what -- who the other members of |
| 10:14 | 7 | Spirit were, who the members of Spirit were after |
| 10:14 | 8 | you and Mr. Andes left to form Jo-Jo Gunne. |
| 10:14 | 9 | Did you ever see Spirit perform after you |
| 10:15 | 10 | and Mr. Andes left? |
| 10:15 | 11 | A.   I -- on one occasion, I saw them play at a |
| 10:15 | 12 | club.  I think it was in Redondo Beach.  And that |
| 10:15 | 13 | was the only time I really went and saw them without |
| 10:15 | 14 | us in the band. |
| 10:15 | 15 | Q.   And what year was that? |
| 10:15 | 16 | A.   Pardon? |
| 10:15 | 17 | Q.   I'm sorry.  What year? |
| 10:15 | 18 | A.   Oh.  It was shortly after the breakup.  So |
| 10:15 | 19 | I would guess '71. |
| 10:15 | 20 | Q.   Did they perform "Taurus"? |
| 10:15 | 21 | A.   I cannot recall. |
| 10:15 | 22 | Q.   Is there any occasion where you can recall |
| 10:15 | 23 | Spirit performing "Taurus"? |
| 10:15 | 24 | A.   Santa Monica Civic Auditorium.  And we |
| 10:15 | 25 | headlined the show.  We had the luxury of a long |

| | | |
|---|---|---|
| 10:15 | 1 | amount of music.  I remember playing there. |
| 10:15 | 2 | And in terms of specific shows, that would |
| 10:15 | 3 | probably be it for me. |
| 10:15 | 4 | Q.   Okay.  When was the performance at the |
| 10:15 | 5 | Santa Monica Civic? |
| 10:15 | 6 | A.   I would guess '70. |
| 10:16 | 7 | Q.   Well, I don't want you to guess. |
| 10:16 | 8 | A.   Oh.  You want me to try to locate it? |
| 10:16 | 9 | Q.   Well, can we do it in bite-size pieces? |
| 10:16 | 10 | A.   Sure. |
| 10:16 | 11 | Q.   It makes my life easier. |
| 10:16 | 12 | A.   Sure.  Mine, too. |
| 10:16 | 13 | Q.   First of all, do you recall when the |
| 10:16 | 14 | performance was at the Santa Monica Civic? |
| 10:16 | 15 | A.   No. |
| 10:16 | 16 | Q.   Okay.  If you could look through |
| 10:16 | 17 | Exhibit 300 and see if that refreshes your memory as |
| 10:16 | 18 | to when that performance was. |
| 10:16 | 19 | A.   [Witness reviews document]. |
| 10:16 | 20 | It would be May 29, 1970. |
| 10:16 | 21 | Q.   If you look at the first page, there's a |
| 10:16 | 22 | listing for playing at the Santa Monica Civic on "29 |
| 10:16 | 23 | Sep."  Do you see that? |
| 10:17 | 24 | A.   Yes. |
| 10:17 | 25 | Q.   Could that be the performance -- the |

10:18  1          A.    Uh-huh.

10:18  2          Q.    -- are you surmising that is a candidate

10:18  3    for that performance, or do you actually remember

10:18  4    now that it was -- "Oh, it was May 29, 1970"?

10:18  5          MR. MALOFIY:  Objection.  Compound.

10:18  6    Objection.  Vague and ambiguous.  Also, asked and

10:18  7    answered.

10:18  8          THE WITNESS:  It's both.  It would have

10:18  9    been a fairly likely candidate, and I do have a

10:18 10    mental image, and I believe it's from that stage at

10:18 11    that performance.

10:18 12    BY MR. ANDERSON:

10:18 13          Q.    Okay.  How long in the time period '68,

10:18 14    '69, '70, how long were Spirit's sets?  Let me

10:18 15    rephrase that.

10:18 16          I may ask you questions from time to time

10:18 17    that seem, at least about phrases, that seem obvious

10:18 18    to you, and it's not to slow things down or

10:18 19    anything.  It's just that a judge or a jury may not

10:18 20    know the meaning of some phrases.

10:19 21          Have you heard the phrase "set"?

10:19 22          A.    Yes.

10:19 23          Q.    And what is a set?

10:19 24          A.    A set is a list of songs that you -- that

10:19 25    you intend to perform in a show -- in a performance.

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 10:19 | 1 | Q.   Okay.  When "Taurus" -- when Spirit |
| 10:19 | 2 | performed in 1968, '69, '70, when they performed |
| 10:19 | 3 | live, how long were they generally on the stage? |
| 10:19 | 4 | A.   It really varied show by show.  If we were |
| 10:19 | 5 | the opening act and time was tight, we would play as |
| 10:19 | 6 | little as half an hour.  If we were the headliner, |
| 10:19 | 7 | we might play an hour and a half at maximum.  I |
| 10:19 | 8 | would bet our average was 45 to an hour -- |
| 10:19 | 9 | 45 minutes to one hour. |
| 10:19 | 10 | Q.   Have you ever heard the phrase "jam band"? |
| 10:19 | 11 | A.   Yes. |
| 10:19 | 12 | Q.   And what is a jam band? |
| 10:19 | 13 | A.   A jam band is a band that improvises on |
| 10:19 | 14 | stage as they are playing.  It does not follow an |
| 10:20 | 15 | exact compositional structure.  They'll kind of open |
| 10:20 | 16 | it up and start playing free-form. |
| 10:20 | 17 | Q.   Was Spirit a jam band? |
| 10:20 | 18 | A.   Very much so.  Especially at the |
| 10:20 | 19 | beginning, it was -- it was almost a jazz jam band. |
| 10:20 | 20 | A few songs, a lot of free-form, a lot of |
| 10:20 | 21 | musical styling and soloing.  As time progressed, |
| 10:20 | 22 | more songs are written, the jamming decreased, the |
| 10:20 | 23 | performed songs increased. |
| 10:20 | 24 | And I think at the end, we really just |
| 10:20 | 25 | chose one song, which was called "Elijah Rock," |

JAY A. FERGUSON - 01/13/2016

10:20 1   written by John Locke, as our jam vehicle.

10:20 2       Q.   What do you mean by a "jam vehicle"?

10:20 3       A.   Well, it would be the one song where we

10:20 4   would take the liberty of giving everybody a solo, a

10:20 5   free-form solo.

10:20 6       Q.   Okay.  And then otherwise you would

10:20 7   perform the songs that the band had written and

10:20 8   recorded?

10:20 9       A.   Yeah.  They were arranged, and -- and we

10:20 10  followed the arrangements.

10:21 11      Q.   Did the solos include drum solos by

10:21 12  Mr. Cassidy?

10:21 13      A.   Absolutely.  He was always a highlight.

10:21 14      Q.   And how long did those solos tend to last?

10:21 15      A.   If we were headlining and could take

10:21 16  liberties, the solos could go five minutes.  The

10:21 17  drum solo could go ten minutes, as I recall.

10:21 18      Q.   Did they sometimes go 20 minutes?

10:21 19      A.   We did a show at the Valley Circle Theater

10:21 20  that could have been a 20-minute drum solo.  That

10:21 21  was Cass's shining moment.

10:21 22      Q.   When was that?

10:21 23      A.   I would guess 1970.

10:21 24      Q.   Okay.  Now, I believe you said that Spirit

10:21 25  got its first recording contract in 1967?

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 10:21 | 1 | A.   Uh-huh.   Yes. |
| 10:21 | 2 | Q.   And who was the recording contract with? |
| 10:22 | 3 | A.   It was Lou Adler.   He was starting his own |
| 10:22 | 4 | label of records, and signed us to Ode Records. |
| 10:22 | 5 | Q.   And how long were you under contract with |
| 10:22 | 6 | Ode Records? |
| 10:22 | 7 | A.   We were under contract for the duration of |
| 10:22 | 8 | the core band to 1971. |
| 10:22 | 9 | Q.   Have you ever -- well, strike that. |
| 10:22 | 10 | And I take it Ode Records released albums |
| 10:22 | 11 | of recording of Spirit's performances? |
| 10:22 | 12 | A.   Yes. |
| 10:22 | 13 | Q.   What was the first album, Spirit album, |
| 10:22 | 14 | released by Ode Records? |
| 10:22 | 15 | A.   It was called "Spirit." |
| 10:22 | 16 | Q.   When was it released? |
| 10:22 | 17 | A.   1967. |
| 10:22 | 18 | Q.   Do you remember when in '67? |
| 10:22 | 19 | A.   I'm thinking early summer. |
| 10:22 | 20 | Q.   What is "a single"? |
| 10:22 | 21 | A.   A single is a song that is chosen out of |
| 10:22 | 22 | an LP.   An LP is typically eight to ten songs.   A |
| 10:23 | 23 | single is one that is chosen to promote on radio |
| 10:23 | 24 | specifically. |
| 10:23 | 25 | At the time, AM radio and FM radio were |

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 10:23 | 1 | two different worlds, and AM radio would never play |
| 10:23 | 2 | an album.  They would only play a single.  So that |
| 10:23 | 3 | was a choice -- it was actually a very critical |
| 10:23 | 4 | choice in a career. |
| 10:23 | 5 | MR. ANDERSON:  I'm sorry.  Could you read |
| 10:23 | 6 | the answer back? |
| 10:23 | 7 | (The record was read.) |
| 10:23 | 8 | MR. ANDERSON:  Thank you. |
| 10:23 | 9 | BY MR. ANDERSON: |
| 10:23 | 10 | Q.   And by "LP," you mean an album, a long |
| 10:23 | 11 | playing album? |
| 10:23 | 12 | A.   Yes.  Physically, an LP is a 12-inch |
| 10:23 | 13 | record.  A single is a 45; it's like a five-inch |
| 10:23 | 14 | record. |
| 10:23 | 15 | Q.   With two sides? |
| 10:23 | 16 | A.   Two sides. |
| 10:23 | 17 | Q.   Okay.  And at that time, in '67, '68, '69, |
| 10:24 | 18 | and '70, is it true that typically a single was |
| 10:24 | 19 | released before the album was released? |
| 10:24 | 20 | MR. MALOFIY:  Objection. |
| 10:24 | 21 | THE WITNESS:  No.  Because the point of |
| 10:24 | 22 | the single was to draw attention to the album.  So |
| 10:24 | 23 | if you released a single without an album, it was |
| 10:24 | 24 | almost a wasted shot. |
| 10:24 | 25 | /// |

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 10:24 | 1 | BY MR. ANDERSON: |
| 10:24 | 2 | Q.   Were there singles released from the first |
| 10:24 | 3 | "Spirit" album? |
| 10:24 | 4 | A.   Yes. |
| 10:24 | 5 | Q.   What were the singles? |
| 10:24 | 6 | A.   The first single was "Mechanical World." |
| 10:24 | 7 | It was our first regional hit.  It broke in Miami |
| 10:24 | 8 | and kind of put us on the map a little bit. |
| 10:24 | 9 | Q.   Was it released before the "Spirit" album |
| 10:24 | 10 | was released, the first one? |
| 10:24 | 11 | A.   No.  Excuse me.  The "Spirit" album had |
| 10:24 | 12 | been released.  It had gotten good reviews.  It was |
| 10:24 | 13 | well received, but it was not really selling a lot |
| 10:25 | 14 | of copies.  And "Mechanical World" kind of kick |
| 10:25 | 15 | started it and gave it more exposure and kind of |
| 10:25 | 16 | moved it forward. |
| 10:25 | 17 | Q.   Were there any other singles released from |
| 10:25 | 18 | the first album? |
| 10:25 | 19 | A.   Had to be, because if you have a |
| 10:25 | 20 | successful single, you always follow it with another |
| 10:25 | 21 | one.  And another if -- if you have two successes. |
| 10:25 | 22 | I don't recall what the next single would have been. |
| 10:25 | 23 | Q.   Was "Fresh Garbage" released as a single? |
| 10:25 | 24 | A.   No.  But I -- well, I don't know.  That |
| 10:25 | 25 | would have been a good candidate.  That was our |

**EXHIBIT 8**
**29**  Page 48

| | |
|---|---|
| 10:25 1 | other song on that record that got a lot of radio |
| 10:25 2 | play. |
| 10:25 3 | Q.   Was "Taurus" released as a single? |
| 10:25 4 | A.   I don't recall. |
| 10:25 5 | Q.   What was the side -- the other side of the |
| 10:25 6 | "Mechanical World" single? |
| 10:25 7 | A.   Those are called B sides.  And I don't |
| 10:25 8 | recall. |
| 10:25 9 | Q.   You are aware of the difference between a |
| 10:25 10 | musical composition and a recording? |
| 10:25 11 | A.   Yes. |
| 10:25 12 | Q.   Who wrote the musical composition "Fresh |
| 10:26 13 | Garbage"? |
| 10:26 14 | A.   I did. |
| 10:26 15 | Q.   And who wrote the musical composition |
| 10:26 16 | "Mechanic World"? |
| 10:26 17 | A.   I did and Mark Andes. |
| 10:26 18 | Q.   What was the second Spirit album released |
| 10:26 19 | by Ode Records? |
| 10:26 20 | A.   It was called the "Family that Plays |
| 10:26 21 | Together." |
| 10:26 22 | And at that point, Randy had blossomed as |
| 10:26 23 | a songwriter, so he was represented with more songs. |
| 10:26 24 | And we had our first big radio hit, which was "I Got |
| 10:26 25 | a Line on You," which was Randy's song. |

JAY A. FERGUSON - 01/13/2016

10:27   1   weeks, as I recall.

10:27   2        Q.   Do you recall when you started recording

10:27   3   those -- that album?

10:27   4        A.   No.

10:27   5        Q.   Do you know when "I Got a Line on You" was

10:27   6   released as a single?

10:27   7        A.   I would guess early 1968.

10:27   8        Q.   But that's only a guess?

10:28   9        A.   That's only a guess.

10:28   10        Q.   Okay.   Is it the case that the second

10:28   11   album, "The Family that Plays Together," was more

10:28   12   successful than the first album?

10:28   13        A.   Definitely.

10:28   14        Q.   Was the album "The Family that Plays

10:28   15   Together" Spirit's first major breakthrough album?

10:28   16        A.   I would say yes.

10:28   17           MR. MALOFIY:   Objection.   Vague.

10:28   18   BY MR. ANDERSON:

10:28   19        Q.   Was the single "I Got a Line on You" a

10:28   20   successful single?

10:28   21        A.   Yes, it was.

10:28   22        Q.   And it became a tent pole song that Spirit

10:28   23   performed in its performances?

10:28   24        A.   It was pretty much the end of the show

10:28   25   song.

JAY A. FERGUSON - 01/13/2016

10:28  1        Q.    And "Mechanical World" and "Fresh Garbage"

10:28  2   were they -- they also became tent poles after the

10:28  3   first album was released?

10:28  4        A.    They were --

10:28  5             MR. MALOFIY:   Objection.   Misstates prior

10:28  6   testimony.

10:28  7             THE WITNESS:   Yes.

10:28  8   BY MR. ANDERSON:

10:28  9        Q.    What was the next Spirit album that was

10:29 10   released?

10:29 11        A.    It was called "Clear Spirit."

10:29 12        Q.    And when was it released?

10:29 13        A.    Once again, I would guess ten months after

10:29 14   the release of "The Family that Plays Together."

10:29 15        Q.    Is that a guess or is that an estimate?

10:29 16        A.    That's a -- both, I would say.

10:29 17        Q.    Well, I mean, the classic example that

10:29 18   lawyers give is:   I could ask you to estimate the

10:29 19   length of this conference table, and you could, you

10:29 20   know, based on your experience in the world, you

10:29 21   could look and you could guess.  If I asked -- I'm

10:29 22   sorry, estimate.

10:29 23             If I asked you to tell me the length of my

10:29 24   dining room table, you would have to guess.  You

10:29 25   would have no idea.

| | | |
|---|---|---|
| 10:29 | 1 | A.   Gotcha. |
| 10:29 | 2 | Q.   And so with that in mind, the testimony or |
| 10:29 | 3 | the -- that, perhaps, "Clear" was released ten |
| 10:29 | 4 | months after "The Family that Plays Together," is |
| 10:29 | 5 | that an estimate, or is that a guess? |
| 10:29 | 6 | A.   It's an estimate. |
| 10:29 | 7 | Q.   So by the end of 1969, Ode Records had |
| 10:30 | 8 | released three Spirit albums? |
| 10:30 | 9 | A.   Uh-huh.  Yes. |
| 10:30 | 10 | Q.   And what was the next Spirit album |
| 10:30 | 11 | released? |
| 10:30 | 12 | A.   The next Spirit album was "The Twelve |
| 10:30 | 13 | Dreams of Dr. Sardonicus." |
| 10:30 | 14 | Q.   And when was that released? |
| 10:30 | 15 | A.   It would be 1970. |
| 10:30 | 16 | Q.   Do you recall when in 1970? |
| 10:30 | 17 | A.   No. |
| 10:30 | 18 | Q.   So prior to 1971, the band had released -- |
| 10:30 | 19 | I'm sorry, Ode Records had released four Spirit |
| 10:30 | 20 | albums? |
| 10:30 | 21 | A.   Yes.  Yes. |
| 10:30 | 22 | Q.   Have you ever heard the phrase "tour in |
| 10:30 | 23 | support of an album"? |
| 10:30 | 24 | A.   Yes. |
| 10:30 | 25 | Q.   And what does that mean to you? |

**EXHIBIT 8**

**33** Page 53

JAY A. FERGUSON - 01/13/2016

10:3  1        A.   You want to generate publicity and

10:3  2   attention to your record, and one of the best ways

10:3  3   is to play performances live.  And a tour in support

10:3  4   of an album is -- it's a somewhat subsidized tour.

10:3  5   And often a record label will pay for some of the

10:3  6   expenses to promote their record.

10:3  7        Q.   So it's both the intention of the band and

10:3  8   the intention of the record company that the band

10:3  9   will perform the recordings -- the compositions that

10:3 10   appear on the most recently released album?

10:3 11        A.   Yes.

10:3 12        Q.   Okay.  And the idea is that you just

10:3 13   released an album or about to release an album and

10:3 14   you want people to go out and buy it?

10:3 15        A.   Exactly.

10:3 16        Q.   And did tour -- I'm sorry.

10:3 17             Did Spirit tour to support its new albums?

10:3 18        A.   Yes.

10:3 19        Q.   And so at live performances, did Spirit

10:3 20   play selections from its new or upcoming album?

10:3 21        A.   Yes.

10:31 22       Q.   Why don't we -- we've been going for an

10:31 23   hour.  Why don't we take a -- just a short break.

10:32 24       A.   Great.

10:32 25            THE VIDEOGRAPHER:  We're going off the

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 10:32 | 1 | record at 10:31. |
| 10:39 | 2 | (Brief recess.) |
| 10:39 | 3 | THE VIDEOGRAPHER:  We're back on the |
| 10:40 | 4 | record at 10:39. |
| 10:40 | 5 | BY MR. ANDERSON: |
| 10:40 | 6 | Q.   Let's talk a little bit about -- little |
| 10:40 | 7 | bit more about this occasion when you met Robert |
| 10:40 | 8 | Plant. |
| 10:40 | 9 | A.   Uh-huh. |
| 10:40 | 10 | Q.   And I take it that's only one occasion? |
| 10:40 | 11 | A.   Uh-huh.  Correct. |
| 10:40 | 12 | Q.   And that occurred where? |
| 10:40 | 13 | A.   It was Birmingham.  It was a club in |
| 10:40 | 14 | Birmingham.  And someone mentioned, "Oh, Robert |
| 10:40 | 15 | Plant is here to see you guys."  And I was very |
| 10:40 | 16 | flattered. |
| 10:40 | 17 | And, as I recall, he was -- he wasn't |
| 10:40 | 18 | backstage.  He was in the -- in the club, sort of |
| 10:40 | 19 | hanging out towards the back.  And I met him.  And |
| 10:40 | 20 | then we did the show. |
| 10:40 | 21 | Q.   Do you remember the name of the club? |
| 10:40 | 22 | A.   No.  I know it's in the notes. |
| 10:40 | 23 | Q.   Was it Mother's Club? |
| 10:40 | 24 | A.   Mother's Club. |
| 10:40 | 25 | Q.   And could you describe Mother's Club, |

JAY A. FERGUSON - 01/13/2016

10:40  1   please.

10:40  2        A.   Not a large club.  Maybe 400 people

10:41  3   capacity.  Kind of -- very English feeling.  Wood --

10:41  4   I remember a lot of wood and kind of a low ceiling.

10:41  5        Q.   Was it a long and narrow room?

10:41  6        A.   Could have been.

10:41  7             MR. MALOFIY:  Objection.  Vague.

10:41  8   BY MR. ANDERSON:

10:41  9        Q.   And was there a bar at one end and then

10:41 10   the stage at the other end?

10:41 11        A.   I don't remember the alignment of the bar

10:41 12   and the stage.

10:41 13        Q.   And you said, if I understood correctly,

10:41 14   you said that Mr. Plant was hanging out toward the

10:41 15   back of the club?

10:41 16        A.   That was my recollection, yes.

10:41 17        Q.   And so -- and that was opposite the stage?

10:41 18        A.   Yes.  The stage would be -- it does seem

10:41 19   like it was a longish room, and the stage would have

10:41 20   been at the other end ~~where~~ *witness correction: from* where I saw Robert Plant.

10:41 21        Q.   Okay.  And who told you that he was "here

10:41 22   to see you guys"?

10:41 23        A.   Either someone in our road crew or someone

10:41 24   from the club.

10:41 25        Q.   And did -- did you hear that, or did

JAY A. FERGUSON - 01/13/2016

10:42  1   someone relay that to you, that -- the person at the

10:42  2   club or in the road crew had said that?  Was that --

10:42  3   were those words you actually heard or someone told

10:42  4   you that?

10:42  5        A.   I think we were backstage, and someone

10:42  6   came in and said, "Robert Plant is here to see you

10:42  7   guys."

10:42  8        Q.   You said you think.  Is that a guess, or

10:42  9   you have recollection of being backstage?

10:42 10        A.   That is a guess.  I mean, it could have

10:42 11   been as we were walking in.  But I think we were as

10:42 12   a group when we were told.

10:42 13        Q.   Okay.  And what did you do next?

10:42 14        A.   It was a -- kind of a polite meeting.  We

10:42 15   did not spend much time together.  And I went back

10:42 16   and prepared to play the show.

10:42 17        Q.   Okay.  How long was that meeting?

10:42 18        A.   15 to 30 seconds.

10:42 19        Q.   Okay.  And who was present -- so it's

10:42 20   really not a meeting.  It was an introduction.

10:42 21        A.   It was a meet-and-greet.

10:42 22             MR. MALOFIY:  Objection.  Misstates the

10:42 23   testimony.

10:42 24   BY MR. ANDERSON:

10:42 25        Q.   A meet-and-greet?

10:42  1          A.   Uh-huh.

10:42  2          Q.   So who was physically present at that

10:42  3     meet- -- in that meet-and-greet?  Let me rephrase

10:43  4     that, because I want to exclude the audience.

10:43  5               Who were the participants in that

10:43  6     meet-and-greet?

10:43  7          A.   I believe at that point it was Mark Andes

10:43  8     and myself.

10:43  9          Q.   Okay.  Do you remember anything that was

10:43 10     said by you in that meet-and-greet?

10:43 11          A.   No.

10:43 12          Q.   Anything that -- do you remember anything

10:43 13     that was said by Mark Andes in that meet-and-greet?

10:43 14          A.   No.

10:43 15          Q.   Do you remember anything that was said by

10:43 16     Mr. Plant in that meet-and-greet?

10:43 17          A.   No.

10:43 18          Q.   Do you know how long Mr. Plant -- When you

10:43 19     were performing, could you see him?

10:43 20          A.   No.

10:43 21          Q.   So you don't know how long he was there

10:43 22     that night; is that correct?

10:43 23          A.   No.

10:43 24          Q.   Is that correct?

10:43 25          A.   That is correct.  I do not.

EXHIBIT 8

JAY A. FERGUSON - 01/13/2016

10:43  1      Q.   Okay.  And do you recall anything else
10:43  2   about that night, other than what you have testified
10:43  3   to so far?
10:44  4      A.   No.  But I was told that that was the
10:44  5   evening where he crashed his car returning from the
10:44  6   show, which was kind of a very bittersweet bit of
10:44  7   news.
10:44  8      Q.   Who told you that?
10:44  9      A.   I don't recall.  I think it was just
10:44 10   discussion because it was a pretty big event.
10:44 11      Q.   Was anyone else performing at the Mother's
10:44 12   Club that night?
10:44 13      A.   I don't believe so.  I don't recall any
10:44 14   other band.
10:44 15      Q.   How long did you perform?
10:44 16      A.   I can only estimate, because we were
10:44 17   headlining, about an hour.
10:44 18      Q.   Is that an estimate, or is that an
10:44 19   assumption?
10:44 20      A.   It's an assumption.  Possibly longer.
10:44 21      Q.   I would like to just go through quickly
10:45 22   the CDs that you produced today.  And what we have
10:45 23   done is -- well, it was done by the kind people
10:45 24   here, was to make a copy of the CD -- a photocopy of
10:45 25   the CD and a physical CD copy, if that makes sense.

JAY A. FERGUSON - 01/13/2016

```
10:55  1                    [CD was played].
10:55  2              MR. ANDERSON:  If you could pause it,
10:55  3   please.
10:55  4              THE VIDEOGRAPHER:  [Videographer
10:55  5   complies].
10:55  6   BY MR. ANDERSON:
10:55  7        Q.   Have you heard enough of the CD marked as
10:55  8   Exhibit 302 to identify whether it is, in fact,
10:55  9   Spirit performing?
10:55 10        A.   Yes.
10:55 11        Q.   And is it, in fact, Spirit performing?
10:55 12        A.   Yes.  I recognize Randy's voice.
10:55 13        Q.   And what was the composition being
10:55 14   performed?
10:55 15        A.   That was a Beatles song "Saw Her Standing
10:55 16   There."
10:55 17        Q.   Did Spirit perform live the songs of other
10:55 18   groups?
10:55 19        A.   Yes.  Not frequently.  But early on, when
10:55 20   we lacked a lot of material, we probably included
10:55 21   more of them to fill out the set.
10:55 22        Q.   When you say "probably," is that a guess?
10:55 23        A.   Not a guess.  Estimation.
10:55 24        Q.   And what other songs, besides that
10:56 25   particular Beatles song, did Spirit perform live?
```

JAY A. FERGUSON - 01/13/2016

10:56  1        A.   I can't be specific, but I'm sure they

10:56  2   were blues songs given Randy's background and

10:56  3   knowledge.

10:56  4        Q.   Are you finished?

10:56  5        A.   Yes.

10:56  6        Q.   Oh.  Sorry.

10:56  7             What do you mean by "Randy's background

10:56  8   and knowledge"?

10:56  9        A.   Randy -- Randy's uncle was Ed Pearl, who

10:56 10   owned the Ash Grove, which was a center in L.A. for

10:56 11   folk 'n' blues.  And legacy blues artists, like

10:56 12   Lightnin' Hopkins and Manslick, would come and play

10:56 13   at the Ash Grove and sometimes stay at Ed Pearl's

10:56 14   house.  And Randy had the opportunity to be there,

10:56 15   spend time with them, listen to them play, learn

10:56 16   guitar.  So he had a -- he had deep blues

10:56 17   background.

10:57 18        Q.   And you learned what you just testified to

10:57 19   by other people telling you?

10:57 20        A.   Uh-huh.  Yes.  I was never there at Ed

10:57 21   Pearl's house with Randy.

10:57 22        Q.   Okay.  Was Randy a fan of the Beatles?

10:57 23        A.   I think we all were.  Yes.

10:57 24        Q.   Okay.

10:57 25             MR. ANDERSON:  If I could get that CD

JAY A. FERGUSON - 01/13/2016

11:01 1          Q.   And do you recall Spirit performing at the
11:02 2     Valley Music Theater in Woodland Hills in December
11:02 3     of 1970?
11:02 4          A.   I do.
11:02 5          Q.   And do you have any -- any understanding
11:02 6     of what Mr. Pates referred to -- was referring to
11:02 7     when he said, "Likely first show"?
11:02 8          A.   That would indicate to me we did two shows
11:02 9     that evening.  And the first show was recorded on
11:02 10    these CDs; the second was not in Bruce's estimation.
11:02 11         Q.   Okay.  And if you look at the list of six
11:02 12    items that's included, what's your understanding of
11:02 13    what those items refer to?
11:02 14         A.   This would be the set list that we
11:02 15    performed.
11:02 16         Q.   This is the music -- the titles of the
11:02 17    compositions that were performed?
11:02 18         A.   Correct.  In order.
11:02 19         Q.   And is it correct that "Taurus" was not
11:02 20    performed at the Valley Music Theater by Spirit in
11:03 21    December of 1970?
11:03 22         A.   It is correct.
11:03 23         Q.   Okay.  I think, because you pointed out
11:03 24    that the photocopies the court reporting service
11:03 25    made doesn't include the handwriting on the -- on

EXHIBIT 8
42  Page 71

JAY A. FERGUSON - 01/13/2016

11:11  1        A.   He did.

11:11  2        Q.   Do you recall when he first started using

11:11  3   it?

11:11  4        A.   It would have been early on.  I would say

11:12  5   probably '69 -- I'm sorry, '68 is my guess.

11:12  6        Q.   Okay.  But that's a guess?

11:12  7        A.   Yeah.  It didn't stay -- he used it on

11:12  8   stage.  Did not stay in the show very long.

11:12  9        Q.   Why not?

11:12 10        A.   I can only guess.  Either the song that

11:12 11   the Theremin was used on was dropped or --

11:12 12             Theremins were notoriously difficult to

11:12 13   play, and it may just not have been musical enough.

11:12 14        Q.   Did he ever use a sonic wave?

11:12 15        A.   I don't know what the sonic wave is.

11:12 16        Q.   Did he ever use any Theremin-like device

11:12 17   other than the one -- the Theremin you are talking

11:12 18   about?

11:12 19        A.   He had several boxes and gadgets,

11:12 20   sound-shaping things.  I don't remember anything

11:12 21   other than the Theremin that produced that sound.

11:12 22        Q.   Okay.  In 1968, 1969, and 1970, when

11:13 23   Spirit performed live, what personnel accompanied

11:13 24   them?  Who was in the road crew, for example?

11:13 25        A.   I think, I believe, Danny Tucker was the

JAY A. FERGUSON - 01/13/2016

11:13 1   road manager.  And there were two roadies, who did

11:13 2   more of the physical work; and one was named Fred

11:13 3   and one was named Robert.  I do not recall the last

11:13 4   names.

11:13 5        Q.   Did an A&R representative -- Do you know

11:13 6   what "A&R" is?

11:13 7        A.   Yes.

11:13 8        Q.   What is A&R?

11:13 9        A.   Artist and repertoire.  And it's really a

11:13 10   go-between.  He's in the employ of the record

11:13 11   company, but he is the interface to the band.  And

11:13 12   his -- his job is to communicate back and forth.

11:13 13   Also to find acts to sign.

11:13 14        Q.   And did Ode have an A&R?

11:13 15        A.   Yeah, it was Marshall -- Marshall Adler?

11:14 16   It was Lou Adler's nephew.

11:14 17        Q.   Who distributed Ode Records at that point

11:14 18   in time, do you know?

11:14 19        A.   I think, originally, it was -- it was True

11:14 20   Independent Label.  Then it became part of the A&M

11:14 21   Records Group.  And then it became part of Columbia

11:14 22   Records Group.

11:14 23        Q.   Do you know when it became part of A&M?

11:14 24        A.   I think it was probably between the first

11:14 25   and second record, is my guess.  So that would be

JAY A. FERGUSON - 01/13/2016

11:16  1        Q.    Other than Danny Tucker; the two roadies,

11:16  2    Fred and Robert, anyone else who was -- who

11:16  3    accompanied you when you went on tour?

11:16  4        A.    It would only be potentially girlfriends

11:16  5    or wives.

11:17  6        Q.    And, again, I may ask you questions that

11:17  7    seem obvious, but just so the record is clear...

11:17  8        A.    No.

11:17  9        Q.    What does it mean to tour?

11:17 10        A.    A tour is a string of shows that are put

11:17 11    together.  It could be as short as a week, as long

11:17 12    as months.

11:17 13            And, basically, when you depart on a tour,

11:17 14    you do not return home after the shows.  You stay on

11:17 15    the road in hotels, traveling from show to show.

11:17 16        Q.    Did Spirit ever tour with Led Zeppelin?

11:17 17        A.    No.

11:17 18        Q.    Is Danny Tucker still alive?

11:17 19        A.    No.  He's passed on.

11:17 20        Q.    The two roadies, Fred and Robert, do you

11:17 21    know if they are alive?

11:17 22        A.    I do not know.  I have not been in touch

11:17 23    with them.

11:17 24        Q.    Do you know if Marshall, Lou Adler's

11:17 25    nephew, is alive?

JAY A. FERGUSON - 01/13/2016

11:20  1    everybody would have one of them in front of him on

11:21  2    the stage.  If you were a singer, it would be on

11:21  3    your mic stand.  If you were Ed Cassidy, it would be

11:21  4    next to his drum set.  So we were all on the same

11:21  5    page.

11:21  6        Q.  Okay.  So you knew what song to perform

11:21  7    next when you finished a particular song?

11:21  8        A.  Yes.  It was critical.

11:21  9        Q.  You all wanted to play the same song,

11:21 10    right?

11:21 11        A.  Uh-huh.

11:21 12        Q.  At the same time.

11:21 13        A.  There -- there was one incident where we

11:21 14    had multiple set lists in another band, and we all

11:21 15    played different songs at different times.  It was a

11:21 16    nightmare.

11:21 17        Q.  And so, just so the record is clear, you

11:21 18    are not suggesting that Exhibit 303 is a copy of one

11:21 19    of those handwritten set lists --

11:21 20        A.  Not at all.

11:21 21        Q.  -- from 1970?

11:21 22        A.  Not at all.

11:21 23        Q.  Is it correct that Spirit performed before

11:21 24    Vanilla Fudge in December of 1968 in Denver?

11:21 25        A.  Yes.

11:21  1      Q.    You are thumbing through the -- one of the

11:22  2   versions of the listings that Mr. Pates --

11:22  3      A.    Right.

11:22  4      Q.    -- prepared and provided to you.

11:22  5           Do you have an independent recollection of

11:22  6   performing in Denver before Vanilla Fudge?

11:22  7      A.    No.

11:22  8      Q.    Do you recall performing at the Denver

11:22  9   Auditorium Arena?

11:22 10      A.    No.

11:22 11      Q.    Do you remember perform- -- recall

11:22 12   performing at an arena where the Denver Rockets,

11:22 13   subsequently referred to as the Denver Nuggets,

11:22 14   performed --

11:22 15      A.    No.

11:22 16      Q.    -- played, rather?

11:22 17           Do you have any recollection at all of

11:22 18   performing after Led Zeppelin performed in Denver

11:22 19   and before Vanilla Fudge performed?

11:22 20      A.    No.

11:22 21      Q.    Do you have any understanding of how it

11:22 22   came to be that Spirit perf- -- well, let me ask it

11:23 23   differently.

11:23 24           Do you recall ever performing with Vanilla

11:23 25   Fudge?

JAY A. FERGUSON - 01/13/2016

11:23  1        A.    Actually, no.

11:23  2        Q.    Okay.  Other than Mr. Pates telling you

11:23  3  that Led Zeppelin performed at a venue in Denver

11:23  4  before Spirit performed, do you have any

11:23  5  recollection of that performance?

11:23  6        A.    No personal recollection.

11:23  7        Q.    When did you first hear of the group Led

11:23  8  Zeppelin?

11:23  9        A.    I was an Anglophile record collector.  So

11:23 10  their first record, I would have listened to.  And

11:23 11  I'm assuming that was '68, early '68.

11:23 12        Q.    You're -- I don't want to mislead you

11:23 13  either by saying something or by not acknowledging

11:24 14  it.

11:24 15              My understanding is, is that the first

11:24 16  album came out late 1968.

11:24 17        A.    Okay.

11:24 18        Q.    But that's my understanding.  And other

11:24 19  than the fact that I actually got that album as

11:24 20  well, I couldn't tell you when it came out.

11:24 21              But do you recall how soon after it was

11:24 22  released that you got it?

11:24 23        A.    I would have been -- because I was an avid

11:24 24  record purchaser, it would have been very soon.

11:24 25              I had followed the progress of that band

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 11:25 | 1 | BY MR. ANDERSON: |
| 11:25 | 2 | Q.   But as you are sitting here now, |
| 11:25 | 3 | Mr. Ferguson, you have no recollection of when the |
| 11:25 | 4 | first album was released? |
| 11:25 | 5 | A.   Not specifically, no. |
| 11:25 | 6 | Q.   Your general recollection is sometime in |
| 11:25 | 7 | '68 or so? |
| 11:25 | 8 | A.   Right.  So... |
| 11:25 | 9 | MR. MALOFIY:  [Attorney retrieves personal |
| 11:25 | 10 | item]. |
| 11:25 | 11 | I do have an answer to your question. |
| 11:25 | 12 | It's March 31st, in the United Kingdom, of '69, |
| 11:26 | 13 | so... |
| 11:26 | 14 | THE WITNESS:  So I am off. |
| 11:26 | 15 | BY MR. ANDERSON: |
| 11:26 | 16 | Q.   Well, or the website could be off.  I |
| 11:26 | 17 | mean -- |
| 11:26 | 18 | A.   Oh. |
| 11:26 | 19 | Q.   -- that does happen too. |
| 11:26 | 20 | Do I understand correctly that, as you are |
| 11:26 | 21 | sitting here now -- I'm sorry.  Let me start again. |
| 11:26 | 22 | Do I understand correctly that your only |
| 11:26 | 23 | recollection of ever being at the same venue -- of |
| 11:26 | 24 | Spirit ever performing at the same venue as Led |
| 11:26 | 25 | Zeppelin was the Atlanta Pop Festival? |

JAY A. FERGUSON - 01/13/2016

11:26  1          A.   Right.

11:26  2          Q.   And do you have -- Did you ever see

11:26  3   Spirit -- Led Zeppelin perform live?

11:26  4          A.   I think that was the one time.

11:26  5          Q.   At the Atlanta Pop Festival?

11:26  6          A.   Uh-huh.

11:26  7          Q.   So after Spirit performed, did you go into

11:26  8   the audience and watch?

11:26  9          A.   When you did the pop festivals, you liked

11:26 10   to kind of hang out on the stage because it was such

11:26 11   a great vibe around the bands.  So went back behind

11:26 12   the amplifiers and watched some of their show.

11:27 13          Q.   And when you say "you," you mean you,

11:27 14   Mr. Ferguson?

11:27 15          A.   Right.

11:27 16          Q.   Okay.  You are talking about what you like

11:27 17   to do?

11:27 18          A.   What I like to do.

11:27 19          Q.   Okay.

11:27 20          MR. MALOFIY:  Just a belated objection as

11:27 21   to "you."  I don't know if he meant it specific to

11:27 22   him or a broader "you."

11:27 23          MR. ANDERSON:  That's why I asked him.  I

11:27 24   thought he clarified it.  But thank you.

11:27 25   ///

Personal Court Reporters, Inc.          **EXHIBIT 8**
800-43-DEPOS                            **50** Page 86

JAY A. FERGUSON - 01/13/2016

11:27   1   BY MR. ANDERSON:

11:27   2         Q.   To your knowledge, did Randy California,

11:27   3   or did you -- I'm sorry.

11:27   4         To your knowledge, did Randy California

11:27   5   ever speak with Jimmy Page?

11:27   6         A.   Not to my knowledge.

11:27   7         Q.   Did Randy California ever speak with any

11:27   8   other member of Led Zeppelin?

11:27   9         A.   Not to my knowledge.

11:27 10         Q.   Did any member of Spirit, other than the

11:27 11   occasion when you and Mr. Andes had a ten- or

11:27 12   15-second meet-and-greet with Robert Plant in

11:27 13   Birmingham, London -- England, did any member of

11:28 14   Spirit speak with any member of Led Zeppelin?

11:28 15         MR. MALOFIY:   Objection.   Asked and

11:28 16   answered.

11:28 17         THE WITNESS:   Personal knowledge, no.

11:28 18   Hearsay, yes.

11:28 19   BY MR. ANDERSON:

11:28 20         Q.   And what is the hearsay you have heard?

11:28 21         A.   I did hear a story that Randy confronted

11:28 22   Jimmy Page over this same issue.

11:28 23         Q.   What issue?

11:28 24         A.   The issue of authorship of "Stairway to

11:28 25   Heaven" vis-a-vis "Taurus."

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 11:28 | 1 | Q.   And who did you hear that story from? |
| 11:28 | 2 | A.   I cannot recall, so I can't verify it. |
| 11:28 | 3 | Q.   When did you hear that story? |
| 11:28 | 4 | A.   It was probably within the last year and a |
| 11:28 | 5 | half as this issue has become more public. |
| 11:28 | 6 | Q.   Have you ever discussed "Stairway to |
| 11:28 | 7 | Heaven" -- did you ever discuss "Stairway to Heaven" |
| 11:28 | 8 | with Randy California? |
| 11:28 | 9 | A.   No. |
| 11:28 | 10 | Q.   Did you ever discuss "Stairway to Heaven" |
| 11:28 | 11 | with Lou Adler? |
| 11:28 | 12 | A.   No. |
| 11:28 | 13 | Q.   Did you ever discuss "Stairway to Heaven" |
| 11:28 | 14 | with anyone affiliated with either Ode Records or |
| 11:29 | 15 | Hollenbeck Music? |
| 11:29 | 16 | A.   No. |
| 11:29 | 17 | Q.   Did you ever discuss "Stairway to Heaven" |
| 11:29 | 18 | with John Locke? |
| 11:29 | 19 | A.   No. |
| 11:29 | 20 | Q.   Is John Locke still live? |
| 11:29 | 21 | A.   No.  John's passed on. |
| 11:29 | 22 | Q.   When did he pass away? |
| 11:29 | 23 | A.   Oh, it was -- I would say seven or eight |
| 11:29 | 24 | years ago. |
| 11:29 | 25 | Q.   Did you ever discuss "Stairway to Heaven" |

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 11:29 | 1 | with Ed Cassidy? |
| 11:29 | 2 | A.   No. |
| 11:29 | 3 | Q.   Is Ed Cassidy still alive? |
| 11:29 | 4 | A.   No.  He passed on five to six years ago. |
| 11:29 | 5 | Q.   Did you ever discuss "Stairway to Heaven" |
| 11:29 | 6 | with Mark Andes? |
| 11:29 | 7 | A.   No. |
| 11:29 | 8 | Q.   Did you ever meet John Bonham? |
| 11:29 | 9 | A.   No. |
| 11:30 | 10 | Q.   I ask that you hold off for a second |
| 11:30 | 11 | before checking the notes that Mr. Pates provided |
| 11:30 | 12 | you, just so I can -- we can first see what you |
| 11:30 | 13 | recall. |
| 11:30 | 14 | Do you recall performing at the Olympia |
| 11:30 | 15 | Stadium in Detroit in May of 1969 with Illinois |
| 11:30 | 16 | Speed Press? |
| 11:30 | 17 | A.   No. |
| 11:30 | 18 | Q.   Okay.  Do you recall performing at the |
| 11:30 | 19 | Northern California Rock -- Folk Rock Festival in |
| 11:30 | 20 | San Jose, California in May of 1969? |
| 11:30 | 21 | A.   Yes. |
| 11:30 | 22 | Q.   And, as I understand it, that was a |
| 11:30 | 23 | two-day festival on May 23rd and 24th; is that |
| 11:30 | 24 | consistent -- |
| 11:30 | 25 | A.   Sounds right. |

JAY A. FERGUSON - 01/13/2016

11:32  1        A.   No, I do not.

11:32  2        Q.   Do you recall who Spirit preceded?

11:32  3        A.   No, I do not.

11:32  4        Q.   Do you recall anything about that

11:32  5   festival?

11:32  6        A.   No.

11:32  7        Q.   I hope that didn't sound...

11:32  8        A.   No.  No.  I just -- like, I'm embarrassed

11:32  9   to say I don't.

11:32 10        Q.   Okay.

11:32 11        A.   I mean, I remember the -- I remember going

11:32 12   to the location.  I remember that we performed

11:32 13   there.

11:32 14             That was the era of several of these

11:32 15   festivals.  And as you are always just arriving and

11:33 16   just leaving for the next show, they tend to blur.

11:33 17        Q.   Okay.  Do you have any knowledge as to

11:33 18   whether or not Led Zeppelin actually performed at

11:33 19   that performance?

11:33 20        A.   Other than the poster, no.

11:33 21        Q.   They signalled to me that the exhibits

11:33 22   have been corrected, so if you could bear with me.

11:33 23   We don't need to take a break.  Let me just walk out

11:33 24   and grab those, and we'll finish off that line of

11:33 25   questioning.

JAY A. FERGUSON - 01/13/2016

| 11:40 | 1 | Q.   Okay. |
| 11:40 | 2 | A.   Thank you. |
| 11:40 | 3 | Q.   You are welcome, sir. |

11:40  4        Then moving on, I'm going to hand you a

11:40  5  cassette case and CD -- or, CD -- I'm sorry.  Let me

11:40  6  rephrase that, a CD case and CD with the

11:40  7  type-written label "Spirit.  The Forum, Los Angeles,

11:40  8  California, December 12, 1970."  And then on the

11:40  9  inside a listing of nine titles.

11:40  10        And if you could, please tell me what is

11:40  11  that and who did you get it from.

11:40  12      A.   I am certain I got this from Bruce Pates.

*witness correction: fairly*

11:40  13  This would have been a show at The Forum.  Judging

11:40  14  by the set list, we were the opening act, not the

11:40  15  headliner; and I could refer to the notes and tell

11:41  16  you who was.

11:41  17      Q.   Okay.  And by referring to the notes, you

11:41  18  would look at Mr. Pates' --

11:41  19      A.   Yes.

11:41  20      Q.   -- document to see who else was appearing

11:41  21  at The Forum that day?

11:41  22      A.   Right.

11:41  23      Q.   And you said that you could tell you are

11:41  24  the opening act.  And why is that?

11:41  25      A.   It's an abbreviated set list.

11:41 1          Q.    It's not nine compositions?

11:41 2          A.    Right.  If we were headlining, I would

11:41 3   guess it would be 14 possibly.

11:41 4          Q.    Okay.  And do you recall that performance

11:41 5   at The Forum?

11:41 6          A.    No.

11:41 7          Q.    Okay.

11:41 8          A.    No, I -- let me correct that.

11:41 9                I recall performing at The Forum.  I don't

11:41 10  recall who we performed with.  But I remember the

11:41 11  venue.

11:41 12         Q.    Okay.  Do you have any reason to believe

11:41 13  that "Taurus" was performed by Spirit that night?

11:41 14         A.    Given what I see here, there is no reason.

11:41 15         Q.    Okay.  Now I'm going to hand you the same

11:41 16  drill.  It's a CD attached to two pages, and I'm

11:42 17  going to ask you to confirm that those are -- and I

11:42 18  know -- well, let me rephrase that, that the two

11:42 19  pages replicate the handwritten and typewritten

11:42 20  notes on the CD that you produced that's labeled as

11:42 21  "The Forum."

11:42 22         A.    Yes.

11:42 23         Q.    Okay.  And is it correct you have not

11:42 24  listened to the CD that you produced?

11:42 25         A.    No -- I mean it's correct I have not

11:42  1     listened.

11:42  2              MR. ANDERSON:  Okay.  And I'm going to ask

11:42  3     that the court reporter mark that as next in order,

11:42  4     Exhibit 306.

11:42  5              (Deposition Exhibit 306 was marked for

11:42  6              identification and is attached hereto.)

11:42  7              MR. MALOFIY:  Do you have a copy of that?

11:42  8              MR. ANDERSON:  I don't, unfortunately.

11:42  9     Those were just prepared.  But I have made a note to

11:42 10     try and have them make copies today, and I'll have

11:42 11     an extra copy made for you.

11:42 12              MR. MALOFIY:  Oh, well, then let me just

11:42 13     have a chance to look at it.  That's all.

11:42 14              MR. ANDERSON:  Okay.  Sure.

11:42 15              And to move this along, I'm going to ask

11:43 16     that the court reporter mark as the next exhibits in

11:43 17     order, which will be 307, 308, 309, 310, 311, and

11:43 18     312, each of which is a CD affixed to paper

11:43 19     photocopies of two pages in length.

11:43 20              So if you could mark those and place them

11:43 21     in front of the witness.

11:43 22              (Deposition Exhibit 307, Exhibit 308,

11:43 23              Exhibit 309, Exhibit 310, and Exhibit 311

11:43 24              were marked for identification and

11:46 25              are attached hereto.)

JAY A. FERGUSON - 01/13/2016

11:46    1        A.    [Witness reviews documents and CDs].

11:46    2              They are all accurate.

11:46    3        Q.    Okay.  Let me just go through this, and

11:46    4    we'll try to do this all in one step.

11:46    5              But the CDs that you have produced are

11:46    6    labeled as "Spirit" at the "Center Arena, Seattle,

11:47    7    Washington, May 22nd, 1970"; "Spirit" at the "Civic

11:47    8    Center, Baltimore, Maryland, October 3, 1969";

11:47    9    "Spirit" at the "Grande Ballroom, Detroit, Michigan,

11:47   10    February 1, 1969"; "Spirit" at the "Whisky a Go Go,

11:47   11    Hollywood, California, October 31st, Oregon" -- or,

11:47   12    I'm sorry, I apologize, "or," "October 31st or

11:47   13    November 1st or 2nd."

11:47   14        A.    Got it.

11:47   15        Q.    [Reading]:  "Spirit" at an "unknown venue

11:47   16    Cincinnati, Ohio, late 1970; "Spirit" at the

11:47   17    "Mammoth Gardens, Denver, Colorado, June 5 or 6,

11:47   18    1970"; is that correct?

11:47   19        A.    Uh-huh.  Yes, they are all correct.

11:47   20        Q.    And is it correct that these are all CDs

11:47   21    that Mr. Pates provided to you?

11:47   22        A.    Yes.  ◇  witness correction: to the best of my knowledge

11:47   23        Q.    Do you have any recollection of any of

11:47   24    these performances?

11:48   25        A.    I recall this, the Seattle performance,

JAY A. FERGUSON - 01/13/2016

11:48  1    May 22nd.

11:48  2                MR. MALOFIY:  This is -- which exhibit is

11:48  3    that?

11:48  4                THE WITNESS:  It's not --

11:48  5    BY MR. ANDERSON:

11:48  6        Q.   You should have the court reporter's label

11:48  7    on it.

11:48  8        A.   It doesn't have...

11:48  9                (Deposition Exhibit 312 was marked for

11:48 10                identification and is attached hereto.)

11:48 11    BY MR. ANDERSON:

11:48 12        Q.   Any others that you recall?

11:48 13        A.   Grande Ballroom.

11:48 14                We played many shows at the Whisky, so

11:48 15    this specific show, I do not recall.

11:49 16                And Cincinnati, Ohio, I do not recall.

11:49 17                Mammoth Gardens, I do not recall.  I might

11:49 18    be able to recall a show like this if I knew who

11:49 19    headlined it, but no.

11:49 20        Q.   On the Seattle show, was it at the Center

11:49 21    Arena?

11:49 22        A.   Uh-huh.

11:49 23        Q.   "Yes"?

11:49 24        A.   Yes.

11:49 25        Q.   And was it on or about May 22nd, 1970,

JAY A. FERGUSON - 01/13/2016

| | |
|---|---|
| 11:49 | 1 | that you recall? |
| 11:49 | 2 | A.   I believe so, yes. |
| 11:49 | 3 | Q.   And is the list of songs, 14 songs, is |
| 11:49 | 4 | that what Spirit performed that day? |
| 11:49 | 5 | A.   These are all songs that would have been |
| 11:49 | 6 | in our set typically, but I can't guarantee it is |
| 11:49 | 7 | the exact performance, because I don't recall. |

11:49  8        Q.   Okay.  The Grand- -- Grande --

11:49  9        A.   Grande.

11:49 10        Q.   -- Ballroom --

11:49 11        A.   And it was not grand either.  [Laughter

11:50 12   elicited].

11:50 13        Q.   Actually, let's go back.

11:50 14             Do you recall anything -- what do you

11:50 15   recall about the performance at the Center Arena in

11:50 16   Seattle, Washington in May of 1770?

11:50 17        A.   I recall the venue and the other bands

11:50 18   that played with us.

11:50 19        Q.   What other bands -- are you referring to

11:50 20   Steppenwolfe and Blues Image?

11:50 21        A.   Yes.

11:50 22        Q.   Any other bands you recall playing with

11:50 23   you?

11:50 24        A.   We did a show in Seattle with Young

11:50 25   Rascals or -- they became the Rascals, headlining,

JAY A. FERGUSON - 01/13/2016

11:50  1    but that's not indicated here.

11:50  2        Q.   Do you have any understanding as to why at

11:50  3    the Center Arena there were 14 -- apparently 14

11:50  4    songs performed, but you weren't the -- headlining?

11:50  5        A.   I was just looking at that, and it's a

11:50  6    puzzle to me, because usually the headliner will not

11:50  7    allow an opening act that much time on stage.

11:50  8        Q.   Anything else that you recall about the

11:50  9    performance at Seattle?

11:50 10        A.   No.

11:50 11        Q.   And the Grande Ballroom in Detroit on --

11:51 12    what do you recall about that performance?

11:51 13        A.   I believe it was with Jethro Tull.  And I

11:51 14    recall the venue.  And I recall it being a good show

11:51 15    and playing with another good band.

11:51 16        Q.   Do you recall now if, in fact, Spirit

11:51 17    performed the compositions that are listed, the 13

11:51 18    compositions?

11:51 19        A.   Once again, these are all in our current

11:51 20    line of songs that could have been in a set list.  I

11:51 21    can't tell you specifically if this was exactly what

11:51 22    we played.

11:51 23        Q.   Okay.  And I'm not sure I asked this but

11:51 24    just to make sure...

11:51 25             It is your testimony that Exhibits 307

JAY A. FERGUSON - 01/13/2016

11:51  1    through 312 are true and correct copies of the

11:51  2    printed and handwritten language that appears on

11:51  3    these CDs that you produced?

11:51  4         A.   They are.

11:51  5         Q.   And do you have any reason to believe that

11:51  6    "Taurus" was performed at any of those live

11:51  7    performances?

11:51  8         A.   Given what I see in the set lists, there

11:52  9    is no indication.

11:52 10         Q.   Okay.  Let me hand you back the originals,

11:52 11    the ones that you produced.

11:52 12              I'm now going to ask that the court

11:52 13    reporter mark as the next exhibit a photocopy of a

11:52 14    newspaper article.

11:52 15              (Deposition Exhibit 313 was marked for

11:52 16              identification and is attached hereto.)

11:52 17    BY MR. ANDERSON:

11:52 18         Q.   Do you recall seeing this before, sir?

11:52 19         A.   You know, I probably, when I received it

11:52 20    from Bruce, I looked at it, and, of course, the

11:52 21    headline is the best part of it.

11:52 22         Q.   What do you mean by that?

11:52 23         A.   "Rock Concert is Real Groovy."

11:52 24         Q.   It takes you back, right?

11:52 25         A.   It takes -- it's frightening.

JAY A. FERGUSON - 01/13/2016

11:52  1        Q.   Do you have any understanding of what this

11:52  2   is?

11:52  3        A.   It's a review of a life show featuring

11:52  4   Vanilla Fudge, Spirit, and Led Zeppelin.

11:52  5        Q.   At the Auditorium Arena?  This is the one

11:52  6   we talked about before.

11:52  7        A.   This is the one, yes.

11:53  8        Q.   If you could take a moment and -- as much

11:53  9   time as you feel you need, and let -- the question

11:53 10   is going to be whether anything in this article

11:53 11   refreshes your memory in any way as to the

11:53 12   performance in Denver in 1968 with Vanilla Fudge and

11:53 13   apparently Led Zeppelin?

11:54 14        A.   Well, it describes a typical Spirit show

11:54 15   at the time.  I do not specifically remember this

11:54 16   show.  Although, the plug being pulled on Vanilla

11:54 17   Fudge, I do remember that.

11:54 18        Q.   And what do you remember about the plug

11:54 19   being pulled on Vanilla Fudge?

11:54 20        A.   There was a big faux pas, a big break in

11:54 21   the show, and it was mechanical or electrical issue.

11:54 22        Q.   Does that refresh your recollection -- I'm

11:54 23   sorry.

11:54 24             Now that you have read this --

11:54 25        A.   Uh-huh.

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 11:54 | 1 | Q.   -- this exhibit and the article, do you |
| 11:54 | 2 | have any recollection of Led Zeppelin being on the |
| 11:54 | 3 | same bill as Spirit in Colorado? |
| 11:54 | 4 | A.   No personal recollection. |

11:55  5       Q.   Okay.  And does this change any of the

11:55  6   testimony -- has this triggered a memory that now

11:55  7   changes any of the testimony you have given so far?

11:55  8       A.   I don't believe so.

11:55  9       MR. ANDERSON:  Okay.  Next is Exhibit 314,

11:55 10   I believe.

11:55 11       (Deposition Exhibit 314 was marked for

11:55 12        identification and is attached hereto.)

11:55 13   BY MR. ANDERSON:

11:55 14       Q.   Have you ever seen this before, sir?

11:55 15       A.   Only as it came to me from Bruce Pates.

11:55 16       Q.   So you have read this before?

11:55 17       A.   No, I did not read through it.

11:55 18       Bruce would send me quantities of CDs,

11:55 19   reviews, clippings, and I am -- I was just never the

11:56 20   type to pour over them, to play them back.  I would

11:56 21   file them away and thank him.

11:56 22       Q.   Okay.  Can you let me know if anything in

11:56 23   this article refreshes your memory in any way as

11:56 24   to -- and by that, I mean, all of a sudden now you

11:56 25   remember something you didn't remember before about

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 11:59 | 1 | what other English bands were or might be in |
| 11:59 | 2 | attendance that day? |
| 11:59 | 3 | A. Not specifically. |
| 11:59 | 4 | Q. Do you have a general understanding? |
| 11:59 | 5 | A. No. I just -- that was -- it was sort of |
| 11:59 | 6 | an understood thing that the English bands were fans |
| 11:59 | 7 | of ours before even the American public was. |
| 11:59 | 8 | Q. Okay. And I'm sorry. I apologize. You |
| 11:59 | 9 | mentioned the Lyceum, so we went off on that. |
| 11:59 | 10 | Do you have any information that Led -- |
| 11:59 | 11 | any member of Led Zeppelin heard Spirit perform at |
| 11:59 | 12 | the Atlanta Pop Festival? |
| 11:59 | 13 | A. No. But it would be likely, in that they |
| 11:59 | 14 | followed us, so they were -- well, that's -- I |
| 11:59 | 15 | shouldn't say it's likely. It's possible, depending |
| 12:00 | 16 | on where they were placed before their performance. |
| 12:00 | 17 | If they were ready to go on stage, they would have |
| 12:00 | 18 | seen us. If they were in their dressing room, maybe |
| 12:00 | 19 | not. |
| 12:00 | 20 | Q. Were there dressing rooms provided? |
| 12:00 | 21 | A. There were always dressing rooms provided, |
| 12:00 | 22 | probably would have been a van or a trailer. |
| 12:00 | 23 | Q. Have you ever met Janis Joplin? |
| 12:00 | 24 | A. Yes. |
| 12:00 | 25 | Q. Did you spend any time with Janis Joplin |

JAY A. FERGUSON - 01/13/2016

| 12:01 | 1 | A.   These festivals had a haphazard element to |
|---|---|---|

12:01  1        A.   These festivals had a haphazard element to

12:01  2   them.  Things would be shifted around.  It could

12:01  3   have been that this was the original order and then

12:02  4   they changed it for whatever reason.

12:02  5        Q.   Right.

12:02  6             Did you ever see any member of Led

12:02  7   Zeppelin speaking with any member of Spirit other

12:02  8   than when Andes -- Mr. Andes and you were -- had

12:02  9   that meet-and-greet with Robert Plant?

12:02 10        A.   No.

12:02 11        Q.   Do you recall performing at the Seattle

12:02 12   Pop Festival in Woodinville, Washington outside of

12:02 13   Seattle in July of 1969?

12:02 14        A.   Yes.  Vaguely.

12:02 15        Q.   Okay.  And what do you recall?

12:02 16        A.   Probably I recall traveling to Seattle and

12:02 17   playing at, yet, another pop festival.

12:02 18        Q.   Okay.  You say "probably," and I want to

12:02 19   make sure you are not speculating.

12:02 20        A.   I am speculating, so I should rephrase

12:02 21   that.

12:02 22             I remember we were in Seattle playing a

12:03 23   pop festival.

12:03 24        Q.   Do you recall who else was there?

12:03 25        A.   No.

JAY A. FERGUSON - 01/13/2016

```
12:12  1        A.   Yes.   It's not in the format of a poster.
12:12  2   And the graphics design -- the graphics are small.
12:12  3   It's more informational.  Looks like a hand bill.
12:12  4        Q.   I take it the Texas Pop Festival occurred
12:12  5   over three separate days?
12:12  6        A.   Uh-huh.
12:12  7        Q.   "Yes"?
12:12  8        A.   Well -- yes.
12:12  9        Q.   And is it correct that Spirit performed on
12:12 10   the last day, Monday, September 1st?
12:12 11        A.   I couldn't tell you.  I don't know.
12:12 12        Q.   Okay.  I notice this has both Spirit and
12:12 13   Family Stone, Sly and the Family Stone, on the same
12:12 14   days.  Is that your recollection, that they
12:12 15   performed on the same day?
12:12 16        A.   Okay.  I was looking at this and -- for a
12:12 17   second, I thought it was alphabetical.
12:12 18             Yeah, we did.
12:12 19        Q.   Okay.
12:12 20        A.   We played on Monday.
12:12 21        Q.   Okay.  I'm sorry.
12:12 22             So just to be clear, your testimony is
12:12 23   that at the Texas Pop Festival, Spirit performed on
12:12 24   Monday, September 1st?
12:12 25        A.   Yes.
```

**EXHIBIT 8**
**67** Page 115

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 12:12 | 1 | Q. Okay. Do you have any reason to doubt |
| 12:13 | 2 | that if Led Zeppelin performed -- I'm sorry. Let me |
| 12:13 | 3 | start over again. |
| 12:13 | 4 | You have no recollection of Led Zeppelin |
| 12:13 | 5 | performing at the Texas Pop Festival; is that |
| 12:13 | 6 | correct? |
| 12:13 | 7 | A. No. |
| 12:13 | 8 | Q. Is that correct? |
| 12:13 | 9 | A. Yes. Correct. |
| 12:13 | 10 | Q. Okay. And do you have any reason to doubt |
| 12:13 | 11 | that if Led Zeppelin did perform, it performed on a |
| 12:13 | 12 | different day? |
| 12:13 | 13 | A. No. I have no doubt. |
| 12:13 | 14 | MR. MALOFIY: Objection. Argumentative. |
| 12:13 | 15 | BY MR. ANDERSON: |
| 12:13 | 16 | Q. No reason to doubt? |
| 12:13 | 17 | A. No reason to doubt. |
| 12:13 | 18 | Q. Okay. I'm sorry. I want to go back for a |
| 12:13 | 19 | second to Denver. |
| 12:13 | 20 | If the court reporter could please mark |
| 12:13 | 21 | this as Exhibit 320. |
| 12:13 | 22 | (Deposition Exhibit 320 was marked for |
| 12:13 | 23 | identification and is attached hereto.) |
| 12:13 | 24 | BY MR. ANDERSON: |
| 12:13 | 25 | Q. Do you recognize Exhibit 320? |

JAY A. FERGUSON - 01/13/2016

```
14:12  1        A.    They are old.  I would say the dates
14:12  2   probably correspond closely to the dates on the
14:12  3   cassettes.
14:12  4        Q.    Okay.  On Exhibit 336, do you recognize
14:12  5   that as the -- as a photocopy of the outside and a
14:12  6   slip of paper that was attached to a cassette that
14:12  7   you produced?
14:13  8        A.    Yes.
14:13  9        Q.    And is there any writing either on --
14:13 10   first of all, on Exhibit 336 that is yours?
14:13 11        A.    Can I examine the actual cassette?
14:13 12        Q.    Yes.  And I'm trying to treat the spine
14:13 13   separately.
14:13 14        A.    Boy, it's close to mine, but it looks a
14:13 15   little different.  I can't really confirm if that's
14:13 16   me or not.
14:13 17        Q.    Okay.  Do you know when you got --
14:13 18   where -- I'm sorry.
14:13 19             Do you know how you received the cassette
14:13 20   that is the photocopy of which is marked as
14:13 21   Exhibit 336?
14:13 22        A.    Again, no, I don't.
14:13 23        Q.    Okay.  Do you know what it is a recording
14:13 24   of?
14:13 25        A.    The Fillmore performance.  May 16, 1970.
```

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 14:13 | 1 | Both sides. |
| 14:14 | 2 | We must have been headlining because there |
| 14:14 | 3 | are several songs on this show. |
| 14:14 | 4 | Q. You know if the songs that are listed |
| 14:14 | 5 | starting with "Sweet Stella" on one side and "Dark |
| 14:14 | 6 | Eyed" on the other -- "Dark Eyed Woman" on the other |
| 14:14 | 7 | side are songs that were actually performed by |
| 14:14 | 8 | Spirit on that occasion? |
| 14:14 | 9 | A. I have no reason to not think that we |
| 14:14 | 10 | performed all these songs. |
| 14:14 | 11 | Q. And it's correct that "Taurus" isn't |
| 14:14 | 12 | listed? |
| 14:14 | 13 | A. Once again, "Taurus" is not listed. |
| 14:14 | 14 | Q. So is it correct you didn't perform |
| 14:14 | 15 | "Taurus" at the Fillmore West in -- |
| 14:14 | 16 | A. Judging by this, it is likely we did not |
| 14:14 | 17 | perform it. |
| 14:14 | 18 | Q. Okay. And who wrote the handwritten |
| 14:14 | 19 | note -- first of all, can you read the handwritten |
| 14:14 | 20 | note? |
| 14:14 | 21 | A. Barely. It was not me this time. |
| 14:14 | 22 | "Audience tape," and then -- this |
| 14:14 | 23 | photocopy is not -- "Audience tape - have board tape |
| 14:15 | 24 | already." |
| 14:15 | 25 | So whoever provided this made a tape at |

JAY A. FERGUSON - 01/13/2016

14:20  1        Q.    Actually, you can have that -- the actual,

14:20  2    physical album in front of you, but my question is

14:20  3    going to about the liner notes.

14:20  4              So let me also have the court reporter

14:20  5    mark as Exhibit 339 a copy of the cover and portions

14:20  6    of the insert.

14:20  7              (Deposition Exhibit 339 was marked for

14:20  8              identification and is attached hereto.)

14:20  9    BY MR. ANDERSON:

14:20 10        Q.    Do you recognize Exhibit 339 as the cover

14:20 11    and insert of the "Time Circle" album?

14:20 12        A.    Yes.

14:20 13        Q.    What is the "Time Circle" album?

14:20 14        A.    It was a re-issue of -- it was on

14:20 15    Columbia, under their sub label Epic, of our catalog

14:20 16    in one place, at one time.  And they included a very

14:20 17    nice booklet.  It was a nice project.

14:20 18        Q.    Did you participate at all in the creation

14:21 19    of the booklet?

14:21 20        A.    I don't believe so.  I -- no, this was all

14:21 21    done in-house there.

14:21 22        Q.    Do you know - I forget his first name -

14:21 23    Mr. Ruhlmann?  Do you know who he is?

14:21 24        A.    No.

14:21 25        Q.    Were you interviewed for the -- in

JAY A. FERGUSON - 01/13/2016

```
14:25  1              Yeah, I do remember this now.  I remember
14:25  2    feeling, "Well, that's one side of the story."
14:25  3         Q.   So is it your testimony that Randy
14:25  4    California and Mr. Cassidy participated in the
14:25  5    creation of the liner notes and you did not?
14:25  6         A.   Yes.  And, as I recall, that was the case.
14:25  7         Q.   If you look at Page -- the page that has
14:25  8    the bold numbers in the lower right-hand corner
14:25  9    beginning with D and ending with 142.
14:26 10         A.   Got it.
14:26 11         Q.   If you look in the third column --
14:26 12              MR. MALOFIY:  Which page?  I'm sorry.
14:26 13              MR. ANDERSON:  142.
14:26 14    BY MR. ANDERSON:
14:26 15         Q.   -- it states as follows:
14:26 16              "In fact, California's sole
14:26 17              contribution to the first Spirit album
14:26 18              was an instrumental called 'Taurus,' a
14:26 19              song that would have distinct influence
14:26 20              on a band formed the following year in
14:26 21              England, as a comparison of its opening
14:26 22              with the opening of the Led Zeppelin
14:26 23              'Stairway to Heaven,' recorded over
14:26 24              three years later will attest.  'When
14:26 25              we did our first tour of Europe, in
```

14:37  1        A.   Only one time.

14:37  2        Q.   And when was that?

14:37  3        A.   It was a song called "Dark Eyed Woman."

14:38  4             We -- go ahead.

14:38  5        Q.   No.  Go ahead.

14:38  6        A.   We both were pretty much solitary writers.

14:38  7   We did not go back and forth and co-write.

14:38  8        Q.   Did you ever discuss with Randy California

14:38  9   what his musical influences were?

14:38 10        A.   No.  I mean, Randy wouldn't be the one to

14:38 11   verbalize specifically.  But he was a sponge, so,

14:38 12   you know, he just -- he learned from everybody.  He

14:38 13   learned from, obviously, Jimi Hendrix, all the blues

14:38 14   and folk masters.

14:38 15        Q.   Were you present when "Taurus" was

14:38 16   recorded for Spirit's first album?

14:38 17        A.   I'm sure I was.

14:38 18        Q.   Do you recall that, or are you just

14:38 19   assuming that to be the case?

14:38 20        A.   I know that the first album, we were all

14:38 21   present for the recordings.  Later albums, we would

14:38 22   sometimes come and go.

14:38 23        Q.   Was "Taurus" recorded, for the first

14:38 24   Spirit album, after Spirit signed a recording

14:38 25   contract?

JAY A. FERGUSON - 01/13/2016

| | | |
|---|---|---|
| 14:38 | 1 | A.   I believe everything would be, yes. |
| 14:38 | 2 | Q.   And do you recall anyone else was -- who |
| 14:38 | 3 | was present besides Mr. California and you, when |
| 14:38 | 4 | "Taurus" was recorded? |
| 14:39 | 5 | A.   Members of the band, Lou Adler, and the |
| 14:39 | 6 | recording engineer, who was probably listed. |
| 14:39 | 7 | Q.   And then Marty Paich, I believe? |
| 14:39 | 8 | A.   Right. |
| 14:39 | 9 | Q.   He was brought in afterwards? |
| 14:39 | 10 | A.   He was brought in after the fact and added |
| 14:39 | 11 | the arrangements. |
| 14:39 | 12 | Q.   Okay.  Do you have an understanding of |
| 14:39 | 13 | what instruments were used to generate the sounds |
| 14:39 | 14 | that appear at the beginning of "Taurus" as |
| 14:39 | 15 | released? |
| 14:39 | 16 | A.   It sounds to me like a string ensemble, a |
| 14:39 | 17 | few woodwinds, and a prominent flute. |
| 14:39 | 18 | Q.   Did -- did Spirit ever tour or perform |
| 14:39 | 19 | live with a string ensemble, woodwinds, or a flute? |
| 14:39 | 20 | A.   No. |
| 14:39 | 21 | Q.   So if Spirit performed "Taurus" live after |
| 14:39 | 22 | the release of the album, it wouldn't have the music |
| 14:39 | 23 | that people hear when they play "Taurus" on the |
| 14:39 | 24 | album, correct? |
| 14:40 | 25 | A.   No.  It would be different.  I mean, the |

JAY A. FERGUSON - 01/13/2016

14:40 1   actual guitar part is identical, but all the other

14:40 2   instruments were not there.

14:40 3        Q.   Prior to the completion and recording of

14:40 4   "Taurus" for the first Spirit album, did you ever

14:40 5   hear any earlier versions of "Taurus"?

14:40 6        A.   Probably in rehearsal.  Possibly in

14:40 7   performance.  Because everything on first album had

14:40 8   pretty much been performed live and worked through.

14:40 9        Q.   What do you mean by "worked through"?

14:40 10       A.   Someone would bring a song in, we work on

14:40 11  parts.  It would change.  It would evolve.  It would

14:40 12  finally reach its form, and then, at the end of the

14:40 13  day, maybe it will get on the next record.

14:40 14       Q.   So if I understand correctly, the

14:40 15  compositions were works-in-progress that sometimes a

14:40 16  version of the work-in-progress would be

14:40 17  performed --

14:40 18       A.   Oh, yeah.

14:40 19       Q.   -- live?

14:40 20       A.   Yeah, that was part -- that was kind of

14:40 21  the crucible in which these songs were fully

14:40 22  developed.

14:41 23       Q.   Other than what you have produced, do you

14:41 24  have any live recordings of "Taurus"?

14:41 25       A.   Everything that I have is here.

EXHIBIT 8

JAY A. FERGUSON - 01/13/2016

16:12  1        Q.   Okay.   I have what we'll mark as 347.

16:13  2   I'll represent that it is dated August 29th, 1967.

16:13  3   And it is the recording contract with Ode Records.

16:13  4            Please let the record reflect I'm handing

16:13  5   it to be marked.

16:13  6            (Deposition Exhibit 347 was marked for

16:13  7            identification and is attached hereto.)

16:13  8   BY MR. MALOFIY:

16:13  9        Q.   If we look at this contract marked as 347,

16:13 10   do you recall this contract?

16:13 11        A.   Yes.

16:14 12        Q.   And if we look at this contract, it says

16:14 13   August 29th, 1967, correct?

16:14 14        A.   Uh-huh.

16:14 15        Q.   And is that your understanding of when you

16:14 16   entered into this contract?

16:14 17            MR. ANDERSON:   Objection.   Leading.

16:14 18            THE WITNESS:   I have no reason to doubt

16:14 19   it.   I don't have a specific date in mind when I

16:14 20   remember entering the contract.

16:14 21   BY MR. MALOFIY:

16:14 22        Q.   Let me ask you this:   In -- in

16:14 23   August 29th, 1967, how old were you?

16:14 24        A.   19.

16:14 25        Q.   Under 21, correct?

JAY A. FERGUSON - 01/13/2016

16:18 1    Q.   What about -- which members of the band
16:18 2    felt they were taken advantage of?
16:18 3    A.   The band, if you had to look for any kind
16:18 4    of split in opinion, it would have been Mark Andes
16:18 5    and myself on one side, Ed Cassidy and Randy on the
16:18 6    other, and John Locke somewhere in the middle.  John
16:18 7    was often the peacemaker.
16:18 8    Q.   Would you -- is it accurate to say that,
16:18 9    from what you know, being in the band, that Randy
16:19 10   California felt that he was being taken advantage of
16:19 11   by Lou Adler, in his business dealings with Lou?
16:19 12         MR. ANDERSON:  Objection.  Lacks
16:19 13   foundation.
16:19 14         THE WITNESS:  That is the impression that
16:19 15   I got.
16:19 16   BY MR. MALOFIY:
16:19 17   Q.   Did you understand there to be a demo of
16:19 18   "Taurus" that was recorded prior to actual final
16:19 19   recording was done with Lou Adler?
16:19 20   A.   I do not recall anything like that.
16:19 21   Q.   Do you remember an individual by the name
16:19 22   of Barry Hansen?
16:19 23   A.   Oh.  Absolutely.
16:19 24   Q.   Okay.  And what was his involvement with
16:19 25   the band?

JAY A. FERGUSON - 01/13/2016

16:38 1          Is there anything else besides your --

16:38 2     your recollection of Peter Grant at that show,

16:38 3     making a show of who was playing and in what order?

16:38 4     Do you have any other recollection from that show,

16:38 5     whether it being an actual performance,

16:38 6     communications with the band, interaction with the

16:38 7     band or the roadies and associates?

16:38 8          MR. ANDERSON:  Objection.

16:38 9     Mischaracterizes the testimony.  Lacks foundation.

16:38 10    Vague and ambiguous.  And compound.

16:38 11         THE WITNESS:  No.  And part of that was --

16:38 12    and this is not just Led Zeppelin, but the English

16:38 13    bands tended to keep to themselves.  There was not a

16:38 14    lot of fratern- -- fraternization at that show

16:38 15    between us and them.

16:38 16    BY MR. MALOFIY:

16:38 17         Q.   Okay.  All right.  I have a transcription

16:39 18    of a phone call between me and Dave Waterbury.

16:39 19         Do you know who Dave Waterbury is?

16:39 20         A.   No.

16:39 21         Q.   Did -- do you have any understanding that

16:39 22    Dave Waterbury was a bass player with Spirit in some

16:39 23    later years?

16:39 24         A.   Oh.

16:39 25         MR. ANDERSON:  Objection.  Leading.

JAY A. FERGUSON - 01/13/2016

17:37    1    disseminated.

17:37    2              MR. MALOFIY:   Thank you for pointing that

17:37    3    out.

17:37    4              THE WITNESS:   Thank you.

17:37    5

17:37    6              FURTHER EXAMINATION

17:37    7    BY MR. ANDERSON:

17:37    8         Q.   Let's talk just a little bit about

17:37    9    Atlanta, the pop festival in Atlanta Pop.

17:37   10              So I understood your testimony earlier

17:37   11    today, your recollection is that Spirit performed

17:37   12    after Janis Joplin performed and before Led Zeppelin

17:37   13    performed, correct?

17:37   14         A.   That's my recollection, yes.

17:37   15         Q.   And as I understood your testimony today,

17:37   16    you decided to watch some of Led Zeppelin's -- some

17:37   17    or all of Led Zeppelin's performance from behind one

17:37   18    of the amplifiers?

17:37   19         A.   Correct.

17:37   20         Q.   Okay.  Was there any point in time --

17:37   21    well, let me put it differently.

17:38   22              When Spirit was leaving the stage, was Led

17:38   23    Zeppelin's members on the stage?

17:38   24         A.   I don't think we were on the stage at the

17:38   25    same moment.  No.

JAY A. FERGUSON - 01/13/2016

17:38  1        Q.   That's what I am asking.

17:38  2             So it's not correct that -- okay.  Well,

17:38  3   thank you for clarifying that.

17:38  4        A.   I -- I can give you a better answer.

17:38  5             The order of things is that the roadies

17:38  6   come out and change the gear before the band shows

17:38  7   up, so there is a gap.

17:38  8        Q.   Okay.  And so there wouldn't have been any

17:38  9   occasion when both the members of Led Zeppelin and

17:38 10   the members of Spirit were on the stage except for

17:38 11   when you were behind the amplifiers listening?

17:38 12        A.   Right.

17:38 13        Q.   Okay.  Did you ever -- after you attained

17:38 14   21 years old, did you ever disaffirm the recording

17:38 15   contract that you entered into with Ode Records?

17:38 16        A.   No.

17:38 17        Q.   Did you -- after you obtained the age of

17:38 18   21, did you ever disaffirm the publishing agreement

17:39 19   or songwriter's agreement that you entered into with

17:39 20   Hollenback?

17:39 21        A.   No.

17:39 22        Q.   Do you have any information that Randy

17:39 23   California, when he obtained the age of 21, ever

17:39 24   disaffirmed either of the -- the recording contract

17:39 25   with Ode Records or his songwriter agreement with

JAY A. FERGUSON - 01/13/2016

17:53  1          MR. MALOFIY:  Okay.

17:53  2          MR. ANDERSON:  Okay.  And move to strike

17:53  3   to the extent --

17:53  4          THE WITNESS:  Sorry.

17:53  5          MR. ANDERSON:  -- it's speculation.

17:53  6          MR. MALOFIY:  Objection to move to strike.

17:53  7

17:53  8                    FURTHER EXAMINATION

17:53  9   BY MR. ANDERSON:

17:53 10      Q.   The gear, what do you mean by getting

17:53 11   their gear or moving gear?

17:53 12      A.   Every band has their amplifiers, their

17:53 13   guitars, their drums, and the mics are placed

17:54 14   specifically for their setup.  And it's not as if

17:54 15   you just walk off and someone plugs into your amp

17:54 16   and your mic.

17:54 17          Your road crew comes on and re-arranges

17:54 18   the stage, takes -- your road crew, as you exit,

17:54 19   removes your gear.  The on-coming band's road crew,

17:54 20   at the same time - and these overlap - is bringing

17:54 21   on the gear for the next band.

17:54 22      Q.   Okay.  So, for example, let's assume for

17:54 23   this hypothetical that Led Zeppelin is performing

17:54 24   before Spirit in Denver.

17:54 25      A.   Uh-huh.

17:54  1        Q.    And it would be the case that Mr. Cassidy

17:54  2   would not play the drums on the drums that

17:54  3   Mr. Bonham was playing the drums on?

17:54  4        A.    No.

17:54  5        Q.    And he would not be playing with the

17:54  6   cymbals that Mr. Bonham was using?

17:54  7        A.    No.

17:54  8        Q.    And so someone would come on, the road

17:54  9   crew would come on, and they would have to dismantle

17:54 10   the cymbals; they would have to discount the

17:54 11   amplifiers; they would have to take off the guitars.

17:55 12   The microphones would be placed in different places

17:55 13   or whatever.  And they would move all of that out.

17:55 14            And then another -- and another road crew,

17:55 15   perhaps simultaneously, perhaps afterwards, would be

17:55 16   putting on the next band's gear?

17:55 17            MR. MALOFIY:  Objection.  Compound.

17:55 18   BY MR. ANDERSON:

17:55 19        Q.    Is that correct?

17:55 20        A.    Exactly.

17:55 21            MR. MALOFIY:  Ambiguous.

17:55 22   BY MR. ANDERSON:

17:55 23        Q.    Okay.  And all of that, that -- do you

17:55 24   have an estimate, from your experience, how long

17:55 25   that takes?  Are we talking --

17:55   1           A.   It varied.  And I know back in the early

17:55   2   shows, especially in the festivals, because there

17:55   3   were so many bands, there would be a rush to move

17:55   4   things on and off.

17:55   5           In -- you know, in a standard concert,

17:55   6   there would be more time.  And nowadays, you go to a

17:55   7   show, and you wait 45 minutes between acts.

17:55   8           So, yeah, it was done fairly fast back

17:55   9   then.

17:55  10       Q.   Are we talking ten to 15 minutes?

17:55  11       A.   I would say 15 to 20.

17:55  12       Q.   15 to 20 minutes.

17:55  13           And at that point, in that 15 to

17:55  14   20 minutes, the performers would not be on the

17:56  15   stage; it would be just the road crew?

17:56  16       A.   No.  They might be off stage.  They may be

17:56  17   waiting to come on stage.  But they would not be on

17:56  18   stage.

17:56  19       Q.   Okay.  And they could be in a dressing

17:56  20   room.  They could be in a trailer?  If it was pop

17:56  21   festival, they --

17:56  22       A.   Uh-huh.

17:56  23           MR. MALOFIY:  Objection.

17:56  24   BY MR. ANDERSON:

17:56  25       Q.   They could be outside in the alley smoking

JAY A. FERGUSON - 01/13/2016

17:56  1    a cigarette?

17:56  2         A.    Yeah.   Their road manager would be

17:56  3    corralling their cats and getting ready to get on

17:56  4    stage.   But in that period between bands, they could

17:56  5    start in a dressing room and work towards the stage

17:56  6    or already be there.

17:56  7              MR. ANDERSON:   Okay.   Two things.   One,

17:56  8    actually, is directed to Mr. Malofiy.

17:56  9              The witness has produced in response to

17:56 10    the subpoena, I believe, nine audio tapes that he --

17:56 11    and a score of documents that he says he received

17:56 12    from Mr. Pates, none of which Mr. Pates produced in

17:56 13    response to the subpoena, which, actually,

17:56 14    technically, is a contempt of court.

17:56 15              I have Mr. Pates's deposition on Tuesday.

17:56 16    It is imperative that by tomorrow you produce

17:56 17    everything to me that was within the subpoena from

17:57 18    Mr. Pates.   Otherwise, I intend to call the clerk --

17:57 19    excuse me, the clerk for the magistrate judge and

17:57 20    explain to the judge the situation.   And I really

17:57 21    don't want to do that.

17:57 22              MR. MALOFIY:   Yeah, I understand the

17:57 23    requirement.

17:57 24              MR. ANDERSON:   Okay.   So --

17:57 25              MR. MALOFIY:   I provided everything to

| PAGE | LINE | TEXT | REASON |
|------|------|------|--------|
| 24 | 16 | ...COMPOSITION 'IN' TO 'AND' | ACCURACY |
| 28 | 17 | GO ON FOR 'FOUR' YEARS | " |
| 56 | 20 | ...END 'FROM' 'WHERE I SAW | " |
| 63 | 15 | ...THAT 'THEY' HAD PROVIDED | " |
| 66 | 12 | MANSLICK TO 'MANCE LIPSCOMB' | " |
| 74 | 19 | IT WAS 'A' TRUE... | " |
| 94 | 12 | 'FAIRLY' CERTAIN | " |
| 97 | 22 | 'TO THE BEST OF MY KNOWLEDGE' | " |
| 127 | 5 | INSERT: 'AS FAR AS THE ORIGINAL BAND' AT TOP OF LINE | " |
| 134 | 1 | 'MOST PROBABLY' BRUCE PATES | " |
| 138 | 2 | CHANGE 'CORE' TO 'CHORD' | " |
| 144 | 9 | CHANGE 'TIME' TO 'TEMPO' | " |
| 152 | 6 | CHANGE TO 'I'M ALMOST CERTAIN' | " |
| 171 | 13 | SHOULD READ 'NO' | " |
| 171 | 15 | " | " |
| 255 | 3 | 'BIONIZED' CHANGE TO 'LIONIZED' | " |
| 259 | 3 | 'DRUGGED' CHANGE TO 'DRAGGED' | " |
| 287 | 21 | 'SATISFACTION' SHOULD BE ITALICIZED | " |
| 305 | 17 | 'SOMEWHERE' IN THE RANGE' | " |
| 325 | 19 | 'BAT' CHANGE TO 'BAR' | " |

WITNESS SIGNATURE                                    DATE

**EXHIBIT 8**
**85**

1    STATE OF CALIFORNIA              )

2    COUNTY OF LOS ANGELES            )    ss.

3

4         I, Dayna Hester, C.S.R. No. 9970, in

5    and for the State of California, do hereby certify:

6         That prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but the

9    truth;

10        That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction, and

13   the same is a true, correct, and complete transcript of

14   said proceedings;

15        That if the foregoing pertains to the original

16   transcript of a deposition in a Federal Case, before

17   completion of the proceedings, review of the transcript

18   (√) was ( ) was not required.

19        I further certify that I am not interested in the

20   event of the action.

21        Witness my hand this 26th day of _January_

22   20 16.

23        _____

24            Certified Shorthand Reporter

25            for the State of California

EXHIBIT 8
86

# EXHIBIT 9

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


MICHAEL SKIDMORE, ETC.,          )
                                 )
            PLAINTIFFS,          )   CASE NO.
                                 )
        VS.                      )   2:15-CV-03462 RGK (AGRx)
                                 )
LED ZEPPELIN, ET AL.,            )
                                 )
            DEFENDANTS.          )
                                 )
_____  )


VIDEOTAPED DEPOSITION OF MARK CHRISTOPHER ANDES

FRIDAY, JANUARY 15, 2016


JOB NO. 69364

REPORTED BY:  DAYNA HESTER, C.S.R. 9970

MARK CHRISTOPHER ANDES - 01/15/2016

1    today.

2              MARK CHRISTOPHER ANDES,

3              having been first duly sworn, was

4              examined and testified as follows:

5

6                    EXAMINATION

7    BY MR. ANDERSON:

10:08  8         Q.   Mr. Andes, could you please state and

10:08  9    spell your full name.

10:08 10         A.   Mark Christopher Andes; M-a-r-k,

10:08 11    C-h-r-i-s-t-o-p-h-e-r, A-n-d-e-s.

10:08 12         Q.   Thank you, sir.

10:08 13         A.   Yes, sir.

10:08 14         Q.   And, again, my name is Peter Anderson, and

10:08 15    I represent the defendants in this action.

10:08 16              Have you ever had your deposition taken

10:08 17    before?

10:08 18         A.   I believe so, but it's a been a long time.

10:08 19    I'm not sure what it was in regard to.  But I've

10:08 20    had -- I've been deposed before at some point.

10:08 21         Q.   How long ago was it?

10:08 22         A.   It's got to be, maybe, 20 years.

10:08 23         Q.   Okay.  Let me just go over the procedure

10:08 24    we're going to follow today.

10:08 25              The woman to your left is a certified

MARK CHRISTOPHER ANDES - 01/15/2016

10:10 1  have you taken any medications that would impair

10:10 2  your ability to testify truthfully today or to

10:11 3  recall events from the past?

10:11 4       A.   No.

10:11 5       Q.   Is there any reason we shouldn't proceed?

10:11 6       A.   No.

10:11 7       Q.   And I understand Mr. Malofiy is

10:11 8  representing you today?

10:11 9       A.   Correct.

10:11 10      Q.   Has he represented you in other matters?

10:11 11      A.   Yes.

10:11 12      Q.   And what other matters has he represented

10:11 13  you in?

10:11 14      A.   It was the Rock and Roll Hall of Fame

10:11 15  that -- when Heart was inducted.

10:11 16      Q.   Is that an ongoing piece of litigation?

10:11 17      A.   I'm not sure.  I think it was resolved,

10:11 18  but I'm not positive about that.

10:11 19      Q.   Okay.  And did Mr. Malofiy represent you

10:11 20  in that litigation before the lawsuit over "Stairway

10:11 21  to Heaven" was filed?

10:11 22      A.   Yes.

10:11 23      Q.   How long before?

10:11 24      A.   I'm not sure.

10:11 25      Q.   Okay.  Do you have any recollection --

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 10:17 | 1 | A.   No. |
| 10:17 | 2 | Q.   Did you -- after speaking with Mr. Adler |
| 10:17 | 3 | on that occasion, did you check with the website? |
| 10:17 | 4 | A.   No. |
| 10:17 | 5 | Q.   Who else was present during the portion of |
| 10:17 | 6 | the conversation where "Stairway to Heaven" was |
| 10:17 | 7 | mentioned? |
| 10:17 | 8 | A.   I -- I think Howard. |
| 10:17 | 9 | Q.   Anyone else? |
| 10:17 | 10 | A.   No. |
| 10:17 | 11 | Q.   Other than that conversation that you just |
| 10:17 | 12 | described, have you had any conversations with Lou |
| 10:17 | 13 | Adler regarding "Stairway to Heaven"? |
| 10:17 | 14 | A.   No. |
| 10:17 | 15 | Q.   Other than what you've just described, |
| 10:17 | 16 | have you had any conversations with anyone |
| 10:17 | 17 | associated with Hollenbeck Music regarding "Stairway |
| 10:17 | 18 | to Heaven"? |
| 10:17 | 19 | A.   No. |
| 10:17 | 20 | Q.   Have you had any conversation -- let me |
| 10:17 | 21 | start again. |
| 10:17 | 22 | What is Ode Records? |
| 10:17 | 23 | A.   Ode Records was the record label owned by |
| 10:17 | 24 | Lou that signed Spirit to a recording contract. |
| 10:18 | 25 | Q.   Other than the conversation you've just |

MARK CHRISTOPHER ANDES - 01/15/2016

10:43  1        A.   I'm here.

10:43  2              MR. ANDERSON:  Here.  Counsel, may I

10:43  3   direct the witness --

10:43  4              MR. MALOFIY:  Yeah, sure.

10:43  5              MR. ANDERSON:  -- or do you want to

10:43  6   direct?

10:43  7              MR. MALOFIY:  Absolutely.

10:43  8   BY MR. ANDERSON:

10:43  9        Q.   Right there.  You just past it, sir.

10:43 10   "Category No. 1."

10:43 11        A.   Yeah, okay.

10:43 12        Q.   Did you search for any copies of set lists

10:44 13   that you might have of performances by Spirit?

10:44 14        A.   No.  I -- no.

10:44 15        Q.   And is there a reason why you didn't

10:44 16   search for them?

10:44 17        A.   I don't have that stuff.  I don't really

10:44 18   collect it.  I don't...

10:44 19        Q.   Did you search for any other documents

10:44 20   that identified the songs that Spirit performed in

10:44 21   concerts prior to 1972?

10:44 22        A.   You know, I -- no, I did not.

10:44 23              MR. MALOFIY:  Just to be clear, "no" --

10:44 24   "no," you didn't search for it?  Or "no," you don't

10:44 25   have it?  Or -- just to be clear, for the record.

MARK CHRISTOPHER ANDES - 01/15/2016

10:44  1           MR. ANDERSON:  I asked that question

10:44  2   but...

10:44  3           THE WITNESS:  I did -- I did --

10:44  4           MR. ANDERSON:  He's testified he didn't

10:44  5   search for it.

10:44  6   BY MR. ANDERSON:

10:44  7       Q.   Correct, sir?

10:44  8       A.   I -- I -- I actually did not search for

10:44  9   that particular item, you know...

10:44 10           I mean, I -- I looked through the stuff,

10:44 11   and I -- that I have, and it was very minimal

10:44 12   really.

10:44 13       Q.   If I understand your testimony, and you

10:44 14   can correct me if you're wrong -- if I'm wrong, but

10:45 15   you're telling me you don't have copies of set

10:45 16   lists; is that right?

10:45 17       A.   Correct.

10:45 18       Q.   Okay.  And Category No. 1 is broader and

10:45 19   refers to any document that identifies the songs

10:45 20   that Spirit had performed at any particular concert.

10:45 21           And my question is:  Do you know whether

10:45 22   you have any documents that identify the songs that

10:45 23   Spirit played at concerts prior to 1972?

10:45 24       A.   I don't -- I really don't know if I have

10:45 25   any of that stuff.

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 10:52 1 | | got them from Bruce Pates. |
| 10:52 2 | A. | Right. |
| 10:52 3 | Q. | Okay.  When did you provide them to |
| 10:52 4 | Mr. Malofiy? | |
| 10:52 5 | A. | I'm not sure. |
| 10:52 6 | Q. | Was it before the lawsuit was filed? |
| 10:52 7 | A. | No. |
| 10:52 8 | Q. | Was it before December of this last year? |
| 10:52 9 | A. | I don't recall. |
| 10:52 10 | Q. | Okay.  When were you born? |
| 10:52 11 | A. | 1948. |
| 10:52 12 | Q. | Where? |
| 10:52 13 | A. | Philadelphia, Pennsylvania. |
| 10:52 14 | Q. | Did you go to high school? |
| 10:52 15 | A. | Yes, sir. |
| 10:52 16 | Q. | Did you graduate? |
| 10:52 17 | A. | Yes, sir. |
| 10:52 18 | Q. | When? |
| 10:52 19 | A. | 1965. |
| 10:52 20 | Q. | Did you go to college? |
| 10:52 21 | A. | Yes. |
| 10:52 22 | Q. | Where did you go? |
| 10:52 23 | A. | Pierce Junior College. |
| 10:52 24 | Q. | And did you graduate from Pierce? |
| 10:52 25 | A. | No. |

MARK CHRISTOPHER ANDES - 01/15/2016

| 10:52 | 1 | Q. When were you at Pierce? |
| 10:52 | 2 | A. 1966 for a semester is all I was there. |
| 10:52 | 3 | Q. Did you have a major? |
| 10:52 | 4 | A. It was -- yes. Animal husbandry. |
| 10:53 | 5 | Q. After the semester at Pierce, have you had |
| 10:53 | 6 | any formal education? |
| 10:53 | 7 | A. No, sir. |
| 10:53 | 8 | Q. What do you do for a living? |
| 10:53 | 9 | A. I'm a musician. |
| 10:53 | 10 | Q. And when did you become a professional |
| 10:53 | 11 | musician? |
| 10:53 | 12 | A. 1966. |
| 10:53 | 13 | Q. Do you have any formal training in music? |
| 10:53 | 14 | A. No. |
| 10:53 | 15 | Q. Do you have any -- |
| 10:53 | 16 | A. Piano -- actually, piano lessons when I |
| 10:53 | 17 | was in grade school, but that's -- but that's it. |
| 10:53 | 18 | Q. Do you play piano? |
| 10:53 | 19 | A. No. |
| 10:53 | 20 | Q. Like most people who had them in grade |
| 10:53 | 21 | school? |
| 10:53 | 22 | MR. KULIK: Including some of us sitting |
| 10:53 | 23 | at the table. |
| 10:53 | 24 | THE WITNESS: Yeah. |
| 10:53 | 25 | /// |

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 10:53 | 1 | BY MR. ANDERSON: |
| 10:53 | 2 | Q.   Do you play any instruments as a |
| 10:54 | 3 | professional musician? |
| 10:54 | 4 | A.   I do. |
| 10:54 | 5 | Q.   What instruments? |
| 10:54 | 6 | A.   The bass guitar and guitar. |
| 10:54 | 7 | Q.   And when did you learn how to play the |
| 10:54 | 8 | bass guitar? |
| 10:54 | 9 | A.   In high school. |
| 10:54 | 10 | Q.   Did you take classes, or you learned out |
| 10:54 | 11 | of school? |
| 10:54 | 12 | A.   Just learned.  Self taught. |
| 10:54 | 13 | Q.   Okay.  And when did you learn how to play |
| 10:54 | 14 | the guitar? |
| 10:54 | 15 | A.   Actually, before -- it was junior high |
| 10:54 | 16 | school when we were, like -- maybe I was 12, 11 or |
| 10:54 | 17 | 12 years old, and we were starting to figure out how |
| 10:54 | 18 | to play the guitar, my brother and I. |
| 10:54 | 19 | Q.   Did you start with the guitar and then |
| 10:54 | 20 | moved on to a bass guitar? |
| 10:54 | 21 | A.   Yes, sir. |
| 10:54 | 22 | Q.   Are you proficient in both instruments |
| 10:54 | 23 | today? |
| 10:54 | 24 | A.   Yes. |
| 10:54 | 25 | Q.   Any other instruments that you're |

MARK CHRISTOPHER ANDES - 01/15/2016

10:54  1    proficient in?

10:54  2         A.   No.

10:54  3         Q.   Can you read sheet music?

10:54  4         A.   No.

10:54  5         Q.   Can you transcribe sheet music?

10:54  6         A.   No.  To differentiate between chord

10:55  7    sharps, I can -- that is within my wheelhouse.  But

10:55  8    to actually transcribe sight reading notes and stuff

10:55  9    is not.  I don't have that skill.

10:55 10         Q.   Okay.  Do you have relative pitch?

10:55 11    Perfect pitch?  Neither?

10:55 12         A.   Maybe neither.  I -- maybe relative, but

10:55 13    definitely not perfect pitch.

10:55 14         Q.   And are you a founding member of the band

10:55 15    Spirit?

10:55 16         A.   Yes.

10:55 17         Q.   When was Spirit formed?

10:55 18         A.   Well, there were several -- there was a

10:55 19    couple of incarnations.  We -- The Red Roosters

10:55 20    was -- was basically the -- the beginnings of

10:55 21    Spirit.  But we did not take the name "Spirit" until

10:55 22    after Randy came back from New York.  So, I would

10:55 23    say, in 1966, Spirit would be formed.

10:56 24         Q.   And who were the initial members of

10:56 25    Spirit?

MARK CHRISTOPHER ANDES - 01/15/2016

10:56  1         A.    Randy Wolfe, John Locke, Ed Cassidy, Jay

10:56  2   Ferguson, and myself.

10:56  3         Q.    And Randy Wolfe and Randy California are

10:56  4   the same person?

10:56  5         A.    Same person.

10:56  6         Q.    What was your role in the band?  What --

10:56  7   you played bass guitar?

10:56  8         A.    Bass.  And we co-wrote songs.  We all

10:56  9   participated in the song writing stuff.  Although,

10:56 10   Randy and Jay were the dominant guys.  But everybody

10:56 11   contributed to the writing.

10:56 12         Q.    Besides being a contributor to writing,

10:56 13   what did Randy Wolfe do?  What was his role in the

10:56 14   band?

10:56 15         A.    He was the lead guitarist and lead -- one

10:56 16   of the two lead singers.

10:56 17         Q.    And what was Mr. Ferguson's role?

10:56 18         A.    A percussionist.  He was a songwriter,

10:56 19   percussionist, lead singer.

10:56 20         Q.    What was Mr. Cassidy's role?

10:57 21         A.    Drummer.

10:57 22         Q.    And what was Mr. Locke's role?

10:57 23         A.    Piano player and writer.

10:57 24         Q.    I believe you testified that you and

10:57 25   Mr. Ferguson left Spirit in 1972?

MARK CHRISTOPHER ANDES - 01/15/2016

10:57   1        A.   Correct.

10:57   2        Q.   Why did you leave?

10:57   3        A.   The dynamic.  This inner band dynamic was

10:57   4   going through some changes.  And Randy had injured

10:57   5   himself, and his behavior became erratic.  And Jay

10:57   6   and I decided to have more control over our destiny,

10:57   7   so we formed another band.

10:57   8        Q.   And that was Jo Jo Gunne?

10:57   9        A.   Correct.

10:57  10        Q.   And how long did you and Mr. Ferguson

10:57  11   perform with Jo Jo Gunne?

10:57  12        A.   It was -- we put the -- the band together.

10:57  13   It took quite a while to -- to actually get the band

10:57  14   go- -- put together.  But I was only involved from

10:57  15   the first record.  I got fired from my own band on

10:57  16   the first tour.  So that was pretty devastating.

10:58  17        Q.   Why did you get fired?

10:58  18        A.   I really don't know.  I think they did --

10:58  19   they didn't like my -- my girlfriend, actually.  So

10:58  20   very -- very spinal tap --

10:58  21        Q.   So, it was a very --

10:58  22        A.   -- Peter.

10:58  23        Q.   -- Beatles Yoko Ono kind of thing?

10:58  24        A.   I guess.  But Mo was -- my wife, Maurine,

10:58  25   was, I don't -- she wasn't even that involved.  It

MARK CHRISTOPHER ANDES - 01/15/2016

11:05 1    The first -- my memory of the first Spirit recording

11:05 2    was -- it was released in 1967.

11:05 3         Q.   And what was that first recording?

11:05 4         A.   It was self-titled "Spirit."

11:05 5         Q.   Oh.  That was the album?

11:05 6         A.   That was the album, yeah.

11:06 7         Q.   How long were you under contract with Ode

11:06 8    Records?

11:06 9         A.   Until Lou sold it to Epic.  I think we...

11:06 10   yeah.

11:06 11        Q.   Sold the contract to Epic?

11:06 12        A.   Yes.

11:06 13        Q.   And then did Epic distribute Spirit

11:06 14   recordings after that?

11:06 15        A.   That's my understanding.

11:06 16        Q.   Okay.  And the -- if I understood

11:06 17   correctly, the first Spirit album released was

11:06 18   titled "Spirit"?

11:06 19        A.   Yes.

11:06 20        Q.   And do you remember when that was

11:06 21   released?

11:06 22        A.   I think, '67.

11:06 23        Q.   Was there a single off -- do you know what

11:06 24   a single is?

11:06 25        A.   Yes.

MARK CHRISTOPHER ANDES - 01/15/2016

11:06  1      Q.   Okay.  And -- well, first of all, let me

11:06  2   say, I know you know what a single is.

11:06  3      A.   I -- yeah, I understand.

11:06  4      Q.   But I have to ask you questions like this

11:06  5   because a judge or a jury may not understand exactly

11:06  6   what we are talking about.  So -- so, it's not to

11:06  7   belabor points.  It's not to offend you.

11:07  8      A.   I understand.

11:07  9      Q.   Could you, please, tell me what your

11:07 10   understanding of a single is?

11:07 11      A.   A single is a song that's released, and it

11:07 12   doesn't even have to be from a record, or from an --

11:07 13   from an album.  It can be just a single that's

11:07 14   released on its own.  But it's to be played on the

11:07 15   radio and to sell copies, and -- and that's pretty

11:07 16   much what a single is.

11:07 17      Q.   Back in the day - we're talking about 1966

11:07 18   through, let's say, 1972 - is my understanding

11:07 19   correct that singles were in vinyl form on a 45 RPM?

11:07 20      A.   Correct.

11:07 21      Q.   And they had a Side A and a Side B?

11:07 22      A.   Correct.

11:07 23      Q.   And they were typically a track off of an

11:07 24   album?

11:07 25      A.   Yes.

MARK CHRISTOPHER ANDES - 01/15/2016

11:07  1      Q.   And you -- you indicated that singles were

11:08  2   played on the radio.  Was that to increase or

11:08  3   encourage interest in people buying the album?

11:08  4      A.   Yes.  And to -- to sell concert tickets as

11:08  5   well.

11:08  6      Q.   So a single was a way of promoting a new

11:08  7   album?

11:08  8      A.   Correct.

11:08  9      Q.   And also the concert?

11:08 10      A.   Yes, sir.

11:08 11      Q.   And were any singles released from the

11:08 12   first Spirit album?

11:08 13      A.   Yes.  A song that I actually co-wrote with

11:08 14   Jay called "Mechanical World."  That was the first

11:08 15   single.

11:08 16      Q.   Do you recall what the B Side was?

11:08 17      A.   I don't.

11:08 18      Q.   And was "Fresh Garbage" released as a

11:08 19   single?

11:08 20      A.   I don't recall.

11:08 21      Q.   Other than "Mechanical World," were there

11:08 22   any other recordings that appeared in the first

11:08 23   Spirit album that were released as singles?

11:09 24      A.   To be honest, I really don't remember the

11:09 25   playlist of the first -- I could tell you if we had

MARK CHRISTOPHER ANDES - 01/15/2016

11:09 1    a playlist. But I -- they kind of all merge, you

11:09 2    know, but...

11:09 3         Q.   Was "Taurus" ever released as a single?

11:09 4         A.   Not that I am aware of.

11:09 5         Q.   Are you aware of the difference between a

11:09 6    musical composition and a recording of a performance

11:09 7    of a composition?

11:09 8              MR. MALOFIY:  Objection.  Vague and

11:09 9    ambiguous.

11:09 10             You can answer.

11:09 11             THE WITNESS:  Can you repeat that one?

11:09 12   BY MR. ANDERSON:

11:09 13        Q.   Do you have an unders- -- have you ever

11:09 14   heard the phrase "musical composition"?

11:09 15        A.   Correct.  Yes.

11:09 16        Q.   What is musical composition?

11:09 17        A.   It's a piece of music that is written or

11:09 18   performed, you know, by the songwriter for that

11:09 19   sake, you know --

11:09 20        Q.   Okay.

11:09 21        A.   -- just creating of -- of a piece of

11:09 22   music.

11:09 23        Q.   Okay.  What was the next Spirit album

11:09 24   released by Ode Records after the first album titled

11:09 25   "Spirit"?

MARK CHRISTOPHER ANDES - 01/15/2016

| 11:09 | 1 | A.   It was called "The Family That Plays |
| 11:10 | 2 | Together." |
| 11:10 | 3 | Q.   And when was that released? |
| 11:10 | 4 | A.   I think it was in '68. |

11:10  5        Q.   Do you recall how long it took to record

11:10  6    the songs that appear on the album "The Family That

11:10  7    Plays Together"?

11:10  8        A.   I don't know the exact amount of time.

11:10  9    But it -- it did not take us long to record these

11:10 10    records.

11:10 11        Q.   More than a week?

11:10 12        A.   I would say more than a week.

11:10 13        Q.   More than a month?

11:10 14        A.   I would say maybe a month might be an

11:10 15    accurate --

11:10 16        Q.   Okay.

11:10 17        A.   -- amount of time.

11:10 18        Q.   Was the second album, "The Family That

11:10 19    Plays Together," more or less successful than the

11:10 20    first album "Spirit," commercially?  Commercially --

11:10 21        A.   Commercially, I would say probably it was

11:10 22    more successful.

11:10 23        Q.   Was -- is it correct that "The Family That

11:10 24    Plays Together" was Spirit's first major

11:10 25    breakthrough?

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 11:11 | 1 | MR. MALOFIY:  Objection. |
| 11:11 | 2 | THE WITNESS:  No.  You know, I -- |
| 11:11 | 3 | MR. MALOFIY:  Ambiguous. |
| 11:11 | 4 | BY MR. ANDERSON: |
| 11:11 | 5 | Q.   Were there any singles released from the |
| 11:11 | 6 | album "The Family That Plays Together"? |
| 11:11 | 7 | A.   I'm sure there was.  I -- I don't recall |
| 11:11 | 8 | which songs were selected as singles. |
| 11:11 | 9 | Q.   Are you familiar with the recording "I Got |
| 11:11 | 10 | a Line on You"? |
| 11:11 | 11 | A.   Yes. |
| 11:11 | 12 | Q.   And who wrote that? |
| 11:11 | 13 | A.   Randy. |
| 11:11 | 14 | Q.   Which album did it appear on? |
| 11:11 | 15 | A.   My memory is that it was on "The Family |
| 11:11 | 16 | That Plays Together." |
| 11:11 | 17 | Q.   Was it released as a single? |
| 11:11 | 18 | A.   Yes. |
| 11:11 | 19 | Q.   Was it a successful single, commercially? |
| 11:11 | 20 | A.   Yes.  I think -- I think it was -- I think |
| 11:11 | 21 | it -- maybe it got into the Top 40, but not in the |
| 11:11 | 22 | high numbers.  I mean, it was -- but it was probably |
| 11:11 | 23 | the most successful single that Spirit had, I think. |
| 11:11 | 24 | Q.   What was the next Spirit album that Ode |
| 11:11 | 25 | Records released? |

MARK CHRISTOPHER ANDES - 01/15/2016

11:11  1          A.   There was an album called "Clear Spirit."

11:11  2          Q.   When was "Clear Spirit" released?

11:11  3          A.   I guess --

11:11  4          Q.   I don't want you to guess.

11:11  5          A.   Okay.

11:12  6          Q.   If you have a recollection, that's fine,

11:12  7    even if it's vague.

11:12  8          A.   I think at the increments of -- it was

11:12  9    about -- an album per year is my understanding so --

11:12 10    but I can't exactly say exactly when "Clear Spirit"

11:12 11    was released.  It was actually after the movie the

11:12 12    "Model Shop" was released.  We did the -- the music

11:12 13    for that movie.

11:12 14          Q.   When you say "we did the music"...

11:12 15          A.   Spirit.  Spirit did.

11:12 16          Q.   Do you recall when the movie the "Model

11:12 17    Shop" was released?

11:12 18          A.   I'm guessing 19- -- no, I shouldn't guess.

11:12 19    1969.

11:12 20          Q.   Okay.  Is it your best memory that, by the

11:12 21    end of 1969, Ode Records had released, at least,

11:12 22    three Spirit albums?

11:12 23          A.   Yes, sir.

11:12 24          Q.   When was the next Spirit album released?

11:12 25          A.   I believe, Dr. -- "The Twelve Dreams of

MARK CHRISTOPHER ANDES - 01/15/2016

11:13  1    Dr. Sardonicus" was released in 1970.

11:13  2         Q.    Okay.  So from -- strike that.

11:13  3              And I take it the band Spirit performed

11:13  4    live?

11:13  5         A.    Yes, sir.

11:13  6         Q.    Have you heard the phrase "sets" --

11:13  7         A.    Yes.

11:13  8         Q.    -- in con- -- in connection with live

11:13  9    performances?

11:13  10        A.    Yes.

11:13  11        Q.    What's a set?

11:13  12        A.    A set is a list of songs that are to be

11:13  13   performed so that everybody knows what is coming up

11:13  14   next, what song we will play next.

11:13  15        Q.    Back in -- from 1966 to 1972, did Spirit

11:13  16   have written set lists?

11:13  17        A.    Yes.

11:13  18        Q.    And who prepared the written set lists?

11:13  19        A.    I think we all kind of discussed and --

11:13  20   and had all participated in -- in the set lists.

11:13  21   And -- and I have to say that it was not always

11:13  22   adhered to.  I mean, sometimes we would just go off

11:13  23   on tangents.  It was improvised.  A lot of

11:14  24   improvisation.

11:14  25        Q.    Have you heard the phrase a "jam band"?

MARK CHRISTOPHER ANDES - 01/15/2016

11:16  1     least.  Maybe two hours.

11:16  2          Q.   Did Mr. Cassidy play extended drum solos

11:16  3     during Spirit performances?

11:16  4          A.   He did.

11:16  5          Q.   And how long do you recall those solos

11:16  6     lasting?

11:16  7          A.   They could vary greatly.  But he could

11:16  8     play for a -- he could play a five-minute solo or a

11:17  9     25-minute solo, depending on what he felt like.

11:17 10          Q.   Okay.  Have you ever heard the phrase

11:17 11     "tour in support of an album"?

11:17 12          A.   Yes.

11:17 13          Q.   What does that mean to you?

11:17 14          A.   Tour, are we talking about tour -- tour

11:17 15     and support?  Or are you differentiating between --

11:17 16     or, I'm -- I'm thinking tour support as --

11:17 17          Q.   Yeah, no, I'm --

11:17 18          A.   Bands tour to support an album, which

11:17 19     means they go out on the road and play shows.

11:17 20               And then there's tour support, which is

11:17 21     financial aid to help the band afford to be able to

11:17 22     go out and play.

11:17 23          Q.   Okay.  Let's take those separately.

11:17 24          A.   Okay.

11:17 25          Q.   Does -- does a record company, for

MARK CHRISTOPHER ANDES - 01/15/2016

11:17  1      example, sometime -- sometimes, back in the day,

11:17  2      provide financial help to a band in order to enable

11:17  3      it to tour?

11:17  4          A.   Yes.

11:17  5          Q.   And that's what you mean by tour support?

11:17  6          A.   Yes, sir.

11:17  7          Q.   Okay.  And in terms of a band touring in

11:17  8      order to support an album, what does that mean to

11:18  9      you?

11:18 10          A.   Getting on the road.  Playing as many

11:18 11      shows as you can to promote the album and generate

11:18 12      record sales and hopefully generate more ticket

11:18 13      sales.

11:18 14          Q.   So touring was a way of promoting a new

11:18 15      album so that the audience could hear the recordings

11:18 16      and then, in theory, would go out and buy them?

11:18 17               MR. MALOFIY:  Objection.  Vague and

11:18 18      ambiguous.  Compound.  Speculative.

11:18 19      BY MR. ANDERSON:

11:18 20          Q.   Is that what you're talking about?

11:18 21               MR. MALOFIY:  But you can answer.

11:18 22               THE WITNESS:  I can answer?

11:18 23               MR. MALOFIY:  Yeah.

11:18 24               THE WITNESS:  Yeah, yeah, yeah.  It's --

11:18 25      it's -- it's one of those positive cycles.  You --

MARK CHRISTOPHER ANDES - 01/15/2016

11:18  1    you -- you tour to sell records which then sell

11:18  2    tickets.  So if you're on the positive side of that

11:18  3    cycle, you're -- it all becomes a money-making

11:18  4    thing, hopefully, to -- to initiate -- to get

11:18  5    traction with your fan-base.

11:18  6           Sometimes it's necessary for the record

11:18  7    company to help you to subsidize your -- the money

11:19  8    so you can maybe not make so much money at shows and

11:19  9    still afford to be able to go out and do it.

11:19  10   BY MR. ANDERSON:

11:19  11       Q.   When Spirit was touring to support a newly

11:19  12   released album, was the newly released album

11:19  13   available at the venue so audience members could buy

11:19  14   it coming in or out?

11:19  15       A.   No.

11:19  16       Q.   Have you seen that done in modern times?

11:19  17       A.   Yes.

11:19  18       Q.   And I take it -- we've been talking,

11:19  19   generally, about the meaning of the phrases.

11:19  20           Did tour -- I'm sorry.

11:19  21           Did Spirit tour to support its new albums?

11:19  22       A.   Yes.

11:19  23       Q.   And as part of that, at live performances,

11:19  24   did Spirit play selections from either a new album

11:19  25   or an upcoming album?

MARK CHRISTOPHER ANDES - 01/15/2016

11:19 1     A.    Yes.

11:19 2     Q.    Is it also correct that, at live

11:19 3  performances, Spirit played its most well-known

11:19 4  songs like "Fresh Garbage," "Mechanical World," and

11:19 5  "I Got a Line on You"?

11:19 6     A.    Yes.

11:20 7     Q.    The set lists, were they physical pieces

11:20 8  of paper that were provided to the band members?

11:20 9     A.    Typically.

11:20 10    Q.    And who -- who wrote them out?

11:20 11    A.    Various different -- I mean -- I -- I

11:20 12 don't recall one person designated the set list

11:20 13 writer, but we all participated in the creation of

11:20 14 the set list.  But they were, typically, on pieces

11:20 15 of paper.

11:20 16    Q.    And do you know what happened to the

11:20 17 pieces of paper?

11:20 18    A.    No.  They're just -- they were not -- to

11:20 19 my knowledge, nobody ever saved them or anything.  A

11:20 20 lot of times people -- the audience would grab them,

11:20 21 and we would autograph them and then they would just

11:20 22 be a memento from the show.

11:20 23    Q.    Have you ever seen any of those on the

11:20 24 Internet, a set list where -- that had been

11:20 25 autographed by Spirit?

MARK CHRISTOPHER ANDES - 01/15/2016

11:38 1    A.    They could have been.  We -- we played

11:38 2    there many, many times with many other people.  And

11:38 3    without other people, so I don't know.

11:38 4    Q.    Do you recall this specific performance in

11:38 5    late October, October 31st or November 1st or 2nd of

11:38 6    1968?

11:38 7    A.    Not really.

11:38 8    Q.    Do you recall Spirit performing live at

11:38 9    the Grande Ballroom in Detroit, Michigan, on

11:38 10   February 1st of 1969, possibly with Jethro Tull?

11:38 11   A.    I recall playing the Grande.  I -- I do

11:38 12   not know that it was on the date.  But, yeah, I know

11:39 13   we played the Grande and probably with Jethro Tull.

11:39 14   Q.    And how many times did you play the

11:39 15   Grande?

11:39 16   A.    I would estimate maybe six -- five or six

11:39 17   times.

11:39 18   Q.    Is it correct that the occasion in which

11:39 19   you played with Jethro Tull, "Taurus" was not

11:39 20   performed by Spirit?

11:39 21   A.    I can't say if it was or not.

11:39 22   Q.    Do you recall Spirit playing in Topanga,

11:39 23   possibly at the Corral, in 1969?

11:39 24   A.    Yes.

11:39 25   Q.    Did Spirit play the Beatles song "I Saw

MARK CHRISTOPHER ANDES - 01/15/2016

11:40  1        Q.   And I apologize.  I -- my question, I

11:40  2    think, wasn't clear.

11:40  3             "Like A Rolling Stone," some Hendrix

11:40  4    songs, and some traditional blues were among other

11:40  5    groups' songs --

11:40  6        A.   Correct.

11:40  7        Q.   -- that Spirit performed live?

11:40  8             MR. MALOFIY:  Objection.  Vague and

11:40  9    ambiguous.

11:41 10             You can answer.

11:41 11             THE WITNESS:  Correct.

11:41 12    BY MR. ANDERSON:

11:41 13        Q.   Okay.  And was Randy California a fan of

11:41 14    the Beatles'?

11:41 15        A.   I'm not sure.  I would -- I would think

11:41 16    that he would have loved them.  But we -- I don't

11:41 17    recall he and -- I don't recall him being a real

11:41 18    rabid Beatles fan, to be honest.

11:41 19        Q.   Okay.  Do you recall Spirit playing at the

11:41 20    Corral in Topanga at 1669?

11:41 21        A.   Yes.

11:41 22        Q.   And did Spirit perform "Taurus"?

11:41 23        A.   I'm not sure.

11:41 24        Q.   Do you recall Spirit performing live at

11:41 25    the Civic Center in Baltimore, Maryland, opening for

MARK CHRISTOPHER ANDES - 01/15/2016

11:42  1                MR. MALOFIY:  Can you repeat?  And I

11:42  2   apologize for interrupting your -- your flow there.

11:43  3   But -- but where was that?

11:43  4                MR. ANDERSON:  The Mammoth Gardens.

11:43  5                MR. MALOFIY:  Yeah.

11:43  6                MR. ANDERSON:  Denver.  In June of 1970.

11:43  7   Possibly with the Gypsy and -- possibly with Gypsy

11:43  8   and Gypsy, and poss- -- and the Pentangle.

11:43  9                MR. MALOFIY:  Pentangle?

11:43 10                MR. ANDERSON:  Pentangle,

11:43 11   P-e-n-t-a-n-g-l-e.

11:43 12                MR. MALOFIY:  All right.  Thank you.  I

11:43 13   apologize for interrupting your flow.

11:43 14                MR. ANDERSON:  No worries.  No worries.

11:43 15   BY MR. ANDERSON:

11:43 16        Q.   Do you recall that performance, or are you

11:43 17   just telling me that it sounds like something you

11:43 18   might have done?

11:43 19        A.   It sounds like something we might have

11:43 20   done.

11:43 21        Q.   Okay.  Do you recall Spirit performing

11:43 22   live in Cincinnati, Ohio, in late 1970?

11:43 23        A.   No.

11:43 24        Q.   Do you recall Spirit performing live at

11:43 25   The Forum in Los Angeles in December of 1970,

MARK CHRISTOPHER ANDES - 01/15/2016

11:43  1    possibly with The Moody Blues and Trapeze?

11:43  2        A.   Yes.

11:43  3        Q.   And was Spirit the opening act, the second

11:43  4    act, the closing act?

11:43  5        A.   I'm not sure.  Who was -- who was at the

11:43  6    bill -- on the bill?

11:43  7        Q.   I wasn't -- I did not attend that

11:44  8    particular performance, but -- but the information

11:44  9    we have obtained in discovery is that it might have

11:44 10    been with The Moody Blues and Trapeze, who I don't

11:44 11    recall.

11:44 12        A.   I'm guessing that Trapeze was the opening

11:44 13    band and Spirit was the second band and The Moody

11:44 14    Blues headlining.

11:44 15        Q.   Is that a guess based on the assumption

11:44 16    that Spirit was more popular than Trapeze?

11:44 17        A.   Exactly.

11:44 18        Q.   And Moody Blues were more popular than

11:44 19    Spirit?

11:44 20        A.   Yes.

11:44 21        Q.   Okay.

11:44 22            MR. MALOFIY:  I would just caution you not

11:44 23    to guess.

11:44 24            THE WITNESS:  I'm just -- yeah.

11:44 25            MR. KULIK:  Now, are you guessing, or do

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 11:44 | 1 | you have a memory? |
| 11:44 | 2 | THE WITNESS:  I'm guessing. |
| 11:44 | 3 | MR. KULIK:  Well, don't -- don't guess. |
| 11:44 | 4 | You remember -- |
| 11:44 | 5 | THE WITNESS:  Okay.  Okay. |
| 11:44 | 6 | MR. KULIK:  We can all logically deduce |
| 11:44 | 7 | certain things. |
| 11:44 | 8 | Okay. |
| 11:44 | 9 | MR. KULIK:  But that's not what counsel |
| 11:44 | 10 | wants. |
| 11:44 | 11 | THE WITNESS:  I understand.  Thank you. |
| 11:44 | 12 | MR. KULIK:  If you have a memory, even a |
| 11:44 | 13 | faint one, you should say so. |
| 11:44 | 14 | THE WITNESS:  Okay. |
| 11:44 | 15 | MR. KULIK:  But if you're just guessing, |
| 11:44 | 16 | don't guess. |
| 11:44 | 17 | THE WITNESS:  Thank you, Glen. |
| 11:44 | 18 | Yeah, I don't -- well, I would be guessing |
| 11:44 | 19 | at that. |
| 11:44 | 20 | BY MR. ANDERSON: |
| 11:44 | 21 | Q.   Yeah.  At this occasion in The Forum, |
| 11:45 | 22 | where The Moody Blues also -- where you understand |
| 11:45 | 23 | played, is it correct that Spirit did not play |
| 11:45 | 24 | "Taurus"? |
| 11:45 | 25 | A.   I -- I -- I don't know. |

MARK CHRISTOPHER ANDES - 01/15/2016

11:45  1        Q.   Do you recall Spirit performing live at

11:45  2   the Valley Music Theater in Woodland Hills in

11:45  3   December of 1970, possibly with Taj Mahal and

11:45  4   Therapy?

11:45  5        A.   Yes.   That was a New Year's Eve show, I

11:45  6   believe.

11:45  7        Q.   Yes.   December 31st, 1970; do you recall

11:45  8   that performance?

11:45  9        A.   Yes.

11:45 10        Q.   Is it correct that Spirit did not play

11:45 11   "Taurus"?

11:45 12        A.   I -- Spirit could -- I -- I'm -- I don't

11:45 13   know.   No, it's not -- I -- I have no idea whether

11:45 14   we played "Taurus" at that point.

11:45 15        Q.   Okay.   Do you recall playing at the

11:45 16   Auditorium Arena in Denver, Colorado, in December of

11:45 17   1968, with Vanilla Fudge as the headlining act?

11:45 18        A.   Uh-huh.   Yes, I do.

11:45 19        Q.   Can you describe the Auditorium Arena?   Do

11:46 20   you recall it?

11:46 21        A.   Yeah.   Typical arena, you know, with no

11:46 22   seating.   Kids standing.   It was a well-attended

11:46 23   show.   We had a great set, actually, and you know...

11:46 24        Q.   My understanding is -- is that -- and tell

11:46 25   me if this is different than yours, that the

MARK CHRISTOPHER ANDES - 01/15/2016

11:49  1    members were?  Were you in a dressing room?  Do you

11:49  2    recall?

11:49  3         A.    I don't really recall.

11:49  4         Q.    Did Spirit bring its own instruments and

11:49  5    equipment to perform in Denver?

11:49  6         A.    Yes.

11:49  7         Q.    And what instruments and equipment was

11:49  8    brought?

11:49  9         A.    Amplifiers and guitar and a keyboard.

11:49 10         Q.    And drums?

11:49 11         A.    Oh, and drums, yeah.  And percussion

11:49 12    equipment.

11:49 13         Q.    Did it bring its own mics?

11:49 14         A.    No.

11:49 15         Q.    Use the -- the venue mics?

11:49 16         A.    The -- right.  The -- the -- yes.

11:49 17         Q.    Okay.  And there was an amplifier for the

11:49 18    bass guitar and amplifier for the electric guitar?

11:50 19         A.    We -- we brought our amps.

11:50 20         Q.    Right.

11:50 21               And who -- when Spirit performed in 1968

11:50 22    through 1970, '71, who handled bringing in the

11:50 23    equipment and setting it up for Spirit's

11:50 24    performances?

11:50 25         A.    Our road crew.

MARK CHRISTOPHER ANDES - 01/15/2016

11:51 1    has their equipment already set up as well.

11:51 2         Q.   So, your test- -- it's your testimony

11:51 3    that, before anyone takes the stage, all the

11:51 4    equipment for all the -- for example, equipment for

11:51 5    three different groups is on stage?

11:51 6         A.   That's typical.

11:51 7         Q.   Was that done in -- in Denver at the

11:51 8    Auditorium Arena in 1968?

11:51 9         A.   That's my -- that's my memory.

11:51 10        Q.   Okay.  And who do you recall striking

11:52 11   Spirit's equipment?

11:52 12        A.   Our road crew.

11:52 13        Q.   Okay.  And do you have a recollection

11:52 14   of how -- and I don't want you to guess.

11:52 15             But do you have a recollection of how long

11:52 16   it took for the preceding band's equipment in -- at

11:52 17   the Auditorium Arena to be struck and any

11:52 18   arrangements made for your equipment so that you

11:52 19   could start performing?

11:52 20        A.   I don't recall.

11:52 21        Q.   Do you have an estimate that you can

11:52 22   provide?  I don't want you to guess, but I'm

11:52 23   entitled --

11:52 24        A.   I can estimate --

11:52 25             MR. KULIK:  Well, hold on.  Hold on.  Hold

MARK CHRISTOPHER ANDES - 01/15/2016

11:52 1    on a second.

11:52 2            Are you asking him to estimate based on a

11:52 3    recollection?  Or are you asking him to estimate

11:52 4    based on what the -- how the practices --

11:52 5            MR. ANDERSON:  I'm asking him to estimate

11:52 6    based on a recollection.

11:52 7            MR. KULIK:  Okay.  So, if you -- okay.

11:52 8            THE WITNESS:  I don't have a -- have a --

11:52 9    BY MR. ANDERSON:

11:52 10       Q.   Okay.

11:52 11       A.   I can't provide that.

11:52 12       Q.   Okay.

11:52 13       A.   Thank you.

11:53 14       Q.   Let me show you a document that was

11:53 15   previously marked as Exhibit 320.

11:53 16           (Exhibit 320, a previously marked

11:53 17           document, was attached for reference.)

11:53 18           MR. ANDERSON:  Actually, let me grab it.

11:53 19           MR. MALOFIY:  Which one is 320, Peter,

11:53 20   because I'm missing it?

11:53 21           MR. ANDERSON:  Yeah, hold on for a second.

11:53 22           MR. MALOFIY:  Oh, I'm not -- I'm not

11:53 23   missing it.

11:53 24           MR. ANDERSON:  Okay.  So I placed that in

11:53 25   front of the witness.

MARK CHRISTOPHER ANDES - 01/15/2016

11:53  1   BY MR. ANDERSON:

11:53  2       Q.   Have you ever seen this before?

11:53  3       A.   [Witness reviews document].

11:53  4            I'm not sure.

11:53  5       Q.   It's included, another copy of that, I

11:53  6   believe, is included --

11:53  7       A.   Yeah.

11:53  8       Q.   -- in the documents you produced.

11:53  9       A.   Yeah.  Okay.  Then -- yeah, then it's what

11:53 10   I think it is.

11:53 11       Q.   What do you think it is?

11:54 12       A.   It looks like a -- a -- a playbill for --

11:54 13   actually, this looks like an ad taken out by the

11:54 14   record company.  This is not -- this is not a poster

11:54 15   for the show.  This is a -- a -- an advertisement

11:54 16   for "The Family That Plays Together" record

11:54 17   promoting the show, but it's ba- -- basically a

11:54 18   flier for -- probably on display at record stores.

11:54 19       Q.   Okay.  Again, when you say "probably," we

11:54 20   want to make sure that you're not speculating.

11:54 21            But to the best of your recollection, if I

11:54 22   understand correctly, this is something that was put

11:54 23   out by the -- you believe, the record company, in

11:54 24   connection with the Denver Auditorium Arena

11:54 25   performance in December of 1968?

MARK CHRISTOPHER ANDES - 01/15/2016

11:54  1      A.   Yes.   That's my recollection.

11:54  2      Q.   And you know at the very top it states,

11:55  3  "The Family That Plays Together."   That was the

11:55  4  title of Spirit's latest album at that point?

11:55  5      A.   Correct.

11:55  6      Q.   And this performance was to promote that

11:55  7  album?

11:55  8      A.   Yes.

11:55  9           MR. MALOFIY:   Objection.

11:55 10  BY MR. ANDERSON:

11:55 11      Q.   On this occasion, in December of 1968,

11:55 12  when you were in Denver and Vanilla Fudge headlined,

11:55 13  can you tell me, please, everything you recall about

11:55 14  that evening.

11:55 15      A.   I recall that we -- I recall that it

11:55 16  was -- we had a great set, and that there was just a

11:55 17  really, kind of a pleasant backstage ambience.

11:56 18  Everybody was happy.   Everybody seemed to be pretty

11:56 19  much in the Christmas Spirit.   It was nice.

11:56 20      Q.   Anything else that you recall?

11:56 21      A.   Just that the -- the evening of music was

11:56 22  very, very pleasant.   Every -- all the groups played

11:56 23  really well.   We watched Led Zeppelin's show.   And

11:56 24  the Vanilla Fudge guys were really very dynamic on

11:56 25  their performances.   So it was a pleasant evening.

11:56  1        Q.    Your testimony is that Led Zeppelin also

11:56  2  performed at that show?

11:56  3        A.    Right.  Isn't this -- yes, sir.

11:56  4        Q.    And did they precede Spirit's performance?

11:56  5        A.    Yes, sir.

11:56  6        Q.    And so before Spirit performed, you

11:56  7  watched Led Zeppelin perform?

11:56  8        A.    Bits of their performance, yeah.

11:56  9        Q.    And from where did you watch bits of their

11:56 10  performance?

11:56 11        A.    Oh, it could vary.  I don't recall exactly

11:57 12  where.  Probably on the side of the stage for some

11:57 13  of it.

11:57 14        Q.    And do you recall what you saw them

11:57 15  perform?  What songs?

11:57 16        A.    No.

11:57 17        Q.    Do you recall how much time of their

11:57 18  performance you saw?

11:57 19        A.    I recall -- no, not really.  I would be

11:57 20  guessing.

11:57 21        Q.    I don't want you to guess.  Was it more

11:57 22  than a couple of minutes?

11:57 23        A.    I'm sure it was probably more than a

11:57 24  couple of minutes.

11:57 25        Q.    Is there anything else that you recall

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 11:57 | 1 | that -- from that evening? |
| 11:57 | 2 | A.   Just that Spirit had a very good show, and |
| 11:57 | 3 | we got -- had a very good response from the crowd. |

11:57  4       Q.   And then you -- after you -- Spirit

11:57  5  performed, you watched --

11:57  6       A.   Vanilla --

11:57  7       Q.   -- Vanilla Fudge perform?

11:57  8       A.   Yes.   Parts of their show.   We -- I

11:57  9  didn't -- I don't recall staying for the whole show,

11:57 10  but I could have.

11:58 11       Q.   And you might not have?

11:58 12       A.   Might not have.

11:58 13       Q.   Okay.   Let me ask you to look at another

11:58 14  exhibit that's been previously marked in this case.

11:58 15  Exhibit 313.

11:58 16            (Exhibit 313, a previously marked

11:58 17            document, was attached for reference.)

11:58 18  BY MR. ANDERSON:

11:58 19       Q.   Have you ever seen this before?

11:58 20       A.   Yes.

11:58 21       Q.   Could I ask you to -- and take as much

11:58 22  time as you need, But if you can read through this.

11:58 23            And then my question is going to be

11:58 24  whether it refreshes your memory as to anything that

11:58 25  occurred at the Denver Auditorium Arena in December

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 11:58 | 1 | of 1968. |
| 11:59 | 2 | A.   [Witness reviews documents]. |
| 11:59 | 3 | Okay.  So the question... |
| 11:59 | 4 | Q.   Yeah.  Now that you've read Exhibit 313, |
| 11:59 | 5 | does it refresh your memory, does a light bulb go |
| 12:00 | 6 | off, that you now recall something else about that |
| 12:00 | 7 | evening that you haven't already testified to? |
| 12:00 | 8 | A.   No, not really. |
| 12:00 | 9 | Q.   Okay.  What songs did Spirit perform on |
| 12:00 | 10 | that occasion; do you recall? |
| 12:00 | 11 | A.   Well, "Mechanical World" and -- and |
| 12:00 | 12 | "Elijah" for sure.  Typically, it was not unusual |
| 12:00 | 13 | for "Taurus" to be played right before "Mechanical |
| 12:00 | 14 | World" as sort of a segue.  So -- so, I recall |
| 12:00 | 15 | "Taurus" being played before "Mechanical World" |
| 12:00 | 16 | there. |
| 12:00 | 17 | Q.   Okay.  Now, keep in mind that we don't |
| 12:00 | 18 | want you to speculate.  I understand part of that |
| 12:00 | 19 | answer is "typically" -- |
| 12:00 | 20 | A.   Right. |
| 12:00 | 21 | Q.   -- "Taurus" was performed before |
| 12:00 | 22 | "Mechanical World," right? |
| 12:00 | 23 | A.   Right. |
| 12:00 | 24 | Q.   Okay.  Do you actually, as you're sitting |
| 12:01 | 25 | here now, 45 years later, recall that Spirit |

MARK CHRISTOPHER ANDES - 01/15/2016

12:01 1 performed "Taurus" in -- at the Auditorium Arena in

12:01 2 Denver --

12:01 3          MR. MALOFIY:  Objection.  I believe --

12:01 4 BY MR. ANDERSON:

12:01 5     Q.    -- in December of 1968?

12:01 6          MR. MALOFIY:  Objection.  I believe his

12:01 7 answer said he remembers "Taurus" being played there

12:01 8 at that -- at that event.

12:01 9          MR. ANDERSON:  No speaking objections,

12:01 10 please.

12:01 11          MR. MALOFIY:  Hold on.

12:01 12          That's what his testimony is.

12:01 13          MR. ANDERSON:  So you object that it

12:01 14 mischaracterizes his testimony.  You don't talk.

12:01 15 BY MR. ANDERSON:

12:01 16     Q.   So I'm asking you:  Are you telling me,

12:01 17 under oath, that it's your recollection, as you're

12:01 18 sitting here now, that you actually recall "Taurus"

12:01 19 being performed at the Denver Auditorium Arena?

12:01 20          MR. MALOFIY:  Objection.  His testimony is

12:01 21 his testimony.

12:01 22          MR. KULIK:  Just take -- take a second and

12:01 23 think about it.

12:01 24          THE WITNESS:  Yeah.  I mean...  Yeah.

12:01 25          MR. KULIK:  If you have a recollection, a

MARK CHRISTOPHER ANDES - 01/15/2016

12:01  1    faint one, "Yes."  If it's guessing or speculating,

12:01  2    "No."

12:01  3            THE WITNESS:  I have a faint recollection

12:01  4    of playing "Taurus."

12:01  5    BY MR. ANDERSON:

12:01  6        Q.   Okay.

12:01  7            MR. ANDERSON:  And I would also object to

12:01  8    the coaching.  I get to ask the questions.  You

12:01  9    don't get to coach him.

12:01 10            MR. KULIK:  He answered it once.

12:02 11    BY MR. ANDERSON:

12:02 12        Q.   And is that, in part, based on -- on your

12:02 13    belief that, typically, "Taurus" was played before

12:02 14    "Mechanical World"?

12:02 15            MR. MALOFIY:  Objection.

12:02 16            THE WITNESS:  That happened --

12:02 17            MR. MALOFIY:  Hold on.

12:02 18            Objection.  Mischaracterizes his

12:02 19    testimony.  He said he has a faint recollection.

12:02 20    BY MR. ANDERSON:

12:02 21        Q.   Sir?

12:02 22            MR. MALOFIY:  You can answer the question.

12:02 23            THE WITNESS:  Yeah, that -- that would, I

12:02 24    think -- during that time frame, being shortly after

12:02 25    the -- after the first record, the -- the second

MARK CHRISTOPHER ANDES - 01/15/2016

12:02 1    record had just come out, yeah, that would be

12:02 2    typical as a -- as a nice segue.  That happened

12:02 3    frequently.

12:02 4    BY MR. ANDERSON:

12:02 5         Q.   Can you identify any performances where

12:02 6    that happened?

12:02 7              MR. MALOFIY:  Objection.  Mischaracterizes

12:02 8    his testimony.  He already identified Denver.

12:02 9              THE WITNESS:  I -- I -- I recall playing

12:02 10   at the Santa Monica Civic, and I recall it

12:02 11   playing -- we opened for Cream in the Anaheim

12:03 12   Convention Center, and we played it.

12:03 13   BY MR. ANDERSON:

12:03 14        Q.   Any other performances where you recall

12:03 15   "Taurus" being performed?

12:03 16        A.   Well, it was not unusual to play "Taurus"

12:03 17   during that time.  So I really don't have a vivid

12:03 18   memory of a specific show, other than those where it

12:03 19   really -- but it was -- it was a valuable thing in

12:03 20   our set because it got such a great response.

12:03 21   People loved hearing it.

12:03 22   BY MR. ANDERSON:

12:03 23        Q.   I'm just going to do this for the record.

12:03 24   Don't be offended.

12:03 25              MR. ANDERSON:  Move to strike as

MARK CHRISTOPHER ANDES - 01/15/2016

12:03  1    non-responsive.

12:03  2    BY MR. ANDERSON:

12:03  3        Q.   Other than --

12:03  4            MR. MALOFIY:  I'm going to object to the

12:03  5    last statement.

12:03  6    BY MR. ANDERSON:

12:03  7        Q.   Other than -- other than the Santa Monica

12:03  8    Civic and Anaheim -- the Anaheim Convention Center,

12:03  9    and what you've described after statements of

12:03 10    counsel as a faint memory regarding Denver, is there

12:03 11    any other occasion that you can tell me "Taurus" was

12:04 12    performed live by Spirit?

12:04 13        A.   I can't give you specific performances and

12:04 14    dates.  I just know that we did it frequently.

12:04 15        Q.   Which performance, at the Santa Monica

12:04 16    Civic, are you referring to?  Can you tell me --

12:04 17    tell me the time, the date or the -- and/or the

12:04 18    other bands that performed?

12:04 19        A.   Not really.  I can't be specific.  I --

12:04 20    we -- we headlined many shows there.  It was kind of

12:04 21    our home venue so not really.

12:04 22        Q.   But you recall a performance at the Santa

12:04 23    Monica Civic where "Taurus" was performed?

12:04 24        A.   Absolutely.

12:04 25        Q.   And when did you open for Cream at the

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 12:04 | 1 | Anaheim Convention Center? |
| 12:04 | 2 | A.   I think -- I would be -- I -- I really |
| 12:04 | 3 | can't give you a specific date.  I can't, so, I |
| 12:04 | 4 | would be guessing. |
| 12:04 | 5 | Q.   Okay.  I'm going to ask that the court |
| 12:04 | 6 | reporter to mark as Exhibit 352, I believe, the next |
| 12:04 | 7 | exhibit. |
| 12:04 | 8 | (Defendant's Exhibit 352 was marked for |
| 12:05 | 9 | identification and is attached hereto.) |
| 12:05 | 10 | BY MR. ANDERSON: |
| 12:05 | 11 | Q.   Have you ever seen this before? |
| 12:05 | 12 | MR. MALOFIY:  What did we mark it as, |
| 12:05 | 13 | 350-... |
| 12:05 | 14 | MR. ANDERSON:  -2. |
| 12:05 | 15 | MR. MALOFIY:  Thank you. |
| 12:05 | 16 | THE WITNESS:  [Witness reviews document]. |
| 12:05 | 17 | I -- I don't think so. |
| 12:05 | 18 | BY MR. ANDERSON: |
| 12:05 | 19 | Q.   This was a document that Mr. Ferguson |
| 12:05 | 20 | testified was provided to him by Mr. Pates.  And it |
| 12:05 | 21 | purports to be a set list for the February 1, 1969, |
| 12:05 | 22 | performance, less than -- well, approximately a |
| 12:05 | 23 | month and a few days after the -- the Denver |
| 12:05 | 24 | performance. |
| 12:05 | 25 | A.   Uh-huh. |

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 12:05 | 1 | Q.   Do you have any reason to doubt that the |
| 12:05 | 2 | 13 compositions on Exhibit 352 are the compositions |
| 12:05 | 3 | that Spirit performed on February 1st, 1969? |
| 12:06 | 4 | A.   No. |
| 12:06 | 5 | MR. MALOFIY:  Object. |
| 12:06 | 6 | MR. ANDERSON:  And -- |
| 12:06 | 7 | MR. MALOFIY:  Objection.  Vague and |
| 12:06 | 8 | ambiguous.  Calls for speculation. |
| 12:06 | 9 | BY MR. ANDERSON: |
| 12:06 | 10 | Q.   What is "Apple Orchard"? |
| 12:06 | 11 | A.   It's a -- it's a -- a song. |
| 12:06 | 12 | Q.   Is it an instrumental or... |
| 12:06 | 13 | A.   No.  It was a vocal. |
| 12:06 | 14 | Q.   Is it fast or slow or... |
| 12:06 | 15 | A.   It was about mid-tempo kind of a thing. |
| 12:06 | 16 | Q.   And what is "Aren't You Glad"? |
| 12:06 | 17 | A.   Another song that Jay also wrote. |
| 12:06 | 18 | Q.   Okay.  Would you describe this as a |
| 12:06 | 19 | typical set list for Spirit's performances in that |
| 12:06 | 20 | time period? |
| 12:06 | 21 | MR. MALOFIY:  Objection.  Vague and |
| 12:06 | 22 | ambiguous. |
| 12:06 | 23 | THE WITNESS:  Well, I would say that this |
| 12:06 | 24 | is -- yeah, I would say it was typical. |
| 12:06 | 25 | /// |

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 12:06 | 1 | BY MR. ANDERSON: |
| 12:06 | 2 | Q.   Have you ever spoken with Jimmy Page? |
| 12:06 | 3 | A.   No. |
| 12:06 | 4 | Q.   Did you see him, other than watching him |
| 12:06 | 5 | perform for a bit at the -- perform for some period |
| 12:07 | 6 | of time at the Denver Auditorium Arena in December, |
| 12:07 | 7 | did you see him backstage, or see him at any point |
| 12:07 | 8 | during that performance? |
| 12:07 | 9 | A.   Yeah.  Yeah.  There was -- we were all |
| 12:07 | 10 | kind of milling about. |
| 12:07 | 11 | Q.   But you didn't speak to him? |
| 12:07 | 12 | A.   No. |
| 12:0 | 13 | Q.   Did you see any member of Spirit speak to |
| 12:0 | 14 | him? |
| 12:0 | 15 | A.   I don't recall. |
| 12:0 | 16 | Q.   Okay.  Have you ever spoken with John Paul |
| 12:0 | 17 | Jones? |
| 12:0 | 18 | A.   I don't recall. |
| 12:0 | 19 | Q.   Did you ever see anyone -- any member of |
| 12:0 | 20 | Spirit speak with John Paul Jones? |
| 12:0 | 21 | A.   I have no memory of that. |
| 12:0 | 22 | Q.   Have you ever spoken with John Bonham? |
| 12:0 | 23 | A.   I really don't have a memory of that |
| 12:0 | 24 | either. |
| 12:0 | 25 | Q.   Did you ever see any member of Spirit |

MARK CHRISTOPHER ANDES - 01/15/2016

12:07  1   speaking with John Bonham?

12:07  2        A.   I don't -- no.

12:07  3        Q.   Did you speak with Robert Plant at any

12:07  4   point during the December 1968 concert in Denver?

12:08  5        A.   You know, I don't have a memory of him --

12:08  6   having -- having a conversation with -- I don't

12:08  7   recall having a conversation with him at that show.

12:08  8        Q.   Do you re- -- do you recall seeing him

12:08  9   speak to any member of Spirit at that show?

12:08 10        A.   No.

12:08 11        Q.   Do you have any recollection of what the

12:08 12   members of Led Zeppelin did after they performed?

12:08 13        A.   Well, what I -- actually, what I do have a

12:08 14   memory of was I was introduced to those guys.

12:08 15             Toby Roberts was a dear friend of mine,

12:08 16   who is their -- he provided them -- he was one of

12:09 17   the people that helped them lease that big airplane.

12:09 18   He was -- he introduced me to those guys, but it

12:09 19   wasn't, like, a conversation; it was just an

12:09 20   introduction.

12:09 21        Q.   Was that at Denver?

12:09 22        A.   Uh-huh.

12:09 23        Q.   I'm sorry.  You have to answer...

12:09 24        A.   Yes.

12:09 25        Q.   And so you didn't speak with them; he just

12:09  1    introduced you to them?

12:09  2         A.   Yes.

12:09  3              MR. MALOFIY:   Objection.

12:09  4    Mischaracterization.

12:09  5    BY MR. ANDERSON:

12:09  6         Q.   And --

12:09  7              MR. MALOFIY:   But go ahead.

12:09  8    BY MR. ANDERSON:

12:09  9         Q.   And your testimony is that Mr. Roberts

12:09 10    knew the members of Led Zeppelin because he had

12:09 11    helped them lease an airplane?

12:09 12         A.   Yeah.   And he travelled with them,

12:09 13    actually.

12:09 14         Q.   And so as of December of 1968, Led

12:09 15    Zeppelin had already leased an airplane?

12:09 16         A.   That's my rec- -- memory.

12:09 17         Q.   Okay.   Was anyone else present when Toby

12:09 18    Roberts introduced you to the members of Led

12:09 19    Zeppelin?

12:09 20         A.   Any members of Spirit, you mean?

12:09 21         Q.   Anyone else present, anyone besides you,

12:09 22    Toby Roberts --

12:09 23         A.   I'm sure it was a typical backstage scene,

12:09 24    you know.

12:09 25         Q.   Do you have a recollection of it, of

MARK CHRISTOPHER ANDES - 01/15/2016

12:10  1   anyone else being present with -- during that
12:10  2   introduction?
12:10  3        A.   No one in particular.
12:10  4             MR. MALOFIY:  And --
12:10  5   BY MR. ANDERSON:
12:10  6        Q.   And do you recall anything that was said?
12:10  7             MR. MALOFIY:  Anyone else present besides
12:10  8   Spirit?  Or anyone else present besides --
12:10  9             MR. ANDERSON:  No, no.  Don't coach him.
12:10 10             MR. MALOFIY:  I'm not coaching him, but
12:10 11   the question wasn't clear.  I wasn't --
12:10 12   BY MR. ANDERSON:
12:10 13        Q.   Do you recall anything that was said in
12:10 14   that conversation?
12:10 15        A.   No.
12:10 16        Q.   It was just an introduction?
12:10 17        A.   Correct.
12:10 18        Q.   And was this before you -- you went on
12:10 19   stage to perform?
12:10 20        A.   I'm not sure.
12:10 21        Q.   Okay.  Do you recall if any member of
12:10 22   Spirit was present during that introduction?
12:10 23        A.   No.
12:10 24        Q.   Which of the members of Led Zeppelin did
12:10 25   Toby Roberts introduce you to?

MARK CHRISTOPHER ANDES - 01/15/2016

12:10  1        A.    I think I was introduced to all of them.

12:10  2        Q.    Is that your recollection, or you --

12:10  3        A.    That's my recollection.

12:10  4        Q.    And other than that occasion, it's

12:10  5   nevertheless your testimony that you've never spoken

12:10  6   with Jimmy Page, John Paul Jones or John Bonham?

12:10  7        A.    Correct.

12:10  8        Q.    Okay.  Do you recall when the members of

12:11  9   Led Zeppelin left the Denver Auditorium Arena after

12:11 10   performing?

12:11 11        A.    I do not.

12:11 12        Q.    Do you have any understanding as to

12:11 13   whether or not they heard Spirit perform at the

12:11 14   Denver Auditorium?  You don't know either way or you

12:11 15   do --

12:11 16        A.    I don't know either way.

12:11 17             MR. MALOFIY:  Can you repeat back the last

12:11 18   question?

12:11 19             (The record was read.)

12:11 20   BY MR. ANDERSON:

12:11 21        Q.    Have you ever spoken with Robert Plant --

12:11 22   let me do it differently.

12:11 23             Setting aside that -- that brief

12:11 24   introduction that you've testified to, have you ever

12:11 25   met or spoken with Robert Plant?

MARK CHRISTOPHER ANDES - 01/15/2016

12:11 1      A.   Yes.

12:11 2      Q.   On what other -- on what occasions have

12:11 3  you -- occasion or occasions have you met or spoken

12:11 4  with Robert Plant?

12:11 5      A.   There -- there was -- Robert was the most

12:12 6  friendly.  He was the most gregarious.  And I forget

12:12 7  which of the festivals.  Maybe it was Atlanta.  But

12:12 8  we -- my recollection is that we were passing each

12:12 9  other, so going on or off stage, there was -- he was

12:12 10  very friendly.  So that's my recollection of -- of

12:12 11  talking with him.

12:12 12          And then I saw him in England, and in

12:12 13  Blackpool when he came to the show, and we hung out

12:12 14  afterwards.  And then I saw him in '82 when he came

12:12 15  to a Heart show.

12:12 16      Q.   Okay.  So, Atlanta, what was the -- was

12:12 17  that the Atlanta Pop Festival?

12:12 18      A.   Yes, sir.

12:12 19      Q.   And you saw Mr. Plant as you passed each

12:12 20  other?

12:12 21      A.   Well, we -- in the back stage area

12:13 22  there -- it was very, very friendly, social hang

12:13 23  back then and everybody was visiting and stuff.

12:13 24      Q.   Do you recall what was -- what, if

12:13 25  anything, was said by you and by Mr. Plant?

MARK CHRISTOPHER ANDES - 01/15/2016

12:13 1      A.   I think we just complimented each other on

12:13 2  each other's bands and just, typical, you know,

12:13 3  friendly small talk, kind of.

12:13 4      Q.   You said you think.  And, again, I don't

12:13 5  want you to speculate.

12:13 6           Do you have any recollection of what, if

12:13 7  anything, was said by you and Mr. Plant and anyone

12:13 8  else present?

12:13 9      A.   I think we both -- I -- I -- I remember

12:13 10 complimenting him on his band, and he compli- --

12:13 11 complimented me on our -- on my band.

12:13 12     Q.   So, basically, you said, "You guys are

12:13 13 great," and he said, "Your guys are great, too"?

12:13 14     A.   Basically, yes.

12:13 15     Q.   Okay.  Was anyone else present in that

12:13 16 exchange?

12:13 17     A.   I don't recall.

12:13 18     Q.   Okay.  And then I -- I believe you said

12:14 19 that you saw him at Blackpool in England?

12:14 20     A.   That's -- yes.

12:14 21     Q.   And when was that?

12:14 22     A.   I'm not exactly sure of the year.  But

12:14 23 Spirit did a performance in a small venue, and he

12:14 24 came and hung out and visited.

12:14 25     Q.   Is this at Mother's Club?

MARK CHRISTOPHER ANDES - 01/15/2016

12:14  1          A.   I think that's what it was, yeah.

12:14  2          Q.   Mr. Ferguson testified that someone came

12:14  3   and told you that Robert Plant was there, and that

12:14  4   you and Mr. Ferguson went out in a short

12:14  5   meet-and-greet of ten to 15 seconds, and then -- and

12:14  6   that was it.

12:14  7              MR. MALOFIY:  Objection.

12:14  8   BY MR. ANDERSON:

12:14  9          Q.   Is that your recollection as well?

12:14 10              MR. MALOFIY:  Objection.

12:14 11   Mischaracterization.

12:14 12              You can answer.

12:14 13              THE WITNESS:  The meet-and-greet probably

12:14 14   took place.  But I have a memory of us in a pub

12:14 15   playing snooker with him.

12:15 16   BY MR. ANDERSON:

12:15 17          Q.   Okay.  So, at Mother's -- What do you

12:15 18   recall happening at Mother's with respect to Robert

12:15 19   Plant?

12:15 20          A.   I do recall the -- the meet-and-greet, and

12:15 21   I -- yeah, that's what I'm -- recall, yeah.

12:15 22          Q.   Okay.  And -- and other than that

12:15 23   meet-and-greet, which -- would you agree it was --

12:15 24   we're talking about ten or 15 seconds?

12:15 25          A.   Yeah.  Probably a minute, maybe longer.

MARK CHRISTOPHER ANDES - 01/15/2016

12:15  1      Q.   And -- and do you recall anything that was

12:15  2   said in the meet-and-greet?

12:15  3      A.   No.

12:15  4      Q.   And then if I understand correctly, after

12:15  5   that, your recollection is you played pool in a pub

12:15  6   with -- or snooker -- snooker in a pub with

12:15  7   Mr. Plant?

12:15  8      A.   That's my recollection.  And I'm -- I'm

12:15  9   not sure whether it was at Mother's or whether we

12:15 10   went to another location.

12:15 11          But I remember having several pints and

12:15 12   just having a very laid back, very casual, an hour

12:16 13   or -- or longer visit teach- -- having him teach us

12:16 14   how to play snooker.

12:16 15      Q.   And who else was present, besides you?

12:16 16      A.   I think it was John Locke and Randy, I

12:16 17   believe.

12:16 18      Q.   And other than having a few pints and

12:16 19   teaching you how to play snooker, what else do you

12:16 20   recall about that -- that night?

12:16 21      A.   Just a pleasant conversation.

12:16 22      Q.   Did you folks dis- -- talk about music?

12:16 23      A.   I -- I'm sure we did, but I have no memory

12:16 24   of exactly what we discussed musically.

12:16 25      Q.   Did you folks talk about "Taurus"?

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 12:16 | 1 | A.   I am not sure. |
| 12:16 | 2 | Q.   Do you have any recollection that anyone |
| 12:16 | 3 | talked about "Taurus" at any point either at |
| 12:16 | 4 | Mother's Club or at the pub afterwards? |
| 12:16 | 5 | A.   No. |

12:16   6       Q.   Okay.  And then the only other occasion

12:17   7   where you've been physically present with Robert

12:17   8   Plant was -- I'm sorry, spoken with Robert Plant,

12:17   9   was in 1982 when you were with Heart?

12:17  10       A.   Uh-huh.

12:17  11       Q.   "Yes"?  You have to answer audibly.

12:17  12   Sorry.

12:17  13       A.   Yes, sir.  Yes.

12:17  14       Q.   You can leave out the "sir."

12:17  15       A.   Yeah.

12:17  16       Q.   And what was that occasion?  Was it at a

12:17  17   venue?

12:17  18       A.   Yes.

12:17  19       Q.   And what was the venue?

12:17  20       A.   I don't recall the name of the venue.  It

12:17  21   was an outdoor show.  Heart was opening up for

12:17  22   Queen.  And it was my first tour with Heart, 1982.

12:17  23           And he -- he came and remembered me from

12:17  24   Spirit, and we had a pleasant conversation with Ann

12:17  25   and Nancy and the guys and Heart present.

MARK CHRISTOPHER ANDES - 01/15/2016

12:21 1  that you recall?

12:21 2          A.   But I don't recall Jay being --

12:21 3               Oh, I'm sorry.

12:21 4          Q.   Go ahead.

12:21 5          A.   -- at the snooker event.  He might have

12:21 6  not been there.  Okay.

12:21 7          Q.   And when was Mr. Plant effusive, in the

12:21 8  meet-and-greet or at the pub?

12:21 9          A.   I'm not -- I'm not sure.  He was just very

12:22 10 friendly all night really.  So -- but he was

12:22 11 complimentary to the band.

12:22 12         Q.   What did he say about the band?

12:22 13         A.   Just that he -- that he thought it was

12:22 14 good music and enjoyed it and was...

12:22 15         Q.   And, as you're sitting here now, you don't

12:22 16 recall any mention of "Taurus" though, correct?

12:22 17         A.   No.

12:22 18         Q.   That is correct?

12:22 19         A.   That is correct.

12:22 20         Q.   Okay.  Do you recall performing at the

12:22 21 Olympia Stadium in Detroit in May of 1969, possibly

12:22 22 with Illinois Speed Press also on the bill?

12:22 23         A.   I don't recall that show, but easily could

12:22 24 have played it.

12:22 25         Q.   Other than Atlanta, do you recall -- and

MARK CHRISTOPHER ANDES - 01/15/2016

12:26  1    move to strike as speculation.

12:26  2    BY MR. ANDERSON:

12:26  3        Q.   And just to close this off, as you're

12:26  4    sitting here now, you do not know, one way or the

12:26  5    other, whether Led Zeppelin performed at the

12:26  6    Northern California Folk Rock Festival in 1969,

12:26  7    correct?

12:26  8        A.   Correct.

12:26  9        Q.   I'm sorry.  But this a little bit -- I got

12:26 10    this a little bit out of order.  I apologize for

12:26 11    that.  I don't mean to jump around.

12:26 12        A.   Okay.

12:26 13        Q.   But before we go too much further down

12:26 14    this road, let me place in front of you Exhibit 321,

12:26 15    previously marked at Mr. Ferguson's deposition.

12:26 16            (Exhibit 321, a previously marked

12:26 17            document, was attached for reference.)

12:26 18    BY MR. ANDERSON:

12:26 19        Q.   Have you ever seen Exhibit 32- -- this

12:26 20    before?

12:26 21        A.   No, sir.

12:27 22        Q.   And you testified that Mr. Plant had a

12:27 23    horrible accident after the occasion when, possibly

12:27 24    at the Mother's Club, where you met him and then

12:27 25    after that went to a pub.

MARK CHRISTOPHER ANDES - 01/15/2016

12:28  1        Q.    Did you ever talk to any member of Led

12:28  2  Zeppelin about his accident?

12:28  3        A.    No, I did not.

12:28  4        Q.    And just to be clear, as far as you know,

12:28  5  Jimmy Page, John Paul Jones and -- and John Bonham

12:28  6  were not present at Mother's Club and were not

12:28  7  present at the pub where you -- where Mr. Plant was

12:28  8  teaching you how to play snooker?

12:28  9        A.    Correct.  I don't recall them -- them

12:28 10  being there.

12:28 11              MR. MALOFIY:  Objection.  Compound.

12:29 12  Ambiguous.  Vague.

12:29 13  BY MR. ANDERSON:

12:29 14        Q.    You mentioned the Atlanta International

12:29 15  Pop Festival.

12:29 16        A.    Yeah.

12:29 17        Q.    And do I understand correctly that your

12:29 18  recollection is that, in passing, you and Mr. Plant

12:29 19  complimented each other on your respective music?

12:29 20              MR. MALOFIY:  Objection.  Mischaracterizes

12:29 21  his testimony.

12:29 22              THE WITNESS:  My memory is that, in the

12:29 23  backstage area, we had a chance to have a very

12:29 24  casual, pleasant conversation.  We didn't -- not

12:29 25  have a conversation as we were passing each other.

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 12:30 | 1 | A.   -- you know. |
| 12:30 | 2 | Q.   Fair enough. |
| 12:30 | 3 | A.   Typically, there's lots of people hanging. |
| 12:30 | 4 | MR. ANDERSON:  Well, move to strike |
| 12:30 | 5 | everything after "typically," and everything after |
| 12:30 | 6 | that as speculation. |
| 12:30 | 7 | BY MR. ANDERSON: |
| 12:30 | 8 | Q.   But -- but thank you. |
| 12:30 | 9 | A.   Sure. |
| 12:30 | 10 | Q.   Do you have any other recollection of the |
| 12:30 | 11 | Atlanta International Pop Festival, besides what |
| 12:30 | 12 | you've described so far? |
| 12:30 | 13 | A.   Yes. |
| 12:30 | 14 | Q.   What? |
| 12:30 | 15 | A.   I think a -- a -- a lady gave birth during |
| 12:31 | 16 | our set.  She had her kid.  And they had to take her |
| 12:31 | 17 | away.  We had to pause for a while. |
| 12:31 | 18 | And a -- we were made aware that a lot of |
| 12:31 | 19 | kids could not make it to the show, so Delaney and |
| 12:31 | 20 | Bonnie; Spirit; and Chicago performed a free show |
| 12:31 | 21 | park in -- after the -- the festival was over, and |
| 12:31 | 22 | put on a free show for the -- for the city. |
| 12:31 | 23 | Q.   Anything else you recall from the Atlanta |
| 12:31 | 24 | Pop Festival? |
| 12:31 | 25 | A.   Just one of the nicer festivals.  It was |

MARK CHRISTOPHER ANDES - 01/15/2016

12:31  1    really well done.

12:31  2         Q.   Did you watch Led Zeppelin perform?

12:31  3         A.   I -- I believe so.

12:31  4         Q.   That's your recollection?

12:31  5         A.   Yes, sir.

12:31  6         Q.   Did you watch their entire set?

12:31  7         A.   I don't think I watched their whole show.

12:31  8         Q.   How much of their show did you watch?

12:31  9         A.   Maybe half.

12:31 10         Q.   Do you have any knowledge as to whether

12:31 11    any member of Led Zeppelin saw Spirit perform?

12:31 12         A.   I don't.

12:31 13         Q.   Okay.  Do you know who preceded Spirit on

12:32 14    stage at the Atlanta Pop Festival?

12:32 15         A.   No.

12:32 16         Q.   Do you know who followed Spirit on stage

12:32 17    at the Atlanta Pop Festival?

12:32 18         A.   I thought it was Led Zeppelin.

12:32 19         Q.   Okay.  Do you recall how the equipment

12:32 20    change was handled at the Atlanta Pop Festival?

12:32 21         A.   I don't.

12:32 22         Q.   Do you know how long -- do you recall or

12:32 23    have an estimate from your memory as to how long the

12:32 24    equipment change took?

12:32 25         A.   No.

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 12:32 | 1 | Q.   Let me place in front of you a document |
| 12:32 | 2 | that was previously marked as Exhibit 314. |
| 12:32 | 3 | (Exhibit 314, a previously marked |
| 12:33 | 4 | document, was attached for reference.) |
| 12:33 | 5 | BY MR. ANDERSON: |
| 12:33 | 6 | Q.   And what I'm going to ask is if you could, |
| 12:33 | 7 | please - and take as much time as you need - read |
| 12:33 | 8 | through this and then let me know if it refreshes |
| 12:33 | 9 | your memory as to anything that happened at the |
| 12:33 | 10 | Atlanta Pop Festival. |
| 12:33 | 11 | A.   [Witness reviews document]. |
| 12:33 | 12 | Oh, Janis, yeah.  Great.  Yeah.  I think I |
| 12:34 | 13 | recall Janice being the group that played before |
| 12:34 | 14 | Spirit at that show, after reading this. |
| 12:34 | 15 | Q.   Okay.  Anything else that you now recall |
| 12:34 | 16 | having read this Exhibit 314? |
| 12:35 | 17 | A.   No.  No.  It was a great festival. |
| 12:35 | 18 | Q.   It sounds like it, actually. |
| 12:35 | 19 | A.   It was really, really good. |
| 12:35 | 20 | Q.   Do you have any recollection of seeing any |
| 12:35 | 21 | member of Spirit interact with any member of Led |
| 12:35 | 22 | Zeppelin at the Atlanta Pop Festival? |
| 12:35 | 23 | A.   I don't have a memory of that. |
| 12:35 | 24 | MR. MALOFIY:  Objection. |
| 12:35 | 25 | THE WITNESS:  Well, except we -- |

MARK CHRISTOPHER ANDES - 01/15/2016

```
12:35  1              MR. MALOFIY:  Mischaracterizes testimony.
12:35  2   BY MR. ANDERSON:
12:35  3        Q.   Was "Taurus" performed at the Atlanta Pop
12:35  4   Festival?
12:35  5        A.   I don't -- I'm not sure.
12:35  6        Q.   Okay.  Next is Exhibit 315.
12:35  7             (Exhibit 315, a previously marked
12:35  8             document, was attached for reference.)
12:35  9   BY MR. ANDERSON:
12:35 10        Q.   And the same question, sir.  If you could
12:35 11   take a moment, or as much time as -- time as you
12:35 12   need, to read Exhibit 315, and then my question will
12:35 13   be whether it -- a light bulb goes off and you now
12:35 14   recall something else that -- about the Atlanta Pop
12:35 15   Festival that you haven't testified to so far.
12:36 16        A.   [Witness reviews document].
12:36 17             Yep, no...
12:36 18        Q.   It doesn't refresh your memory as to any
12:36 19   of the subjects we've discussed so far?
12:36 20        A.   Not really.
12:36 21        Q.   Okay.  Do you recall performing at the
12:36 22   first Seattle Pop Festival in Woodinville outside of
12:36 23   Seattle in 1969?
12:37 24        A.   I have a vague memory of that.
12:37 25        Q.   Okay.  Let me show you -- well, what do
```

MARK CHRISTOPHER ANDES - 01/15/2016

12:37  1    you recall?  Let's start with that.

12:37  2          A.   Actually, not much.  I mean, I really have

12:37  3    very little recall of, actually, that show.

12:37  4          Q.   Did you see -- was Led Zeppelin -- I'm

12:37  5    sorry.

12:37  6               Did Led Zeppelin perform at the Seattle

12:37  7    Pop Festival in 1969?

12:37  8          A.   I am assum- -- I'm assuming they did.  I

12:37  9    don't -- I don't have a memory of them performing.

12:37 10          Q.   Okay.  And you're assuming they did

12:37 11    because you've seen documents that indicate they

12:37 12    did?

12:37 13          A.   The posters and stuff, yeah.

12:37 14          Q.   Okay.  But setting aside the posters, is

12:37 15    it correct you have no recollection of Led Zeppelin

12:37 16    being at the Seattle Pop Festival?

12:37 17          A.   Correct.

12:37 18          Q.   Is it correct, then, that you have no

12:37 19    recollection of -- well, strike that.

12:37 20               Do you know -- do you recall what songs

12:38 21    Spirit performed at the Seattle Pop Festival?

12:38 22          A.   I do not.

12:38 23          Q.   Okay.  First is Exhibit 316.

12:38 24               (Exhibit 316, a previously marked

12:38 25               document, was attached for reference.)

MARK CHRISTOPHER ANDES - 01/15/2016

```
12:38  1        Q.   Okay.  Next is 317.
12:39  2             (Exhibit 317, a previously marked
12:39  3             document, was attached for reference.)
12:39  4   BY MR. ANDERSON:
12:39  5        Q.   If you would take a moment.  And I
12:39  6   apologize it's small.
12:39  7        A.   Yeah.
12:39  8        Q.   But if you could take a moment and -- or,
12:39  9   as long as you need, actually, and let me know if
12:39 10   any of it refreshes your memory in any way as to the
12:39 11   Atlanta Pop Festival --
12:39 12        A.   It is difficult --
12:39 13        Q.   I'm sorry.  The Seattle Pop Festival.
12:39 14        A.   It's really difficult for me to read,
12:39 15   actually.
12:39 16             [Witness reviews document].
12:39 17        Q.   Well, take your time, sir.
12:39 18             (A discussion was held off the record.)
12:39 19             MR. KULIK:  Can you enlarge this so --
12:39 20             MR. ANDERSON:  That's what I'm -- I'm
12:39 21   pulling out my laptop to see if I can come up with a
12:39 22   larger copy on my -- on my laptop.  And I'm happy to
12:39 23   place that in front of the witness if I can actually
12:39 24   do that.
12:40 25             MR. MALOFIY:  If anyone was 75 in this
```

MARK CHRISTOPHER ANDES - 01/15/2016

12:40  1    office, they would have a magnifying glass, but it's

12:40  2    a young office.

12:40  3         MR. ANDERSON:  Well, my friend, I have to

12:40  4    tell you, I have a magnifying glass at home.  So I

12:40  5    do have one.  I just don't happen to have one at the

12:40  6    office.  And that's primarily because on a lap- --

12:40  7    on the screen, you can always make things bigger.

12:40  8    At home, it doesn't work that way.  But let me see.

12:40  9    I'm pretty sure I can come up with a bigger copy for

12:40 10    the witness.

12:40 11         MR. KULIK:  Perhaps you can show the

12:40 12    witness on your screen.

12:40 13         MR. ANDERSON:  That's what I just --

12:40 14    that's what I said.  I'm scanning right now.

12:40 15         THE WITNESS:  Yeah.

12:40 16    BY MR. ANDERSON:

12:40 17         Q.   Hold on for a second.  I think I can put

12:40 18    it in front of the witness my laptop that --

12:41 19         A.   That would be great.

12:41 20         Q.   Yeah, it's -- it's pretty small.

12:41 21    Challenging to read this.

12:41 22         A.   Yeah.  Yeah.

12:41 23         MR. KULIK:  I'm pretty jealous looking at

12:41 24    these -- the groups that performed at these shows.

12:41 25    I wish I had been to some of these shows.  Oh, my

MARK CHRISTOPHER ANDES - 01/15/2016

| 12:41 | 1 | god. |

12:41  1    god.

12:41  2            I don't know if you were aware at the time

12:41  3    of the -- how amazing this was.  Perhaps not when

12:41  4    you're living it, but looking back on it now.

12:41  5            THE WITNESS:  Yeah.

12:41  6            MR. KULIK:  I mean, probably --

12:41  7            THE WITNESS:  It is.

12:41  8            MR. KULIK:  A lot of great groups.

12:41  9            THE WITNESS:  Yeah.

12:41 10            MR. KULIK:  Music has changed a little bit

12:41 11    since then.

12:41 12            THE WITNESS:  Yeah.

12:41 13            MR. MALOFIY:  I think we're still on the

12:41 14    record but...

12:41 15            MR. KULIK:  I -- I don't mind.

12:41 16            MR. MALOFIY:  He was also a -- a member of

12:42 17    Canned Heat.

12:42 18            MR. KULIK:  Oh, you were?

12:42 19            MR. MALOFIY:  Yeah.

12:42 20            MR. KULIK:  Oh, my god.  You were in some

12:42 21    of my --

12:42 22            I love Firefall, too.  You were really in

12:42 23    some of my favorite bands.

12:42 24            MR. MALOFIY:  And Heart.  That was --

12:42 25            MR. KULIK:  I know Heart, yeah.

MARK CHRISTOPHER ANDES - 01/15/2016

12:42  1                    THE WITNESS:  I was the first bass player

12:42  2     for Canned.  Larry Taylor took my place.

12:42  3                    MR. KULIK:  I saw Canned Heat once, I

12:42  4     think, with Creedence Clearwater Revival.  I --

12:42  5     yeah.

12:42  6                    MR. ANDERSON:  I'm getting there.

12:42  7                    (A discussion was held off the record.)

12:42  8     BY MR. ANDERSON:

12:43  9          Q.   Okay.  I'm not sure this is -- oh, no.

12:43 10     This is -- actually, it's easier.

12:43 11          A.   It might not have the line that this has

12:43 12     going through it.

12:43 13          Q.   Unfortunately, it has the line.

12:43 14          A.   Okay.

12:43 15          Q.   But -- let me unplug it, and let's --

12:43 16          A.   Awesome.

12:43 17          Q.   I'm trying to find --

12:43 18          A.   You want me to come over there?

12:43 19          Q.   Oh, no, no.  I'll -- I'll place it in

12:43 20     front of you --

12:43 21          A.   Okay.

12:43 22          Q.   -- once I can get it positioned, again.

12:43 23                    Now, it may be easier -- I've -- I've

12:43 24     centered it.  There you go.  Is that -- hopefully

12:43 25     it's easier.

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 12:43 | 1 | A.   Oh, yeah.  Yeah, now we're talking. |
| 12:43 | 2 | (Attorney places in front of witness |
| 12:43 | 3 | laptop monitor with exhibit displayed |
| 12:43 | 4 | BY MR. ANDERSON: |
| 12:43 | 5 | Q.   Yeah.  Is that better? |
| 12:43 | 6 | A.   Yeah.  Yes, sir. |
| 12:43 | 7 | Q.   And, again, the question is, simply, |
| 12:44 | 8 | whether you read something there that triggers a |
| 12:44 | 9 | memory. |
| 12:44 | 10 | A.   [Witness reviews monitor screen]. |
| 12:44 | 11 | Can I bring this down -- |
| 12:44 | 12 | Q.   Oh, I'm sorry. |
| 12:44 | 13 | A.   -- slightly. |
| 12:44 | 14 | Q.   So... |
| 12:44 | 15 | A.   Just the text.  There is a line that I'm |
| 12:44 | 16 | actually missing at the top.  I guess, if you bring |
| 12:44 | 17 | it down, you'll probably lose some of the bottom |
| 12:44 | 18 | but... |
| 12:44 | 19 | Q.   [Attorney complies]. |
| 12:44 | 20 | A.   Okay.  Okay.  Okay.  Great. |
| 12:44 | 21 | Q.   [Attorney complies]. |
| 12:44 | 22 | A.   This thing came off.  I'm sorry.  Sorry. |
| 12:44 | 23 | Thank you. |
| 12:44 | 24 | Q.   No worries.  Thank you. |
| 12:44 | 25 | A.   Okay.  There we go. |

MARK CHRISTOPHER ANDES - 01/15/2016

| | |
|---|---|
| 12:44 | 1 |
| 12:46 | 2 |
| 12:46 | 3 |
| 12:46 | 4 |
| 12:46 | 5 |
| 12:46 | 6 |
| 12:46 | 7 |
| 12:46 | 8 |
| 12:46 | 9 |
| 12:46 | 10 |
| 12:46 | 11 |
| 12:46 | 12 |
| 12:46 | 13 |
| 12:46 | 14 |
| 12:46 | 15 |
| 12:46 | 16 |
| 12:46 | 17 |
| 12:47 | 18 |
| 12:47 | 19 |
| 12:47 | 20 |
| 12:47 | 21 |
| 12:47 | 22 |
| 12:47 | 23 |
| 12:47 | 24 |
| 12:47 | 25 |

1            [Witnesses review monitor screen].

2            Thank you.

3            But it does little to really help me

4    remember much.  I don't -- I really have very little

5    memory of that at all.

6        Q.   Okay.  And -- and just to -- to be sure,

7    you said "it doesn't help much."  Does it help at

8    all?  Does it -- any memories trigger?

9        A.   Kind of not.  I -- I'm drawing a blank on

10   that one.  Sorry.

11       Q.   It -- no need to apologize.  And I

12   appreciate you taking the time to make sure that you

13   were able to read the entire article.

14       A.   Stellar review of Led Zeppelin, though.

15       Q.   The article refers to them coming on, I

16   believe, after The Doors after 11:00 p.m.

17       A.   Right.

18       Q.   Did you stay around to watch The Doors

19   perform?

20       A.   I don't know.  I don't think so.

21       Q.   Do you know when Spirit performed that

22   day?

23       A.   I have no idea.

24       Q.   Did you perform during the daytime or

25   nighttime?

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 12:47 | 1 | A.   I have no idea. |
| 12:47 | 2 | Q.   Okay. |
| 12:47 | 3 | A.   I really don't have a memory of that show. |
| 12:47 | 4 | Q.   No, no.  That's fine. |
| 12:47 | 5 | A.   [Witness whistles] one of those [witness |
| 12:47 | 6 | waves hand over head]. |
| 12:47 | 7 | Q.   I can only find out by asking. |
| 12:47 | 8 | A.   There you go. |
| 12:47 | 9 | Q.   Do you recall performing at the Texas -- |
| 12:47 | 10 | Texas Pop Festival at the Dallas International |
| 12:47 | 11 | Speedway in 1969? |
| 12:47 | 12 | A.   Yes.  I do remember some of that one. |
| 12:47 | 13 | Q.   Okay.  What do you recall from that |
| 12:47 | 14 | festival? |
| 12:47 | 15 | A.   Just that it was another one of those |
| 12:47 | 16 | wonderful gatherings.  And it was a great selection |
| 12:47 | 17 | of music.  I recall Spirit having a great set. |
| 12:47 | 18 | Q.   Let me show you a document previously |
| 12:48 | 19 | marked as Exhibit 319.  And, actually -- do you |
| 12:48 | 20 | have -- actually, this may be easier. |
| 12:48 | 21 |      The witness has gone back to Exhibit 315 |
| 12:48 | 22 | and turned it to -- which page?  The page -- the |
| 12:48 | 23 | black-and-white of the Texas Pop Festival? |
| 12:48 | 24 | A.   Right. |
| 12:48 | 25 | Q.   Just before this -- the poster for the |

MARK CHRISTOPHER ANDES - 01/15/2016

12:49  1    don't have much of a memory of that.

12:49  2         Q.   Okay.  If you see it, it lists -- it's a

12:49  3    three-day festival; is that correct?

12:49  4         A.   Right.  Uh-huh.

12:49  5         Q.   It was a three-day festival?

12:49  6         A.   Correct.

12:49  7         Q.   And do you know which day Spirit performed

12:49  8    on?

12:49  9         A.   The date it says here, Monday.

12:49 10         Q.   Is that your recollection?

12:49 11         A.   I have no memory.  Yeah.  I mean, it could

12:49 12    easily have been.

12:49 13         Q.   Do you recall that Spirit performed on the

12:49 14    last day of the three-day festival?

12:49 15         A.   I don't recall.

12:49 16         Q.   Okay.  This also shows Led Zeppelin as

12:49 17    performing on Sunday, the day before?

12:50 18         A.   Right.

12:50 19         Q.   Is that your recollection or --

12:50 20         A.   I have no memory of who played when.

12:50 21         Q.   Do you have any recollection that --

12:50 22    setting aside documents that you've seen, do you

12:50 23    have any recollection of Led Zeppelin performing at

12:50 24    the Texas International Pop Festival in 1969?

12:50 25         A.   No.

MARK CHRISTOPHER ANDES - 01/15/2016

14:21  1      Q.   How many did you co-write with him?

14:21  2      A.   Oh, I -- I'm not sure.

14:21  3      Q.   Did you ever discuss with him what his

14:21  4  musical influences were?

14:21  5      A.   Oh, I'm sure.  Yes.  Yeah.

14:21  6      Q.   And what were -- what did you understand

14:21  7  his musical influences were?

14:21  8      A.   Well, he was a child prodigy, and his

14:21  9  uncle owns -- owned the Ash Grove.  And so Max

14:21 10  Lipscomb and --

14:22 11          Randy's influences were broad from

14:22 12  traditional blues.  He loved Wes Montgomery.  He

14:22 13  loved John Coltrane.  And then later when he

14:22 14  realized that Jimi Hendrix was Jimmy James, he

14:22 15  really enjoyed Jimi's music.

14:22 16          So, he was -- his -- his influences were

14:22 17  very broad.

14:22 18      Q.   Were you present when "Taurus" was

14:22 19  recorded for Spirit's first album?

14:22 20      A.   Yes.

14:22 21      Q.   Where was it recorded?

14:22 22      A.   I think Gold Star, I believe.

14:22 23      Q.   When was it recorded?

14:22 24      A.   Probably 196- -- early -- late '66 or

14:22 25  early '67.

MARK CHRISTOPHER ANDES - 01/15/2016

14:22  1      Q.   Was it recorded after Spirit signed the

14:22  2   recording contract with Lou Adler's company?

14:23  3      A.   Yes.

14:23  4      Q.   Who else was present besides --

14:23  5           MR. MALOFIY:  I'll just put an

14:23  6   objection -- objection.  Recorded album version or

14:23  7   different version, to be clear?

14:23  8   BY MR. ANDERSON:

14:23  9      Q.   We're -- we're talking about the album

14:23 10   version, right?

14:23 11      A.   Okay.  Right.  And those are -- those are

14:23 12   two sessions, by the way.

14:23 13      Q.   What do you mean "two sessions"?

14:23 14      A.   Well, there's the version that the band

14:23 15   played live, which was just the acoustic -- the

14:23 16   guitar and the band coming in.  And then there's

14:23 17   the -- the -- the album version has Marty Paich's

14:23 18   beautiful orchestrations, and the flutes and the

14:23 19   strings and all that.  That was -- that was another

14:23 20   session.

14:23 21           We happened to be there when that was

14:23 22   happening, but we -- it was another session, and it

14:23 23   was an overdub, basically.

14:23 24      Q.   Who else was there for the overdub, other

14:23 25   than you?

MARK CHRISTOPHER ANDES - 01/15/2016

14:34  1   playing off of those changes.

14:34  2        Q.   It's a descending chromatic scale; is that

14:34  3   correct?

14:35  4            Do you know what that is?

14:35  5        A.   Yeah.  I think it would be definitely

14:35  6   chromatic.  Yeah.

14:35  7        Q.   Okay.  Is it fair to say that "Taurus" was

14:35  8   a work-in-progress until it was recorded by Ode

14:35  9   records in its final form?

14:35 10            MR. MALOFIY:  Objection.  Mischaracterizes

14:35 11   his testimony.

14:35 12            THE WITNESS:  The thing about Spirit is

14:35 13   that everything was fluid, and the recordings were

14:35 14   important because they were the benchmark.  But

14:35 15   everything we played had changes from performance to

14:35 16   performance so...

14:35 17   BY MR. ANDERSON:

14:35 18        Q.   Okay.  Just for the record, to identify

14:35 19   what we just heard, that was another audio file

14:35 20   produced by plaintiff, and it was labeled "Taurus

14:35 21   recording 8.1967."

14:35 22            Okay.  When "Taurus" was recorded by Ode

14:35 23   Records, who was the recording engineer?

14:35 24        A.   I'm not sure.

14:35 25        Q.   Who else was present, besides members of

MARK CHRISTOPHER ANDES - 01/15/2016

14:37  1          A.   Yes.

14:37  2          Q.   And what instruments were used to create

14:37  3    the sounds of the orchestration in "Taurus" as

14:37  4    released by Ode Records?

14:37  5          A.   Well, the string section, obviously.  And

14:37  6    the flute improvisation.

14:37  7          Q.   And the string section, what do you mean

14:37  8    by "string section"?

14:37  9          A.   Multiple violinists.  I am -- I'm not sure

14:37 10    of the exact orchestration, but there was violins.

14:37 11    Maybe viola.  Possibly even cello.  But I -- I'm not

14:37 12    sure, to be honest.

14:37 13          Q.   Okay.  And I don't want you to guess, but

14:37 14    if you have a recollection, I -- I would like that.

14:37 15          A.   Yeah, that's what a typical string section

14:37 16    is made up of.

14:37 17          Q.   Okay.  And did members of -- of Spirit

14:37 18    perform those instruments?

14:37 19          A.   No.

14:37 20          Q.   Were any members of the band Spirit, in

14:37 21    that time frame, able to play violin?

14:37 22          A.   No.

14:38 23          Q.   Were any members of Spirit, at that time,

14:38 24    able to play cello or viola?

14:38 25          A.   I don't think so.

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 14:38 | 1 | Q.   And who played the flute? |
| 14:38 | 2 | I'm sorry.  Let me rephrase that. |
| 14:38 | 3 | You okay? |
| 14:38 | 4 | A.   Yeah.  Yeah. |
| 14:38 | 5 | Q.   When -- in Marty Paich's orchestration, do |
| 14:38 | 6 | you know who played the flute? |
| 14:38 | 7 | A.   No. |
| 14:38 | 8 | Q.   Is it correct it wasn't a member of the |
| 14:38 | 9 | band Spirit? |
| 14:38 | 10 | A.   Yes. |
| 14:38 | 11 | Q.   Was there any member of the band Spirit |
| 14:38 | 12 | who, at that point in time, could play flute and |
| 14:38 | 13 | played the flute part that appears in the "Taurus," |
| 14:38 | 14 | as recorded by Ode Records? |
| 14:38 | 15 | A.   No. |
| 14:38 | 16 | Q.   Did -- when "Taurus" -- excuse me. |
| 14:38 | 17 | When Spirit toured, did they ever bring in |
| 14:38 | 18 | a string section and a flutist? |
| 14:38 | 19 | A.   No. |
| 14:38 | 20 | Q.   And so is it fair to say that when Spirit |
| 14:38 | 21 | toured, they were unable to perform live "Taurus" as |
| 14:38 | 22 | it appeared in the Ode record that had been released |
| 14:38 | 23 | to the public? |
| 14:39 | 24 | MR. MALOFIY:  Objection.  Argumentative. |
| 14:39 | 25 | Also mischaracterizes prior testimony. |

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 14:39 | 1 | THE WITNESS:  Well, we -- correct.  We |
| 14:39 | 2 | could not perform with the strings and flute and -- |
| 14:39 | 3 | which we did not do -- |
| 14:39 | 4 | BY MR. ANDERSON: |
| 14:39 | 5 | Q.   Okay.  So if Spirit -- I apologize. |
| 14:39 | 6 | A.   Which we did not do.  We performed it like |
| 14:39 | 7 | you played earlier with the -- you know, just the |
| 14:39 | 8 | group playing. |
| 14:39 | 9 | Q.   And so if Spirit performed "Taurus" live, |
| 14:39 | 10 | after the release of the first "Spirit" album, it |
| 14:39 | 11 | wouldn't have sounded the same as the recorded |
| 14:39 | 12 | version with the orchestration, right? |
| 14:39 | 13 | MR. MALOFIY:  Objection. |
| 14:39 | 14 | THE WITNESS:  That is correct. |
| 14:39 | 15 | MR. MALOFIY:  Objection.  Vague and |
| 14:39 | 16 | ambiguous.  Also, mischaracterizes his prior |
| 14:39 | 17 | testimony. |
| 14:39 | 18 | THE WITNESS:  Right.  It would be |
| 14:39 | 19 | performed without the strings and the flute. |
| 14:39 | 20 | BY MR. ANDERSON: |
| 14:39 | 21 | Q.   Okay.  Did "Taurus" -- did Spirit ever |
| 14:39 | 22 | perform "Taurus" after the release of the Spirit |
| 14:39 | 23 | album? |
| 14:39 | 24 | A.   Oh, yeah. |
| 14:39 | 25 | Q.   Spirit toured in Europe? |

MARK CHRISTOPHER ANDES - 01/15/2016

14:41  1    tour?

14:41  2         A.   I believe so, yes.

14:41  3         Q.   Okay.  So, let's --

14:41  4              MR. ANDERSON:  And I thank you,

14:41  5    Mr. Malofiy, for reminding me of that.

14:41  6    BY MR. ANDERSON:

14:41  7         Q.   Let's exclude what your -- you've

14:41  8    testified to about Mother's.

14:41  9              And other than what you've testified about

14:41 10    Mother's and Mr. Plant being at Mother's, to your

14:41 11    knowledge, was any member of Led Zeppelin present at

14:41 12    any performance by Spirit on the European tour?

14:41 13         A.   I have no memory of them coming to the

14:41 14    show --

14:41 15         Q.   Okay.

14:41 16         A.   -- any shows.  Excuse me.

14:41 17         Q.   Did Spirit perform at the Hornsey Town

14:41 18    Hall?

14:41 19         A.   Boy, that sounds familiar, but I --

14:41 20         Q.   Well -- okay.

14:41 21         A.   I don't know.

14:41 22         Q.   Well, let me show you an exhibit to see if

14:41 23    it refreshes your memory.

14:42 24         A.   Yeah.

14:42 25         Q.   Let me place in front of you Exhibit 322.

MARK CHRISTOPHER ANDES - 01/15/2016

14:52  1        Q.    Was there any member of Spirit who did not

14:52  2   write or co-write any of the Spirit compositions?

14:52  3              MR. MALOFIY:  Objection.  Compound.  Vague

14:52  4   and ambiguous.

14:52  5              You can answer.

14:52  6              THE WITNESS:  Well, no.  Actually,

14:52  7   everybody did write -- because we had many

14:53  8   compositions that were group songs that would have

14:53  9   been split equally, no matter what so...

14:53 10   BY MR. ANDERSON:

14:53 11        Q.    When did you first hear "Stairway" --

14:53 12   "Stairway to Heaven"?

14:53 13        A.    I don't know the date, but it was probably

14:53 14   when it was played on the radio.  Whenever that was.

14:53 15        Q.    Is it fair to say that you first heard

14:53 16   "Stairway to Heaven" when it was first released and

14:53 17   played on the radio?

14:53 18        A.    Yes.

14:53 19        Q.    Did you ever buy the album that it appears

14:53 20   on?

14:53 21        A.    Yes.

14:53 22        Q.    When did you -- did you buy it after its

14:53 23   release --

14:53 24        A.    Yes.

14:53 25        Q.    -- in the early 1970s?

MARK CHRISTOPHER ANDES - 01/15/2016

| | | |
|---|---|---|
| 14:53 | 1 | A.  Uh-huh.  Yes.  Yes, sir. |
| 14:53 | 2 | MR. MALOFIY:  Objection to the date.  I |
| 14:53 | 3 | don't know if it's accurate. |
| 14:53 | 4 | BY MR. ANDERSON: |
| 14:53 | 5 | Q.  Of the 1970s. |
| 14:53 | 6 | A.  Whatever the date was.  I mean, I was |
| 14:53 | 7 | just -- |
| 14:53 | 8 | MR. MALOFIY:  Oh, early -- I thought |
| 14:53 | 9 | you said early '70 or is -- |
| 14:53 | 10 | MR. ANDERSON:  '70s. |
| 14:53 | 11 | THE WITNESS:  Oh, sorry.  Yeah.  Yeah. |
| 14:53 | 12 | MR. ANDERSON:  That's what I meant to say. |
| 14:53 | 13 | BY MR. ANDERSON: |
| 14:53 | 14 | Q.  Did you understand me to say "early |
| 14:54 | 15 | 1970s"? |
| 14:54 | 16 | A.  '70s, yes.  I did, yeah. |
| 14:54 | 17 | Q.  Okay.  And I believe you testified that, |
| 14:54 | 18 | when you first heard it, you believed that there was |
| 14:54 | 19 | similarities with "Taurus"? |
| 14:54 | 20 | A.  Yes. |
| 14:54 | 21 | Q.  And what are those similarities? |
| 14:54 | 22 | A.  Well, the introduction to "Stairway to |
| 14:54 | 23 | Heaven" has the same figure, that nice, little minor |
| 14:54 | 24 | descending figure that's in "Taurus." |
| 14:54 | 25 | Q.  Anything else that you think is a |

MARK CHRISTOPHER ANDES - 01/15/2016

1  STATE OF CALIFORNIA                              )

2  COUNTY OF LOS ANGELES                            )  SS.

3

4          I, Dayna Hester, C.S.R. No. 9970, in

5  and for the State of California, do hereby certify:

6          That, prior to being examined, the witness

7  named in the foregoing deposition was by me duly

8  sworn to testify to the truth, the whole truth, and

9  nothing but the truth;

10          That said deposition was taken down by me

11  in shorthand at the time and place therein named and

12  thereafter reduced to typewriting under my

13  direction, and the same is a true, correct, and

14  complete transcript of said proceedings;

15          That if the foregoing pertains to the

16  original transcript of a deposition in a Federal

17  Case, before completion of the proceedings, review

18  of the transcript {X} was {  } was not required;

19          I further certify that I am not interested

20  in the event of the action.

21          Witness my hand this _____ day of

22  _____, 20___.

23          _____

24                  Certified Shorthand Reporter

25                  for the State of California

1   STATE OF CALIFORNIA                    )

2   COUNTY OF LOS ANGELES                  )   ss.

3

4       I, Dayna Hester, C.S.R. No. 9970, in

5   and for the State of California, do hereby certify:

6       That prior to being examined, the witness named

7   in the foregoing deposition was by me duly sworn to

8   testify to the truth, the whole truth, and nothing but the

9   truth;

10      That said deposition was taken down by me in

11  shorthand at the time and place therein named and

12  thereafter reduced to typewriting under my direction, and

13  the same is a true, correct, and complete transcript of

14  said proceedings;

15      That if the foregoing pertains to the original

16  transcript of a deposition in a Federal Case, before

17  completion of the proceedings, review of the transcript

18  {√} was { } was not required.

19      I further certify that I am not interested in the

20  event of the action.

21      Witness my hand this 28TH day of January,

22  2016

23      _____

24          Certified Shorthand Reporter

25              for the State of California

**EXHIBIT 9**
**167**

# EXHIBIT 10

ODE RECORDS, INC.
c/o Mitchell, Silberberg & Knupp
6380 Wilshire Boulevard
Los Angeles, California  90048

August 29, 1967

Messrs. Mark Andes, Edward Cassidy,
    John Ferguson, John Locke and
    Randy Wolfe (P/K/A "SPIRIT")
c/o Ann Appelquist
5201 Amestoy Avenue
Encino, California

Gentlemen:

The following, when signed by you and by us, will constitute the agreement between you and us:

1.    This agreement shall commence as of the date <u>August 29, 1967,</u> and shall continue in force for a term which shall consist of an initial period of <u>one year from such date</u>, and the additional period or periods, if any, by which such term may be extended through our exercise of one or more of the options granted to us herein.

2.    a) During the term of this agreement you will render your services at recording sessions at our studios, at times and places to be designated by us, for the purpose of making phonograph records.  The musical compositions to be recorded shall be designated by us, and each master recording made hereunder shall be subject to our approval as satisfactory for the manufacture and sale of phonograph records.  During the initial period of the term hereof, you will perform for the recording of satisfactory master recordings which shall constitute a minimum of six 78 rpm record sides, or their equivalent, and we will record your performances.  Additional master recordings shall be performed by you and recorded by us at our election.

    b)  You recognize our distributor's important position in the Broadway show album and the sound track album fields and the additional benefits which accrue to you when such prestige and position among record consumers, critics, etc. is maintained.  You understand that success in these efforts enhance the company's overall sales potential and the status of all of our artists. Accordingly, you agree that when we record such albums, we may require you to cooperate with us by performing for recordings of individual compositions from such shows.

SA(1)67-992MMD

**EXHIBIT 10**
**168**



EXHIBIT 347
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970

347

- 1 (a) -

c)  Your duties, liabilities, obligations, warranties, representations, authorizations and agreements contained in this agreement are joint and several and all reference herein to "you" and "your" in connection therewith shall include all of you inclusively and each of you individually, unless otherwise specified.  It is specifically understood and agreed that we shall have the right at all times, at our election, to render statements and to make any and all payments to you hereunder, with the specific exception of the union scale payments referred to in sub-paragraph 6. a) hereof, to and in the name of "Spirit" and all such payments so made shall constitute payments to you.

d)  You warrant and represent that you own all rights in and to the name, "Spirit" (hereinafter referred to as "The Name"), and that you have the sole and exclusive right to use and to allow others to use The Name in connection with the manufacture, advertising and sale of phonograph records.  You hereby grant to us, and further warrant and represent that we shall have, the right to use and to allow others to use The Name for advertising and purposes of trade, and otherwise without restriction, in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artists and products and exclusively in connection with merchandising rights to the same extent and on the same terms and conditions a set forth herein with respect to your name.  It is understood and agreed that (i) during the term of this agreement, you will not authorize or knowingly permit any performance by any person or persons who shall in any way be identified with The Name (or any name substantially similar thereto), for the purpose of making phonograph records for any person other than us, and (ii) during a period of five years after the expiration of the term of this agreement, for any reason whatsoever, you will not authorize or knowingly permit the performance by any person or persons who shall in any way be identified with The Name (or any name substantially similar thereto) of any composition recorded hereunder for any person other than us for the purpose of making phonograph records.  It is further understood and agreed that you will not at any time manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying (i) the performances by any person or persons rendered during the term of this agreement, or (ii) the performance by any person or persons of a composition recorded hereunder rendered within five years after the expiration of the term of this agreement, which phonograph records and/or performances shall in any way be identified with The Name, or any name substantially similar thereto.  You acknowledge that any use of The Name (or any name substantially similar thereto) contrary to the provisions hereof, would cause us irreparable injury, and you agree to use your best efforts in assisting us to prevent any such use.

e)  In the event that during the term of this agreement any artist shall leave the group hereunder identified with The Name, and/or shall cease to perform as a member of such group, you shall promptly give us notice in

( Page 1 (b) follows)

**EXHIBIT 10**
**169**

547-2

- 1 (b) -

writing to such effect and such leaving member shall be replaced, if the remaining members and we shall mutually deem it advisable, by a new member who shall be mutually acceptable; and the name of such new member shall thereafter be deemed substituted in this agreement in the place of such leaving member, and such new member, by performing hereunder, shall automatically be bound by all the terms and conditions of this agreement. Upon our request therefor, the remaining members of the group will duly cause any such new member to execute and deliver to us such document as we, in our judgment, may deem necessary or expedient to carry out or effectuate the purpose or intent of the foregoing sentence. Such leaving member shall thereafter be relieved from further performances hereunder with the group, but shall continue to be bound individually by the applicable provisions of this agreement, including, without limitation, the provisions set forth in sub-paragraph 2. f) hereof.

   f)  You warrant and represent that, in the event any one or more of the artists shall so leave the group as provided in sub-paragraph 2. e) hereof, we shall have, and you and each of you does hereby grant to us, an irrevocable option on your individual and exclusive services for the purpose of making phonograph records. Such option, with respect to any such leaving member, may be exercised by us by giving such leaving member notice in writing within ninety days after our receipt of the notice provided for in said sub-paragraph 2. e); and, in the event of our such exercise of option, such leaving member shall execute our then current standard form of term recording contract containing the following provisions: (i) a term consisting of not less than the remaining balance of the term of this agreement as it may be extended by our exercise of the options granted to us herein, (ii) a minimum of four 78 rpm record sides, or their equivalent, for which satisfactory master recordings will be performed and recorded during each year of such term, it being understood that if the remaining balance of the term of this agreement shall be less than six months, then the minimum number of such 78 rpm record sides for which master recordings will be performed and recorded during such remaining balance of the term shall be one-half the foregoing number, (iii) a royalty in respect of phonograph records embodying performances recorded during such term at the rate of 6% and (iv) a payment for services rendered at each recording session at the rate of union scale, which payments shall constitute advances chargeable against such royalties. In the event that during the term of this agreement the group shall completely disband, you shall promptly give us notice in writing to such effect and, in such event, the provisions of this sub-paragraph 2. f) shall be applicable with respect to each member of the group.

   g)  As to all matters contained in this agreement to be determined by mutual agreement between you and us, or as to which your approval or consent is required, you shall not unreasonably withhold such agreement, approval or consent.

( Page 2. follows )

**EXHIBIT 10**
**170**

347-3

- 2 -

h) As to all matters contained in this agreement to be determined by mutual agreement between you and us, or as to which your approval or consent is required, you shall not unreasonably withhold such agreement, approval or consent.

3. During the term of this agreement, you will not perform for the purpose of making phonograph records or master recordings for any person other than us, and during a period of five years after the expiration of the term of this agreement, for any reason whatsoever, you will not perform any musical composition which shall have been recorded hereunder for any person other than us for the purpose of making phonograph records or master recordings; and you acknowledge that your services are unique and extraordinary, and that we shall be entitled to equitable relief to enforce the provisions of this paragraph.

4. All master recordings recorded hereunder and all matrices and phonograph records manufactured therefrom, together with the performances embodied thereon, shall be entirely our property, free from any claims whatsoever by you or any person deriving any rights or interests from you. Without limiting the generality of the foregoing, we (including other divisions of our company) and/or our subsidiaries, affiliates and licensees shall have the unlimited right, from time to time, to manufacture, by any method now or hereafter known, phonograph records and other reproductions, on any mediums or devices now or hereafter known, of the master recordings made hereunder, and to sell, transfer or otherwise deal in the same throughout the world under any trademark, trade names and labels, or to refrain from such manufacture, sale and dealing.
There is no Paragraph 5.
~~At your election, all compositions recorded pursuant to this~~
or any other agreement between you and us, which are written or composed by you or owned or controlled by you or any party which is allied or affiliated with you or in which you have a direct or indirect interest, shall be licensed to us at the applicable royalty rate set forth below per 78 rpm record side, or its equivalent, on the basis of 90% of net sales of records, except that (i) with respect to records sold and/or distributed as "bonus" and/or "free" records through any "Club Operation" (as defined in sub-paragraph 8. b) of this agreement) the royalty rate shall be three-fourths of the applicable rate set forth below payable on the basis of 90% of net sales of records, and (ii) no copyright royalties shall be payable with respect to records described in sub-paragraph 8. e) hereof. Arranged versions of musical compositions in the public domain, when furnished by you or any party described ~~above for recordings hereunder, shall be free of copyright royalties.~~


INITIAL HERE

**EXHIBIT 10**
171

347-4

~~Each assignment made of the ownership or copyright in any such~~ composition or in any such arranged version of a musical composition in the public domain shall be made subject to the provisions hereof.

INITIAL HERE

Applicable Copyright Royalty Rates.
2¢ per composition on "pop singles" which
contain only one such composition
~~1-1/2¢ per composition on all other records~~

6.  a) For your services rendered hereunder, and for the rights granted herein to us, we will make a nonreturnable payment to you, within fourteen days after the services are rendered at each recording session, at the rate of union scale; and each such payment shall constitute an advance and shall be charged against your royalties under this and/or any other agreement between you and us, if and when earned. Without limiting the generality of the foregoing, included among payments which shall hereunder constitute advances chargeable against royalties shall be all amounts which are paid by us pursuant to the requirements of any collective bargaining agreement between us and any union representing you for performances hereunder.

   b) We shall specify your accompaniment (instrumental and vocal), arrangements and copying in respect of master recordings made hereunder, and we shall pay the costs of such accompaniment, as well as the costs of such arrangements and copying which are specifically undertaken in respect of such master recordings (such costs are hereinafter collectively referred to as "Accompaniment Costs"); and all such Accompaniment Costs so paid by us, plus studio and engineering charges at our then prevailing rates (hereinafter collectively referred to as "Studio Charges"), shall constitute advances and shall be charged against your royalties under this and/or any other agreement between you and us if and when earned. Without limiting the generality of the foregoing, included among Accompaniment Costs which shall hereunder constitute advances chargeable against royalties shall be all amounts which are paid by us pursuant to the requirements of any collective bargaining agreements between us and any union representing other persons who render services hereunder or in connection with any accompaniment (instrumental and vocal), arrangements and copying for performances hereunder.

7.  a) We will pay you a royalty of (1) 10 % of the applicable wholesale price (less all taxes) in respect of 90% of all phonograph records, embodying on both sides thereof your performance(s) recorded hereunder, manufactured and sold by us (including other divisions of our company) or by any subsidiary, affiliate or licensee to whom we have supplied a master or a matrix embodying such

**EXHIBIT 10**
**172**

347-5

- 4 -

performance(s), and (2) one-half of such percentage of the applic-
able wholesale price (less all taxes) in respect of 90% of all
phonograph records, embodying such performance(s) on only one
side thereof, so manufactured and sold.  In computing the num-
ber of records manufactured and sold hereunder, we shall have
the right to deduct returns and credits of any nature including,
without limitation, those on account of 100% return privilege, de-
fective merchandise, exchange privilege, promotional credits,
errors in billing, usable overstock and errors in shipment.

   b) Royalties for records sold for distribution outside of the
United States of America shall be computed in the national cur-
rency, at our election, of the country of manufacture, the country
of sale or the United States, and as to sales made for distribution
outside of the United States of America, shall be paid at the same
rate of exchange as we are paid; provided, however, that royalties
on records sold for distribution outside of the United States of
America shall not be due and payable until payment therefor has
been received by us in the United States of America, and provided
further, that if we do not receive payment in United States dollars
currently and elect to accept payment in a foreign currency, we
may deposit to your credit (and at your expense) in such currency
in a depository selected by us all payments so received as royal-
ties applicable to this agreement and shall notify you thereof promp-
tly.  Such deposit as above stated shall fulfill our obligation here-
under as to record sales to which such royalty payments are applic-
able.

   c) With respect to any master recording embodying your per-
formance hereunder together with the performance of another artist
or artists to whom we are obligated to pay royalties in respect of
phonograph records embodying the joint performances contained on
such master recording,

      1) the royalty rate to be used in determining the royalties
   payable to you in respect of such master recording shall be
   computed by multiplying the royalty rate otherwise applicable
   thereto by a fraction, the numerator of which shall be one and
   the denominator of which shall be the total number of royalty
   artists whose performances are embodied on such master
   recording;

      2) in determining the portion of the Accompaniment Costs
   and Studio Charges applicable to such master recording
   which shall be charged against your royalties if and when
   earned, such portion shall be computed by multiplying the
   aggregate amount of such Accompaniment Costs and Studio
   Charges by the same fraction used in determining the roy-
   alties payable to you in respect of such master recording.

**EXHIBIT 10**
**173**

347-6

- 5 -

d) With respect to a side of a long playing (33 1/3rpm) or extended play (45 rpm) microgroove record, which embodies on such side performances contained on another master recording(s) in addition to the performances contained on a master record-ing(s) recorded hereunder, the royalty payable to you in respect of such record shall be computed by basing the rate provided in sub-paragraph 7.a) (2) (or other applicable rate) upon that pro-portion of the applicable wholesale price (less all taxes) of such record that the number of 78 rpm sides required to embody your performances recorded hereunder on such record side bears to the total number of 78 rpm sides required to embody the total number of performances on such record side.

e) With respect to all phonograph records sold hereunder, royalties on phonograph records included in albums, jackets, boxes, cartridges or any other type of package or container (herein collectively referred to as "container(s)" shall be based solely upon the applicable wholesale price of such phonograph records in containers less all taxes and also less a container charge equal to ten percent of the applicable wholesale price of phonograph records in containers as defined in sub-division (e) (i) or (e) (ii), as the case may be, of paragraph 16 hereof.

8.    Notwithstanding anything to the contrary contained in this or any other agreement between you and us, the following shall apply with respect to phonograph records manufactured pursuant to this or any such other agreement and sold and/or distributed in the manner set forth hereinbelow.

a) In respect of phonograph records sold for distribution out-side of the United States of America, the royalty rate payable to you therefor shall be equal to one-half of the applicable royalty rate which would have been payable to you therefor if such records had been sold for distribution in the United States.

b) In respect of phonograph records sold through any direct mail order operation or through any direct sales to consumer operation carried on by us (including other divisions of our com-pany), our subsidiaries, affiliates or licensees including, with-out limitation, the Columbia Record Club (herein collectively re-ferred to as "Club Operation"), the royalty rate shall be one-half of the otherwise applicable royalty rate. Notwithstanding the pre-ceding sentence, if such phonograph records are sold through any such Club Operation at a price (excluding postage and handling charges) of $1.00 or less, the royalty rate payable to you in re-spect of such phonograph records shall be one-half of the royalty

**EXHIBIT 10**
**174**

347-7

-6-

rate which would have been payable to you in respect of such phonograph records if they had been sold through such Club Operation at a price of more than $1.00, and, notwithstanding anything to the contrary contained in this agreement, such royalty rate shall be computed on the basis of the actual sales price charged by such Club Operation for such phonograph records (excluding postage and handling charges).  Notwithstanding anything contained in the foregoing two sentences, or elsewhere in this agreement, no royalty shall be payable to you with respect to (i) phonograph records which are received by members of any such Club Operation, either in an introductory offer in connection with joining such Club Operation or upon recommending that another join such Club Operation and/or as a result of the purchase of a required number of records including, without limitation, records distributed as "bonus" and/or "free" records, or (ii) phonograph records for which such Club Operation is not paid.

c)  In respect of phonograph records sold to our clients or our distributor's clients for promotional, sales incentive or educational purposes or phonograph records sold to educational institutions or libraries, the royalty rate payable to you therefor shall be one-half the royalty rate otherwise payable and shall be computed on the basis of the actual sales price therefor (less all taxes and container charges) to any of the foregoing.

d)  In respect of phonograph records sold in the form of prerecorded tape (in cartridges or otherwise), the royalty rate payable to you therefor shall be one-half of the applicable royalty rate which would have been payable to you if such records were sold in disc form.

3)  No royalty shall be payable to you in respect of phonograph records sold as "cut-outs" after the listing of such records has been deleted from our catalog or in respect of phonograph records distributed as "free" or "no charge" records or records sold and/or distributed to radio stations or for use on transportation facilities to promote or stimulate the sale of phonograph records embodying your performances.

**EXHIBIT 10**
**175**

347 - 8

9.   In respect of the royalties provided for herein:

a)  We will compute royalties payable to you hereunder, within forty-five days after June 30th and after December 31st of each year during which records made hereunder are sold, for the preceding six-month period, and will render accountings for and pay such royalties, less any unrecouped advances under this and/or any other agreement between you and us, within such forty-five days, except as provided in sub-paragraph 7.b) hereof.

b)  All royalty statements, and all other accounts rendered by us to you hereunder, shall be binding upon you and not subject to any objection by you for any reason unless specific objection in writing, stating the basis thereof, is given to us within one year from the date rendered.  Notwithstanding anything to the contrary contained herein, we shall be under no obligation to account to you in respect of, and/or pay to you, sums of $50 or less, unless we receive a written demand from you for such an accounting and payment.

10. a) We shall have the right to use and to allow others to use your name and likeness, and biographical material concerning you, for advertising and purposes of trade, and otherwise without restriction, in connection with the phonograph records made pursuant to his agreement and in advertisements for our company, its artists and products. We shall not use or authorize any direct endorsement by you of any record or performance without your prior written consent.  During the term of this agreement you shall not endorse or authorize your name or likeness to be used in connection with the advertising or sale of products in the same category as those which are currently manufactured and sold by or for us.

b)  Without limiting the provisions of sub-paragraph 10.a) hereof you hereby grant to us during the term of this agreement, the exclusive right, throughout the world, to authorize the use of your name and/or likeness, and/or biographical material concerning you, whether alone or in conjunction with other elements, in connection with the sale, lease, license or other disposition (herein collectively called "sale(s)") of merchandising rights and to enter into agreements covering such sales.  It is expressly understood and agreed that any contract entered into by us for such a sale during the term of this agreement shall continue in full force and effect in accordance with the provisions thereof but after the termination of the term of this agreement we shall have no right to enter into a new contract to make any new sale authorizing the use of your name and/or likeness after the termination of the term of this agreement.  For the rights granted by this sub-paragraph we will pay you, in United States dollars, fifty percent (50%) of the net

**EXHIBIT 10**
**176**

347 - 9

monies earned and received in the United States of America by us
from such sales of merchandising rights authorizing the use of
your name and/or likeness and/or biographical material concern-
ing you pursuant to this agreement.

11.  You will not at any time manufacture, distribute or sell or
authorize or knowingly permit the manufacture, distribution or sale
by any person other than us of phonograph records embodying
    a) any performance rendered by you during the term of this
       agreement, or
    b) any performance rendered by you within five years after the
       expiration of the term of this agreement of a composition
       which shall have been recorded pursuant to this agreement.
You will not record or authorize or knowingly permit to be recorded
for any purpose any such performance without in each case taking
reasonable measures to prevent the manufacture, distribution and
sale at any time by any person other than us of phonograph records
embodying such performances.  Specifically, without limiting the
generality of the foregoing, you agree that,
    a) if, during the term of this agreement you perform for the
       purpose of making transcriptions for radio or television or
       sound tracks for motion picture films, or
    b) if, within five years after the expiration of the term of this
       agreement you perform for any such purpose any composi-
       tion which shall have been recorded pursuant to this agree-
       ment,
you will do so only pursuant to a written contract containing an ex-
press provision that neither such performance nor any recording
thereof will be used, directly or indirectly, for the purpose of mak-
ing phonograph records.  You will promptly furnish to us, at our
New York office, a copy of the pertinent provisions of each such
contract and will cooperate fully with us in any controversy which
may arise or litigation which may be brought relating to our rights
under this paragraph.

12.  You warrant and represent that you are under no disability, re-
striction or prohibition in respect of (a) your right to execute this
agreement and perform its terms and conditions, and more particu-
larly (b) your right to perform for the recording of any and all com-
positions hereunder, except to the extent, if any, set forth in
Schedule No. 1 attached hereto and made a part hereof.  You agree
to and do hereby indemnify, save and hold us harmless from loss or
damage (including attorneys' fees) arising out of or connected with
any claim by a third party which is inconsistent with any of the war-
ranties or representations made by you in this agreement.  You will
reimburse us on demand for any payment made by us at any time
after the date hereof in respect of any liability or claim to which the
foregoing indemnity relates.

**EXHIBIT 10**
**177**

347-10

13. We may at our election assign this agreement or any of our rights hereunder.

14. a) You warrant and represent that you are now a member in good standing of the American Federation of Television and Radio Artists, or will become a member within thirty days after your first engagement by us, and that you will remain so during the term of this agreement.

b) The provisions of the AFTRA 1965-68 National Code of Fair Practice for Phonograph Recordings are made a part of this agreement with the same force and effect as if fully set forth herein.

c) If by reason of illness, injury, accident or refusal to work, you fail to perform for us in accordance with the provisions of paragraph 2 of this agreement, or if due wholly or partly to any labor controversy or adjustment thereof, or to any other cause not entirely within our control or which we could not by reasonable diligence have avoided, we are materially hampered in the recording, manufacture, distribution or sale of records, or our normal business operations become commercially impractical then, without limiting our rights in any such event, we shall have the option without liability to suspend operation of sub-paragraph 2.a) and/or sub-paragraph 9.a) of this agreement for the duration of any such contingency by giving you written notice thereof; and, at our election, a period of time equal to the duration of such suspension shall be added at the end of the then current period of the term hereof, and then such period and the term of this agreement shall be accordingly extended.

15. If during the initial period or any additional period of the term of this agreement we fail, except for reasons set forth in paragraph 14 hereof, to record master recordings constituting the minimum number of record sides provided for herein, and if, within thirty days after the expiration of such period, you shall notify us by registered mail of your request that we record such of your performances as will fulfill our minimum obligation with respect to such period, then we shall, at our option within sixty days after our receipt of such request, either record such performances or pay you at the rate of union scale in full settlement of our obligation in connection therewith. In the event that you do not so notify us within such thirty-day period, then, we shall be under no obligation to you for failure to record master recordings constituting such minimum number of record sides.

**EXHIBIT 10**
**178**

547-11

16. For purposes of this agreement (a) "master recording means any original recording, whether on magnetic recording tape or wire, a lacquer or wax disc, or on any other substance or material, whether now known or unknown, which is used in the manufacture of phonograph records, (b) "matrix" means any die or mold or device which is now or hereafter used, directly or indirectly, in the manufacture of phonograph records and which is made from a master recording (c) "person" and "party" include any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing, (d) "records", "phonograph records" and "recordings" mean and include all forms of recording and reproductions, now known or which may hereafter become known, manufactured or sold primarily for home use and/or juke box use and/or use on or in means of transportation including, without limiting the generality of the foregoing, magnetic recording tape in cartridges or otherwise; film and any other medium or device for the reproduction of artistic performances manufactured or sold primarily for home use and/or juke box use and/or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound" devices, (e) "wholesale price" means (i) with respect to records sold hereunder for distribution in the United States, the average net price received from distributors for our phonograph records during the six-month period immediately preceding the applicable accounting period for the computation of royalties to be made pursuant to sub-paragraph 9a) hereof, it being understood that a separate calculation of the average wholesale price shall be made for each price category of phonograph records manufactured and sold by us (e.g. CL, CS, ML, MS, HL, Ol, etc.) and (ii) with respect to records sold hereunder for distribution outside of the United States, one-half of the suggested retail list price or applicable list price, as the case may be, of such records in, at our election, the country of manufacture, the United States or the country of sale, (f) "merchandising rights" shall mean and include all rights with respect to printed material, endorsements, and merchandising or commercial tie-ups, in connection with the manufacture, advertising and sale of physical property, including without limitation, toys, novelties, articles of apparel and juvenile publications (e.g. coloring books, paper cut-outs, activity books, etc.), and (g) as used in sub-paragraph 10.b) hereof, "net monies earned and received" shall mean the total amount received by us pursuant to sales (as that term is defined in sub-paragraph 10.b) hereof) of merchandising rights hereunder, after the deduction of all direct costs, expenses and commissions attributable to such sales, and after the deduction of any amounts which we may be required to pay, as expenses, commissions, or otherwise, to third persons in connection with such sales, all to be computed in accordance with our standard accounting practices and procedures.

**EXHIBIT 10**
**179**

347-12

-11-

17.  This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any provision thereof shall be binding upon us unless confirmed by a written instrument signed by an officer of our company.  No waiver of any provision of or default under this agreement shall affect our rights thereafter to enforce such provision or to exercise any rights or remedy in the event of any other default, whether or not similar.  The validity, construction and effect of this agreement, and any and all extensions and/or modifications thereof, shall be governed by the laws of the State of California.

18.  Any option to extend the term of this agreement, as hereinafter in this agreement granted to us, may be exercised by us by giving you notice in writing at least thirty days prior to the expiration of such term.  Such notice to you may be given by delivery to you personally or by mailing to you at your address last known to us.  Such notice by mail shall be deemed to have been given on the date on which it is mailed.

19.  You grant us the option to extend the term of this agreement for a first additional period of one year upon all the terms and conditions herein contained.

20.  If we have exercised the option granted in paragraph 19 hereof, we shall have another option to extend the term of this agreement for a second additional period of one year upon all the terms and conditions herein contained.

21.  If we have exercised the option granted in paragraph 20 hereof, we shall have another option to extend the term of this agreement for a third additional period of one year upon all the terms and conditions herein contained.

22.  If we have exercised the option granted in paragraph 21 hereof, we shall have another option to extend the term of

**EXHIBIT 10**
**180**

347-13

-12-

this agreement for a fourth additional period of one year upon all the terms and conditions herein contained.

Very truly yours,

ODE RECORDS, INC.

By_____
Lou Adler
Its President

AGREED TO AND ACCEPTED:

_____ Soc. Sec. # ████████████
Mark Andes

_____ Soc. Sec. # ████████████
Edward Cassidy

_____ Soc. Sec. # ████████████
John Ferguson

_____ Soc. Sec. # ████████████
John Locke

_____ Soc. Sec. # ████████████
Randy Wolfe

p/k/a "SPIRIT"

347 -14

**EXHIBIT 10**
**181**

Rider to agreement dated  August 29, 1967                    by and
between      ODE RECORDS, INC.
and   MARK ANDES, JOHN FERGUSON and RANDY WOLFE

      To the extent any of the terms and conditions of this rider are inconsistent with the terms and conditions of the agreement to which this rider is attached, the terms and conditions of this rider shall prevail.

     (a)  Company agrees to abide by the rules and regulations of the Board of Education of the City of Los Angeles and of the Department of Industrial Relations of the State of California, relating to the employment of minors.

     (b)  No assignment of the agreement between Company and each of you during your minority shall be valid or effective until such assignment has been approved by the Court which approves this agreement.

     (c)  Upon the occurrence of any one or more of the following events, Company may, in its sole discretion, terminate or suspend and extend this agreement by serving written notice upon you, which notice shall specify the election made:

     (i)  During the time Company is complying with the regulations of the Department of Industrial Relations  of the State of California, Company is prohibited from utilizing your services by any law or by any rule or regulation of the Department of Industrial Relations or other lawful body controlling or regulating the employment of minors.

     (ii)  In the event you (the recording artists herein) or your parents, or anyone legally acting in your behalf, for a period of sixty (60) days after written notice from Company to bring such proceeding, fail to bring an appropriate proceeding in the Superior Court of the State of California for the County of Los Angeles, to secure approval of this agreement.

     (iii)  In the event you (the recording artists herein) breach any term, condition or covenant of this agreement.

Any suspension hereunder shall commence upon the date specified in the written notice from Company, but not earlier than the occurrence of such event.  Such suspension shall continue until the cessation of the continuance of the event giving rise to the suspension.

**EXHIBIT 10**
**182**

347-15

(d)  Company shall not have the right to exercise its option in any succeeding years beyond the first year of the term hereof unless it has commercially released one master recording in the year immediately preceding said optional year.

(e)  You (the recording artists herein) shall have the right to audit and inspect the books and records of Company solely for the purpose of verifying the accuracy of royalty statements to be rendered hereunder, provided the expense for such audit shall be borne solely by you, and you shall first have given Company reasonable advance written notice.

ODE RECORDS, INC.

Mark Andes

By: _____
Its: _____
Lou Adler
President

John Ferguson

Randy Wolfe

-2-

**EXHIBIT 10**
**183**

347-16

# EXHIBIT 11

<u>EXCLUSIVE SONGWRITER'S AND COMPOSER'S AGREEMENT</u>

THIS AGREEMENT made and entered into this 29 day of August, 1967 by and between   HOLLENBECK MUSIC, 800 Stone Canyon Road, Los Angeles, California 90024, (hereinafter referred to as "Publisher") and   RANDY CRAIG WOLFE, 213 Bay Street, Santa Monica, California, (hereinafter referred to as "Writer").

For and in consideration of the mutual covenants herein set forth, the parties do hereby agree as follows:

1. <u>Employment</u>. Publisher hereby employs Writer to render his services as a songwriter and composer and other- wise as may be hereinafter set forth.   Writer hereby accepts such employment and agrees to render such services exclusively for Publisher during the term hereof, upon the terms and conditions set forth herein.

2. <u>Term</u>.   The term of this agreement shall commence with the date hereof and shall continue in force for a period of one (1) year from said date.   Writer hereby grants to Publisher a series of four ( 4) separate, consecutive and irrevocable options to extend this agreement for periods of one (1) year, each beginning at the expiration of the original term hereof, upon all of the same terms and conditions as are applicable to the original term.   Each option may be exercised only by written notice to Writer given by Publisher at least fifteen (15) days prior to the expiration of the then current period.

3. <u>Grant of Rights</u>.   Writer hereby irrevocably and absolutely assigns, transfers, sets over and grants to Publisher

-1-

its successors and assigns each and every and all rights and
interests of every kind, nature and description in and to the
results and proceeds of Writer's services hereunder, including
but not limited to the titles, words and music of any and all
original musical compositions in any and all forms and
original arrangements of musical compositions in the public
domain in any and all forms, and/or all rights and interests
existing under all agreements and licenses relating thereto,
together with all world-wide copyrights and renewals and
extensions thereof, which musical works have been written, com-
posed, created or conceived, in whole or in part, by Writer
alone or in collaboration with another or others, and which
may hereafter, during the term hereof, be written, composed,
created or conceived by Writer, in whole or in part, alone or
in collaboration with another or others, and which are now
owned or controlled and which may, during the term hereof, be
owned or controlled, directly or indirectly, by Writer, alone
or with others, or as the employer or transferee, directly or
indirectly, of the writers or composers thereof, including the
title, words and music of each such composition, and all world-
wide copyrights and renewals and extensions thereof, all of
which Writer does hereby represent are and shall at all times
be Publisher's sole and exclusive property as the sole owner
thereof, free from any adverse claims or rights therein by any
other person, firm or corporation.

Writer acknowledges that, included within the rights
and interests hereinabove referred to, but without limiting
the generality of the foregoing, is Writer's irrevocable grant

-2-

EXHIBIT 11
185

to Publisher, its successors, licensees, sublicensees and
asssigns, of the sole and exclusive right, license, privilege
and authority throughout the entire world with respect to the
said original musical compositions and original arrangements
of compositions in the public domain, whether now in existence
or hereafter created during the term hereof, as follows:

     (a)  To perform said musical compositions pub-
licly for profit by means of public and private performance,
radio broadcasting, television, or any and all other means,
whether now known or which may hereafter come into existence.

     (b)  To substitute a new title or titles for
said compositions and to make any arrangement, adaptation,
translation, dramatization and transposition of said compo-
sitions, in whole or in part, and in connection with any other
musical, literary or dramatic material as Publisher may deem
expedient or desirable.

     (c)  To secure copyright registration and pro-
tection of said compositions in Publisher's name or otherwise
as Publisher may desire at Publisher's own cost and expense
and at Publisher's election, including any and all renewals
and extensions of copyrights, and to have and to hold said
copyrights, renewals, extensions and all rights of whatsoever
nature thereunder existing, for and during the full term of
all said copyrights and all renewals and extensions thereof.

     (d)  To make or cause to be made, master
records, transcriptions, sound tracks, pressings, and any
other mechanical, electrical or other reproductions of said
compositions, in whole or in part, in such form or manner and
as frequently as Publisher's sole and uncontrolled discretion

-3-

EXHIBIT 11
186

shall determine, including the right to synchronize the same with sound motion pictures and the right to manufacture, advertise, license or sell such reproductions for any and all purposes, including but not limited to private performances and public performances, by broadcasting, television, sound motion pictures, wired radio and any and all other means or devices whether now known or which may hereafter come into existence.

(e)  To print, publish and sell sheet music, orchestrations, arrangements and other editions of the said compositions in all forms, including the right to include any or all of said compositions in song folios or lyric magazines with or without music, and the right to license others to include any or all of said compositions in song folios or lyric magazines with or without music.

(f)  Any and all other rights of every and any nature now or hereafter existing under and by virtue of any common law rights and any copyrights and renewals and extensions thereof in any and all of such compositions.  Writer grants to Publisher, without any compensation other than as specified herein, the perpetual right to use and publish and to permit others to use and publish Writer's name (including any professional name heretofore or hereafter adopted by Writer), likeness, voice and sound effects and biographical material, or any reproduction or simulation thereof and titles of all compositions hereunder in connection with the printing, sale, advertising, distribution and exploitation of music, folios, recordings, performances, player rolls and otherwise concerning any of the compositions hereunder, and for any

-4-

EXHIBIT 11
187

other purpose related to the business of Publisher, its affiliated and related companies, or to refrain therefrom. This right shall be exclusive during the term hereof and nonexclusive thereafter. Writer will not authorize or permit the use of his name, likeness, biographical material concerning Writer, or other identification of Writer, or any reproduction or simulation thereof, for or in connection with any musical composition or works, in any manner or for any purpose, other than by or for Publisher. Writer further grants to Publisher the right to refer to Writer as a "Publisher Exclusive Songwriter and Composer" or other similar appropriate appellation.

4. <u>Exclusivity</u>. From the date hereof and during the term of this agreement, Writer will not write or compose, or furnish or dispose of, any musical compositions, titles, lyrics or music, or any rights or interests therein whatsoever, nor participate in any manner with regard to the same for any person, firm or corporation other than Publisher, nor permit the use of his name or likeness as the writer or cowriter of any musical composition by any person, firm or corporation other than Publisher.

5. <u>Warranties</u>. Writer hereby warrants and represents to Publisher: Writer has the full right, power and authority to enter into and perform this agreement and to grant to and vest in Publisher all the rights herein set forth, free and clear of any and all claims, rights and obligations whatsoever; all the results and proceeds of the services of Writer hereunder, including all of the titles, lyrics, music and

-5-

EXHIBIT 11
188

musical compositions, and each and every part thereof, delivered and to be delivered by Writer hereunder are and shall be new and original and capable of copyright protec-tion throughout the entire world, and that no part thereof shall be an imitation or copy of, or shall infringe any other original material and that Writer has not and will not sell, assign, lease, license or in any other way dispose of or encumber the rights herein granted to Publisher.

6. <u>Power of Attorney</u>. Writer does hereby irrevocably constitute, authorize, empower and appoint Publisher, or any of its officers, Writer's true and lawful attorney (with full power of substitution and delegation) in Writer's name, and in Writer's place and stead, or in Publisher's name, to take and do such action, and to make, sign, execute, acknowledge and deliver any and all instruments or documents which Publisher, from time to time, may deem desirable or necessary to vest in Publisher, its successors, assigns and licensees, any of the rights or interests granted by Writer hereunder, including but not limited to such documents required to secure to Pub-lisher the renewals and extensions of copyrights throughout the world of musical compositions written or composed by Writer and owned by Publisher, and also such documents necessary to assign to Publisher, its successors and assigns, such renewal copyrights and all rights therein for the terms of such renewals and extensions for the use and benefit of Publisher, its successors and assigns.

7. <u>Compensation</u>. Provided that Writer shall faith-fully and completely perform the terms, covenants and condi-

-6-

EXHIBIT 11
189

tions of this agreement, Publisher hereby agrees to pay Writer for the services to be rendered by Writer under this agreement and for the rights acquired and to be acquired hereunder, the following compensation based on the musical compositions which are the subject hereof:

(a)  Five (5¢) cents per copy for each and every regular piano copy and for each and every dance orchestration sold by Publisher and paid for, after deduction of each and every return, in the United States.

(b)  Ten (10%) per cent of the retail selling price upon each and every printed copy of each and every other arrangement and edition thereof printed, published and sold by Publisher and paid for, after deduction of each and every return, in the United States, except that in the event that such compensation shall be used or caused to be used, in whole or in part, in conjunction with one or more other musical compositions in a folio or album, Writer shall be entitled to receive that proportion of said ten (10%) per cent which the subject musical composition shall bear to the total number of musical compositions contained in such folio or album.

(c)  Fifty (50%) per cent of any and all net sums actually received (less any costs for collection) by Publisher from mechanical rights, electrical transcription and reproducing rights, motion picture synchronization and television rights and all other rights (excepting public performing rights) therein, including the use thereof in song lyric folios, magazines or any other editions whatsoever sold by licensees of Publisher in the United States.

(d)  Writer shall receive his public performance royalties throughout the world directly from his own affiliated performing rights society and shall have no claim whatsoever against Publisher for any royalties received by Publisher from any performing rights society which makes payment directly (or indirectly other than through Publisher) to writers, authors and composers.

(e)  Fifty (50%) per cent of any and all net sums, after deduction of foreign taxes, actually received (less any costs for collection) by Publisher from sales and uses directly related to

-7-

EXHIBIT 11
190

subject musical compositions in countries out-
side of the United States (other than public
performance royalties as hereinabove mentioned
in paragraph 7(d).

(f)  Publisher shall not be required to pay
any royalties on professional or complimentary
copies or any copies or mechanical derivatives
which are distributed gratuitously to performing
artists, orchestra leaders, disc jockeys or for
advertising or exploitation purposes.  Further-
more, no royalties shall be payable to Writer on
consigned copies unless paid for, and not until
such time as an accounting therefor can properly
be made.

(g)  Royalties as specified hereinabove shall
be payable solely to Writer in instances where
Writer is the sole author of the entire composi-
tion, including the words and music thereof.
However, in the event that one or more other
songwriters are authors along with Writer on any
composition, then the foregoing royalties shall
be divided equally between Writer and the other
songwriters of such composition unless another
division of royalties is agreed upon in writing
between the parties concerned.

(h)  Except as herein expressly provided, no
other royalties or moneys shall be paid to Writer.

8.  _Advances_.  Subject to all of the terms and condi-
tions of this agreement, Publisher agrees to pay Writer as a

nonreturnable advance against the royalties payable to Writer

under this or any other agreement whether now in existence

or hereafter entered into between Writer and Publisher or its

subsidiaries or affiliates, and upon the condition that

Writer fully performs all of Writer's obligations hereunder

and does not breach any of Writer's warranties, the sum of One

Hundred ($100.00)   Dollars upon the execution of this agree-
ment.

9.  _Accountings_.  Publisher will compute the total

composite royalties earned by Writer pursuant to this agreement

-8-

EXHIBIT 11
191

and pursuant to any other agreement, previous, simultaneous or subsequent hereto between Writer and Publisher, within sixty (60) days after the first day of January and the first day of July of each year for the preceding six (6) month period, and will remit to Writer the net amount of such royalties, if any, after deducting any and all unrecouped advances and chargeable costs under this agreement or any other agreement between Writer and Publisher, together with the detailed royalty statement, within such sixty (60) days.  All royalty statements rendered by Publisher to Writer shall be binding upon Writer and not subject to any objection by Writer for any reason unless specific objection is made, in writing, stating the basis thereof, to Publisher within one (1) year from the date rendered.  Writer shall have the right, upon the giving of at least thirty (30) days written notice to Publisher, to inspect the books and records of Publisher, insofar as the same concerns Writer, at the expense of Writer, at reasonable times during normal business hours, for the purpose of verifying the accuracy of any royalty statement rendered to Writer hereunder.

10.  <u>Collaboration with other Writers</u>.  Whenever Writer shall collaborate with any other person in the creation of any musical composition, any such musical composition shall be subject to the terms and conditions of this agreement and Writer warrants and represents that prior to the collaboration with any other person, such other person shall be advised of this exclusive agreement and that all such compositions must be published by Publisher.  In the event of such collaboration

-9-

EXHIBIT 11
192

with any other person, Writer shall notify Publisher of the extent of interest that such other person may have in any such musical composition and Writer shall cause such other person to execute a separate songwriter's agreement with respect thereto, which agreement shall set forth the division of the songwriter's share of income between Writer and such other person, and Publisher shall make payment accordingly.  If Publisher so desires, Publisher may request Writer to execute a separate agreement in Publisher's customary form with respect to each musical composition hereunder.  Upon such request, Writer will promptly execute such agreement.  Publisher shall have the right, pursuant to the terms and conditions hereof, to execute such agreement in behalf of Writer hereunder.  Such agreement shall supplement and not supersede this agreement. In the event of any conflict between the provisions of such agreement and this agreement, the provisions of this agreement shall govern.  The failure of either of the parties hereto to execute such agreement, whether requested by Publisher or not, shall not affect the rights of each of the parties hereunder, including but not limited to the rights of Publisher to all of the musical compositions written and composed by Writer.

11.  <u>Writer's Services</u>.  Writer agrees to perform the services required hereunder conscientiously and solely and exclusively for and as requested by Publisher.  Writer is deemed to be a "writer for hire" hereunder with full rights of copyright renewal vested in Publisher.  Writer further agrees to promptly and faithfully comply with all requirements and requests made by Publisher in connection with its business as

-10-

EXHIBIT 11
193

set forth herein.  Writer will deliver a manuscript copy of
each musical composition hereunder immediately upon the com-
pletion or acquisition of such musical composition.  Nothing
contained in this agreement shall obligate Publisher to
exploit in any manner any of the rights granted to Publisher
hereunder.  Publisher at its sole discretion shall reasonably
make studio facilities available for Writer so that Writer,
subject to the supervision and control of Publisher, may make
demonstration records of the musical compositions hereunder
and also for Writer to perform at such recording sessions.
Writer shall not incur any liability for which Publisher may
be responsible in connection with any demonstration record
session without having first obtained Publisher's written
approval as to the nature, extent and limit of such liability.
In no event shall Writer incur any expense whatsoever in behalf
of Publisher without first having received written authoriza-
tion from Publisher.  Writer shall not be entitled to any
compensation (in addition to such compensation as may be other-
wise provided for herein) with respect to services rendered
in connection with such demonstration record recording ses-
sions.  Publisher shall advance the costs for the production
of demonstration records, and one-half (1/2) of such costs
shall be deemed additional nonreturnable advances to Writer
and shall be deducted from royalties payable to Writer by
Publisher under this or any other agreement between the parties.
All recordings and reproductions made at demonstration
recording sessions hereunder shall become the sole and exclu-
sive property of Publisher, free of any claims whatsoever by

-11-

EXHIBIT 11
194

Writer or any person deriving any rights from Writer.

Writer will, from time to time, at Publisher's request, whenever the same will not unreasonably interfere with other professional engagements of Writer, appear for photography, art work and other similar reasons under the direction of Publisher or its duly authorized agent; appear for interviews with such representatives of newspapers, magazines and other publications; and confer and consult with Publisher regarding Writer's services hereunder and other matters which may concern the parties hereto.  Writer will also cooperate with Publisher in promoting, publicizing and exploiting musical compositions written or composed by Writer hereunder, and for any other purpose related to the business of Publisher, its affiliated and related companies.  Writer shall not be entitled to any compensation (other than as may be specified herein) for rendering such services.

12.  Unique Services.  Writer acknowledges that the services to be rendered hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that a breach by Writer of any of the provisions of this agreement will cause Publisher great and irreparable injury and damage.  Writer expressly agrees that Publisher shall be entitled to the remedies of injunction and other equitable relief to prevent a breach of this agreement or any provision hereof, which relief shall be in addition to any other remedies, for damages or otherwise, which may be available to Publisher.

-12-

EXHIBIT 11
195



13. **Actions**. Publisher may take such action as it deems necessary, either in Writer's name or in its own name, against any person to protect all rights and interests acquired by Publisher hereunder. Writer will at Publisher's request, cooperate fully with Publisher in any controversy which may arise or litigation which may be brought concerning Publisher's rights and interests obtained hereunder. Publisher shall have the right, in its absolute discretion, to employ attorneys and to institute or defend any action or proceeding and to take any other proper steps to protect the right, title and interest of Publisher in and to each musical composition hereunder and every portion thereof and in that connection, to settle, compromise or in any other manner dispose of any matter, claim, action or proceeding and to satisfy any judgment that may be rendered, in any manner as Publisher in its sole discretion may determine. Any legal action brought by Publisher against any alleged infringer of any musical composition hereunder shall be initiated and prosecuted by Publisher, and if there is any recovery made by Publisher as a result thereof, after deduction of the expense of litigation, including but not limited to attorneys' fees and court costs, a sum equal to fifty (50%) per cent of such net proceeds shall be paid to Writer. If a claim is presented against Publisher in respect of any musical composition hereunder, and because thereof Publisher is jeopardized, Publisher shall have the right thereafter, until said claim has been finally adjudicated or settled, to withhold any and all royalties that may be or become due with respect to such disputed compositions pending

-13-

EXHIBIT 11
196

the final adjudication or settlement of such claim.  Publisher, in addition, may withhold other royalties to be earned pursuant to this agreement or any other agreement between Writer and Publisher, and its affiliated or related companies, sufficient, in the opinion of Publisher, to reimburse Publisher for any contemplated damages, including court costs and attorneys' fees and costs resulting therefrom.  Publisher shall advance the costs of litigation, if any, including court costs and attorneys' fees together with any damages which may be paid as a result of the settlement or adjudication of a claim in connection with a musical composition written or composed by Writer.  All such costs and damges shall be deemed an advance against any royalties payable to Writer under this or any other agreement between Writer and Publisher.  Upon the final adjudication or settlement of each and every claim hereunder, all moneys withheld shall then be disbursed in accordance with the rights of the parties as provided hereinabove.

14. _Notices_.  Any written notice, statement, payment or matter required or desired to be given to Publisher or Writer pursuant to this agreement shall be given by addressing the same to the addresses of the respective parties referred to above, or to such other address as either party may hereafter designate, in writing, to the other party, and on the date when same shall be deposited, so addressed, postage prepaid, in the United States mail, or on the date when delivered, so addressed, toll prepaid, to a telegraph or cable company, or on the date when same shall be delivered to the other party personally or to his duly authorized agent (as designated in writing), such notice shall be deemed to have been duly made pursuant hereto.

-14-

EXHIBIT 11
197

15.   Entire Agreement.   This agreement supersedes
any and all prior negotiations, understandings and agreements
between the parties hereto with respect to the subject matter
hereof.   Each of the parties acknowledges and agrees that
neither party has made any representations or promises in
connection with this agreement or the subject matter hereof
not contained herein.

16.   Modification, Waiver, Illegality.   This agree-
ment may not be canceled, altered, modified, amended or
waived, in whole or in part, in any way, except by an instru-
ment in writing signed by both Publisher and Writer.   The
waiver by Publisher of any breach of this agreement in any
one or more instances, shall in no way be construed as a
waiver of any subsequent breach (whether or not of a similar
nature) of this agreement by Writer.   If any part of this
agreement shall be held to be void, invalid or unenforceable,
it shall not affect the validity of the balance of this agree-
ment.   This agreement shall be governed by and construed under
the laws and judicial decisions of the State of California.

17.   Termination.   Publisher shall have the right to
terminate this agreement upon thirty (30) days prior written
notice.

18.   Assignment.   Publisher shall have the right to
assign this agreement or any of its rights hereunder to any
party.   This agreement shall inure to the benefit of and be
binding upon each of the parties hereto and their respective
successors, assigns, heirs, executors, administrators and legal
and personal representatives.

19.   Definitions.   For purposes of this agreement,
the word "person" means and refers to any individual, cor-
poration, partnership, association or any other organized group

-15-

EXHIBIT 11
198

of persons or legal successors or representatives of the fore-
going.  Whenever the expressions "the term of this agreement"
or "period hereof" or words of similar connotation are
included herein, they shall be deemed to mean and refer to
the original period of this agreement and the period of all
renewals, extensions, substitutions or replacements of this
agreement, whether expressly indicated or otherwise.

 21. <u>Attorneys' Fees</u>. In the event of any action,
suit or proceeding by Publisher against Writer under this
agreement, in which Publisher shall prevail, Publisher shall
be entitled to recover reasonable attorneys' fees and costs
of said action, suit or proceeding.

 IN WITNESS WHEREOF, the parties hereto have executed
this agreement as of the day and year first above written.

"PUBLISHER"       "WRITER"
HOLLENBECK MUSIC

By _____ _____
           Randy Craig Wolfe

       Writer's address
       for payment of
       royalties is:  213 Bay Street

           Santa Monica, California

-16-

EXHIBIT 11
199

# EXHIBIT 12

1  MITCHELL SILBERBERG & KNUPP

2  6380 WILSHIRE BOULEVARD

3  LOS ANGELES, CALIF. 90048

4  OLIVE 3-7511

5  Attorneys for Petitioner

**FILED**

NOV 80 1967
WILLIAM G. SHARP, County Clerk

BY L. L. ____, Deputy

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     FOR THE COUNTY OF LOS ANGELES

10

11  In the Matter of the Contract        )
                                          )              NO. 921051
12  between                              )
                                          )        ORDER APPROVING CONTRACT OF
13  LOU ADLER, doing business as         )        MINOR AND ESTABLISHING SAVINGS
    HOLLENBECK MUSIC, Petitioner,        )        PLAN FOR BENEFIT OF MINOR PURSUANT
14                                       )        TO SECTIONS 36 AND 36.1 OF
    and                                  )        THE CALIFORNIA CIVIL CODE.
15  RANDY CRAIG WOLFE,                   )
                                          )
16                    a Minor.           )

17

18          The petition of LOU ADLER, doing business as HOLLENBECK MUSIC,

19  and the petitioner herein, for an order approving the contract of the

20  minor, RANDY CRAIG WOLFE (hereinafter referred to as the "minor"), to

21  render services as a songwriter, having come on regularly to be heard on

22  the 21st day of November, 1967, at 1:45 P.M., in Department 11 of the

23  above entitled Court, the Honorable A. A. Scott, Judge presiding, and
                                        *BERNICE WOLFE CASSIDY,*
24  the minor and the parent of the minor,∧ being the sole legal guardian of

25  the minor, having filed her written consent to the hearing being held

26  at the aforesaid time and place, and the parent of the minor having filed

27  her consent to the making of the order approving the contract of the

28  minor and to the Court setting aside for the benefit of said minor a

29  portion of the gross earnings of the minor pursuant to Sections 36.1 and

30  36.2 of the Civil Code of the State of California, and the petitioner

31  appearing by its counsel, Mitchell, Silberberg & Knupp and Abraham Somer,

32  and the minor and his parent, having appeared in person, and all persons

**EXHIBIT 12**
**200**

-1-

introduced, the Court hereby finds that RANDY CRAIG WOLFE is a minor the approximate age of sixteen (16) years; that said minor is to be employed in the County of Los Angeles, State of California; that said minor and petitioner have entered into a written Songwriter's Agreement dated as of August 29, 1967 (herein called the "minor's contract") whereby the petitioner agreed to employ the minor as a songwriter, a true copy of which is attached to said petition as Exhibit "A" thereto.

The Court further finds that all of the allegations in the petition are true, and that the minor's contract is in full force and effect, and is in all respects fair, just and equitable to the parties.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That said minor's contract, attached as Exhibit "A" to the petition is hereby approved and confirmed subject to the terms and conditions of this Order.

2. That petitioner deduct and withhold 25% of the gross compensation payable to the minor under said minor's contract, and deposit the sums so withheld in a blocked trust savings account to be opened in a federally insured bank or savings and loan association in the name of the minor, with ~~one of~~ the parents of the minor as trustee. The funds so deposited in the bank or savings and loan association account shall not be withdrawn, dispersed or turned over to any person whomsoever without the further order of this Court.

3. Petitioner's right to seek injunctive relief for any breach of said minor's contract shall be subject to the provisions of the Code of Civil Procedure Section 526.

DATED: _____nov. 30_____, 1967.

A. A. SCOTT
Judge of the Superior Court

**EXHIBIT 12**
**201**

I certify that this is a true and correct copy of the original Order on file in this office.

FEB 2 4 2016

SHERRI R. CARTER, Executive Officer/Clerk of the Superior Court of California County of Los Angeles

By _____ , Deputy
K. Camara

**EXHIBIT 12**
**202**

# EXHIBIT 13

From: **Peter J. Anderson** <pja@pjanderson.com>
Date: Fri, Sep 18, 2015 at 4:06 PM
Subject: RE: LED ZEPPELIN - Notice - Further Inquire as to Standing is Without Merit
To: Francis Alexander Malofiy <francis@francisalexander.com>, "Helene M. Freeman"
<hfreeman@phillipsnizer.com>
Cc: AJ Fluehr <aj@francisalexander.com>, Staff <staff@francisalexander.com>, Glen Kulik
<gkulik@kgmslaw.com>


Francis:


Thank you for your e-mails.


We'll get back to you with any questions after we've had a chance to review the attachments.  In the meantime, please note that plaintiff's responses were late, because they were due 30 days after the discovery was served by hand on Glen, as plaintiff's local counsel.  The fact that we mailed you another copy as a courtesy doesn't add three days for plaintiff to respond to the discovery.  I expect that won't be an issue in this instance, but in the future please keep in mind that when documents are served by hand on plaintiff's counsel, there is no extension for mailing.


Best regards.


Peter.


**EXHIBIT 13**
**203**

# EXHIBIT 14

LAW OFFICES OF

# PETER J. ANDERSON
A PROFESSIONAL CORPORATION
100 WILSHIRE BOULEVARD
SUITE 2010
SANTA MONICA, CALIFORNIA 90401
TELEPHONE (310) 260-6030
FACSIMILE (310) 260-6040
EMAIL: pja@pjanderson.com

October 5, 2015

*By E-Mail & U.S. Mail*

Francis Malofiy, Esq.
Francis Alexander, LLC
280 N. Providence Road
Suite 105
Media, PA 19063

Re:   *Led Zeppelin adv. Skidmore*

Dear Francis:

I am writing with respect to plaintiff's Responses to the first Request for Admissions and first and second sets of Interrogatories and Requests for Production.[1]

I believe that plaintiff has failed to comply with his discovery obligations in material respects. I trust we will be able to resolve the deficiencies quickly and amicably and, pursuant to this District's Local Rule 37-1, I ask that within 10 days you confer with me to discuss the deficiencies.[2]

---

[1] I note that plaintiff's Responses to the second sets of written discovery were, like plaintiff's Responses to the first sets, late. If you find you are unable to meet a response deadline please do not hesitate to request more time; I assure you that whenever reasonably possible we will agree to the normal courtesies. But – and I do not know the practice in Pennsylvania – in this District failing to timely respond waives objections. *See, also* Fed. R. Civ. P. 33(b)(4) ("Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure"). Although we are not relying on that waiver here, we may raise waiver if you fail to timely respond in the future.

[2] The Local Rules are available on the Court's website and I expect you have already reviewed them. But, to err on the side of caution, Local Rule 37-1 provides:

**L.R. 37-1 Pre-Filing Conference of Counsel.** Prior to the filing of any motion relating to discovery pursuant to F.R.Civ.P. 26-37, counsel for the parties shall confer in a good faith effort to eliminate the necessity for hearing the motion or to eliminate as many of the disputes as possible. It shall be the responsibility of counsel for the moving party to arrange for this conference. If both counsel are located within the same county of the Central District, the conference shall take place in person at the office of the moving party's counsel, unless the parties agree to meet someplace else. If both counsel are not located within the

**EXHIBIT
204**

Francis Malofiy, Esq.
October 5, 2015
Page 17

quests No. 53-54, plaintiff undertakes to produce his retained experts' reports at the appropriate time and, of course, that is acceptable. But, to the extent plaintiff has withheld any other documents – including but not limited to historical documents provided by Mr. Pates and any other documents upon which the chart that plaintiff provided is based – we do not believe the withholding is appropriate. Neither do we believe that plaintiff's reference to an attached chart is a sufficient response to Request No. 55.

If we are unable to resolve this issue, we will seek an Order compelling production of all documents within Request Nos. 53-55, other than retained expert reports that can legitimately be withheld under Rule 26.

While I fully expect that we will be able to quickly resolve the deficiencies in the discovery responses, Local Rule 37-1 requires that I mention that if the deficiencies are not promptly cured and I do have to file a motion, the motion may also seek an Order shifting the attorneys' fees and costs of obtaining this relief to plaintiff and/or his counsel, as the Court deems appropriate.

Please provide me as soon possible with available dates in the next 10 days, to conduct the Local Rule 37-1 meeting.

Thank you for your attention to the foregoing, and I look forward to hearing from you.

Very truly yours,

Peter J. Anderson

cc:     Helene M. Freeman, Esq.
        Glenn L. Kulik, Esq.

**EXHIBIT
205**

# EXHIBIT 15

1   Peter J. Anderson, Esq., Cal. Bar No. 88891
    E-Mail: pja@pjanderson.com
2   LAW OFFICES OF PETER J. ANDERSON
    A Professional Corporation
3   100 Wilshire Boulevard, Suite 2010
    Santa Monica, CA 90401
4   Tel: (310) 260-6030
    Fax: (310) 260-6040
5   Attorneys for Defendants
    JAMES PATRICK PAGE, ROBERT ANTHONY
6   PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
    MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
7   ATLANTIC RECORDING CORP., RHINO
    ENTERTAINMENT COMPANY and WARNER
8   MUSIC GROUP INC.

9   Helene Freeman, Esq., admitted *pro hac vice*
    E-Mail:  hfreeman@phillipsnizer.com
10  PHILIPS NIZER LLP
    666 Fifth Avenue
11  New York, NY 10103-0084
    Tel: (212) 977-9700
12  Fax: (212) 262-5152
    Attorneys for Defendants
13  JAMES PATRICK PAGE, ROBERT ANTHONY
    PLANT and JOHN PAUL JONES

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17                    **WESTERN DIVISION**

18  MICHAEL SKIDMORE, *etc.*,            )   Case No. 2:15-cv-03462 RGK
                                         )   (AGRx)
19          Plaintiff,                   )
                                         )
20      vs.                              )
                                         )   REQUEST FOR ADMISSIONS
21  LED ZEPPELIN, *et al.*,              )
                                         )
22          Defendants.                  )
                                         )
23  _____ )

24

25  PROPOUNDING PARTIES:    DEFENDANTS

26  RESPONDING PARTY:     PLAINTIFF

27  SET NO. TWO

28

**EXHIBIT 15**
**206**

1    Pursuant to Rule 36 of the Federal Rules of Civil Procedure, defendants James
2    Patrick Page, Robert Anthony Plant, John Paul Jones, Warner/Chappell Music, Inc.,
3    Super Hype Publishing, Inc., Atlantic Recording Corp., Rhino Entertainment
4    Company and Warner Music Group Inc., request that within 30 days of the service
5    of this Request for Admissions plaintiff Michael Skidmore admit the truth of the
6    Requests set forth below.

7                                **DEFINITIONS**

8        1.    "You" and "your" mean plaintiff Michael Skidmore, individually and
9    as the alleged Trustee of the Randy Craig Wolfe Trust.

10       2.    The "*Taurus* Composition" means the musical composition titled
11   *Taurus* and identified in the First Amended Complaint in this action.

12       3.    The "February 19, 2002 Stipulation and Order" means the February 19,
13   2002 Stipulation and Order in *In re Conservatorship of the Estate of Randy Craig*
14   *Wolfe*, Case No. P 72493 in the California Superior Court for the County of Ventura.

15       4.    The "Exclusive Songwriter's and Composer's Agreement" means the
16   Exclusive Songwriter's and Composer's Agreement dated August 29, 1967 between
17   Hollenbeck Music and Randy Craig Wolfe.

18                         **REQUESTS FOR ADMISSION**
19   **REQUEST NO. 6:**

20       The February 19, 2002 Stipulation and Order attached to this Request for
21   Admission as Exhibit 1 is genuine.

22   **REQUEST NO. 7:**

23       Plaintiff contends that the Randy Craig Wolfe Trust was created by the
24   February 19, 2002 Order of the California Superior Court for the County of Ventura
25   in Case No. P 72493.

26   **REQUEST NO. 8:**

27       The Exclusive Songwriter's and Composer's Agreement attached to this
28   Request for Admission as Exhibit 2 is genuine.

**EXHIBIT 15** 1
**207**

1   **REQUEST NO. 9:**

2        The July 29, 2014 letter from your counsel to Louis L. Adler attached to this

3   Request for Admission as Exhibit 3 is genuine.

4   **REQUEST NO. 10:**

5        The *Taurus* Composition is a work for hire.

6   **REQUEST NO. 11:**

7        The *Taurus* Composition is a work for hire in which you contend that Randy

8   Craig Wolfe was a beneficial owner.

9   **REQUEST NO. 12:**

10       The *Taurus* Composition is a work for hire in which you claim beneficial

11  ownership of the copyright as the successor to Randy Craig Wolfe.

12  **REQUEST NO. 13:**

13       The *Taurus* Composition is a work for hire in which you claim beneficial

14  ownership of the copyright on the ground royalties are received for the exploitation

15  of the *Taurus* Composition.

16  **REQUEST NO. 14:**

17       The *Time Circle* liner notes attached to this Request for Admission as Exhibit

18  4 are genuine.

19  **REQUEST NO. 15:**

20       Randy Craig Wolfe made the statements attributed to him at page 8 of the

21  *Time Circle* liner notes attached to this Request for Admission as Exhibit 4.

22  **REQUEST NO. 16:**

23       Randy Craig Wolfe approved the *Time Circle* liner notes attached to this

24  Request for Admission as Exhibit 4.

25  ///

26  ///

27  ///

28  ///

**EXHIBIT 15**₂
**208**

1   **REQUEST NO. 17:**

2        Randy Craig Wolfe did not object to the *Time Circle* liner notes attached to

3   this Request for Admission as Exhibit 4.

4

5   Dated: December 4, 2015

6                                         Peter J. Anderson, Esq.
                                          LAW OFFICES OF PETER J. ANDERSON
7                                         A Professional Corporation
                                          Attorney for Defendants
8                                         JAMES PATRICK PAGE, ROBERT
                                          ANTHONY PLANT, JOHN PAUL JONES,
9                                         WARNER/CHAPPELL MUSIC, INC.,
                                          SUPER HYPE PUBLISHING, INC.,
10                                        ATLANTIC RECORDING CORP., RHINO
                                          ENTERTAINMENT COMPANY and
11                                        WARNER MUSIC GROUP INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 15**
**209**

# EXHIBIT 4

EXHIBIT 15
210



**EXHIBIT 15**
**211**

D000138



D000139

**DISC ONE**

1  Fresh Garbage (3:10)
(J. Hopper)
from Spirit

2  Uncle Jack (2:44)
(J. Hopper)
from Spirit

3  Mechanical World (5:15)
(R. Ferguson/J. Hopper)
from Spirit

4  Taurus (2:38)
(R. California)
from Spirit

5  Girl In Your Eye (3:23)
(J. Hopper)
from Spirit

6  Straight Arrow (2:55)
(J. Hopper)
from Spirit

7  Topanga Windows (3:36)
(J. Hopper)
from Spirit

8  Grandmother's Man (3:50)
(J. Hopper/J. Locke/N. Cassidy/M. Andes/E. Cassidy)
from Spirit

9  The Great Canyon Fire In General (2:47)
(J. Hopper)
from Spirit

10  I Got A Line On You (2:42)*
(R. California)
from The Family That Plays Together

11  It Shall Be (3:20)*
(R. California/J. Hopper)
from The Family That Plays Together

12  Poor Richard (2:29)*
(J. Hopper)
from The Family That Plays Together

13  Silky Sam (4:10)*
(J. Hopper)
from The Family That Plays Together

14  Shecrooked (1:11)*
(J. Locke)
previously unreleased outtake from The Family That Plays Together

15  All The Same (4:11)*
(R. California/J. Locke)
from The Family That Plays Together

16  Dream Within A Dream (3:00)*
(J. Hopper)
from The Family That Plays Together

17  Aren't You Glad (5:36)*
(J. Hopper)
from The Family That Plays Together

18  Eventide (4:21)*
(J. Locke)
previously unreleased, originally recorded to the soundtrack of The Model Shop

19  Model Shoppe Theme (The Moving Van) (2:58)*
(J. Hopper/J. Locke/M. Andes/E. Cassidy/J. Cassidy)
previously unreleased, originally recorded to the soundtrack of The Model Shop

20  Green Gorilla (2:48)*
(J. Hopper/J. Locke/M. Andes/E. Cassidy/J. Cassidy)
previously unreleased, originally recorded to the soundtrack of The Model Shop

21  Rehearsal Demo (1:10)*
(J. Hopper/J. Locke/M. Andes/E. Cassidy/J. Cassidy)
previously unreleased

*remixed
**mono

**DISC TWO**

1  Fog (2:23)
(J. Locke/R. Clark)
previously unreleased outtake from The Family That Plays Together

2  Now Or Anywhere (4:25)
(R. Ferguson/J. California/J. Locke)
previously unreleased outtake from The Family That Plays Together

3  Dark-Eyed Woman (3:28)
(R. California/J. Hopper)
from Clear

4  So Little Time To Fly (2:36)
(R. California/J. Locke)
from Clear

5  Ground Hog (3:11)
(R. Clark)
from Clear

6  Ice (2:07)
(J. Hopper)
from Clear — previously unreleased full length version

7  I'm Truckin (2:26)
(R. California)
from Clear

8  New Dope In Town (4:23)
(J. Locke/R. California/J. Locke/R. Clark)
from Clear

9  1984 (3:38)**
A-side single

10  Sweet Stella Baby (2:50)**
(J. Ferguson)
mono B-side of "1984"

11  Prelude—Nothin' To Hide (3:42)
(R. California)
from The Twelve Dreams Of Dr. Sardonicus

12  Nature's Way (2:25)
(R. California)
from The Twelve Dreams Of Dr. Sardonicus

13  Animal Zoo (3:17)
(J. Hopper)
from The Twelve Dreams Of Dr. Sardonicus

14  Love Has Found A Way (2:41)
(R. California/J. Locke)
from The Twelve Dreams Of Dr. Sardonicus

15  Why Can't I Be Free (1:04)
(R. California)
from The Twelve Dreams Of Dr. Sardonicus

16  Mr. Skin (3:50)
(J. Hopper)
from The Twelve Dreams Of Dr. Sardonicus

17  When I Touch You (5:30)
(J. Hopper)
from The Twelve Dreams Of Dr. Sardonicus

18  Street Worm (3:40)
(J. Hopper)
from The Twelve Dreams Of Dr. Sardonicus

19  Morning Will Come (2:51)
(R. California)
from The Twelve Dreams Of Dr. Sardonicus

20  Turn To The Right (3:46)
(R. California)
unreleased on the from Twelve Plays Live
Sessions

*remixed
**mono

EXHIBIT 15
212

D000140

S point may be the quintessential band of 1967, that heady year which promised so much in terms of musical and cultural flowering, and the group came together in a quintessentially 1967 sort of way. "There was a love-in—and love-ins were big—in Griffith Park in Los Angeles," says guitarist Randy California (born Randy Wolfe on February 20, 1951, "and that's where Ed Cassidy and I met. Jay Ferguson and Mark Andes, and we started talking and decided to put together the group Spirit. It was a beautiful day, there were conga drum players and incense burning."

Serendipitous as this may sound, however, the chance meeting was a reunion, not a first encounter. The four musicians had in fact played together in a band called the Red Roosters a year before, splitting when California and Cassidy, who was the guitarist's stepfather, moved to New York in 1966.

And, of course, the story really starts much earlier than that, as far back as May 4, 1923, when Ed Cassidy, who may fairly claim to be the oldest rock 'n' roll musician around, was born in Chicago. Cassidy grew up in Bakersfield, California, and was already drumming professionally when still in his teens. "I started out, actually, in 1928 in country-western," he recalls, "and then worked my way around to Dixieland, then into Latin music, and then into jazz—small combos, then the big bands." By the early '50s, Cassidy was back in small groups, among them the New Jazz Trio, which also included pianist John Locke (born in Los Angeles on September 23, 1943).

But by 1964, Cassidy was ready to grab up jazz, and he joined a R&B blues band called the Rising Sons that included Ry Cooder and Taj Mahal. It was when the Sons were playing the Ash Grove in Los Angeles that Cassidy met Randy Wolfe's mother,

Bernice Pearl, who was visiting her brother, the club's owner. The two eventually married.

Randy Wolfe was also a frequent visitor at the Ash Grove. It was, he recalls, "the mecca of folk music of Los Angeles at that time. They used to have everybody from Linda Ronstadt to Bob Dylan to Doc Watson to Mance Lipscomb, Lightnin' Hopkins, the Staple Singers, the Chambers Brothers, Canned Heat."

Wolfe's access to such a wide range of folk and blues musicians helped his rapidly accelerating facility on the acoustic guitar. That in turn led to his meeting other aspiring musicians in the Los Angeles area, including two who came from a more conventional suburban background.

John Arden (Jay) Ferguson (born February 5, 1947) and Mark Andes (born February 19, 1948), the son of film actor Keith Andes (who would be the subject of the Spirit song "Straight Arrow"), met while attending Dollsworth High School in the San Fernando Valley. Andes was on the football team, and Ferguson was a cheerleader, in addition to being student body president. Both were also aspiring musicians. Andes played in a band called the Marksmen with his brother Matt, and they at one point backed up Bobby "Boris" Pickett (famous for his hit "The Monster Mash"). Ferguson had some classical training, played piano and guitar, and was writing his own songs.

The two first met Randy Wolfe in 1964 at a folk music camp in the mountains outside of Los Angeles, where Wolfe was playing in a country band with Ferguson's brother Tom. Hitting it off musically, they formed the Red Roosters, along with rhythm guitarist/vocalist Mike Fondiler and sitting in to help out the youngsters, Ed Cassidy on drums. They played at the Ash Grove.



"The Red Roosters were a folk-rock band, to put it pretty simply," says Barry Hansen (a.k.a. "Dr. Demento"), who worked at the Ash Grove and would later become a close associate at the members of Spirit. "Randy would play these Chuck Berry double-neck leads over the tight folk-rock that the rest of the Roosters laid down. They would do versions of blues and folk-blues tunes that Randy had perhaps been exposed to through being around the Ash Grove, plus they would do originals that Jay had written and maybe a couple that Mike Fondiler wrote." Finally, the Roosters split when Cassidy took his wife and stepson to live in New York. It was there that the 15-year-old Wolfe met the man who would be a major influence on his playing. He was in Manhattan at Manny's music store on West 48th Street, examining electric guitars, having only played acoustic so far. "In the back of

Manny's, there stood Jim, and I walked up to him," Randy California recalls of the man that he would know as Jimmy James and who, incidentally, would give him his new last name. "I listened to him. He was playing a Stratocaster[,] and for some reason we suited in on each other, and I said, 'Could I try that Strat that you're playing?' He gave me the Strat. I played some licks, and he said, 'Hey, I like what you're doing. Will you come down to the Village tonight and play in the band?' And this is the first night that he had done a solo gig."

The renamed Randy California played with Jimmy James and the Blue Flames throughout the summer of 1966. It was during this period that Hendrix was spotted by Chas Chandler, who became his manager and, at the end of the summer, took him to England to form the Jimi Hendrix Experience. "He asked me to go because he felt he was really

From left to right: John Locke, Mark Andes, Ed Cassidy, Randy California, and Jay Ferguson of The Spirit, 1968

EXHIBIT 15

213

D000141



Santa California

wanted another guitar player with him," California says, "and I guess I was too young. My folks said no. And I think Chas Chandler had a different type of idea for what Jimi should do. He wanted him to play in a trio as the only guitar player, but I think Jimi was always interested in playing with other guitar players. I didn't know his real name until I got back to California and the Jimi Hendrix album *[Are You Experienced?]* came out."

"In the meantime, some of the other guys in the band, specifically Jay Ferguson and Mark Andes and Mike Fondiler, had formed Western Union," says Hansen, who notes that Matt Andes was also a member of the group. "They almost got a record deal, but it never happened, and they broke up. But that gave Jay and Mark in particular a lot more onstage experience and got them around a little bit. Mark Andes also served a stint with Canned Heat, and he and his brother were briefly part of the touring version of a studio group called the Yellow Balloon that had scored a hit with a song of the same name in the spring of 1967. Meanwhile, Hansen worked with Ferguson on a solo single that was never released. It was at this point that Ferguson and Andes went to the Ash Grove and got re-acquainted with Cassidy and California, who, having returned to Los Angeles, had begun playing with Cassidy's old bandmate John Locke in a group they were calling Spirits Rebellious, after the title of the 1948 book written by Kahlil Gibran.

Cassidy remembers the deliberation with which the quintet was put together. "I wanted the band to be mechanical, and also one his brother were briefly the individuals' musical backgrounds," he says. "I didn't want the band to be a jazz band. I only wanted them to write their interpretation of jazz, and I didn't want the band to be primarily a rock

band. I wanted them to write their version and their interpretation of rock. And so forth and so forth — Latin, country, classical, avant-garde. I think that, out of all the musicality of the time, you're gonna hear the influencers, because they were young people, and they were being influenced by the music and what was going on around them."

The music and what was going on around Spirits Rebellious, when they started playing their first gigs — at the Ash Grove, naturally — in June, 1967, were historic matters. The Beatles' *Sgt. Pepper's Lonely Hearts Club Band,* which ushered in an era of musical eclecticism and psychedelia, was released June 3. And on the weekend of June 16–18 came the Monterey Pop Festival, organized by John Phillips of the Mamas and the Papas and that group's producer, Lou Adler. The festival headlined the new San Francisco acts such as Big Brother and the Holding Company and Country Joe and the Fish; R&B performers such as Otis Redding and Booker T. and the MG's; and emerging British imports like the Who and the Jimi Hendrix Experience, demonstrating that the umbrella of "pop" covered a wide variety of musical styles as of mid-1967.

Spiritually, California could be better for a new group that Randy California describes as "two guys with strong blues influence [himself and Mark Andes], two guys with strong jazz [Ed Cassidy and John Locke], and one classical guy [Jay Ferguson]." Barry Hansen recalls that the band's Monday night residence at the Ash Grove would "find them jamming extensively, especially on tunes by jazz saxophonist John Coltrane, also at one point jamming format that became 'Elijah.' 'Elijah' was always what they played toward the end of their set, and it quickly became the centerpiece of their whole set. A good many of the other Spirit songs

originated with riffs that were developed on 'Elijah,' especially 'I Got A Line On You.'"

The band was of course interested in finding a record company to sign them. "We had played and auditioned for more than one record label but they were looking for something more commercial," Cassidy remembers. "As they put it, they loved the band, but they wanted to know if we had any songs that had more of a story line, and you figure that out. They wanted to categorize you. And since we didn't fit into any category it made it difficult for them, and so it made it difficult for us to have someone sign us."

"We went to RCA Records and did a live audition

for these guys in suits," says California, "played all our five or six songs, and then they came up to us and said, 'Well, that's really nice, but do you have any pop kind of songs?' (The incident had a sufficient impact on the band that they wrote 'Gramophone Man' to describe it.)

Conventional wisdom, to be sure, but in 1967 the band's very diversity was what made it potentially successful. If only a record company executive could see it. *Sgt. Pepper* has no simple love songs on it, and when you look at the new groups that were debuting on the charts in the first half of the year, the Mothers of Invention in February, Buffalo Springfield and the Doors in March, the Grateful

EXHIBIT 15

214

D000142



John Locke

Dead, Cream, the Velvet Underground, and the Who in May. Country Joe and the Fish in June. It's apparent that the public was experiencing an interest in something more involved than just simple, straightforward, romantic pop songs.

It took Lou Adler, however, to apply this lesson by signing Spirit. The band was still called Spirits Rebellious when Brian Berry, brother of Jan Berry of Jan and Dean, heard them then rehearsing while working on Bay Street in Santa Monica. Berry not only suggested they cut then some demos to Spirit, but he also introduced them to Anne Appleyard, who arranged an audition for Adler, then starting his own record label, Ode.

Ken Berry, another brother, arranged for the band to cut a demo at the newly opened Paramount Studios, produced by Barry Hansen. "We got the studio for free," Hansen recalls. "I think they were

just trying to see if everything worked. One thing that did not work was the echo chamber, and that's why the recordings are so dry. That gave in a very pure and crystaline sound, whether we wanted it or not."

Adler must have been sufficiently expressed, since Spirit signed a four-album contract with Ode on August 28, 1967. Though Hansen had guided the band's sound until this time, Adler himself became Spirit's producer, allowing only the band, himself and the engineers to attend the first album sessions. Adler chose the ten cuts material from among a large number of songs submitted, especially by California and Ferguson, with a decided leaning toward the latter.

In fact, California's sole contribution to the first Spirit album was an instrumental called "Taurus," a song that would have a distinct influence on a band formed the following year in England, as a comparison of its opening with the opening of the Led Zeppelin classic "Stairway to Heaven" recorded over three years later, will testify. When we did our first tour of Europe, in the '80 or maybe '82," California recalls, "all these guys used to come up and sit in the front row of all our shows, and we became friends. It they wanted to use that, that's fine. I'll let them have the beginning of 'Taurus' for their song."

After the Spirit tracks were completed by the band, Adler brought in arranger Marty Paich to add strings and horns to the tracks. "Too had a real sweet sound and actually that's apparent in his mixes of the Mamas and the Papas and other stuff that he had done prior to that," says California. "So I do respect his ability to produce fine, clear, good sounding records, although I believe that the guts on the balls of the group was taken out of the this record. The drums are sort in the background, and

the strings and the horns it's more of a classical type of production than a rock type of production That might have been a mistake. People like the album, but I think it could have hit harder. But he may have thought that (was) the most commercial thing to do."

Ironically Adler's production, which is in keeping with the light, eclectic feel of 1967 music, was perhaps less summercial than what Spirit's raw sound might have been. In the different musical climate of 1968. If '67 was the year of Pink Floyd and Procol Harum (both of whom debuted in the charts during the second half of the year), the class of '68, in addition to Spirit, included the Amboy Dukes, the Band, the Jeff Beck Group, Blood, Sweat and Tears, Blue Cheer, Creedence Clearwater Revival, Deep Purple, Iron Butterfly, the Steve Miller Band, Steppenwolf, and Ten Years After, groups that largely eschewed the light pop of the previous year for harder rock and blues.

Spirit was released on January 22, 1968, and broke into the charts in April, eventually rising to no. 31. Ode also released a single of "Mechanical World," which had earned some radio attention in Florida, and it scraped into the bottom of the charts. As early as February, however, the band was thinking of how to take a more commercial approach.

"After the first album-and it did pretty good, it's not great, we were wondering what we were gonna do for the second album, and Lou Adler came up to the band and said, 'You guys need a hit song,'" California recalls. "I guess I took that to heart, because I remember going outside, sitting on the porch with my acoustic guitar, and saying, 'I'm gonna write a hit song,' and right then and there I came up with the riff." The riff was the opening for

"I Got A Line On You." (California does not dispute Barry Hansen's assertion that the riff emerged initially from a jam on "Elijah" at around the same time.) The track was recorded in February 1968, but not released until the end of October, when it prefaced the second album, The Family That Plays Together. "I Got A Line On You," which critic Robert Christgau later called, "that great rolling 7:29 of hard rock guitar," got to no. 25, Spirit's most successful single ever.

Just as important, it marked Randy California's emergence as a songwriter. "By the second album, because the first album maybe didn't sell as well as everyone thought, and since I had written 'I Got A Line On You,' I was allowed to be a major contributor as a writer," he says. In fact, he nearly split the album's writing credits with Ferguson. Released in December 1968, The Family That Plays Together improved on the first album's showing, reaching no. 22.

The band, meanwhile, was occupied scoring and appearing in a new film being made by French director Jacques Demy (of The Umbrellas of Cherbourg). Set in Los Angeles, it starred Anouk Aimee, best known for the 1966 film A Man And A Woman, and Gary Lockwood, star of 2001: A Space Odyssey, but was not as much of a success as those resumes would suggest. Still, The Model Shop, released in early 1969, remains notable for its soundtrack, none of which appeared on disc. Included here for the first time are three of these previously unreleased tracks: "Eventide," "The Model Shoppe Theme" and "Green Gorilla." That is, more directly, though California notes of Clear, the next Spirit lp, released in July, 1969, "The album itself was an afterthought in that we were working on the soundtrack of the movie. A lot of the music

EXHIBIT 15
215

was specifically with a movie on mind, more of a background kind of thing. So of all the albums, that was the least of the concentrated effort of the group as doing a real Spirit album." The Lp marked a commercial setback for the band, only getting to no. 55.

In an attempt to restore its commercial fortunes, Spirit once again endeavored to write a hit single. The result was "1984." "I had just finished reading the George Orwell book," says California. "At that time, there was a lot ad commen in Los Angeles about the helicopters the police were starting to use, so I included the machine-day aspect with the predictions of the book. Hence the second verse. They call themselves protection. But you know it's no game." 'To protect and serve' is the motto of the

LA police. We rehearsed it, went on and recorded it. Lou Adler wasn't there on the finishing of it. We went to another studio because that studio had a Leslie organ, and we got the sound there that we wanted for the keyboards, and we mixed it there."

The single B-side, which never appeared on a Spirit Lp, was Ferguson's "Sweet Stella Baby." "Stella was our most dedicated fan throughout the years," California notes. "She lives in Chicago, and she came to our first concert there and has been to all of our concerts for the song, and I think it was a wonderful girl. Jay wrote the song, and I think it was a kind of thoughtless to say things about her. We are thankful for her dedication to the group."

"1984" "Sweet Stella Baby" was released in December 1969. "It immediately started getting a lot of airplay for the first three weeks and started climbing the local charts." according to California. "Back then they had tip sheets, and there was a tip sheet that said that this song has two [many] political ideas in it and it should not be played. Immediately after that the song pretty much was banned on AM radio. At the same time, it became a big hit in Germany" California's statement is backed up by the song's chart history. Debuting in February 1970, it climbed rapidly to no. 69, then suddenly stopped and disappeared from the charts.

Another explanation for the single's failure may be that it came at the end of Ode's distribution deal with Epic. While Spirit may have suffered commercially due to what seems to have been an uneasy alliance between the labels, it was probably not helped in the short run by the expiration of the agreement. In the long run, however, Spirit benefited, since Adler "loaded" the group, which had one album to go on the contract, to Epic.

This also meant they needed a new producer,

and California took the advice of Neil Young in hiring David Briggs, who had co-produced his two solo albums, Neil Young and Everybody Knows This Is Nowhere. "David was more of an equal with us and worked very closely with us," California recalls. "David was a good catalyst because he had sharp ears and he knew how to relate to everybody in the group and keep things under control"

Sessions for the fourth Spirit album commenced at Sound City Studios on April, 1970. But while previous albums had been finished in a matter of weeks, work on what would become Twelve Dreams Of Dr. Sardonicus went on for more than six months. The first complication came when Randy California was thrown from a horse in Topanga Canyon. "I was thrown back on the cement, and I got a skull fracture, so I was in the hospital for about a month," he says. "Right before I went under, when they drove me to the hospital in the ambulance, I said, 'Don't do anything without me. Don't do any more work on the album!'"

They didn't. In the interim, however, Epic released a single from the Lp in-progress, Ferguson's "Animal Zoo," in July It grazed the bottom of the charts in September

More serious than California's injury in the long run, however, was the growing dissatisfaction in the group. "The original quality of the band, with Ferguson and California on one end and Cassidy and Andes on the other, was splitting once again" is the way Barry Hansen puts it. "Jay was always fascinated with the music business. He wanted to make it. He wanted to be a star, and he saw Randy as being someday who was a great musician and very inspired, but tended to live in the clouds."

"Jay convinced Mark that they really didn't want to play in Spirit because Spirit had too much vari-

ety," California says. "He felt that him and Mark would be better of playing on a straight hard rock band without the jazz influence, and during that time, even after I recovered, Jay and Mark were sneaking off rehearsing and not calling anybody and so a lot of the mixing and finishing up for Sardonicus was just left with me and David"

The album was preceded by a single of California's "Nature's Way" a song that has gone on to become one of Spirit's most popular tunes. "Nature's Way was written sitting by the pool at a hotel in San Francisco," says California. "There's a jealousy between San Francisco and Los Angeles, and they always say 'You guys have smog down there,' and you guys are just smug. So I was sitting there at this hotel in San Francisco, and I looked out across the San Francisco Bay and this huge bank of smog started rolling in. So I said, 'Okay guys, it's Nature's way of telling you something's wrong! You got it, too! Everyone comes up and says, 'God, it helped me when I had a baby, and 'it helped me through this time.' 'it's open for interpretation. But if people want to know why I wrote it, that's the mundane reason."

Twelve Dreams Of Dr. Sardonicus was finally released on November 29, 1970, and the band went on two tours in early 1971 to promote it. But despite the touring, despite the band's direct signing to Epic, and increased promotion, despite the album's sheer quality, it was not at first a big success. getting only to no. 63

"There was frustration," Cassidy says, "we had had what we thought was going to be successful. And I think everybody was starting to think, 'Maybe it's not working. Maybe it's time to move on. This was sort of like The Last Hurrah, so to speak, and I think that's one of the reasons why it became a



Jay Ferguson

D000143

EXHIBIT 15

216

classic album. It was advanced for its times, doing a lot of things electronically that were not being done, and the arranging of songs, and how we had instead the blending of one song into another.'

'Everyone thought this is a great album and it should do really well,' says California, 'but a month after it was out, it got reviewed in *Rolling Stone* magazine, the San Francisco-based operation. The press in San Francisco always used to call Los Angeles groups 'plastic.' So, when that review came out, it was a complete thumbs-down review, and it really broke my heart. I think maybe that was a catalyst in my mind to say, 'Well, okay, the group's next Our last album was a failure.' Of course, over the years, its been respected and sold a lot, and people revere it now as a work of art. That's consolation 20 years later, but at the time it was heartbreaking, and the guy who wrote that should know

what he did to help wreck Spirit.'

The review was written by Nick Tosches, and appeared in the March 4, 1971, issue of *Rolling Stone*. While calling it 'a complete thumbs-down review,' California is perhaps putting things too strongly the review is written in the smart-alecky, hyperventilated style typical of early *Rolling Stone*. The last sentence alone compares more than 150 words, and any attempt to disagree it would be a grammarian's worst nightmare. Elsewhere, Tosches longwindedly criticizes three of the album's tracks, but calls 'Nothin' To Hide' a 'hamburger,' and also has kind, if cloudy words to say about 'Animal Zoo' and 'Nature's Way.' He concludes by calling *Sardonicus* a 'blockbuster.'

However true that may be artistically (and even, to an extent, later commercially), *Sardonicus*'s apparent lack of success was the final event in the demise of the original band. In June, 1971, Ferguson and Andes called a band meeting to announce formally that they were leaving Spirit and, with Matt Andes and bass drummer Curly Smith, forming Jo Jo Gunne.

The remaining members tried to carry on, adding the brothers Al and Chris Staehely, who were friends of Smith's. Cassidy, Locke, and the Staehely brothers went into the studio in November with Bergs as producer again, and emerged with *Feedback*, which was released on Epic under the Spirit name in February, 1972. The same month, Jo Jo Gunne entered the charts with the first and most successful of its four albums, *Jo Jo Gunne*, which contained the top 30 single 'Run Run Run.' Later, Ferguson would go solo, releasing two albums between 1976 and 1982 and scoring the hits 'Thunder Island' and 'Shakedown Cruise.')



Mark Andes

Though *Feedback* was not a great success, Spirit's back catalog was starting to show life for Epic. *Sardonicus*, though off the charts, sold steadily (by 1976, it would be certified gold for sales in excess of 500,000 copies) as did *Twelve*. Epic re-released *The Family That Plays Together* and soon re-enters the charts.

Randy California, meanwhile, having taken six months off after leaving Spirit, re-emerged in November, 1972, with a solo album, an epic called *Kapt. Kopter And The [Fabulous] Twirly Birds*. The LP featured a power trio format with a varying rhythm section including, among others, Ed Cassidy, bassist Larry 'Fuzzy' Knight, and another bass player called 'Clit McTorias,' who was really Jimi Hendrix Experience member Noel Redding performing under a *nom de studio* for contractual reasons.

California played dates with Cassidy (who had split from Locke) and Knight (Redding was unable to stay in the U.S.) under the Kaptain Kopter name, and he prepared a follow-up album, a concept record called *The Adventures Of Kaptain Kopter & Commander Cassidy in Potatoland* that went unreleased for eight years, Of 'Turn To The Right,' one of *Potatoland*'s selections, California recalls, 'That song was written when I was 13 in the 1960s, and we used to do it back then. So that's probably the earliest written song on the whole album.' As for *Potatoland* itself, 'I don't know how I came up with the idea of the march of the potato-face people,' he says, 'it's kind of a comment on American society as I saw it in those days.

California and Cassidy intended to go forward under their own names, but when the group were contacted by European promoters for an extensive tour, it was Spirit they wanted, not Kaptain Kopter

and Commander Cassidy. California did the tour, but then dropped out of the music business again, moving to Hawaii. Cassidy, who was with his shaved head was the most visually striking member of the group, had no trouble assembling what he now calls 'the Spirit copycat band,' and going on the road to promote an increasingly viable commercial entity.

'Interestingly enough a lot of the people that heard the band didn't even know that it wasn't the same band 'cause I was in it,' he says.

Certainly, in 1973, audiences were happy to hear a band that played note-perfect versions of Spirit songs. Epic released the two double albums juxtaposing the group's first and third, and second and fifth albums, and also put out a compilation, *The Best Of Spirit*. That record, and one of the two disks, reached the charts, as did a single of the *Sardonicus* track, 'Mr. Skin' (appropriately enough, a song about Cassidy).

In January, 1974, Randy California returned to the music business, pairing with Cassidy again and reforming Spirit. Since that time, the group has released a series of albums, first on Mercury, then for various independent and European labels, sometimes featuring one, two, or even all three of the other original members. The most recent Spirit release, 1990's *Tent Of Miracles*, featuring a lineup of California, Cassidy, and bassist Mike Nile, came out on the group's own label, with distribution by Cardine Records. At this writing, they plan another album by the end of 1991. John Locke and Mark Andes (who joined Heart in the early 80s) appeared on a Spirit album as recently as 1989. Jay Ferguson, who last appeared with the group in 1986, does movie soundtrack work.

Just as Spirit's disc/Epic records continued to sell healthily in the years after the split-up of the

D000144

**EXHIBIT 15**

217

D000145

**EXHIBIT 15**

218

The Twelve Dreams Of Dr. Sardonicus are among the finest albums to emerge in the last ten years. "Spirit was one of the strangest and best bands to come of the anything-goes attitude that surrounded California rock in the late sixties," noted John Swenson in The Rolling Stone Record Guide in 1979. And in 1983, Robert Santelli, in his book Sixties Rock: A Listener's Guide, wrote, "Some of the most innovative rock to surface in L.A. came from Spirit.

"At the time, they were not as big as Blue Cheer," Barry Hansen admits, "but they may be more fondly remembered than Blue Cheer now, and I guess their mix of styles had something to do with that. People who write more the connoisseur type, people who were more open-minded about their music, people who appreciated versatility, Spirit was a group they could love." Maybe that's why, 20 years after the original group broke up, Spirit remains a band musicians can love, both in the hundred or so concerts the current edition plays each year, and on recordings that sound as fresh and innovative as ever.

Notes by William Ruhlmann

Well, here we are in 1991 and it's been 24 years since our first recording sessions. I would like to thank the following producers for helping guide and mold the Spirit sound: Barry Hansen, Lou Adler, David Briggs and Bob Irwin.

When Richard Bauer at Epic/Legacy asked me to write something for the Time Circle (1968-1972) booklet, one phrase from a particular Spirit song came to mind, "Life has just begun."

It occurred to me that a lot of kids from my son's age (7) on up, would be introduced to Spirit for the first time. That song, like "Fresh Garbage" and

**Ed Cassidy**

original band, so the group's reputation has risen as histories of the period appear. "Spirit is a supergroup that just never caught on," announced the update in Lillian Roxon's Rock Encyclopedia, compiled by Ed Naha, in 1978. "In spite of fantastic albums, excellent live performances, and tremendous songwriting ability, the band always remained bogged down in the 'cult following' category ... Spirit, The Family That Plays Together, and

"Nature's Way" have lasted all this time and carry a deeper meaning now because of our present day environmental awareness.

Ed Cassidy just celebrated his 68th birthday this year and hasn't slowed down a bit. We are still recording and performing, and digging through our old tape boxes to see what surprises we can bring you in the near future. I would also like to thank the many dedicated Spirit fans who have attended our five performances each year.

May the circle remain unbroken!

*[signature]*

Digital Producer: Bob Irwin
Project Director: Richard Bauer
Package Coordinator: Steve Berkowitz
Liner Notes: William Ruhlmann
Art Direction: Nancy Donzella
Digitally remastered and mastered by Vic Anesini
Sony Music Studios, New York

Booklet photos courtesy of Randy California
Ed Cassidy and Sony Music Photo Archives

Special thanks to Randy California and Ed Cassidy for their invaluable assistance

Additional thanks to John Ingrassia, Joanne Newman and Ted Livesy

Correspondence for Spirit should be addressed to:
Spirit
P.O. Box 665
Ojai, CA 93024
or call (805) 646 MUSIC

**Original Producers:**

| | |
|---|---|
| Lou Adler | Disc 1, Tracks 1–21 |
| | Disc 2, Tracks 1–8 |
| Spirit | Disc 2, Tracks 9–10, 20 |
| David Briggs | Disc 2, Tracks 11–19 |

**Spirit:**

Randy California: Vocals, Guitar
Jay Ferguson: Vocals, Percussion
Mark Andes: Bass
John Locke: Keyboards
Ed Cassidy: Drums, Percussion

**SPIRIT SELECTED U.S. ALBUMS DISCOGRAPHY**

| Label | Record # | Title | Year |
|---|---|---|---|
| Ode | 44004 | Spirit | 1968 |
| Ode | 44014 | The Family That Plays Together | 1968 |
| Ode | 44016 | Clear | 1969 |
| Epic | 30267 | The Twelve Dreams Of Dr. Sardonicus | 1970 |
| Epic | 31175 | Feedback | 1972 |
| Epic | 32271 | The Best Of Spirit | 1973 |
| Mercury | 804 | Spirit Of '76 | 1975 |
| Mercury | 1053 | Son Of Spirit | 1975 |
| Mercury | 1094 | Farther Along | 1976 |
| Mercury | 1133 | Future Games (A Magical Kahauna Dream) | 1977 |
| Potato | 2001 | Live | 1979 |
| Rhino | 303 | The Adventures Of Kaptain Kopter & Commander Cassidy in Potatoland | 1981 |
| Mercury | 830 574 | Spirit Of '84 | 1984 |
| I.R.S. | 82007 | Rapture In The Chambers | 1989 |
| Dolphin | 22091 | Ten DR Minutes | 1990 |

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California and my business address is 100 Wilshire Boulevard, Suite 2010, Santa Monica, CA 90401. I am over the age of 18 and not a party to this action.

On December 4, 2015, I served the foregoing document described as **REQUEST FOR ADMISSIONS**, on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope at Santa Monica, California, addressed as follows:

Glen L. Kulik, Esq.
Kulik Gottesman & Siegel, LLP
15303 Ventura Boulevard
Suite 1400
Sherman Oaks, CA 91403

☐ I caused such envelope with postage thereon fully prepaid to be placed in the United States mail. I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service. Correspondence for mailing is deposited with the United States Postal Service on that same day in the ordinary course of business. The foregoing document was sealed and placed for collection and mailing on the foregoing date, following the firm's ordinary practices. I am aware that on motion of any party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

☒ I caused such envelope to be delivered by hand to the offices of the addressee.

☐ I placed such envelope in a box or other facility regularly maintained by Federal Express, in an envelope or package designated and provided by Federal Express, with delivery fees paid or provided for, addressed to the above-indicated addressees.

☐ I caused a copy of the foregoing document to be faxed to the addressee.

Executed on December 4, 2015 at Santa Monica, California. I declare under penalty of perjury that the above is true and correct.

_____
Peter J. Anderson

**EXHIBIT 15** 4
**219**

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California and my business address is 100 Wilshire Boulevard, Suite 2010, Santa Monica, CA 90401. I am over the age of 18 and not a party to this action.

On December 4, 2015, I served the foregoing document described as **REQUEST FOR ADMISSIONS**, on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope at Santa Monica, California, addressed as follows:

Francis Malofiy, Esq.
Francis Alexander, LLC
280 N. Providence Road
Suite 105
Media, PA 19063

[X] I caused such envelope with postage thereon fully prepaid to be placed in the United States mail. I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service. Correspondence for mailing is deposited with the United States Postal Service on that same day in the ordinary course of business. The foregoing document was sealed and placed for collection and mailing on the foregoing date, following the firm's ordinary practices. I am aware that on motion of any party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

[ ] I caused such envelope to be delivered by hand to the offices of the addressee.

[ ] I placed such envelope in a box or other facility regularly maintained by Federal Express, in an envelope or package designated and provided by Federal Express, with delivery fees paid or provided for, addressed to the above-indicated addressees.

[ ] I caused a copy of the foregoing document to be faxed to the addressee.

Executed on December 4, 2015 at Santa Monica, California. I declare under penalty of perjury that the above is true and correct.

Peter J. Anderson

**EXHIBIT 15** 5
**220**

# EXHIBIT 16

# Additional Certificate of Registration of a Claim to Copyright

This is to certify that the statements set forth in the attached have been made a part of the records of the Copyright Office with claim of copyright registered under number

In testimony whereof, the seal of this office is affixed hereto on

## EU 35222

## July 15, 2014

Register of Copyrights and
Associate Librarian for Copyright Services

**EXHIBIT 16**
**221**

*Complete all applicable spaces on next page*





Page 1

# Application for Registration of a Claim to Copyright

in a **musical** composition the author of which is a citizen or domiciliary of the United States of America or which was first published in the United States of America

**FORM E**

| CLASS | REGISTRATION NO |
|-------|-----------------|
| E | Eu 35222 |

DO NOT WRITE HERE

**Instructions:** Make sure that all applicable spaces have been completed before you submit the form. The application must be SIGNED at line 9. For published works the application should not be submitted until after the date of publication given in line 4(a), and should state the facts which existed on that date. For further information, see page 4.

Pages 1 and 2 should be typewritten or printed with pen and ink. Pages 3 and 4 should contain exactly the same information as pages 1 and 2, but may be carbon copies.

Mail all pages of the application to the Register of Copyrights, Library of Congress, Washington, D.C., 20540, together with:

(a) If unpublished, one complete copy of the work and the registration fee of $6.

(b) If published, two copies of the best edition of the work and the registration fee of $6.

Make your remittance payable to the Register of Copyrights.

**1. Copyright Claimant(s) and Address(es):** Give the name(s) and address(es) of the copyright owner(s). In the case of published works the name(s) should ordinarily be the same as in the notice of copyright on the copies deposited.

Name ..... Hollenbeck Music Co.

Address ..... 800 Stone Canyon Rd.     Bel Air, Calif.

Name .....

Address ..... /

**2. Title:** .....

_(Give the title of the musical composition as it appears on the copies)_

Tauras

**3. Authors:** Citizenship and domicile information must be given. Where a work is made for hire, the employer is the author. Organizations formed under U.S. Federal or State law are U.S. citizens.

Authors include composers of music, authors of words, arrangers, compilers, etc. If the copyright claim is based on new matter (see line 5) give information about the author of the new matter.

Name ..... Randy California ..... Citizenship: U.S.A. ..... X ..... Other ..... _(Name of country)_
_(Give legal name followed by pseudonym if latter appears on the copies)_     _(Check if U.S. citizen)_

Domiciled in U.S.A. Yes X. No ..... Address ..... Los Angeles, Calif. ..... Author of ..... Music
     _(State which: words, music, arrangement, etc.)_

Name ..... Citizenship: U.S.A. ..... Other ..... _(Name of country)_
_(Give legal name followed by pseudonym if latter appears on the copies)_     _(Check if U.S. citizen)_

Domiciled in U.S.A. Yes ..... No ..... Address ..... Author of .....
     _(State which: words, music, arrangement, etc.)_

Name ..... Citizenship: U.S.A. ..... Other ..... _(Name of country)_
_(Give legal name followed by pseudonym if latter appears on the copies)_     _(Check if U.S. citizen)_

Domiciled in U.S.A. Yes ..... No ..... Address ..... Author of .....
     _(State which: words, music, arrangement, etc.)_

**▶▶ NOTE:** Leave all spaces of line 4 blank unless your work has been PUBLISHED. ◀◀

**4. (a) Date of Publication:** Give the date when copies of this particular version of the work were first placed on sale, sold, or publicly distributed. The date when copies were made or printed, or the date when the work was performed should not be confused with the date of publication. (NOTE: The full date (month, day, and year) must be given.)

..... ..... .....
_(Month)   (Day)   (Year)_

**(b) Place of Publication:** Give the name of the country in which this particular version of the work was first published.

**▶▶ NOTE:** Leave all spaces of line 5 blank unless the instructions below apply to your work. ◀◀

**5. Previous Registration or Publication:** If a claim to copyright in any substantial part of this work was previously registered in the U.S. Copyright Office in unpublished form,

or if any substantial part of the work was previously published anywhere, give requested information.

Was work previously registered? Yes ..... No ..... Date of registration ..... Registration number .....

Was work previously published? Yes ..... No ..... Date of publication ..... Registration number .....

Is there any substantial NEW MATTER in this version? Yes ..... No ..... If your answer is "Yes," statement of the nature of the NEW MATTER in this version. (New matter may consist of compilation, abridgment, translation, editorial revision, and the like, as well as additional words and music.)

EXHIBIT 16

222

_Complete all applicable spaces on next page_

**7. Name and address of person or organization to whom correspondence or refund, if any, should be sent:**

Name    H8llenbeck Music Co.        Address    800 Stone Canyon Rd. Bel Air

**8. Send certificate to:**

(Type or print name and address)    Name    Hollenbeck Music Co.

Address    800 Stone Canyon Rd.
(Number and street)

Bel Air, Calif.
(City)            (State)            (ZIP code)

**9. Certification:**

(Application not acceptable unless signed)

I CERTIFY that the statements made by me in this application are correct to the best of my knowledge.

(Signature of copyright claimant or duly authorized agent)

## Application Forms

Copies of the following forms will be supplied by the Copyright Office without charge upon request.

Class A  Form A—Published book manufactured in the United States of America.

Class A or B  { Form A-B Foreign—Book or periodical manufactured outside the United States of America (except works subject to the ad interim provisions of the copyright law).
Form A-B Ad Interim—Book or periodical in the English language manufactured and first published outside the United States of America.

Class B  { Form B—Periodical manufactured in the United States of America.
Form BB—Contribution to a periodical manufactured in the United States of America.

Class C  Form C—Lecture or similar production prepared for oral delivery.

Class D  Form D—Dramatic or dramatico-musical composition.

Class E  { Form E—Musical composition the author of which is a citizen or domiciliary of the United States of America which was first published in the United States of America.
Form E Foreign—Musical composition the author of which is not a citizen or domiciliary of the United States of America and which was not first published in the United States of America.

Class F  Form F—Map.

Class G  Form G—Work of art or a model or design for a work of art.

Class H  Form H—Reproduction of a work of art.

Class I  Form I—Drawing or plastic work of a scientific or technical character.

Class J  Form J—Photograph.

Class K  { Form K—Print or pictorial illustration.
Form KK—Print or label used for an article of merchandise.

Class L or M  { Form L–M—Motion picture.

Form R—Renewal copyright.

Form U—Notice of use of copyrighted music on mechanical instruments.

FOR COPYRIGHT OFFICE USE ONLY

Application received

FEB - 5 1968

(One copy received)

DEC 2 2 1967

Two copies received

Fee received

5/5 27  DEC 2 2 1967

Renewal

No  729-868

U.S. GOVERNMENT PRINTING OFFICE

**EXHIBIT 16**

223 Page

# EXHIBIT 17



**EXHIBIT 17**
**224**

D040443

# EXHIBIT 18

# STAIRWAY TO HEAVEN

Words and Music by
JIMMY PAGE
ROBERT PLANT

JAN 20 1972

E u 301137



LIBRARY OF CONGRESS COPYRIGHT
DEPOSIT
UNITED STATES OF AMERICA

Copyright ©1972 by SUPERHYPE MUSIC, INC., 1841 Broadway, New York, N.Y. 10023
International Copyright Secured    Printed in U.S.A.    All Rights Reserved

EXHIBIT 18
224

D000562

# EXHIBIT 19





63278



MARK ANDES—BASS & VOCALS
CASSIDY—DRUMS & PERCUSSION
RANDY CALIFORNIA—GUITARS
JOHN LOCKE—KEYBOARD
JAY FERGUSON—VOCAL & PERCUSSION

SIDE 1
FRESH-GARBAGE/Ferguson
UNCLE JACK/Ferguson
MECHANICAL WORLD/Andes & Ferguson
TAURUS/California
GIRL IN YOUR EYE/Ferguson
STRAIGHT ARROW/Ferguson

SIDE 2
TOPANGA WINDOWS/Ferguson
GRAMOPHONE MAN/Ferguson, Locke,
California, Andes & Cassidy
WATER WOMAN/Ferguson
THE GREAT CANYON FIRE
IN GENERAL/Ferguson
ELIJAH/Locke

Producer: Lou Adler
Strings & Horns Arranged By Marty Paich
Engineers: Eirik Wangberg, Armin Steiner
& Mike Leitz
Album Design: Corporate Head
Art Director: Tom Wilkes
Cover Photo: Guy Webster
Back Cover Photo: Jay Thompson
Assisted By Terry Clements/Marshall Blonstein/Doug Wallack

CBS is a Trademark of the Columbia Broadcasting System,
Inc., U.S.A.
Printed and made by Ernest J. Day & Co. Ltd., London. Patent Pending

**EXHIBIT 19**

225



BE PLAYED ON TODAY'S MONO RECORD PLAYERS WITH EXCELLENT RESULTS. THEY WILL LAST AS LONG AS

# EXHIBIT 20

RETURN WITH ME NOW TO THOSE THRILLING DAYS OF YESTERDAY........

TO THE FEBRUARY 1, 1969 PRE- "GROUNDHOG DAY" EXTRAVAGANZA

IN DETROIT, AS **SPIRIT** PLAYS THE LEGENDARY "GRANDE BALLROOM"!!!

(OPENING ACT: JETHRO TULL)

WHILE THE IMAGES AND SOUND MAY BE SUBSTANDARD, I HOPE THE

GOOD MEMORIES WILL MORE THAN MAKE UP FOR IT!!

THE SET LIST

1. FOG  (2:50)

2. ALL THE SAME  (5:04)

3. FRESH GARBAGE  (4:37)

4. APPLE ORCHARD  (3:39)

5. MECHANICAL WORLD  (6:11) (CUT)

6. AREN'T YOU GLAD  (2:59) (CUT)
   NOTE: FROM INFERIOR SOURCE TO REST

7. UNCLE JACK  (3:00)

8. NEW DOPE IN TOWN  (2:46)

9. IT SHALL BE  (3:17)

10. POOR RICHARD  (2:07)

11. DARLIN' IF  (4:59)

12. I GOT A LINE ON YOU  (1:42) (CUT)

13. ELIJAH  (22:22) (CUT)

TOTAL  (65:42)

BROUGHT TO YOU IN LIVING MONO BY BRUCE PATES "PRODUCTIONS"!!
HAPPY HOLIDAYS!!!!

**EXHIBIT 20**
**226**

EXHIBIT   352
WIT: Andes
DATE: 1-15-16
DAYNA HESTER, CSR 9970

# EXHIBIT 21

SPIRIT

1. NATURE'S WAY
2. IT'S ALL THE SAME
3. FRESH GARBAGE
4. PRELUDE: NOTHING TO HIDE
5. MR. SKIN
6. STREET WORM
7. FOG/DRUM SOLO
8. MECHANICAL WORLD
9. I GOT A LINE ON YOU

# SPIRIT

"THE FORUM"

LOS ANGELES, CA

December 12, 1970

Opening for THE
MOODY BLUES



EXHIBIT 306
WIT: Ferguson
DATE: 12-1-16
DAYNA HESTER, CSR 9970

**EXHIBIT 21**
227

# SPIRIT

**"MAMMOTH GARDENS"**

**DENVER, CO**

**JUNE 5 OR 6, 1970**

# SPIRIT

1. THE DECISION (?)
2. SWEET STELLA BABY
3. 1984
4. IT'S ALL THE SAME
5. FRESH GARBAGE
6. UNKNOWN INSTRUMENTAL
7. JEALOUS
8. IT SHALL BE
9. POOR RICHARD
10. GROUNDHOG (CUT)





EXHIBIT 307
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970

**EXHIBIT 21**
**228**

# SPIRIT

**UNKNOWN VENUE**

**CINCINNATI, OH**

**LATE 1970**

**OPENING FOR ??**

### SPIRIT

1. PRELUDE: NOTHING TO HIDE
2. MR. SKIN
3. IT'S ALL THE SAME
4. FRESH GARBAGE
5. STREET WORM
6. FOG/ DRUM SOLO
7. MECHANICAL WORLD
8. I GOT A LINE ON YOU



EXHIBIT 308
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970



**EXHIBIT 21**
**229**

# SPIRIT

"WHISKY A GO GO"

HOLLYWOOD, CA

OCT. 31 OR

NOV. 1 OR 2, 1968

# SPIRIT

1. IT'S ALL THE SAME
2. FRESH GARBAGE
3. NEW DOPE IN TOWN
4. APPLE ORCHARD
5. WATER WOMAN
6. TUNJI



EXHIBIT _309_
WIT: _ferguson_
DATE: _1-13-16_
DAYNA HESTER, CSR 9970



**EXHIBIT 21**
**230**

# SPIRIT

"GRANDE BALLROOM"

DETROIT, MI

FEB. 1, 1969

SPIRIT

1. FOG  (2:50)
2. ALL THE SAME  (5:04)
3. FRESH GARBAGE  (4:37)
4. APPLE ORCHARD  (3:39)
5. MECHANICAL WORLD  (6:11) (CUT)
6. AREN'T YOU GLAD  (2:59) (CUT)
7. UNCLE JACK  (3:00)
8. NEW DOPE IN TOWN  (2:46)
9. IT SHALL BE  (3:17)
10. POOR RICHARD  (2:07)
11. DARLIN' IF  (4:59)
12. I GOT A LINE ON YOU (1:42) (CUT)
13. ELIJAH  (22:22) (CUT)

TOTAL TIME  (65:42)

EXHIBIT  310
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970



**EXHIBIT 21**

231

# SPIRIT

"CIVIC CENTER"

BALTIMORE, MD

OCTOBER 3 ,1969

OPENING FOR
IRON BUTTERFLY

**SPIRIT**

1. IT'S ALL THE SAME
2. FRESH GARBAGE
3. JEALOUS
4. GROUNDHOG (MOSTLY CUT)
5. DARK EYED WOMAN (CUT)
6. UNKNOWN SONG
   SOUNDS LIKE EITHER JAY OR
   RANDY INTRODUCES IT AS
   SOMETHING THEY WROTE WITH
   JOHN, BUT IT'S NOT UNDERSTANDABLE.
   STARTS OUT LIKE A JOHN INST.,
   THEN 1-2, IT'S GOES COUNTRY!
7. MECHANCIAL WORLD
8. I GOT A LINE ON YOU (CUT)
TRACK ONE - VOLUME RISES AT APPROX.
50 SEC., AND DROPS FOR 15 SEC. AT 4 MIN.



EXHIBIT 311
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970



**EXHIBIT 21**
**232**

# SPIRIT

"CENTER ARENA"

SEATTLE, WA

MAY 22, 1970

APPEARING IN THE MIDDLE SLOT
WITH STEPPENWOLF HEADLINING,
AND BLUES IMAGE OPENING.

## SPIRIT

1. SWEET STELLA BABY
2. 1984
3. IT'S ALL THE SAME
4. FRESH GARBAGE
5. UNKNOWN INSTRUMENTAL
6. JEALOUS
7. IT SHALL BE
8. POOR RICHARD
9. MR. SKIN
10. POLICEMAN'S BALL
11. AREN'T YOU GLAD
12. DRUM SOLO
13. MECHANICAL WORLD
14. I GOT A LINE ON YOU



EXHIBIT 312
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970



**EXHIBIT 21**
**233**

# EXHIBIT 22



EXHIBIT 320
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970

**EXHIBIT 22**

**234**

# EXHIBIT 23

# 'Rock' Concert Is Real Groovy

### By THOMAS MacCLUSKEY
*Rocky Mountain News Music Critic*

Barry Fey did it again — a GREAT rock concert at the Auditorium Arena Thursday night with the Vanilla Fudge, Spirit and Led Zeppelin in colorful living sound!

And Feyline has nearly solved the sound fidelity problem—even on the main floor—with stationary speaker systems on the floor augmenting the group's systems on the rotating circular stage.

One hitch occurred—tangled cables underneath the bandstand pulled the plug on the Fudge and almost melted their entire performance. When repairs were completed, the clock had punched my deadline. Thus—catch the Fudge review in Saturday's Rocky Mountain News.

Spirit—quintessima strong—MUSICAL!

Everything especially interesting because of a non-ending, highly varied rhythmic continuum structured by Ed Cassidy, pile-driven by bassist Mark Andes, girded by conga drummer-vocalist Jay Ferguson, and filigreed by pianist John Locke and guitarist Randy California.

A UNIQUE dimension added to Spirit's performance was an effective use of varied volume levels. The result not only rendered lyrics thankfully distinguishable, but also enabled a greater variety of subtle pitched and percussive sounds to filter through the textured surface of the music.

Spirit's performance of "Mechanical World" and "Elijah" were exceptionally groovy. The latter, a jazz-oriented swinger in ¾ meter featured each of the players. Locke and Cassidy proved to be the most inventive, although Ferguson's and Andes' display of hambone performing (rhythmic slapping of the thighs and hands) was enjoyable.

A further dimension, especially welcome, was the group's friendliness to the audience and humor.

THE CONCERT was cranked off by another heavy, the Led Zeppelin, a British group making its first U.S. tour.

Blues oriented (although not a blues band) hyped electric, the full routine in mainstream rock—done powerfully, gutsily, unifiedly, inventively and swingingly (by the end of their set).

Singer Robert Plant—a cut above average in style, but no special appeal in sound. Guitarist Jimmy Page, of Yardbirds fame—exceptionally fine. Used a violin box on the guitar strings in a couple of tunes with resultant interesting, well integrated effects.

Bassist John Paul Jones—solid, involved, contributing. John Bonham—a very effective group drummer, but uninventive, unsubtle and unclimactic in an uneventful solo.

Thanks, Barry!



"BEST FILM OF 1966!"
National Society of Film Critics

A Carlo Ponti Production
Antonioni's
BLOW-UP
Vanessa Redgrave

Shown 5:15 and 9:15   COLOR

Recommended for mature audiences

PLUS
DICK BOGARDE IN
OUR MOTHER'S HOUSE
SHOWN 7:15 ONLY!
Ample Free Lighted Parking

TABOR
Fine Arts Theater
3333 WEST ALAMEDA • 936-6314

**EXHIBIT 23**
235



EXHIBIT 313
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970

D000136

# EXHIBIT 24

EXHIBIT 317
WIT: Ferguson
DATE: 1-13-16
DAYNA HESTER, CSR 9970

# Sylvan Rock Flows Smoothly

Seattle Post-Intelligencer
10

BY PATRICK MacDONALD

More than 90,000 rock fans gathered at Woodland Stage's Gold Creek Park over the weekend for a peaceful, by-no-slap music event.

This year's peaceful gathering was the result of crowd control and smooth organization. Festival director Boyd Grafmyre, Seattle promoter who operates Eagles Auditorium and John Chambless, Director of Washington philosophy professor and organizer of the Sky River Rock Festival, kept problems to a minimum with an army of workers and multiple cycle events.

The musical output was...

equally impressive. The program was an amalgam of rock's various styles, including blues, folk and hard rock...

block who showed himself to be a much better guitar player than the recordings would indicate. It was not often played until the audience was unmistakably pleased with it.

Later that same night...

Page is an amazing gesture the ease and excitement...

They were aided by a fine drummer...

But that was one of only a few disappointments of the festival. For the most part it was a rock experience and will be forgotten.

D000117

EXHIBIT
236

# EXHIBIT 25

D000061

# ATLANTIC RECORDS
## A Discography

## Compiled by Michel Ruppli

### Volume 2

*Discographies, Number 1*

GREENWOOD PRESS
Westport, Connecticut • London, England

DISCOGRAPHIES
SERIES EDITOR: Brian Rust

Atlantic Records: A Discography
*Compiled by Michel Ruppli*

The Savoy Label: A Discography
*Compiled by Michel Ruppli*

The Prestige Label: A Discography
*Compiled by Michel Ruppli*

EXHIBIT 25
237

D000062

# Contents

| | |
|---|---|
| Introduction | vii |
| List of Abbreviations Used | ix |
| Atlantic Master Listing (numbers 10000-19999) | 1 |
| Additional Session Issued by Atlantic | 384 |
| Index of Session Leaders | 385 |
| Addendum | 394 |

[v]

Library of Congress Cataloging in Publication Data

Ruppli, Michel.
Atlantic Records.

(Discographies; no. 1 ISSN 0192-334X)
Includes index.
1. Atlantic Recording Corporation. 2. Jazz music—
Discography. 3. Blues (Songs, etc.)—United States—
Discography. 4. Music, Popular (Songs, etc.)—United
States—Discography. I. Atlantic Recording Corporation.
II. Title.
ML156.2.R78  Case  016.789912  78-75237
ISBN 0-313-21170-1

Copyright © 1979 by Michel Ruppli

All rights reserved. No portion of this book may
be reproduced, by any process or technique, without
the express written consent of the publisher.

Library of Congress Catalog Card Number: 78-75237
ISBN: 0-313-21170-1 (set)
ISBN: 0-313-21172-8 (vol. 2)
ISSN: 0192-334X

First published in 1979

Greenwood Press, Inc.
51 Riverside Avenue, Westport, Connecticut 06880

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

EXHIBIT 25
238

D000063

# Introduction

This volume is the second of four volumes listing all recordings made or issued by Atlantic Records.

Since a simple master numbering system is used continuously in Atlantic's files, Atlantic's master number sequence has been used for the listing of sessions in this discography, although this sequence is not the true chronological order.

Because of the length of the Atlantic listing, the listing has been arbitrarily split into four volumes, each of which includes details on roughly 10,000 master numbers.

This volume includes master numbers 10000 to 19999 and covers March 1966 to August 1970. It lists many great rhythm and blues names (Aretha Franklin, Otis Redding, Wilson Pickett, Solomon Burke, Esther Phillips, King Curtis), a gospel series, top jazz artists (Gary Burton, Keith Jarrett, Roland Kirk, Charles Lloyd, Herbie Mann, Carmen McRae, Modern Jazz Quartet), and pop groups (The Bee Gees, Buffalo Springfield, Cream, and Crosby, Stills, Nash & Young).

When the length of a recording is known, the time, in minutes and seconds, is provided in parentheses after the master number. This information should enable the reader to make comparisons between various titles and to distinguish between normal (album) versions and edited (or abridged) versions generally issued on singles.

Issue numbers are listed in the right-hand column after each title. For simplicity, these numbers are limited to United States numbers. (Eventually, an index of records with European issue numbers will be considered as a companion volume to this series.) As a rule, if no issue numbers are given after a title, the title remains unissued, although I may have omitted some issue numbers.

[vii]

EXHIBIT 25

239

D000064

# List of Abbreviations Used

| | | | |
|---|---|---|---|
| arr | arranger | g | guitar |
| as | alto saxophone | hca | harmonica |
| b | bass | mell | mellophone |
| bs | baritone saxophone | org | organ |
| bjo | banjo | p | piano |
| c | cornet | perc | percussion |
| cl | clarinet | picc | piccolo |
| comp | composer | ss | soprano saxophone |
| cond | conductor | tb | trombone |
| dir | director | ts | tenor saxophone |
| dm | drums | tu | tuba |
| el b | electric bass (i.e., bass guitar) | v | violin |
| el g | electric guitar | vb | vibraphone |
| fl | flute | vo | vocal |
| flh | fluegel horn | vtb | valve trombone |
| frh | French horn | wbd | washboard |

The details in this volume are based on studio files which were available to me at the Atlantic offices. Recording dates for Atlantic sessions are believed to be correct, many of them having been checked in session reports. The dates for material that Atlantic distributed only are questionable, however. Those listed in files often look like dates of registration at Atlantic rather than recording dates. Yet in many cases, the date listed is earlier than the numerical sequence suggests and is presumably the true recording date.

As is usual in this type of work, many details are still missing and errors may still exist. All comments from readers which will help improve and complete the present listing will be welcome.

MICHEL RUPPLI

EXHIBIT 25

240

D000065

**THE FABULOUS COUNTS:**

December 2, 1966

| | | |
|---|---|---|
| 15768(2:15) | Jus Jus | Moira 103;Cotillion SD9011 |
| 15769(2:57) | Girl from Kenya | |

**THE CAPITOLS:**
vocal group,with tp,ts,bs,p,g,el b,ds,tambourine,congas.

Detroit,December 2,1968(?)
Karen 1543

| | |
|---|---|
| 15770 | Ain't that terrible |
| 15771 | Soul brother soul sister |

**EDDIE MANN:**
Following titles have been renumbered,see 17943/17946

Berlin,November 11,1968

| | |
|---|---|
| 15772 | Blues in D |
| 15773 | Sense of no return |

Berlin,November 12,1968

| | |
|---|---|
| 15774 | Wailing wall |
| 15775 | My little ones |

**CREAM:**
Eric Clapton(g,vo)Jack Bruce(b,vo)Ginger Baker(dm,perc).

Wally Heider Studios,LA?,November 27,1968

| | | |
|---|---|---|
| 15776 | Buddy miles intro | Atco SD7001 |
| 15777 | I'm so glad | |
| 15778 | Politician | |
| 15779 | Sitting on the top of the world | |

Same.

Wally Heider Studios,LA?,November 19,1968

| | |
|---|---|
| 15780 | Jack's tune |
| 15781 | Ginger's tune |

**PAPA BATE:**
William Sander(ar).

December 3,1968(?)
Dakar 604

| | |
|---|---|
| 15782 | Getting nowhere fast |
| 15783 | Soul strut |

**WILSON PICKETT:**
Wilson Pickett(vo)with Gene "Bowlegs" Miller(tp)Andrew Love,James Mitchell(te)Harry Beckett(p)Duane Allman,Jimmy Johnson(g)Jerry Jemmott(el b)Roger Hawkins(ds).

Muscle Shoals,December 3,1968(?)

| | | |
|---|---|---|
| 15784 | Mini-skirt Minnie | Atl.2611  SD8215 |
| 15785 | Stick it in your ear | Atl. |
| 15786 | Save me | |
| 15787 | Too hold | Atl.2631, - |
| 15788 | My own style of living | Atl.2631, - |
| 15789 | Born to be wild | SD8290 |

---

**CAPTOONS:**

(from Pye)   London,

| | | |
|---|---|---|
| 15790(3:50) | Knick knack man | Atl.2598,SD8219 |
| 15791(2:24) | My manifesto | - |
| 15792(2:39) | The madness of Toby Jugg | - |
| 15793(3:06) | A penny for the sun | Atl.2630, |
| 15794(3:07) | I'll stay | - |
| 15795(3:10) | Girl of yesterday | - |
| 15796(2:52) | I can't walk back | - |
| 15797(2:20) | Let me pressure you | - |
| 15798(3:45) | My favour man | - |
| 15799(2:47) | Ice cream dreams | - |
| 15800(2:39) | Doin' what Mamma said | - |
| 15801(2:05) | See me | |

**DAVID NEWMAN:**
David Newman(fl,as,te)Joe Zawinul(p)Richard Davis(b)Bruno Carr(dm)Omar Clay(perc).

NYC,December 2,1968

| | | |
|---|---|---|
| 15802 | Shiloh (fl) | Atl.SD1524 |
| 15803 | Chained no more (as) (1,2) | Atl.SD1524 |

Same.

NYC,December 3,1968

| | | |
|---|---|---|
| 15804 | Children of Abraham (te) (1) | Atl.SD1524 |
| 15805 | untitled blues | |

Same.

NYC,December 4,1968

| | | |
|---|---|---|
| 15806 | David's blues | Atl.SD1524 |
| 15807 | That's all (te) (2) | |
| 15808 | untitled Zawinul original | |

(2):+ Paul Ingram,Julius Watkins(frn) & string section
(1):+ Ernie Royal,Melvin Lastie(tp)Benny Powell(tb)Jack Knitzer(oboe).

**EDDIE HARRIS:**
Eddie Harris(el smx)Richard Davis(b)Billy Hart(dm)

Atlantic Studios,NYC,December 3,1968

| | | |
|---|---|---|
| 15809 | I'm gonna leave you by yourself | Atl.SD1517 |
| 15810 | Little bit (1) | |
| 15811 | Smoke signals (2) | |

(1):+ Ernie Royal,Snooky Young(tp)Seldon Powell,Phil Bodner(saxs)
Haywood Henry(b)Joe Zawinul(p)Arthur Adams(g)Gerry Jemmott(el b)Bruno Carr(dm).
(2):+ vocal quartet & strings.

**ARTHUR CONLEY:**
Arthur Conley(vo)with

Fame Studios,Muscle Shoals,December 6,1968(?)

| | | |
|---|---|---|
| 15812 | Ob-la-di,ob-la-da | Atco 6640,SD33-276 |
| 15813 | Shine-on | - |
| 15814 | I got a feeling | - |
| 15815 | Speak her name | - |
| 15816 | That can't be my baby | Atco 6661, |
| 15817 | Stuff you gotta watch | - |

**EXHIBIT 25**

**241**

# EXHIBIT 26

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| MICHAEL SKIDMORE | : | CIVIL ACTION |
| As Trustee for the | : | NO. 14-CV-3089 |
| Randy Craig Wolfe Trust | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | Philadelphia, Pennsylvania |
| | : | February 4, 2015 |
| LED ZEPPELIN, et al. | : | |
| | : | |
| Defendants | : | ORAL ARGUMENTS HEARING |

- - - - - - - - - - - - - - - - - - - - - - - - -

- - -

BEFORE THE HONORABLE JUAN R. SANCHEZ
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:       FRANCIS MALOFIY, ESQUIRE
                         FRANCIS ALEXANDER, LLC
                         280 North Providence Road
                         Suite 105
                         Media, Pennsylvania  19063

For the Defendants:      PETER J. ANDERSON, ESQUIRE
                         100 Wilshire Blvd., Suite 2010
                         Santa Monica, California  90401
                         For Super Hype Publishing, Inc.

                         HELENE M. FREEMAN, ESQUIRE
                         PHILLIPS NIZER, LLP
                         666 Fifth Avenue
                         New York, New York  10103
                         For James Patrick Page, Robert A.
                         Plant and John P. Jones

                         MATTHEW S. OLESH, ESQUIRE
                         FOX ROTHSCHILD, LLP
                         2000 Market Street, 20th Floor
                         Philadelphia, Pennsylvania  19103
                         For James Patrick Page

                         - - -

**EXHIBIT 26**
**242**

1   commercial purposes as far as advertisers and things like that.

2   And they've kept a close guard on the song, itself.

3       But there's multiple revenue streams, not just ticket

4   sales, CDs sales, tape sales, merchandising, even when it's

5   played on the radio, but there's all sorts of streams of

6   infringing time done, where -- ah --

7       THE COURT:  But it seems to me, that most of -- you --

8   you keep throwing these infringing acts all relating to sales.

9   But I want to know, specifically, what is the song, the

10  performance, what in specific --

11      MR. MALOFIY:  Well, I think as --

12      THE COURT:  -- is the infringement act?

13      MR. MALOFIY:  -- I think with this case, it's a

14  copyright case, so it's an issue of the authorship of the song,

15  itself.  Here, a copyright determines ownership.

16      And I know there was some argument that, oh, whether or

17  not -- ah -- Mr. Randy C. Wolfe or his trust is -- is an owner.

18  He's by virtue of the Copyright Act, a beneficial owner and he's

19  intended to bring these causes of action.  And that's a very

20  important point to not overlook, is that, because he is a

21  beneficial owner, he can bring these causes of action.

22      The fact that the song's composition was improperly

23  used -- as we alleged as plaintiff -- it means that, not only is

24  the sale of the CD infringing, but also the underlying

25  composition, because the underlying composition was used to

**EXHIBIT 26**
243

68

1    witness?

2             MR. MALOFIY:  Paits would be a fact witness.

3             THE COURT:  And what would he testify about?

4             MR. MALOFIY:  About historical aspects of the band,

5    being there, collecting their history, knowing about what was

6    played, when was it played.  Ah, what songs -- ah -- when things

7    were written.  He was very much a part of the band all the way

8    through day one till today.

9             THE COURT:  Why are the trust books and records in

10   Philadelphia?

11            MR. MALOFIY:  Well, there's two reasons, they're both

12   in Philadelphia and in Massachusetts, because the trust is -- it

13   operates out of Massachusetts, it operates on the East Coast.

14            Because of that and because I also represent the trust,

15   I have, of course, had to go through, before filing the

16   complaint, all the trust documents to make sure that everything

17   is -- is -- is -- ah -- there's no issues with the trust and that

18   the claim could be validly brought as a beneficial owner.

19            THE COURT:  Very well.

20            You argue that California law is irrelevant to this

21   action --

22            MR. MALOFIY:  Yes.

23            THE COURT:  -- copyright action.

24            They seem to be suggesting that because Randy Craig

25   Wolfe's claim of ownership of the copyright to "Taurus" depends

**EXHIBIT 26**
**244**

1   on the invalidity of the agreements, he signed with Hollenbeck

2   Music and/or Records, California may play some role in the case,

3   that seems to be their position.

4           My question is, if an issue is raised in this case as

5   to who owns the copyright to "Taurus", is that issue governed by

6   part of -- in part -- by California law and -- and if so,

7   explain?

8           MR. MALOFIY:  No, I don't think so at all, it's all by

9   copyright law, ah, who owns the authorship of -- of "Taurus"

10  would be copyright law.

11          That the trust -- and it's undisputed that the trust is

12  the beneficial owner and has all of the copyrights, a hundred

13  percent of the copyrights, a hundred percent of all interests --

14  intellectual property -- of Randy Wolfe.

15          Here, an argument was made that, oh, because Hollenbeck

16  Music or -- ah -- Lou Adler is in California, that this is an

17  issue.  I don't see this as an issue at all.  It might change

18  plaintiff's damages in the end.  And that would be worked out

19  between myself or plaintiff and also, Hollenbeck Music.

20          But to be fair, because Hollenbeck Music and Lou Adler

21  had an interest -- or have an interest -- in the song, because

22  they do, it gets split, the revenue, ah, because of that what I

23  had done as I was required to do by law, is cert -- send them a

24  certified mailing showing him the complaint, showing him the

25  allegations.  And I wrote a letter to him, parsing out the

EXHIBIT 26
245

70

1   issues.

2          And I spoke to his associate, Howard Frank even before

3   the filing of the lawsuit.  And I spoke to -- and I -- I

4   corresponded with his -- with him -- and his -- ah -- music

5   group.

6          And they have not claimed that there is any issue with

7   -- they have not claimed that Pennsylvania is in -- that it's

8   inconvenient.  They have not claimed that even -- have not even

9   raised any motion, petition or filing with the Court as to the

10  complaint or any of the allegations in the complaint.

11         So, from the perspective of Hollenbeck Music and Lou

12  Adler, he's done nothing to address the complaint or even claimed

13  that this is an inconvenient forum or this is not a proper forum

14  or that the allegations are untrue or even as an -- having an

15  interest in the potential song -- or excuse me -- interest in the

16  song, "Taurus" and a potential interest in the song, Led Zeppelin

17  -- excuse me -- "Stairway to Heaven", he has not filed anything

18  with this Court.

19         So, the representations of counsel about, this issue is

20  really a non-issue, whatsoever.  And it was an issue, it would

21  have been raised by that individual.

22         That's --

23         THE COURT:  Very well.

24         MR. MALOFIY:  -- that's the best way, I can address

25  that issue.

**EXHIBIT 26**
**246**

71

1          But no, it's not an issue here before us, whatsoever.

2     Plaintiff has full standing as a beneficial owner to bring this

3     claim.  And absolutely, is the author of "Taurus" --

4               THE COURT:  Right.  If --

5               MR. MALOFIY:  -- undisputed.

6               THE COURT:  -- if I find personal jurisdiction in

7     lacking as to all defendants, does the plaintiff -- is the

8     plaintiff asking me to dismiss the case or transfer it as to all

9     defendants -- dismiss or transfer?

10              MR. MALOFIY:  Ah, we would --

11              THE COURT:  If I find personal --

12              MR. MALOFIY:  -- we would ask -- we would ask two

13    things.

14              One is jurisdictional discovery, two would be, I think,

15    if the Court -- and this is, you know, I believe that clearly

16    plaintiff believes that there is jurisdiction here -- if the

17    Court finds -- finds differently, then it's plaintiff's position

18    that, well, California is definitely not the appropriate forum,

19    it would be New York --

20              THE COURT:  All right.

21              MR. MALOFIY:  -- because New York is closer to -- ah --

22    closer to Boston, Massachusetts, closer to the trustee.  And it

23    wouldn't put the plaintiff out of litigation.  But also it's the

24    headquarters of the defendants, where they've litigated before

25    and where they were -- where personal jurisdiction was found for

**EXHIBIT 26**
**247**

90

```
1              THE COURT:  Thank you.

2              ESR OPERATOR:  All rise.

3              (Adjourned in this matter at 3:46 p.m.)

4                        *  *  *
```

I N D E X

| DEFENDANT EXHIBITS | IDENTIFIED | EVIDENCE |
|---|---|---|
| D-1    Jimmy Page Book | 87 | – |
| D-2    Led Zeppelin CDs | 88 | – |

*  *  *

C E R T I F I C A T E

    I do hereby certify that the foregoing is a correct transcript of the electronic-sound recording of the proceedings in the above-entitled matter.


_____      Date: February 8, 2014
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270

**EXHIBIT 26**
**248**