UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 15-3462 RGK (AGRx) | Date | April 8, 2016 |
|---|---|---|---|
| Title | *Michael Skidmore v. Led Zeppelin et al.* | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | | |
|---|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS) Order re: Defendants' Motion for Summary Judgment (DE 97)

## I.     INTRODUCTION

On May 31, 2014, Michael Skidmore, as trustee for the Randy Craig Wolfe Trust ("Plaintiff") filed suit against Led Zeppelin, James Patrick Page, Robert Anthony Plant, John Paul Jones, Super Hype Publishing, Inc., and Warner Music Group Corp., which is the parent company of Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company ("Defendants"). On October 8, 2014, Plaintiff filed a First Amended Complaint ("FAC"). The FAC claims that Defendants' song, *Stairway to Heaven*, infringes another song, *Taurus*, created by the rock band Spirit. The lawsuit alleges: (1) Copyright Infringement and (2) Violation of the Right of Attribution.

Presently before the Court is Defendants' Motion for Summary Judgment. For the following reasons, the Court **DENIES IN PART and GRANTS IN PART** Defendants' motion.

## II.    FACTUAL BACKGROUND

This case involves the vehemently contested history of two songs: the iconic *Stairway to Heaven* by Led Zeppelin and the lesser-known *Taurus* by the rock band Spirit. Because the surviving band members of each group figure prominently in the ensuing narrative, the Court briefly sets out the cast of relevant figures.

In February 1967, Randy Wolfe (guitarist), Mark Andes (bassist), John Locke (keyboardist), Ed Cassidy (drummer), and Jay Ferguson (vocalist/precussionist) joined to form the band Spirit. Only two surviving members of the original group remain, Andes and Ferguson. Across the Atlantic, another rock group formed in 1968 when Jimmy Page (guitarist), Robert Plant (singer), John Paul Jones (bassist), and John Bonham (drummer) joined to create Led Zeppelin. The three surviving members of Led Zeppelin are Page, Plant, and Jones.

### A. The Genesis of *Taurus*

On August 29, 1967, Spirit signed its first recording contract with Ode Records. On that same day, Wolfe entered into an exclusive songwriter agreement with Hollenbeck Music. The exclusive songwriter agreement deemed Wolfe a "writer for hire" with full rights of copyright renewal vested in Hollenbeck. Late in 1967, Ode Records released Spirit's first eponymous album, which included an instrumental composition of *Taurus*. (Ferguson Depo. 46:10-19; Andes Depo. 57:16-22, ECF No. 97.)

According to Defendants, *Taurus* was initially composed and recorded in Ode Records' studio after signing the August 1967 recording contracts and exclusive songwriter agreement. In his deposition, Ferguson, Spirit's singer and tambourine player, testified that *Taurus* was recorded for the first Spirit album after the 1967 recording contract with Ode Records. (Ferguson Depo. 197:15-198:1, ECF No. 97.) Spirit's bassist, Andes, also confirmed in deposition testimony that *Taurus* was recorded for Spirit's initial album after the 1967 recording contract. (Andes Depo. 150:18-151:3, ECF No. 97.) Finally, Defendants submit a copyright registration showing that on December 22, 1967, Hollenbeck, as "Copyright Claimant," registered a copyright in the *Taurus* musical composition with the Copyright Office.

Plaintiff offers a competing narrative of *Taurus'* origin. According to declarations from Wolfe's sisters, in late 1966—before the recording contract or the exclusive songwriter agreement—Wolfe wrote *Taurus* for his high school sweetheart who would eventually become his wife. (Andrea Wolfe Decl. ¶¶4-5; Janet Wolfe Decl. ¶¶4-5, ECF No. 118.) Andes and Ferguson also testified that Wolfe created the song *Taurus* before the 1967 recording contract and exclusive songwriter agreement. (Andes Decl. ¶4; Ferguson Decl. ¶4, ECF No. 119.) Furthermore, according to Andes and Wolfe's sisters, Spirit regularly played *Taurus* at the Ash Grove club in Hollywood in early 1967—before the songwriter agreement was executed. (Andrea Wolfe Decl. ¶5; Janet Wolfe Decl. ¶5, ECF No. 118; Andes Depo. 150-156, ECF No. 124.)

### B. Interaction Between Spirit and Led Zeppelin

In 1968, Ode Records released the second Spirit album, titled *The Family that Plays Together*, and launched a tour to promote the new record. Spirit and Led Zeppelin performed at the same venue on the same day at least three times between 1968 and 1970. The first occasion was on December 26, 1968 when Led Zeppelin, in its United States debut, opened for Spirit in Denver, Colorado ("Denver Festival"). Next, the two bands performed at the Atlanta International Pop Festival ("Atlanta Festival") on July 5, 1969. Finally, the groups both appeared, along with at least ten other bands, at the Seattle Pop Festival ("Seattle Festival") on July 27, 1969.

The parties present conflicting versions of the interaction between Led Zeppelin and Spirit at these three events. The surviving members of Led Zeppelin testified that they never toured with, shared a stage with, or listened to any of Spirit's music during these brief encounters. The surviving Spirit members, on the other hand, recalled conversing with the Led Zeppelin members backstage between sets and performing in succession at two of the festivals.

The two groups also performed at the Texas International Pop Festival in August 1969, although on different days. There is no evidence that members of Led Zeppelin were present when Spirit performed at the Texas Pop Festival, and Spirit's surviving members do not recall performing *Taurus* at the Texas Festival. (Pl.'s SGI Nos. 58-63, ECF No. 118.)

Similarly, Plaintiff submits a promotional poster from the three-day Northern California Folk-Rock Festival in May 1969, which shows that both Spirit and Led Zeppelin would be preforming. (Malofiy Decl. Ex. 12, ECF No. 124.) Beyond that, however, there is no evidence that the two groups

performed on the same day or that Led Zeppelin watched Spirit's performance in Northern California. In fact, Spirit's surviving members do not recall performing *Taurus* at the Northern California festival. (Pl.'s SGI No. 65, ECF No. 118.)

### C. Release of *Stairway to Heaven* and the Intervening Years

The surviving members of Led Zeppelin testified that the band recorded *Stairway to Heaven* between December 1970 and January 1971 entirely in London, England. (Page Decl. ¶4; Plant Decl. ¶4; Jones Decl. ¶3, ECF No. 97.) Plaintiff rebuts with deposition testimony from Page, acknowledging that he and Plant mixed *Stairway to Heaven* at Sunset Studios in Los Angeles, California. (Page Depo. 140-143, ECF No. 124.) Regardless of where the song was mixed, neither party disputes that Led Zeppelin first performed *Stairway to Heaven* in March 1971. The song was first released on the band's untitled fourth album, *Led Zeppelin IV*, in November 1971.

In the intervening years, fans and critics alike noticed the similarity between the two songs. In fact, on April 2, 1991, Wolfe was interviewed in connection with a new album of Spirit recordings titled, *Time Circle*. In the interview, Wolfe was asked about the possibility that Led Zeppelin had copied the opening of *Taurus* for its song *Stairway to Heaven*. Wolfe responded that Led Zeppelin members "used to come up and sit in the front row of all [Spirit's] shows and became friends[,] and if they wanted to use [*Taurus*], that's fine." (Freeman Decl. Ex. 6 at 7, ECF No. 97.) Later in the interview, Wolfe reiterated, "I'll let [Led Zeppelin] have the beginning of *Taurus* for their song without a lawsuit." (Freeman Decl. Ex. 6 at 8, ECF No. 97.)

Wolfe never sued over *Stairway to Heaven* during his lifetime, and he ultimately died in 1997. Wolfe's mother assumed the role as trustee of his trust from 2002 until her death, and she also did not bring suit. Plaintiff in this action became trustee of the Wolfe Trust in 2006. Between 2012-2014, Rhino Entertainment Co. arranged for the re-mastering and re-release of *Stairway to Heaven*. On May 2014, forty-three years after the initial release of *Stairway to Heaven*, Plaintiff initiated the instant action alleging that *Stairway to Heaven* infringed the copyright in *Taurus*.

### III. EXPERT REPORTS

The parties submit dueling expert reports disputing the similarity between *Taurus* and *Stairway*.

### A. Plaintiff's Expert Reports

Plaintiff's first expert, Alexander Stewart, prepared a 22-page report comparing recordings of *Taurus* with recordings and sheet music of *Stairway to Heaven*. (Stewart Decl. ¶2, ECF No. 118.) He explains that, for the purposes of the analytic comparison, the only relevant part of *Stairway to Heaven* is the beginning two-minute segment, which contains all the similarities. (Stewart Decl. ¶7, ECF No. 118.) The structural similarities between the two songs are represented below:

| Taurus | Stairway to Heaven |
|---|---|
| 0:00 Intro | 0:00 A (instrumental) |
| 00:45 A | 0:13 A (instrumental) |
| 00:58 A | 0:26 B |
| 1:12 B | 0:53 A (vocal) |
| 1:37 A | 1:06 A (vocal) |

| 1:50  A | 1:20  B |
| --- | --- |
| 2:04  B | 1:47  A (vocal) |
|  | 2:00  A (instrumental) |
|  | 2:14  End of relevant portion |

As illustrated by the chart, both songs contain repeated "A" sections consisting of a four-measure descending A minor guitar pattern. In both songs, the "A" sections are separated by a longer "B" section, or bridge. (Stewart Decl. ¶5, ECF No. 118.) The two songs do, however, contain three structural differences. First, the version of *Taurus* appearing on the album contains a 45-second introduction; Stewart notes, however, that this introduction does not appear on any live or demo versions of *Taurus*. (Stewart Decl. ¶6, ECF No. 118.) Second, *Taurus* contains two repeated "A" sections (AABAAB) whereas *Stairway to Heaven* contains three repeated "A" sections (AABAABAA). Finally, the "B" section, or bridge, is seven measures in *Taurus* but eight measures in *Stairway to Heaven*. (Stewart Decl. ¶6, ECF No. 118.)

Despite these minor differences, Stewart opines that "[n]early 80% of the pitches of the first eighteen notes match, along with their rhythms and metric placement. The harmonic setting of these "A" sections feature the same chords during the first three measures and an unusual variation on the traditional chromatic descending bass line in the fourth measure." (Stewart Decl. ¶24, ECF No. 118.)

Beyond the core structural and melodic similarities, Stewart opines that the two songs are also similar in instrumentation and orchestration. Stewart explains that "the presence of acoustic guitar, strings, recorder/flute sounds, and harpsichord as well as the noticeable absence of bass and drums (and other instruments characteristic of rock and roll) lend both songs a decidedly 'classical' style, particularly evoking a Renaissance atmosphere." (Stewart Decl. ¶3, ECF No. 118.) Additionally, Stewart notes that live versions of *Taurus* also "feature a similar fingerpicking style in the passage's later appearances." (Stewart Decl. ¶3, ECF No. 118.)

Plaintiff also submits a 31-page expert report prepared by Erik Johnson who also compared both *Taurus* and *Stairway to Heaven*. Johnson transcribed the song *Taurus* from the sound recording and reduced it to its constituent elements: guitar, harpsichord, atmospheric percussion, and strings. (Johnson Decl. ¶11, ECF No. 118.) He also reconstructed *Stairway to Heaven* and recorded each instrument (electric bass, drum set, and electric piano parts) individually. (Johnson Decl. ¶8, ECF No. 118.)

After comparing the reconstructed versions of *Taurus* and *Stairway to Heaven*, Johnson concludes, "If *Stairway to Heaven* is stripped down to the bare elements that received songwriting credit, the listener is left with two parts: [1] an arpeggiated guitar part, the signature element, which is substantially the same as the signature guitar element in *Taurus*; [2] a vocal melody that bears significant resemblance to the harpsichord in *Taurus*, followed by a series of riffs, chord progressions and solos." (Johnson Decl. ¶18, ECF No. 118.)

Plaintiff's final expert report was prepared by Brian Bricklin, who compared audio files of *Taurus* and *Stairway to Heaven*. Bricklin spends the first eight pages of the report explaining the music production and mixing process. He then analyzes the two songs and concludes that "[b]oth songs are presented, in their final commercially released versions, with substantially similar production and mixing techniques." (Bricklin Decl. ¶16, ECF No. 118.) Bricklin points out specific similarities such as "the use of reverb to create a mystic, dreamlike quality [so that] each note of the guitar has a 'whispering tail.'"

### B. Defendants' Expert Reports

Defendants submit an expert report by Lawrence Ferrara who opines that *Taurus* and *Stairway to Heaven* are not substantially similar. Ferrara attacks Stewart's report because it "relies upon and analyzes and compares performance elements in *Taurus* recordings that are nowhere mentioned in the *Taurus* Transcription. The *Taurus* Transcription does not mention or reflect, for example, performance techniques, instrumentation and orchestration, or tempo (i.e., performance speed)." (Ferrara Decl. ¶6, ECF No. 97.)

After disregarding the unprotected performance elements in Stewart's report, Ferrara explains that the only remaining similarities are the interchanging "A" and "B" sections reflected in Stewart's chart above. (Ferrara Decl. ¶8, ECF No. 97.) Ferrara concludes that these commonalities do not evince a substantial similarity between the two works for several reasons. First, he explains that interchanging "A" and "B" sections have been generic in music for centuries. Next, Ferrara contends that Stewart's analysis focuses only on the first two minutes of each song while disregarding the last six minutes of *Stairway*, which constitutes over 70% of the song. Finally, Ferrara opines that any similarities between the two songs are insubstantial and represent commonplace musical devices. (Ferrara Decl. Ex. 1 at ¶22, ECF No. 97.)

Defendants also provide an expert report prepared by Rob Mathes who performed and recorded the *Taurus* sheet music deposited with the Copyright Office on a steel string acoustic guitar. (Mathes Decl. ¶3, ECF No. 97.) Mathes echoes the conclusions of Ferrara and finds that the two songs are not substantially similar.

## IV. JUDICIAL STANDARD

### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On issues where the moving party does not have the burden of proof at trial, the moving party is required only to show that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Upon such showing, the court may grant summary judgment "on all or part of the claim." Fed. R. Civ. P. 56(a)-(b).

To defeat a summary judgment motion, the non-moving party may not merely rely on its pleadings or on conclusory statements. Fed. R. Civ. P. 56(e). Nor may the non-moving party merely attack or discredit the moving party's evidence. *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983). The non-moving party must affirmatively present specific evidence sufficient to create a genuine issue of material fact for trial. *See Celotex Corp.*, 477 U.S. at 324. The materiality of a fact is determined by whether it might influence the outcome of the case based on the contours of the underlying substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over such facts amount to genuine issues if a reasonable jury could resolve them in favor of the nonmoving party. *Id*.

### B. Copyright

"Proof of copyright infringement is often highly circumstantial, particularly in cases involving music. A copyright plaintiff must prove: (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212

F.3d 477, 481 (9th Cir. 2000). Here, Defendants challenge both elements of the copyright test, arguing that Plaintiff does not own the copyright in *Taurus* and cannot demonstrate copying. Additionally, Defendants raise three defenses: abandonment, laches, and defective deposit copy.

V. **DEFENSES**

Defendants assert three defenses: (1) abandonment/waiver, (2) laches, and (3) defective deposit copy. The Court discusses each below.

A. **Abandonment/Waiver**

Defendants contend that Wolfe waived his right to the *Taurus* musical composition. "In copyright, waiver or abandonment of copyright 'occurs only if there is an intent by the copyright proprietor to surrender rights in his work.'" *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001). "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988). "To find abandonment, 'the copyright owner must have clearly manifested that intention through some affirmative act.'" *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392, 1398 (C.D. Cal. 1990).

On April 2, 1991, Wolfe was interviewed in connection with a new album of Spirit recordings titled, *Time Circle.* In the interview, Wolfe was asked about the possibility that Led Zeppelin had copied the opening of *Taurus* for its song *Stairway to Heaven*. Wolfe responded that Led Zeppelin members "used to come up and sit in the front row of all [Spirit's] shows and became friends[,] and if they wanted to use [*Taurus*], that's fine." (Freeman Decl. Ex. 6 at 7, ECF No. 97.) Later in the interview, Wolfe reiterated, "I'll let [Led Zeppelin] have the beginning of *Taurus* for their song without a lawsuit." (Freeman Decl. Ex. 6 at 8, ECF No. 97.) Defendants submit the original article, audio recordings of the interview, and deposition testimony from the journalist who conducted the interview, and argue that Wolfe's public statement demonstrates abandonment of his right in *Taurus*. (Freeman Decl. Exs. 3-7, ECF No. 97.)

Two district court cases have addressed similar arguments of abandonment premised on a copyright holder's public statements. In *Melchizedek v. Holt*, the copyright holder of several videos was quoted at a workshop saying, "I don't care about copyrights or any of that stuff, that doesn't matter. Forget it, just take it and you'll understand what this is all about by tomorrow." 792 F. Supp. 2d 1042, 1053 (D. Ariz. 2011). The court held that the remark was ambiguous as to which copyrights the plaintiff had supposedly abandoned and concluded that "questions of fact exist as to whether the overt acts . . . are indicative of Plaintiff's intent to abandon copyright protection in the [videos]." *Id.* at 1054.

In *Marya v. Warner/Chappell Music, Inc*, the copyright holder, who owned the lyrics to the famed *Happy Birthday* song, was mentioned in a *Time* magazine article as having "no complaint to make on the use of the words because she long ago resigned herself to the fact that her ditty had become common property of the nation." No. CV134460, 2015 WL 5568497, at *11 (C.D. Cal. Sept. 22, 2015). In addressing whether this quote constituted abandonment, the court held, "A public statement like this, if believed, is an overt act on which a reasonable fact finder could base a finding that Patty abandoned her copyright interest in the lyrics. However, we cannot say that this evidence is sufficient [for] a directed verdict at trial inasmuch as it is not a direct quote from [the copyright holder]." *Id.*

At the outset, the Court notes that both *Marya* and *Melchizedek* are factually distinguishable from the instant case. Unlike the copyright holder in *Melchizedek* who did not specify which work was supposedly abandoned, Wolfe explicitly referred to *Taurus* and Led Zeppelin in his interview. *Marya* is similarly distinguishable because the public statement was paraphrased whereas Wolfe's statement was

a direct quote, according to deposition testimony from the journalist who conducted the interview. (Ruhlmann Depo. 17:17-25, ECF No. 124.) While neither *Marya* nor *Melchizedek* squarely governs the instant case, they provide guidance as to how this Court should approach the issue of abandonment. Both cases stand for the larger proposition that a copyright holder's statement must be viewed in context to determine whether it manifests an intent to abandon rights.

Here, Plaintiff has proffered sufficient evidence to raise a triable issue of fact as to whether Wolfe's statement evinced his intent to abandon rights in *Taurus*. For starters, the journalist who conducted the interview testified that Wolfe never received or reviewed the interview notes before the article was published. (Ruhlmann Depo. 17:17-25, ECF No. 124.) Plaintiff also points to the tenor of the interview, which indicates that Wolfe felt cheated by Led Zeppelin and was merely trying to save face and make light of a bad situation. Additionally, Plaintiff submits several pieces of evidence demonstrating that Wolfe acted in a manner inconsistent with an intent to abandon his rights. First, David Waterbury, Spirit's bass player from 1985 to 1988, testified that Wolfe told him that he was upset about the theft and wanted to sue, but was deterred and intimidated. (Waterbury Decl. ¶¶3-9, ECF No. 118.) Next, Wolfe's longtime friend, Tracy Longo, testified that Wolfe had been contemplating a lawsuit against Led Zeppelin for some time before his death. (Longo Decl. ¶26-27, ECF No. 118.)[1] Finally, Plaintiffs proffer testimony from Linda Mensch, an entertainment attorney in Chicago, Illinois, who testified that Wolfe came to see her in the 1990's to inquire about the possibility of bringing a lawsuit against Led Zeppelin. (Mensch Decl. ¶¶2-6, ECF No. 118.)[2]

In sum, a genuine issue of fact exists as to the abandonment defense, and the Court denies summary judgment on this basis.

    **B.**    **Laches**

Defendants argue that the copyright claim is barred by laches because Plaintiff delayed bringing suit for over four decades (from the 1971 release of *Stairway to Heaven* until the 2014 filing of the instant action).

This issue is squarely governed by the Supreme Court's recent decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, where the Court held that "[l]aches . . . cannot be invoked to preclude adjudication of a [copyright] claim for damages brought within the three-year [statute of limitations]." 134 S. Ct. 1962, 1967 (2014). In *Petrella*, the Court explained that until 1957, federal copyright law did not include a statute of limitations for civil suits, which required federal courts to resort to the equitable doctrine of laches. *Id.* at 1968. In 1957, Congress enacted a three-year look-back limitations period for

---

[1] Defendants object to this evidence on the basis of hearsay. The objection is overruled. Wolfe's statements of his intent are admissible under the "state-of-mind" exception to the hearsay rule, which allows "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3). Of course, Rule 803 allows only a statement of the declarant's state of mind, not "statements as to why [the declarant] held the particular state of mind, or what he might have believed that would have induced the state of mind." *Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013).

[2] Defendants object to this evidence as inadmissible under the attorney-client privilege. The objection is overruled. Generally, "the client is the holder of . . . attorney/client privilege and has the right to assert such privilege, but . . . . [i]t is also the law that someone other than the actual client can become the holder of the privilege." *Roberts v. Heim*, 123 F.R.D. 614, 629 (N.D. Cal. 1988). Defendants have failed to show how they could possibly hold Wolfe's attorney-client privilege in this situation; therefore, the Court rejects their argument.

all civil claims arising under the Copyright Act, largely obviating the need for the doctrine of laches. *Id.* at 1973. While the Court held that laches was unavailable as a defense to a copyright action seeking damages, it preserved the role of laches in copyright actions seeking equitable relief. *Id.* at 1977 ("In extraordinary circumstances, however, the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the relief equitably awardable.").

Here, Plaintiff brought suit within the three-year retrospective statute of limitations, as Defendants released a new, remastered version of *Stairway to Heaven* in 2014. *Id.* at 1969 ("[E]ach infringing act starts a new limitations period."). Regardless of Plaintiff's delay in bringing the action, as long as Defendants have committed an infringing act within the three years preceding suit, laches does not prohibit Plaintiff's claim for damages.

Defendants argue that laches operates to bar Plaintiff's action because the lawsuit is an equitable one and *Petrella* expressly reserved laches as a viable defense to equitable relief. According to Defendants, Wolfe is a beneficial owner, and the relationship between a beneficial owner and a legal owner is an "equitable trust relationship . . . which gives the [beneficial owner] standing to sue for infringement." *Warren*, 328 F.3d at 1144. Defendants seize on this language and argue that because a beneficial owner exists in an "equitable trust relationship," he necessarily brings an "equitable" claim subject to laches. The Court disagrees. Defendants' argument, while semantically convenient, is legally baseless, as they indiscriminately latch onto the word "equitable" even though the word is used in two completely different contexts.

The use of "equitable" to describe the status of a beneficial owner is wholly distinct from the use of "equitable" to describe relief a court may grant under the Copyright Act. To describe the role of a beneficial owner as one in an "equitable trust relationship" is simply to explain that he retains an "equitable" right to bring suit even though he does not hold legal title in a copyright—such a characterization does not even remotely bear on the type of relief, legal or "equitable," that a beneficial owner may pursue. The Supreme Court in *Petrella* was clearly concerned with "equitable" in the sense of the relief awardable, not the manner in which a copyright owner can sue. The language of the opinion bears this out. The Court held that "the consequences of a delay in commencing suit may be of sufficient magnitude to warrant . . . curtailment of the *relief equitably awardable*." 134 S. Ct. at 1977. Moreover, in providing an example of equitable relief that would be precluded by laches, the Supreme Court referred to "injunctive relief" such as "destruction of the work." *Petrella* 134 S. Ct. at 1978. Thus, the *Petrella* court used the term "equitable" as a concept of relief to be contrasted with legal or monetary remedy; the Court did not contemplate "equitable" in the sense that Defendants are invoking it.

Accordingly, the Court rejects this argument and finds that laches does not bar Plaintiff's claim.

### C.  Sufficiency of the Deposit Copy

Defendants contend that Plaintiff has failed to produce a deposit copy of the *Taurus* musical composition that was submitted to the Copyright Office in 1967. Even though Defendants were able to acquire a copy from the Library of Congress, they argue that the copy is defective because it does not bear the official Library of Congress stamp. (Anderson Decl. Exs. 17-18, ECF No. 97.)

The Court disposes of this argument in short order. First, Defendants do not cite any case law holding that a missing seal from the Copyright Office invalidates a deposit copy or prohibits an infringement claim. In fact, the case law points in the opposite direction, as the Ninth Circuit has held that mistakes or omissions on copyright registration material do not invalidate a copyright absent detrimental reliance by the infringer or intentional fraud by the registrant. *Three Boys Music*, 212 F.3d at 486; *KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 084267, 2008 WL 5245484, at *9 (N.D. Cal. Dec.

17, 2008) ("[T]he Ninth Circuit has held that the standard governing the sufficiency of copyright deposits for purposes of maintaining an infringement suit is 'broad and deferential.'").

Here, Defendants have not alleged or proven either detrimental reliance or intentional fraud. Accordingly, the Court rejects this argument.

## VI. OWNERSHIP

The instant action is brought on behalf of the deceased Randy Wolfe by the trustee of his trust. Defendants contend that neither Wolfe nor his trustee can sue for copyright infringement of *Taurus* because: (1) the song is a work for hire owned by Hollenbeck Music, (2) Wolfe did not comply with statutory formalities to secure his federal copyright interest, and (3) Wolfe failed to timely respond to a discovery request, thereby conceding the work-for-hire issue.

### A. Work For Hire

"[T]o analyze questions arising from events that occurred before January 1, 1978, such as who is the author of the [work], the 1909 Act applies; for events that occurred after that date, such as registration of the renewal copyright, the 1976 Act applies." *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 971 (9th Cir. 2008). Because *Taurus* was created before 1978 (either in 1966 as Plaintiff contends or in late 1967 as Defendants maintain), the issue is governed by the 1909 Act.

Under the 1909 Act, the author of a work owned the copyright in the work; however, the Act provided that "the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (repealed). While the 1909 Act explicitly carved out a work-for-hire exception, "[n]owhere did the [] Act define what was meant by 'work made for hire' or 'employer.'" *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1136 (C.D. Cal. 2007). "Because the 1909 Act did not define 'employer' or 'works made for hire,' the task of shaping these terms fell to the courts. They concluded that the work for hire doctrine codified in [the 1909 Act] referred only to works made by employees in the regular course of their employment." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 744 (1989). Specifically, the Ninth Circuit "evaluated claims that a work was made for hire [under the 1909 Act] by asking whether it was created at the 'instance and expense' of the engaging party." *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005).

Neither party disputes that on August 29, 1967, Wolfe entered into an exclusive songwriter agreement with Hollenbeck. The agreement deemed Wolfe a "writer for hire" with "full rights of copyright renewal vested in Hollenbeck." (Anderson Decl. Ex. 11 at ¶11, ECF No. 97.) Hollenbeck also registered a copyright in the *Taurus* musical composition with the Copyright Office on December 22, 1967. The registration lists Hollenbeck as the "Copyright Claimant" and Wolfe as the "Author." (Anderson Decl. Ex. 16, ECF No. 97.) In January 1996, however, Wolfe renewed the *Taurus* registration in his own name without any reference to Hollenbeck. (FAC Ex. 1, ECF No. 31.) Finally, on February 18, 2016, Hollenbeck filed supplementary registrations with the Copyright Office, amending both the December 1967 initial registration and the January 1996 renewal registration to clarify that *Taurus* was a work for hire. (Anderson Decl. Ex. 27, ECF No. 129.)

Defendants argue that *Taurus* is a work for hire based on the August 1967 exclusive songwriter agreement and the December 1967 copyright registration certificate listing Hollenbeck as a "Copyright Claimant." Even though the December 1967 registration does not expressly designate *Taurus* as a "work for hire," Defendants contend that such an inadvertent omission does not invalidate a registration certificate. *Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997) ("[I]nadvertent mistakes on registration certificates do not invalidate a copyright . . . unless the alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the Copyright Office."). Moreover,

Defendants maintain that any mistake in listing *Taurus* as a work for hire has been corrected by the supplementary registration, in which Hollenbeck amended the prior registrations to reflect that *Taurus* was a work for hire.

The Court finds that Defendants' reliance on the copyright registration certificates is misplaced. "A copyright certificate establishes prima facie evidence of the validity of a copyright and of the facts in the certificate. The presumption is rebuttable, and does not definitively resolve the ownership issue." *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1096 (N.D. Cal. 2002). Here, Plaintiff has proffered sufficient evidence to rebut the presumption created by the registration certificates. For instance, the two surviving members of Spirit testified that Wolfe created the song *Taurus* before the August 1967 exclusive songwriter agreement. (Andes Decl. ¶4; Ferguson Decl. ¶4, ECF No. 119.) Wolfe's sisters corroborate this point; they testified that in late 1966, Wolfe wrote *Taurus* for his high school sweetheart who would eventually become his wife. (Andrea Wolfe Decl. ¶¶4-5; Janet Wolfe Decl. ¶¶4-5, ECF No. 118.) Furthermore, according to Andes and Wolfe's sisters, Spirit regularly played *Taurus* at the Ash Grove club in Hollywood in early 1967—before the songwriter agreement was executed. (Andrea Wolfe Decl. ¶5; Janet Wolfe Decl. ¶5, ECF No. 118; Andes Depo. 150-156, ECF No. 124.)

Plaintiff has marshaled sufficient evidence to create a triable issue of fact as to whether Wolfe composed *Taurus* before or after the exclusive songwriter agreement, a question that bears directly on the issue of whether *Taurus* is a work for hire. Therefore, summary judgment on this basis is improper.

    **B.**    **Failure to Comply with Statutory Formalities**

Defendants posit that even if Wolfe had composed and performed *Taurus* live or recorded the song before August 29, 1967, he still does not own the copyright because he failed to comply with statutory requirements.

Under the 1909 Act, a work was protected by common law copyright from the moment of its creation; however, as soon as the work was published, the owner was divested of common law protection. *Societe Civile Succession Guino v. Renoir*, 549 F.3d 1182, 1185 (9th Cir. 2008). At the point of divestiture, federal copyright protection did not attach immediately; rather, the owner was required to secure federal copyright protection in one of two ways: (1) by publishing the work with proper notice or (2) by not publishing the work but registering and depositing necessary copies with the Copyright Office. *Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004, 2014 WL 7877773, at *8 (C.D. Cal. Oct. 30, 2014); *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 618 (9th Cir. 2010) ("[F]ederal copyright protection attached only upon publication, and even then, only if proper notice, registration, and deposit occurred."). Under the first method of securing federal copyright protection, neither a live performance nor distribution of a recording constitutes publication of a musical composition. *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 688-89 (9th Cir. 2000) (explaining that selling or distributing records does not qualify as publication); *Am. Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1027 (9th Cir. 1981) ("It has long been held that mere performance or exhibition of a work does not constitute a publication of that work [under the 1909 Act].").

It is undisputed that Wolfe did not personally comply with the statutory formalities. He did not publish copies of *Taurus* with proper notice, nor did he register and deposit copies of the unpublished musical composition with the Copyright Office. Therefore, Defendants maintain, federal copyright protection never actually vested until Hollenbeck registered *Taurus* with a deposit copy in December 1967. Defendants' argument presumes that Hollenbeck must have owned *Taurus* as a work for hire because the song was not registered until December 1967—well after the exclusive songwriter agreement. That is not necessarily so. Assuming Wolfe did, in fact, compose *Taurus* before the August 1967 exclusive songwriter agreement, he acquired common law copyright protection from the moment

of creation. Absent evidence that he somehow lost or transferred his rights, Wolfe continued to own the copyright in *Taurus* when the common law copyright divested and the federal copyright protection attached upon registration in December 1967. The mere fact that Hollenbeck registered *Taurus* and appears as "Copyright Claimant" on the registration certificate does not dispose of Wolfe's ownership claim.

In fact, the evidence in the record provides a plausible explanation as to why Hollenbeck would have registered *Taurus* as a claimant, even if Wolfe had independently created and continued to own the song. In the August 1967 exclusive songwriter agreement, Wolfe assigned his rights in all existing and future musical compositions to Hollenbeck in exchange for royalties.[3] An author who assigns his copyright in a work in exchange for royalties is considered a beneficial owner, while the assignee receiving title is deemed the legal owner of the copyright. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003) (defining a beneficial owner as "an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees."). Even under the 1909 Act, a beneficial owner had standing to sue for copyright infringement. *Moran v. London Records, Ltd.*, 827 F.2d 180, 183 (7th Cir. 1987). Assuming *Taurus* was included in the musical compositions that Wolfe assigned to Hollenbeck, Wolfe would have retained ownership as a beneficial owner, and the record company would have held title as legal owner. In such a situation, it would be entirely conceivable that Hollenbeck would register the song with both its name and Wolfe's name on the certificate.

Of course, the Court does not take a position on the events that transpired over forty years ago. Suffice it to say that Plaintiff has proffered sufficient evidence to create a genuine issue of material fact as to the ownership of *Taurus*.

### C. Untimely Response to Request for Admission

Defendants' final argument is that Plaintiff failed to answer a request for admissions in a timely manner, thereby conceding that *Taurus* is a work for hire. Counsel for Defendants claims that he warned Plaintiff's counsel twice about late responses to requests for admission, and any delay in responding was inexcusable. (Andersen Decl. Ex. 13-14, ECF No. 97.) Plaintiff explains that the trustee of Wolfe's trust had been involved in a serious accident and was unable to verify the answers by the deadline. Given the special circumstances, Plaintiff's counsel mistakenly understood that he had been granted an extension; he subsequently worked with Defendants' counsel to supplement discovery responses and deny that *Taurus* is a work for hire.

"A trial judge has discretion . . . to permit a late response to a request for admissions made pursuant to [Federal Rule of Civil Procedure 36], and thus relieve a party of apparent default." *Am. Gen. Life & Acc. Ins. Co. v. Findley*, No. CV 12-01753, 2013 WL 1120662, at *3 (C.D. Cal. Mar. 15, 2013). In determining whether to permit withdrawal or amendment of an admission, the court considers: (1) whether presentation of the merits will be subserved and (2) whether the non-moving party will suffer prejudice. *Conlon v. United States*, 474 F.3d 616, 621 (9th Cir. 2007).

---

[3] The exclusive songwriter agreement contains a section entitled "Grant of Rights," in which Wolfe agreed to "irrevocably and absolutely assign[], transfer, set[] over and grant[] to [Hollenbeck] . . . the titles, words and music of any and all original musical compositions . . . which are now owned or controlled and which may, during the term hereof, be written, composed, created or conceived by [Wolfe]." (Anderson Decl. Ex. 11 at ¶3, ECF No. 97.) The agreement also includes a section labeled, "Compensation," which specifies that Wolfe would receive royalties. (Anderson Decl. Ex. 11 at ¶7, ECF No. 97.)

"The first half of the test in [Rule 36] is satisfied when upholding the admissions would practically eliminate any presentation of the merits of the case." *Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995). Here, upholding Plaintiff's admission as to the work-for-hire issue would eliminate any presentation of the merits, as he would not have any standing to sue for copyright infringement. Therefore, the first prong is satisfied.

The second prong requires the party relying on the deemed admission to prove prejudice. *Conlon* 474 F.3d at 622. The Court finds that Defendants have not carried their burden to show prejudice. For starters, at the time of the late response, Defendants did not file a motion to compel or have the matter deemed admitted by the court. *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981) ("A party requesting an admission may, if he feels these requirements have not been met, move to determine the sufficiency of the answer, to compel a proper response, or to have the matter ordered admitted."). Defendants chose not to pursue such remedies during discovery.

Beyond their inaction earlier in litigation, Defendants have failed to show any real prejudice. According to Defendants, in reliance on Plaintiff's admission, they chose not to depose certain individuals, like Spirit's producer, about the work-for-hire issue. The Court finds this argument unavailing. Even if Defendants had deposed Spirit's producer and other unnamed potential deponents, they could not conclusively establish that *Taurus* was a work for hire in the face of Plaintiff's contrary evidence. At most, then, Defendants would simply have fortified their position on the work-for-hire issue with additional testimony, but not enough to prevail on summary judgment because of Plaintiff's evidence creating a triable issue of fact.

Accordingly, the Court rejects Defendants' argument that Plaintiff conceded *Taurus* was a work for hire by his untimely response to admissions.

## VII. COPYING

"Because direct evidence of copying is not available in most cases, plaintiff may establish copying by showing that defendant had access to plaintiff's work and that the two works are 'substantially similar' in idea and in expression of the idea." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996). Alternatively, "in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the songs were 'strikingly similar.'" *Three Boys Music Corp.*, 212 F.3d at 485.

The Court finds that Plaintiff has failed to proffer evidence of striking similarity, but he has successfully created a triable issue of fact as to access and substantial similarity.

### A. Striking Similarity

"[I]n rare cases, a plaintiff can prove copying even without proof of access if he can show that the two works are not only similar, but are so strikingly similar as to preclude the possibility of independent creation." *Stabile v. Paul Smith Ltd.*, No. CV 14-3749, 2015 WL 5897507, at *9 (C.D. Cal. July 31, 2015). "'[S]triking similarity simply means that in human experience it is virtually impossible that the two works could have been independently created.'" *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1103 (C.D. Cal. 2005). "To show a striking similarity between works, a plaintiff must produce evidence that the accused work could not possibly have been the result of independent creation." *Seals-McClellan v. Dreamworks, Inc.*, 120 F. App'x 3, 4 (9th Cir. 2004).

Here, Plaintiff's experts opine that *Taurus* and *Stairway to Heaven* bear striking similarity. The Court disagrees. The expert reports point out structural commonalities shared by both songs, but striking similarity is an exceedingly high bar that requires a much greater showing. In fact, Plaintiff's experts

admit that other works use "similar descending minor harmonic patterns." (Stewart Decl. ¶41, ECF No. 118.) Even though the expert also states that *Taurus* and *Stairway to Heaven* "depart from the traditional sequence in similar and significant ways," the fact remains that the primary feature in both works is a common musical structure. (Stewart Decl. ¶9, ECF No. 118.) Thus, the Court cannot definitively say based on the evidence provided that the two works bear a striking similarity.

In the absence of striking similarity, Plaintiff must show: (1) access and (2) substantial similarity to defeat summary judgment on the second element of his copyright claim. As the Court explains below, Plaintiff has demonstrated copying.

### B. Access

"To prove access, Plaintiff must show that the Defendants had a 'reasonable opportunity' or 'reasonable possibility' of viewing Plaintiff's work prior to the creation of the infringing work." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1053 (C.D. Cal. 2010). "Absent direct evidence of access, a plaintiff can prove access using circumstantial evidence of either (1) a chain of events linking the plaintiff's work and the defendant's access, or (2) widespread dissemination of the plaintiff's work." *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846-47 (9th Cir. 2012)

Defendants contend that Plaintiff has not produced any evidence to show that members of Led Zeppelin had any access to the *Taurus* song. The Court addresses each type of access in turn.

#### 1. *Direct Evidence of Access*

"Direct access is shown if there is proof that defendant actually viewed, read, or heard the work at issue." *Shame on You Prods., Inc. v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1149 (C.D. Cal. 2015).

The Court finds that Plaintiff has not proffered sufficient evidence to raise a triable issue of fact that Led Zeppelin members had direct access to *Taurus*. Plaintiff introduces the testimony of Tracy Longo, Wolfe's longtime friend, who recounted a story Wolfe told him: apparently, in 1968 or 1969, Page asked Wolfe to teach him the opening notes for *Taurus*. (Longo Decl. ¶19-21, ECF No. 118.) Plaintiff also submits an interview from April 1970 in which Page stated, "Spirit do some really nice things on albums. They give a really nice atmosphere when they play and I always enjoy seeing them." (Malofiy Decl. Ex. 3, ECF No. 124.) In another interview, this one conducted in November 1972, Page was quoted as saying, "I saw Spirit a couple of times and thought they were very good." (Malofiy Decl. Ex. 4, ECF No. 124.) Finally, Andes testified that Plant attended a Spirit show in February 1970 in Birmingham, England and went out drinking with the Spirit members after the concert. (Andes Depo. 111-118, ECF No. 119.)

The Court discounts Longo's testimony and Page's quoted remarks as they both constitute hearsay that does not fall into any exception. The only remaining testimony is that Plan attended a Spirit concert in 1970. Plaintiff does not provide any evidence that *Taurus* was played at the 1970 concert; therefore, while Plant's presence at the concert may be circumstantial evidence of access, it does not establish direct access.

#### 2. *Circumstantial Evidence: Wide Dissemination*

"As a general matter, it appears that in order for a work to be widely disseminated, it must achieve a high degree of commercial success or be readily available in the relevant market." *Loomis v. Cornish*, No. CV 12-5525, 2013 WL 6044345, at *10 (C.D. Cal. Nov. 13, 2013); *see, e.g.*, *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1144 (9th Cir. 2009) (finding that 2,000 copies per year sold did not constitute wide dissemination); *Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal. 1981)

*aff'd*, 698 F.2d 966 (9th Cir. 1982) (finding that 2,000 copies sold nationwide and 700 copies sold in southern California did not constitute wide dissemination); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) (finding that 17,000 copies sold over thirteen years did not constitute wide dissemination).

The Court finds that Plaintiff has not proffered sufficient evidence to raise a triable issue of fact on the question of widespread dissemination. Neither party disputes that in 1967, Ode Records released Spirit's first eponymous album, which included an instrumental composition of *Taurus*. (Ferguson Depo. 46:10-19; Andes Depo. 57:16-22, ECF No. 97.) Beyond that, however, the record is devoid of any evidence from which a trier of fact can determine whether the song was disseminated widely. Plaintiff does not provide evidence that *Taurus* was played frequently on the radio or released as a single, nor does he submit any evidence attesting to record sales of Spirit's first album.

Instead, Plaintiff submits inadmissible testimony from Mike and Robert Lee, disc jockeys who worked for a Los Angeles radio station in late 1972 and 1973, who stated that *Taurus* was being played on the radio before 1971. (Mike Lee Decl. ¶¶3-4; Robert Lee Decl. ¶3, ECF No. 119.) The Court rejects this testimony, as neither of these witnesses was disclosed to Defendants. (Anderson Decl. ¶8, ECF No. 129.) "A party that fails to disclose witnesses pursuant to FRCP 26 may be prohibited from using that witness to supply evidence during any proceeding, unless that 'failure was substantially justified or is harmless.'" *Nuance Commc'ns, Inc. v. ABBYY Software House*, No. C 08-02912, 2012 WL 2838431, at *1 (N.D. Cal. July 10, 2012).

Plaintiff also proffers testimony from Wolfe's sisters who claim that after the release of Spirit's first album, the group embarked on a lengthy tour to promote the record. (Andrea Wolfe Decl. ¶6; Janet Wolfe Decl. ¶7, ECF No. 118.) This testimony is devoid of any detail as to the duration of the tour, the size of the venues, or the number of shows played. Moreover Wolfe's sisters do not have personal knowledge about the extent of the tour, as they did not travel with the band. Therefore, the proffered evidence is entirely too speculative to demonstrate widespread dissemination.

Accordingly, Plaintiff has not proffered sufficient evidence to raise a genuine issue of fact as to access through wide dissemination.

### 3. *Circumstantial Evidence: Chain of Events*

The second way a plaintiff can present circumstantial evidence of access is by demonstrating a chain of events between the plaintiff's work and defendant's access to that work. *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 824 (C.D. Cal. 2010) *aff'd sub nom. Gable v. Nat'l Broad. Co.*, 438 F. App'x 587 (9th Cir. 2011).

As discussed in the factual section, the record conclusively establishes that Spirit and Led Zeppelin performed at the same festival on the same day three times between 1968 and the release of *Stairway to Heaven* in 1971. The record further demonstrates that at two of these concerts, the Denver Festival and the Atlanta Festival, the two groups performed in succession. The only question, then, is whether this chain of events is sufficient circumstantial evidence to raise a genuine issue of fact about access.

Defendants contend that these three encounters, without more, are not enough for a reasonable juror to find that Led Zeppelin members had access to *Taurus*. For starters, Defendants argue, Spirit rarely played *Taurus* in its performances between 1968 and 1971 because the goal of the tour was to promote its second album by playing new songs and old hits, which did not include *Taurus*. (Ferguson Depo. 53:22-54:21; Andes Depo. 68:7-70:6; ECF No. 97.) As further evidence that *Taurus* was rarely

performed on tour, Defendants submit a set list from a February 1969 live Spirit performance, which included thirteen songs but no mention of *Taurus*. (Anderson Decl. Ex. 20, ECF No. 97.) When asked about the set list, Andes confirmed that it represents a "typical set list for Spirit's performances in that time period." (Andes Depo. 103:18-24, ECF No. 97.) Even if Spirit had performed *Taurus* at any of these festivals, Defendants maintain, none of the Led Zeppelin members ever shared a stage with or heard any live performances by Spirit. (Page Decl. ¶¶8, 12-13; Plant Decl. ¶¶6-10; Jones Decl. ¶¶5-10, ECF No. 97.) According to Page, while the two bands may have preformed in succession on certain occasions, the process of dismantling and setting up equipment between acts generally took 15-20 minutes, meaning that bands would rarely spend time on stage together. (Page Decl. ¶14-15; Ferguson Depo. 344:10-347:6, ECF No. 97.)[4]

In retort, Plaintiff argues that Spirit regularly performed *Taurus* as part of its live tour. Wolfe's sisters testified that Spirit "played *Taurus* at all their shows" because it was Wolfe's "favorite song until the day he died." (Andrea Wolfe Decl. ¶5-6; Janet Wolfe Decl. ¶5-7, ECF No. 118.) Ferguson testified that "there were certain songs [Spirit] played religiously every show. 'Taurus' was not, but it was played often." (Ferguson Depo. 21:4-20, ECF No. 124.) He also explained that *Taurus* had its own unique role in Spirit shows because it served as an acoustic palate cleanser amidst the predominantly electronic music. (Ferguson Depo. 38:1-21, ECF No. 124.) Furthermore, Plaintiff submits evidence that Spirit crossed paths with Led Zeppelin at these music festivals. Andes testified that a mutual friend briefly introduced him and Spirit members to Led Zeppelin backstage at the Denver Festival. (Andes Depo. 105:11-108:3, ECF No. 124.) As to the Atlanta Festival, Ferguson testified that he had a "very clear memory" of Led Zeppelin performing on the same stage right after Spirit played. (Ferguson Depo. 16:16-23, 104:3-6, ECF No. 124.) Andes also recalled meeting and conversing with Plant when Led Zeppelin was going on stage after Spirit's set at the Atlanta festival. (Andes Depo. 124:17-124:24, ECF No. 124.)

Beyond the interaction at the festivals, Plaintiff introduces other evidence to create a triable issue of fact regarding access. First, to impeach Page's testimony that he "has never seen Spirit perform live," Plaintiff submits two interview excerpts in which Page admitted that he was a fan of Spirit and had attended several shows. (Malofiy Decl. Exs. 3-4, ECF No. 124.) Next, Andes testified that Plant attended a Spirit show in February 1970 in Birmingham, England and went out drinking with the Spirit members after the concert. (Andes Depo. 111-118, ECF No. 119.) Finally, the surviving members of Led Zeppelin admitted to performing a bass riff similar to one featured in one of Spirit's hit songs, *Fresh Garbage*—a song that appears on the same album as *Taurus*. (Page Depo. 388-390, ECF No. 124.) While they admit to playing a similar bass riff, however, the Led Zeppelin members testified that they heard the song from either the radio or a compilation of assorted American rock songs, not from Spirit's album. (Page Decl. ¶17, Plant Decl. ¶13, Jones Decl. ¶¶12-13, ECF No. 97.)

Overall, Plaintiff has produced sufficient circumstantial evidence to raise a factual dispute on the issue of access. He has presented evidence that both bands performed in succession and actually interacted at two festivals. Moreover, Plaintiff submitted evidence that Spirit would often perform *Taurus* because it was arguably Wolfe's favorite song. Beyond the two concerts, Plaintiff also proffers evidence that Led Zeppelin played one of Spirit's songs that appeared on the same album as *Taurus*. Finally, he presents impeachment evidence to counter Page's declaration that he never saw a Spirit performance.

    **C.**    **Substantial Similarity**

---

[4] Plaintiff disputes this with testimony from Andes that changing equipment between bands would not take a very long time because each band's material was already set up before the show, meaning that the only work to be done was to remove the outgoing band's equipment. (Andes 90:19-91:1, ECF No. 124.)

"Although summary judgment is not highly favored on questions of substantial similarity in copyright cases, summary judgment is appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the non-moving party, that no reasonable juror could find substantial similarity of ideas and expression." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990).

The parties submit dueling expert reports on the issue of substantial similarity. Defendants attack Plaintiff's expert reports on two bases: (1) the reports improperly consider unprotected performance elements of *Taurus*, and (2) once all the unprotected elements are stripped away, the remaining similarity is nothing more than a common descending bass line not entitled to protection.

         1.     *<u>Unprotected Performance Elements</u>*

Defendants urge this Court to disregard Plaintiff's expert reports because they improperly consider unprotected performance elements in the sound recordings of *Taurus*. According to Defendants, the only copyrighted work is the musical composition, not the sounds recording, and Plaintiff's experts erred by relying on the performance elements in the sounds recordings to conclude that the two works are substantially similar.

"Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights. . . . Accordingly, the court must first determine what elements of Plaintiff's work are protected by his copyright in the musical composition, as opposed to those protected by the copyright in the sound recording, and 'filter out' the latter." *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002), *aff'd*, 349 F.3d 591 (9th Cir. 2003). Courts have held that to determine substantial similarity in the context of a musical composition, only elements in the music sheets deposited with the Copyright Office—not elements in the sounds recordings—may be considered. *Williams*, 2014 WL 7877773 at *9-10; *Fahmy v. Jay Z*, No. 207CV05715, 2015 WL 5680299, at *13-14 (C.D. Cal. Sept. 24, 2015).

Plaintiff disputes that his copyright is limited to the music sheet deposited with the Copyright Office. In retort, he invokes *Three Boys Music* to argue that elements reflected in a sound recording, even if not on the deposit sheet, are to be considered by a jury. In *Three Boys Music*, a jury determined that the Michael Bolton song, *Love is a Wonderful Thing*, infringed on an eponymous song by the Isley Brothers. 212 F.3d at 480. Bolton appealed and argued that the Isley Brothers' deposit copy of sheet music varied from the sound recording, and, therefore, the trial court lacked subject matter jurisdiction. *Id.* at 486. The Ninth Circuit rejected this argument and explained, "Although the 1909 Copyright Act requires the owner to deposit a 'complete copy' of the work with the copyright office, our definition of a 'complete copy' is broad and deferential: 'Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.'" *Id.* Plaintiff seizes on this language and contends that a deposit copy of sheet music does not constitute the entirety of a protected work; rather, additional elements, such as those embodied in a sound recording, may be considered. The Court finds this argument unavailing.

In *Three Boys Music*, the Ninth Circuit did not suggest that a copyright claimant may rely on additional elements in a sound recording to prove infringement of an underlying musical composition. Instead, the court merely reiterated the established proposition that an incomplete deposit copy of sheet music does not invalidate a copyright or strip the court of jurisdiction. The quoted language Plaintiff relies on addressed only subject matter jurisdiction—not the content protected by copyright. *Williams*, 2014 WL 7877773 at *9 (explaining that *Three Boys Music* "address[ed] only subject matter jurisdiction, not the material actually protected by the copyright."). In fact, in *Three Boys Music*, the plaintiff's expert "testified that *the deposit copy included all of the song's essential elements* such as the

title hook, chorus, and pitches." *Id.* at 486 (emphasis added). Ironically, then, the very case Plaintiff relies on to argue that elements beyond the deposit copy should be considered presents a scenario in which no elements outside the deposit copy were considered.[5]

In the present case, Plaintiff's only copyright claim lies in the musical composition of *Taurus*, not the sound recording. *Dowling v. United States*, 473 U.S. 207, 211, 105 n.4 (1985) ("Congress did not extend federal copyright protection to sound recordings until the Sound Recording Act of 1971 . . . and then only to sound recordings fixed after February 15, 1972."). The Court finds that Plaintiff's experts impermissibly relied on performance elements found in the sound recordings. For example, Stewart opined that *Stairway to Heaven* is substantially similar to recorded versions of *Taurus* based on common "fingerpicking style," "acoustic guitar," "classical instruments such as flute . . . strings and harpsichord," "atmospheric sustained pads," and "fretboard positioning." Similarly, Bricklin focused almost exclusively on the music production and mixing process to conclude that *Taurus* and *Stairway to Heaven* shared a common ethereal ambience created in the production process. By analyzing performance elements in the sound recording of *Taurus*, Plaintiff's experts improperly considered features beyond the scope of the musical composition—such features will be disregarded by this Court.

    2. *Extrinsic Test*

Once all the unprotected performance elements are stripped away, the only remaining similarity is the core, repeated A-minor descending chromatic bass line structure that marks the first two minutes of each song.

"The substantial-similarity test contains an extrinsic and intrinsic component. At summary judgment, courts apply only the extrinsic test; the intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). "In analyzing musical compositions under the extrinsic test, [the Ninth Circuit has] never announced a uniform set of factors to be used. . . . So long as the plaintiff can demonstrate, through expert testimony that . . . the similarity was 'substantial' and to 'protected elements' of the copyrighted work, the extrinsic test is satisfied." *Swirsky v. Carey,* 376 F.3d 841, 849 (9th Cir. 2004). "[E]xpressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law." *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003).

Here, Plaintiff has submitted expert testimony attesting to the substantial similarity of protected elements in *Taurus* and *Stairway to Heaven*. The similarity consists of repeated A-minor descending chromatic bass lines lasting 13 seconds and separated by a bridge of either seven or eight measures. Moreover, the similarity appears in the first two minutes of each song, arguably the most recognizable and important segments of the respective works. Finally, "[n]early 80% of the pitches of the first eighteen notes match, along with their rhythms and metric placement. The harmonic setting of these 'A' sections feature the same chords during the first three measures and an unusual variation on the traditional chromatic descending bass line in the fourth measure." (Stewart Decl. ¶24, ECF No. 118.)

Defendants argue that the descending chromatic bass line is a centuries-old, common musical

---

[5] Plaintiff's reliance on *KnowledgePlex, Inc. v. Placebase, Inc.* is misplaced, as that case merely held that an incomplete deposit does not deprive the court of subject matter jurisdiction. Likewise, Plaintiff improperly relies on *Scentsy, Inc. v. B.R. Chase, LLC.*, because that case addressed copyright protection under the 1976 Act. 942 F. Supp. 2d 1045, 1050 (D. Idaho 2013), *aff'd in part, rev'd in part and remanded sub nom. Scentsy, Inc. v. Harmony Brands, LLC*, 585 F. App'x 621 (9th Cir. 2014).

element not entitled to protection, and, therefore, Plaintiff has failed to satisfy the extrinsic test. The Court disagrees. While it is true that a descending chromatic four-chord progression is a common convention that abounds in the music industry, the similarities here transcend this core structure. For example, the descending bass line in both *Taurus* and *Stairway to Heaven* appears at the beginning of both songs, arguably the most recognizable and important segments. *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) ("Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity.") Additionally, the descending bass line is played at the same pitch, repeated twice, and separted by a short bridge in both songs. *Swirsky* 376 F.3d at 851 ("[E]ven an arrangement of a limited number of notes can garner copyright protection.").

The Court finds that Plaintiff has demonstrated "enough similar protectable expression here that the issue of substantial similarity should [proceed to the jury]." *Scentsy, Inc. v. Harmony Brands, LLC*, 585 F. App'x 621, 622 (9th Cir. 2014); *Shaw v. Lindheim*, 919 F.2d 1353, 1360 (9th Cir. 1990) ("Once a court has established that a triable question of objective similarity of expression exists, by analysis of each element of the extrinsic test, its inquiry should proceed no further. What remains is a subjective assessment of the 'concept and feel' of two works . . . a task no more suitable for a judge than for a jury.") Accordingly, the Court denies summary judgment on this ground.

## VIII. DAMAGES

### A. Recovery as a Beneficial Owner

Defendants argue that any potential recovery should be reduced by 50% because Plaintiff is suing as a beneficial owner based on his right to royalties under the 1967 exclusive songwriter agreement. (Anderson Decl. Ex. 11 at ¶11, ECF No. 97.) The exclusive songwriter agreement limited Wolfe to 50% of any recovery, and, therefore, the trust is also limited to half of any damages. *Manno v. Tennessee Prod. Ctr., Inc.*, 657 F. Supp. 2d 425, 432 (S.D.N.Y. 2009) (explaining that recovery in a copyright case is limited to a co-owner's share of damages); *Nimmer on Copyright* § 12.03 (a joint owner can sue only "for his particular share of damages or profits").

Plaintiff has not opposed this argument in his opposition brief. Therefore, the Court grants summary judgment on this issue and holds that Plaintiff, as a beneficial owner, is entitled to only 50% of the recovery.

### B. Laches as a Bar to Profits

Defendants argue that four decades of delay have severely prejudiced them in the form of lost documents, fading memories, and deceased witnesses. (Page Decl. ¶21-22, ECF No. 97.) They also claim that they did not know of the claim until shortly before it was filed in 2014, and, as a result, they could not have filed an action for declaratory relief. Therefore, Defendants maintain, laches operates to bar any award of profits.

In *Petrella*, the Supreme Court held that if a plaintiff ultimately prevails on a copyright claim, a district court may consider the plaintiff's delay in commencing suit when "determining appropriate injunctive relief and assessing profits." 134 S. Ct. at 1978. The Court cautioned, however, that courts should closely examine the defendant's alleged reliance on the plaintiff's delay and take into account

> [defendant's] early knowledge of [plaintiff's] claims, the
> protection [defendant] might have achieved through pursuit
> of a declaratory judgment action, the extent to which
> [defendant's] investment was protected by the separate-

> accrual rule, the court's authority to order injunctive relief
> "on such terms as it may deem reasonable," § 502(a), and
> any other considerations that would justify adjusting
> injunctive relief or profits.

*Id.* at 1978-79.

Defendants' request is overbroad in light of the passage recited above. The Supreme Court did not hold that laches operates to categorically bar an award of profits; rather, it explained that an undue delay in bringing suit may justify adjusting profits. While this Court is sympathetic to Defendants' reliance on the 40-year delay, the circumstances do not merit an outright exclusion of all profits. Instead, if there is ultimately a finding of liability, Defendants may renew their request to reduce profits in an amount commensurate with the delay, and the Court will consider the issue again at that time.

### C. Extraterritorial Profits

Finally, Defendants contend that Plaintiff's damages should not extend to profits obtained from the exploitation of *Stairway to Heaven* outside the United States because the Copyright Act has no extraterritorial reach.

The Ninth Circuit has held that "infringing actions that take place entirely outside the United States are not actionable" under the Copyright Act. *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1091 (9th Cir. 1994). An exception exists, however, allowing a plaintiff "to recover damages flowing from exploitation abroad of the domestic acts of infringement committed by defendants." *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 992 (9th Cir. 1998).

Defendants contend that the extraterritorial principle applies to limit Plaintiff's profits because the undisputed evidence demonstrates that *Stairway to Heaven* was created entirely outside the United States, in London, England. (Page Decl. ¶4; Plant Decl. ¶4; Jones Decl. ¶3, ECF No. 97.) Plaintiff rebuts with Page's testimony that an early iteration of the song was actually mixed at Sunset Studios in Los Angeles, California. (Page Depo. 140-143, ECF No. 124.)

Plaintiff has proffered evidence to create a triable issue of fact as to whether extraterritorial profits are recoverable. Accordingly, the Court denies summary judgment on this issue.

## IX. REMAINING CLAIMS

### A. Claims as to John Paul Jones and Hype

Defendants argue that summary judgment is proper as to John Paul Jones, Super Hype Publishing, Inc., and Warner Music Group Corp. because none of these parties performed or distributed *Stairway to Heaven* within the three years preceding the instant action. In fact, in the 26(f) report, Plaintiff conceded that the three-year statute of limitations "precludes relief as to any alleged infringements prior to May 31, 2011." Plaintiff has not opposed this argument in the opposition brief. Therefore, the Court grants summary judgment as to John Paul Jones, Super Hype Publishing, Inc., and Warner Music Group Corp.

### B. Right of Attribution Claim

Defendants also seek summary judgment on Plaintiff's second claim, labeled "Right of Attribution—Equitable Relief—Falsification of Rock n' Roll History."

The Court grants summary judgment on this claim. Plaintiff presents an inventive—yet legally baseless—claim creatively termed, "Falsification of Rock n' Roll History." The Court has diligently searched but is unable to locate any cognizable claim to support this theory of liability.

Plaintiff's Right of Attribution also fails, but for different reasons. First, the right of attribution, which arises under the Lanham Act, is limited to producers of actual products, not "to the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37, 123 S. Ct. 2041, 2050, 156 L. Ed. 2d 18 (2003). Second, "[t]he law is clear with respect to the right of attribution under Copyright Act— only works of visual arts may enjoy the right of attribution." *Lahiri v. Universal Music & Video Distribution Corp.*, No. CV 02-8330, 2006 WL 6030551, at *4 (C.D. Cal. Mar. 24, 2006). Third, Plaintiff has not opposed Defendants' motion for partial summary judgement on this claim.

Accordingly, the Court grants summary judgment on the Right of Attribution claim.

## X. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment as to the Right of Attribution claim and as to all claims against John Paul Jones, Super Hype Publishing, Inc., and Warner Music Group Corp. The Court also **GRANTS** Defendants' request to limit Plaintiff's damages to 50% of the recovery (his share as a beneficial owner).

The Court **DENIES** Defendants' Motion for Summary Judgment as to the Copyright Infringement claim against the remaining Defendants.

**IT IS SO ORDERED.**

          :      

Initials of Preparer